State, and Watson, Trustee, *v.* Bank of. Tennessee.

BRIEFS AND ARGUMENTS IN THE CAUSE OF
THE STATE AND WATSON, TRUSTEE, *v.*
THE BANK OF TENNESSEE.

W. F. COOPER FOR THE STATE.

BRIEF.

The original bill in this case was filed on the 16th of
May, 1866, for the purpose of having the assets of the
Bank of Tennessee administered, under the orders and de-
crees of the court, in accordance with the provisions of a
general assignment made on the 4th of May, 1866. This
assignment was authorized and directed by an act of the
General Assembly, passed on the 16th of February, 1866,
entitled " an act to wind up and settle the business of the
Bank of Tennessee." It provides, in the first instance, for
the security of the common school fund, and then of the
holders of the circulating notes of the bank issued prior to
the 6th of May, 1861, and creditors of the bank who be-
came such prior to that date.

The original bill was filed in the name of the State, and
S. Watson, trustee under the general assignment, but the
State has recently, and before any decree upon the merits,
caused the bill to be dismissed so far as it was concerned,
as will be hereinafter explained.

The original bill has never been prepared for hearing,
nor brought to a hearing, and still remains in the court below.

Three separate issues were, however, made by different
defendants in the court below, and have been brought here
for the consideration of this court.

1. Mark R. Cockrill, on the 31st of May, 1867, came in

as a defendant by answer, in which he claimed to be a creditor of the bank by deposit, made after the 6th of May, 1861, and on the 24th of March, 1868, he filed his cross-bill, in which he insists that the act of the Legislature of the 16th of February, 1866, and the deed of assignment made under it are void, because in violation of the provisions of art. 1, sec. 10 of the Constitution of the United States, which forbids any state from passing a law impairing the obligation of contracts. The cross-bill seeks, therefore, to have the assets of the bank administered, not under the deed of trust, but in accordance with the supposed rights of the parties under the charter; and insists that the creditors of the bank, including as such the depositors after the 6th of May, 1861, have a prior right of satisfaction out of the assets of the bank over the school fund or the State, by virtue of its claim of subrogation to the rights of the noteholders.

The State was made a party defendant to this cross-bill, but no step was taken against it in the court below, and the suit is abandoned, so far as the State is directly concerned as a party. Watson, as trustee, and the Board of Common School Commissioners, demurred to the cross-bill, and, upon argument, the demurrer was sustained, and the cross-bill dismissed with costs. From this decree Mark R. Cockrill appealed. The State is, therefore, nominally no party to this issue.

2. The second issue presented to the court arises upon the answer and cross-bill of B. R. McKennie and others. These defendants are also depositors of the Bank of Tennessee by deposits made, mostly, if not every instance, after the 6th of May, 1861, on some of which claims judgments seem to have been rendered against the Bank of Tennessee by the court, upon references and reports made in the original cause.

The first answer and cross-bill of these parties was filed on the 2d of December, 1871, and the amended answer and

cross-bill on the 22d of August, 1872. The object of the cross-bill is not only to subject the assets of the Bank of Tennessee to the satisfaction of the complainants' claims upon the grounds assumed by Cockrill in his bill, but to obtain positive relief against the State, to the extent of any deficiency in the bank assets upon its supposed obligations by the charter, and also for the state bonds issued under the act of the 6th of May, 1861, which were taken by the bank, or the consideration paid by the bank therefor.

To these cross-bills the Bank of Tennessee, S. Watson, as trustee, and the Board of Common School Commissioners, filed a demurrer.

The State also appeared, and, by the Attorney-General, filed a separate demurrer.

These demurrers were, upon argument, overruled, and the said defendants all appealed.

3. The third aspect of the case arises upon the answer of T. A. Atchison and Wm. M. Duncan, who came in as defendants to the original bills, and on the 3d day of December, 1872, filed their answer. These defendants claim to be holders of the circulating notes of the Bank of Tennessee, issued after the 6th of May, 1861, and as such, claim priority of satisfaction out of the assets of the Bank, and insist that the Act of February 16, 1866, and the deed of trust made in pursuance thereof, are void, as impairing the obligation of the contract with the noteholders.

Upon this branch of the case, proof was taken, and the Chancellor held that the defendants, Atchison and Duncan, were entitled to the full face value of the notes held by them, and to share *pro rata* with all the billholders, and to priority of satisfaction over the general creditors of the bank, notwithstanding the deed of assignment.

The Chancellor further held that Watson, as trustee and acting receiver, was authorized and bound to receive the notes held by Atchison and Duncan in payment of any debts due to the bank.

State, and Watson, Trustee, v. Bank of Tennessee.

From this decree Watson, as trustee, the Bank of Tennessee, the Commissioners of the School Fund, and B. R. McKennie and other claimants, pray an appeal. The State having previously dismissed the original bill, so far as it was concerned, in which action Atchison and Duncan acquiesce, is not directly a party to this branch of the case.

The foregoing abstract gives a general outline of the issues presented for the consideration of the court, and the mode in which they come up. It will be necessary, however to go more at length into the facts.

It is a matter of history, of which the court will take judicial notice, that early in the year 1861, the State of Tennessee undertook to separate from the Federal Union, and, in fact, join the Southern States in the late civil war. The refusal of the State executive to obey the call of the President of the United States for troops to suppress insurrection was made in April, 1861, and from that time the State ceased to yield obedience to the laws of the United States, and prepared for war. From that time, also, the Government of the United States ceased to recognize the acting State Government of Tennessee, and shortly after the occupation of Nashville, in February, 1862, replaced it by a Military Governor of its own appointment. On the 6th of May, 1861, the acting Legislature for the State, then in open rebellion, authorized the issuance of five millions of bonds, bearing eight per cent. interest, and known as war bonds, expressly for the purpose of raising money for the arming and equipping of troops, and purchasing supplies and materials of war. The public acts of the General Assembly chartering the Bank of Tennessee, show that the bank belonged exclusively to the State, and was its fiscal agent. The record of this case shows that the acting executive of the State, after the separation and commencement of war, used the Bank of Tennessee and its resources in aid of the rebellion, and, through a military board, which was organized on the 26th of April, 1861, drew from the bank

for war purposes $4,625,460.48, and in return paid to the bank in the eight per cent. war bonds, $4,300,000. The facts, as agreed upon in this case, show that the money thus drawn from the Bank of Tennessee by the military board was used for the "arming and equiping of troops and the purchase of military stores in the war then flagrant between the United States Government and the Confederate or rebellious states;" and that the fact that the money so drawn was to be used, and was used for these purposes, was known to the officers and directors of the Bank of Tennessee. It further appears that the circulating notes of the bank and its branches were insufficient to meet the usual banking business of the bank in 1861, and the drafts or checks drawn upon the bank by the military board, and that the bank was compelled, "in order to meet its regular business and the demands of said board," to resort to the issuance of the bank notes now in controversy in the Atchison and Duncan branch of the case, known as the "new issue" of said bank, "and that said notes constituting the 'new issue' were all put into circulation after the 6th of May, 1861."

The court judicially knows, as matter of history, that the Government of the United States was in open war with the acting Government of the State of Tennessee from before the 6th of May, 1861, and did not recognize such government as lawful; that it sent a Military Governor to Tennessee early in 1862, who continued to act as such until after the Constitutional Convention of 1865, and re-organization of the State Government; that the government established by the Military Governor, and by the Convention and re-organization as aforesaid, was alone recognized by the Executive and Congress of the United States as the lawful government of the State.

The Constitutional Convention referred to was called to meet on the 8th of January, 1865, and did meet and adopt certain amendments to the State Constitution, and certain

ordinances in the schedule attached thereto. These amendments and ordinances were declared to have been adopted by the Military Governor by proclamation, dated the 25th of February, 1865.

By the joint resolution of Congress, passed on the 24th of July, 1866, the State of Tennessee was "restored to her former practical relations to the Union." This resolution recites, as causes for restoring the State to its relations, that "whereas, in the year eighteen hundred and sixty-one, the Government of the State of Tennessee was seized upon and taken possession of by persons in hostility to the United States," * * * "and, whereas, the people of the State did, on the 22d of July, 1865, by a large populor vote, adopt and ratify a constitution of government whereby slavery was abolished, and all ordinances and laws of secession, and debts contracted under the same were declared void; and, whereas, a State Government has been organized under said constitution," etc.

This resolution of the political department of the United States Government recognizes the illegality of the acting State Government in 1861, and bases the restoration of the State to its practical relations in the Union upon the constitutional amendments of 1865, and the ordinances thereto attached. Among the ordinances thus referred to are those contained in the 5th and 6th sections of the schedule, which are as follows:

Sec. 5. "All laws, ordinances and resolutions, as well as all acts done in pursuance thereof, under the authority of the usurped government after the declared independence of the State of Tennessee, on or after the 6th day of May, 1861, were unconstitutional, null and void from the beginning. *Provided,* That this section shall not be construed as to affect any judical decisions made by the state courts held at times differing from those provided by law prior to May 6, 1861; said judicial decisions being made pursuant to the laws of the State of Tennessee, enacted previous to

said date, and between parties present in court and litigating their rights."

Sec. 6. "All laws, ordinances and resolutions of the usurped State Government, passed on or after the 6th of May, 1861, providing for the issuance of State bonds, also all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th of May, 1861, and all debts created or contracted in the name of the State by said authority, are unconstitutional, null and void; and no legis-. lature shall hereafter have power to pass any act authorizing the payment of said bonds or debts, or providing for the redemption of said notes."

The Legislature, by the act of February 16, 1866, ch. 28, put the Bank of Tennessee in liquidation, providing for the appointment of directors for the purpose. By the 2d section of this act, the president and directors are required, with all dispatch, to collect the debts due the bank, and are directed to receive in payment United States currency or notes of the Bank of Tennessee issued prior to the 6th of May, 1861, "and studiously refusing and excluding all issues signed by G. C. Torbett; also all re-issues made after the 9th of May, 1861, by G. C. Torbett, or any of the officers of the principal bank, or any of its branches, as utterly void."

By the 5th section, it is provided that the president and directors shall, without delay, "cause an assignment and deed of trust" of all the property of the bank to be made:

1st. To secure $1,500,000, "the amount of the common school fund deposited in the Bank of Tennessee by acts of the Legislature," with interest from the 6th of May, 1861.

2d. To secure "all remaining just creditors of all kinds, excluding all claims and demands of all kinds of date after 6th of May, 1861, as absolutely null and void."

Sec. 6. "That the Attorney-General of the State, if it became necessary in the opinion and judgment of the Governor, file a bill in the Chancery Court to execute the

deed of trust, and, without security, enjoin all creditors from suing said bank, and making all the creditors, as far as known, and all others unknown, by publication in some public print in the city of Nashville, parties, and all others, to the end that all interested therein may come in under one decree, and equal justice be done to all."

On the 4th of May, 1866, in compliance with this act, the president and directors of the bank did make a general assignment of all the property and effects of the bank to Samuel Watson, in trust, to realize the assets, and after meeting the expenses of the trust, to make distribution and dividends, as follows:

" 1st. He shall pay the State of Tennessee, or the proper officer and custodian of the fund, $1,500,000, the amount of the common school fund, deposited in the Bank of Tennessee by acts of the Legislature, with interest accrued and accruing on said sum since the 6th of May, 1861, up to the time of paying over the same."

" 2d. He shall pay in full, if he have means sufficient, and if not, *pro rata,* all holders of the bank notes issued by the Bank of Tennessee prior to the 6th of May, 1861, and all persons who became creditors of said bank prior to that time," etc.

On the 16th of May, 1866, the original bill in this cause was filed in the name of the State of Tennessee and Samuel Watson, trustee, against the President and Directors of the Bank of Tennessee, Wm. G. Brownlow, Governor of the State of Tennessee, A. J. Fletcher, Secretary of State, and S. W. Hatchett, Comptroller (these three as custodians of the bonds in which the coin of the Bank of Tennessee had been invested under the act of the Legislature of the 9th of June, 1865), and against A. G. Jackson, and a number of others named, as creditors of the bank, and against "all creditors of the Bank of Tennessee or claim to be"—(*sic*).

The bill sets forth the act of the 16th of February, 1866, entitled " An act to wind up and settle the business of the

bank of Tennessee," that, in obedience to this act, the deed had been made as hereinbefore stated, a copy of which is exhibited with the bill, and that the bill was filed "in order to close up said trust, with the aid and under the supervision of the honorable court, complainants having been advised by the Governor of the necessity of filing a bill for that purpose."

The bill prays that the persons named in the caption of the bill be made defendants, and that publication be made " for all other persons claiming now, or hereafter claiming to be creditors of said bank, and who will not come in and become parties complainant to this bill, be made parties defendant, and required to file his, her, or its claim, giving its origin and consideration, and when and how it arose, and when said persons became the owners thereof, and the creditors of said bank."

The bill prays also for an injunction, " enjoining all persons or corporations from suing out any writ against said bank or its trustee, either original, intermediate, or final, or commencing any legal proceedings whatever against either, in any court of law or equity in the State of Tennessee or elsewhere."

"Complainants pray that, upon final hearing, all proper and necessary accounts be taken and ordered of the trust funds, or the proceeds, and between said bank and trustee, or between the school fund and said bank, and between said bank and its creditors, and the amount of its indebtedness ascertained, and the amount of its assets ascertained, and, if necessary, a rate bill be declared, and said trust be closed up under the orders and decrees of the court, *according to the uses and trusts* of said deed of assignment and acts of the Legislature."

Injunction was granted upon this bill as prayed, and was issued, executed and published. Some parties came in as defendants, and moved to dissolve the injunction, and the motion was refused. Sundry orders were also made to allow

claimants to sue at law, and for other purposes. But it is not necessary to state all that was done in detail. *What is material to be noticed is, that the original cause has never been prepared or brought to a hearing in the court below on the merits; and, of course, so far as it is undisposed of by decree upon the merits, remains in that court.*

The amended bill was filed December 19, 1866, to bring Robert L. Standifier, the Treasurer of the State, the Tennessee National Bank and George R. Rutter before the court, and to make them account for the bonds bought with the coin of the Bank of Tennessee.

On the 1st of April, 1867, was filed, what purports on its face to be a cross-bill of the president and directors of the Bank of Tennessee, and of the State of Tennessee against S. W. Hatchett, Comptroller of the State and others, the object of which seems to have been to claim the bonds, or their proceeds, into which the coin of the Bank of Tennessee had been turned, as a trust fund for the benefit of the general creditors of the bank. The State, it is obvious, was in this so-called cross-bill, occupying a position antagonistical to its position in the original bill, and by the acts of the Legislature. This play at cross purposes was ended on the 25th of June, 1869, by the court ordering the name of the State of Tennessee to be struck out of the so-called cross-bill as a complainant, and the cross-bill itself was dismissed on demurrer, from which there was an appeal by the bank prayed and granted, upon giving bond as required by law, but no bond seems ever to have been given.

On the 31st of May, 1867, Mark R. Cockrill filed his answer to the original bill, in which he claims to be a depositor of the Bank of Tennessee, his deposits having been made after the 6th of May, 1861, and amounting to the sum of $15,655.41, without interest.

On the 24th March, 1868, Mark R. Cockrill filed the cross-bill upon which one branch of this case has come up to this court. This bill was filed against the State of Ten-

nessee and Wm. G. Brownlow, Governor of Tennessee; G. W. Blackburn, Comptroller, and —— Henry, Treasurer of Tennessee; A. J. Fletcher, Secretary of State, and the president and directors of the Bank of Tennessee, as a Board of Common School Commissioners. It is filed by the complainant, "as well on his own behalf as on behalf of all others, the creditors of the Bank of Tennessee, who may elect to have themselves made parties complainant on the usual terms." The bill is filed by the complainant as a depositor in the Bank of Tennessee, since the 6th of May, 1861, as aforesaid, and insists that the act of the Legislature of the 16th of February, 1866, in directing the deed of assignment of the property of the bank with the preferences therein provided for, was in contravention of art. 1, sec. 10, of the Constitution of the United States in this, that it impaired the obligation of contracts. The complainant insists "that neither the bank by itself, nor with the concurrence of the State, had any power to make an assignment of the assets of the bank to a third party, nor upon any different uses and trusts than those specified in the charter, without first obtaining the consent of the creditors    *    *    * and therefore that the assignment to the defendant Watson was fraudulent and void in law." He prays "that the State of Tennessee and Samual Watson, trustee, be enjoined from the further prosecution of their said bill, and from the further administration of said funds under the provisions of said deed of trust or assignment, but that the same may be administered under the provisions of the charter of the Bank of Tennessee."

The object of the bill, it will be noticed, was to have the assets of the Bank of Tennessee administered not under the deed of assignment of the 4th of May, 1866, but *pro rata* among all the creditors. No relief is sought against the State of Tennessee, if the assets should prove insufficient to pay debts—although some of the allegations of the bill seem to look in that direction. No step has been taken against

the State, and the State is therefore not before the court so far as this cross-bill is concerned. The failure to take any step against it, is a virtual abandonment of the suit as to the State.

On the 17th of April, 1869, D. W. C. Senter, Governor, A. J. Fletcher, Secretary of State, G. W. Blackburn, Comptroller, and Jno. H. Eaton, Superintendent of Common Schools, *as a Board of Commissioners of the School Fund,* were, upon petition, made defendants to the original and amended bills, and also to the cross-bill of Mark R. Cockrill.

On the 24th of May, 1869, these defendants, as such board, demurred to Cockrill's cross-bill, because:

1. The claim and demand of the complainant in said cross-bill is shown to be of date after the 6th of May, 1861, and the said complainant is not entitled in law to a decree therefor.

2. Such complainant does not occupy such a position as a depositor as enables him to attack the assignment.

3. The fund known as the Common School Fund was a trust fund for the benefit of the children of the State forever, the principal, by the terms of its creation, to remain inviolate into whosesoever hands it might come.

4. The president and directors of the Bank of Tennessee were fully empowered by the laws of the State to execute the assignment.

On the same day, the 24th of May, 1869, S. Watson, trustee, filed a demurrer to Cockrill's bill upon substantially the same grounds.

On the 25th of June, 1869, these demurrers were argued before Chancellor Otis and sustained, and Cockrill's cross-bill dismissed with costs, from which decree he appealed.

On the 2nd of December, 1871, B. R. McKennie and others filed their answer and cross-bill, in the original suit, and on the 22nd of August, 1872, their amended answer and cross-bill, in which they claim to be depositors in the

Bank of Tennessee, and not only insist upon being allowed to participate in the trust assets, but claim positive relief against the State.

This answer and cross-bill, (so called) makes defendants the original complainants, the Bank of Tennessee, and the Board of common School Commissioners, who are parties to the original suit, and also P. H. Jamieson, administrator, and all holders and owners, as a class, of the notes of the Bank of Tennessee, denominated the new issue and post notes, and whose names and residences are unknown.

This bill sets out in some detail the provisions of the Constitution of 1834 in relation to the Common School Fund, and of the acts under which the Bank of Tennessee was chartered. It insists that the State had the right to invest the school fund as it saw proper, and that said fund was properly invested in the capital stock of the Bank of Tennessee, and that the complainants are entitled to have the assets of the Bank of Tennessee appropriated to the payment of their debts in preference to the school fund, and the State as subrogated to the rights of noteholders.

The bill sets out the circumstances connected with the Torbett notes, or " new issue," of the Bank of Tennessee, put into circulation after the 6th of May, 1861, and insists that such issue is illegal and void.

It then, not very consistently, refers to the issue by the State of the 8 per cent. war bonds, under the act of the 6th of May, 1861, and says that the bank was forced to take the same ; and claims that such bonds are legal and valid assets of the bank as against the State. But if these bonds should be held void, the complainants pray that the State be held to account to the bank for the sum paid over to the Governor and Financial Board as the consideration of said bonds.

The bill insists that "though the State, as a sovereign power, be not liable to be sued except by its own consent, in the mode indicated by itself; yet having given its consent, and coming into its own courts, and making the credi-

tors of its fiscal agent parties to the proceedings, complainants come in and ask that the State's obligation be ascertained and declared."

It then insists that sec. 2807 of the Code, which provides that actions may be instituted against the State under the same rules and regulations that govern actions between private persons, has not been repealed, but is still in force. This position is put upon the ground that the section of the act of 1865, which purports to repeal said sec. 2807, was added as an amendment to the appropriation bill on its third reading in the Senate, and read only once in the Senate and once in the House, as shown by the Journals; and that a bill had been previously, at the same session, introduced for the express purpose of repealing sec. 2707 of the Code, and been voted down.

The answer of Atchison and Duncan to the original bill was filed on the 3d of December, 1872. This answer admits in detail all the allegations of the original bill, and says: "And regarding this as a bill brought by a trustee to obtain the directions of the Court upon the adverse claims of the different creditors defendants, respondents will proceed to set forth their rights, as they conceive them to be."

The answer then sets out some of the principal provisions of the acts incorporating the Bank of Tennessee, especially those relating to the capital stock and common school fund.

"Upon the above state of facts," continues the answer, "and under the above quoted provisions of law, taken in connection with other statutes and general principles of law, respondents insist for themselves, and all other creditors of the bank, as against complainant, the State of Tennessee, and their co-defendant, the Superintendent of Common Schools."

1. That the State had the right to invest the common school fund, as capital, in the Bank of Tennessee; that they did so invest it, and that neither the State nor the Superintendent of Common Schools have any claim or demand on

State, and Watson, Trustee *v.* Bank of Tennessee.

account of said investment, as against said bank or its assets, save as a stockholder in said bank.

2. That being a mere stockholder, it was not competent for the State of Tennessee to authorize said bank to make an assignment, preferring the State or the school fund as a stockholder over the creditors of the bank.

3. That said bank had no inherent powers, independent of the act of February 16, 1866, to make an assignment preferring its stockholders to its creditors.

4. That it was not competent for said bank, either with or without the aid of said act of February 16, 1866, to prefer any creditors to the billholders, secured, as they were, in a preference over all other creditors by sec. 30 of act of February 6, 1860.

5. That, as upon the investment of the school fund as capital in the bank, certificates of state stock, or indebtedness were to be issued to the Superintendent of Public Instruction, such indebtedness, if any, as was created by said investment, was an indebtedness from the State of Tennessee to the common school fund, and that said fund has no right to look to the bank at all.

6. That the State subscribed $5,000,000 to the capital stock of said bank, and, as a fact, has never paid up to the full amount of its subscription, it is bound now to pay the said subscription for the benefit of the creditors of the bank, and is also bound to the creditors for the unlawful conversion of the coin funds of said bank.

7. That said bank, having been established for the benefit of the State, and the faith and credit of the State pledged for its support, said bank was, in law, the financial agent of the State, and the State was liable for the issue as a principal debtor, and not as a security or guarantor.

8. And at all events should not be allowed, either under the claim of subrogation or otherwise, to receive any part of the assets of the bank until it made good its subscription to the capital stock, and fully paid for its conversion of the

coin of the bank, and also paid up any other debt which may be due from it to the bank.

9. That the notes held by respondents are valid, and entitled to equal rights with the bills and notes issued prior to May 6, 1861, and with other notes, to preference in payment over all other creditors.

10. And that such bills or notes shall be received in payment of debts due to the bank or branches, and that the trustee be directed to receive the same in payment of any debts due to the bank.

Proof has been taken upon the issues raised by this answer, and a decision made in accordance with the positions thus taken, to the extent of holding that the defendants, Atchison and Duncan, are entitled to the full face value of the notes held by them, and to priority of satisfaction over the general creditors of the bank, and to share *pro rata* with all the billholders of the bank, whether the bills are known as new or old issue, for which purpose an account is ordered.

The court below further holds that Samuel Watson, as trustee and acting receiver, is authorized and bound to receive the notes held by Atchison and Duncan in payment from the debtors of the bank, and for this purpose they may be set off against any such claims and demands.

From this decree Watson as trustee, the Bank of Tennessee, B. R. McKennie and others, complainants in the cross-bill already mentioned, pray an appeal to this court.

After the argument of the demurrer in the court below to the cross-bill of McKennie and others, the State, by the Attorney General, came into court and said it would no further prosecute the original bill, and moved that the same be dismissed so far as it was concerned. This motion, after argument, was allowed by the court, and the bill was dismissed, with a reservation of the rights of the defendants previously acquired, if any exist.

On the 30th November, 1872, Jamieson, who was made

a defendant to the cross-bill of McKennie and others, as a holder of some of the "new issue" of the bank, filed his answer, upon which no action has been had in the court below. The cross-bill comes up by appeal from the ruling of the Chancellor on the demurrer of the other defendants.

### ARGUMENT.

The record in this case presents to the court for its consideration a number of important questions, the varied nature of which renders it somewhat difficult to know in what order to take them up. I propose, first, to ascertain the exact situation of the entire case taken as a whole, and the attitude of the parties in relation to it; then the situation of each of the several cases brought up to this court, and the rights of the parties in connection with the main suit; and lastly, to discuss the questions of law raised, or attempted to be raised, in the order which seems best adapted to their full understanding.

The original bill, it will be remembered, is filed by the State of Tennessee and Samuel Watson, trustee, under the act of the 16th of February, 1866, entitled "an act to wind up and settle the business of the Bank of Tennessee." The 6th section of this act provides, "that whenever the Governor shall deem it necessary" the Attorney General shall file a bill in the Chancery Court at Nashville to execute said deed of trust, enjoin all creditors from suing the bank, and make all creditors parties thereto, by process or publication, "to the end that all interested may come in under said bill, and equal justice be done to all."

The main object of the bill was "to execute the deed of trust" made under the act of the 16th of July, 1866, and, incidentally, to prevent an accumulation of costs by limiting the litigation to one forum. The proceeding was in the nature of a bill to wind up an insolvent estate, and, in its very nature, contemplated the bringing in of claims of every character against the Bank of Tennessee, *which might*

*be entitled to share in the trust assets under the deed.* The act of the Legislature and the bill both take for granted the validity of the deed of trust. Under these circumstances, it is very doubtful whether any person was made a defendant, or has a right to come in as a party. defendant, who was not a claimant under the deed of trust. In other words, whether any person having a claim, or pretending to have a claim, against the Bank of Tennessee, could become a party, who was not also secured by the deed of trust. In this view, any person, not expressly named as a defendant, who wished to claim adversely to the deed of trust, would be driven to file an original bill for the purpose of having his rights settled and declared.

But if, by a more liberal construction of the act of the Legislature, any person having, or pretending to have, a claim against the Bank of Tennessee, could become a defendant, whether his interests were to support or overthrow the deed of trust, it is clear that he could only come in by answer so far as to have his claim ascertained and decreed. If he sought relief antagonistic to the rights set up in the bill, he would necessarily be driven to his cross-bill. If, again, he sought independent relief growing out of matters not mentioned in the original bill, he would be driven, as I shall show presently, to an original bill of his own. But in any of these cases, the only decree which could be rendered as between the complainants in the original bill and any one defendant, or class of defendants, unless all parties interested were made defendants to the cross-bill, *would be to ascertain the validity of the defendant's claim.* Anything further than this, it seems obvious, must be done by decree *upon the hearing of the original cause,* prepared and heard as to all the defendants, before the court; otherwise, no decree binding upon all parties could be rendered. If, for example, upon the hearing of the separate case of Mark R. Cockrill, upon his answer and cross-bill, the court should be of opinion that the deed of trust was valid, and should

so declare, that decree would not be binding upon B. R. McKennie and others, although they stand in precisely the same attitude, for they are no parties to the case of Mark R. Cockrill, considered as a separate suit. The court might, upon the hearing of the McKennie case, because the case was better prepared, come to a different conclusion from that previously arrived at in the Cockrill branch suit, and we should have two decrees in direct conflict with each other.

The original bill, it will be borne in mind, has never been prepared for hearing, nor, of course, brought to a hearing. The main suit is, therefore, still in the inferior court, and only separate parts of it have been brought up by the appeals taken. So far as the decrees in those separate branches go to the validity of the specific claims sought to be set up, and the rights of the claimants, the jurisdiction of the court below and of this court may be conceded. But the jurisdiction would scarcely extend to questions involving the validity of the deed of trust, or the relative rights of the claimants as between themselves, whether under the deed or to the assets of the bank considering the deed as invalid. These are questions which can properly be considered only on the hearing of the original cause, prepared and heard as to all the defendants at one and the same time.

If this be not so, the appeal in the Mark R. Cockrill case brought the whole case to this court, and all the subsequent proceedings below are void.

And even if such questions could be disposed of without a hearing of the whole cause, it by no means follows that any claimant can attack the deed of trust except by cross-bill framed for the purpose, or obtain independent relief beyond the scope of the original bill, even if he resort to a cross-bill for the purpose.

Thus, even if the court should hold that Atchison and Duncan may, by answer alone, raise the question of the validity of the new issue, and have that question determined

upon that answer without a general hearing of the whole case on the original bill, we deny their right *by answer alone* to attack the validity of the trust assignment to Watson, or to have any such decrees as was given them in the court below, directing them to have priority of satisfaction over the general creditors of the bank out of the assets in his hands, and requiring the trustee to receive such notes in payment of debts due to the bank.

So, if Mark R. Cockrill and B. R. McKennie and others may, by their cross-bills, raise the question of the validity of the deed of trust, we deny their right *in that mode* to go beyond the scope and object of the original bill and demand independent relief against the State.

The bill of Mark R. Cockrill does not seek independent relief against the State, but the bill of McKennie and others does.

As the argument may thereby be narrowed, I propose to consider these points with some care.

The original bill is based upon the validity of the deed of trust, and is filed for the purpose of executing it. It is the ordinary case of a trustee filing a bill to execute the trust, and, for his protection, to have the debts ascertained, and the trust fund administered under the orders of the court. The question, therefore, for consideration is, whether a creditor of the maker of the deed can, *by answer alone,* contest the validity of the deed, and obtain relief of a positive character in conflict with that sought by the bill.

"It seems now well settled in practice," says Judge Redfield, in his edition of Sto. Eq. Pl., sec. 398 *a*, "that any affirmative relief must be sought either by a cross-bill or an independent suit, and can never be granted upon the facts stated in the answer."

This is necessarily so in a case like the one now before the court. Atchison and Duncan make themselves parties defendant in this suit, and ask that the deed of trust be declared void, and they be allowed to come in for a share of

the funds independently. On the other hand, the Board of Common School Commissioners and other parties make themselves defendants, and assent to the relief sought in the bill. If you go upon the issues tendered by one set of defendants, you dismiss the bill; if the issues of another set, you sustain the bill. The proceedings of the court would become a mere chaos, upon any such system of pleadings. But if the defendants are tied down to the issues tendered by the bill, and are compelled, if they or any of them wish to change these issues, to become actors and bring before the court all parties in antagonism to them as defendants, all is plain.

We insist, therefore, that the only issue before this court upon the answer of Atchison and Duncan, is, whether the Torbett notes are valid. If the court should be of opinion that they are valid, and that the case comes before them in an attitude to have the question disposed of, it can so declare, and, if it sees proper, give the defendants, Atchison and Duncan, a decree against the Bank of Tennessee. The defendants are not entitled, upon the pleadings, to any additional relief, and must be left to such further redress as they may be advised that they are entitled to, if any.

The position thus taken is not captious or technical in an obnoxious sense, but meritorious, because essential to the rights of the litigants. The defendants, Atchison and Duncan, represent less than five thousand dollars of the new issue. Their learned counsel says that their answer is on behalf of themselves, and all other holders of similar notes, and he infers that such an answer would have the same effect as a bill filed by some of a class, for themselves and all others of the same class. But the answer is not filed on behalf of themselves and all other holders of similar notes.

It is only in the prayer of the answer or what would have been the prayer had it been a bill instead of an answer, that any allusion is made to such holders. Respondents ask "that the rights of these respondents, and

such other holders of similar notes and bills as may see proper to come in and adopt this answer, *with the permission of the court*, be ascertained and declared." I am not aware of any law, usage, or practice, of the court of chancery which sanctions this mode of procedure, by which one defendant undertakes to act for himself and all others in like category. Nor does it appear that any other noteholders have taken advantage of this generous offer. The case before us is, therefore, confined to the defendants named.

The importance of limiting the relief as contended for, and to the defendants specially named, will be obvious when it is stated, as is done further on in this argument, that the title of the trustee, Watson, to the property conveyed to him by the trust deed, has been perfected as against all persons claiming adversely to the trust, by the statute of limitations. And that the bank itself is protected by the expiration of its charter on the first of January, 1868, and by the expiration, on the first of January, 1873, of the five years' extension to wind up its business, given by the Code, sec. 1493. The debts and liabilities of the bank have thus been extinguished by operation of law (*Hopkins* v. *Whitesides*, 1 Head, 31), and all pending suits, perhaps, abated. (*Ingraham* v. *Terry*, 11 Hum., 572.) At any rate, here are strong grounds upon which both the trustee and the bank may resist suits brought against them, or either of them, on these notes.

It will be borne in mind that so far as this branch of the case is concerned the State is not before the court. The answer seeks no relief against it, and the defendants, Atchison and Duncan, have taken no appeal from the action of the Chancellor in the court below dismissing the bill, so far as the State was concerned.

We come now to the independent relief sought by the bill of McKennie and others. For, as I have before said, although the State is made a party defendant to the cross-bill

of Mark R. Cockrill, yet no independent relief was sought against it, nor was any step taken in the court below against the State. The State is not, therefore, it is distinctly understood, before this court directly in any of the proceedings to be acted on by this court unless it be as a defendant to the cross-bill of McKennie and others.

The first position we assume on this point is, that a cross-bill is the mode of defense, and cannot introduce new matter not embraced in the original suit. The original bill is to settle up the trusteeship under the deed of trust, and ascertain the valid liabilities of the Bank of Tennessee. The object of the cross-bill under consideration is to hold the State liable directly for supposed deficiencies in the capital stock of the bank, and for over three millions of the 8 per cent. war bonds, or the consideration paid by the bank for these bonds. It is obvious that such relief is new matter not embraced in the original bill, and altogether independent of the relief therein sought.

"A cross-bill," says Judge Story, " *ex vi terminorum,*. implies a bill brought by a defendant in a suit against the plaintiff in the same suit, or against other defendants in the same suit, or against both, *touching the matters in question in the original bill.*" (Sto. Eq. Pl., sec. 389.)

A cross-bill should not introduce new and distinct matters not embraced in the original suit, for as to such matters it is an original bill, and they cannot properly be examined at the hearing of the first suit. *Galatian* v. *Erwin,* Hopk. 48; S. C. 8 Cow., 361. (Sto. Eq. Pl., sec. 401.)

Again he says: "A cross-bill being, as has been already said, a matter of defense, is confined to the matters in litigation in the original suit. And, therefore, if it seeks to bring before the court other distinct matters and rights, it is no longer entitled to be deemed a cross-bill, but is an original suit. Without such a restriction, new matter might be introduced into litigation by cross-suits without end. If, therefore, such a bill should be filed, affecting to be a mere

cross-bill, but containing other distinct and independent matters, it would seem to be open to a demurrer for this cause. And, at all events, no decree founded on such matters would be made upon the hearing of the original cause." (Sto. Eq. Pl., sec. 631. 2. Dan. Ch. Pr. 1649–1652; 19 N. Y., 529; 6 Dana, 186.)

For the same reason it has been held by the Supreme Court of the United States that if the purpose of an auxiliary bill be different from that of the original one, it is not a cross-bill, though the matters presented have a connection with the same general subject. And a circuit court of the United States cannot entertain such a bill unless the citizenship of the parties be such as to confer jurisdiction. *Cross* v. *DeValle*, 1 Wall, 1; *Shields* v. *Barrow*, 17 How., 130.

It will be seen by reference to the demurrer of the State to the cross-bill of McKennie and others, that the 5th and 17th causes assigned are that the so-called cross-bill is filed for purposes outside of and beyond the scope and object of the original bill. The 17th cause of demurrer is, that the cross-bill, so far as it is a cross-bill, is unnecessary, the defendants being entitled to the same relief under their answer; and so far as it is an original bill in the nature of a cross-bill, it is not germane to the case, nor can any relief be granted under it.

We submit, therefore, that the answer, so far as it is filed as a cross-bill, goes beyond its legitimate scope, and the demurrer to it ought to have been sustained.

The learned counsel for McKennie in the court below seemed to labor under the impression that a state or sovereign, by condescending to be a party complainant to a suit in court, not only divested itself of all its sovereign prerogatives, but subjected itself at once to be sued in any mode, and for any cause, a party defendant might see proper to ground an action upon. And he seems to have relied upon *Hullett* v. *King of Spain*, 2 Bligh., N. S., 31, and other cases brought by foreign sovereigns in the English Chancery

Court, in which it has been held that such sovereign is liable to a cross-bill in the case. If he demands equity he must of course be willing to do equity. But I do not understand those cases to hold that a sovereign, by suing in the court of chancery, subjects himself to a cross-bill other than such as would be allowed in like cases between individuals. The claim, too, of cross-action must of course be one in which the court can undertake to adjust the defendant's equity through the sovereign's right of recovery, as for example a claim of set-off. The court would never undertake to give a positive decree for any amount in favor of the defendant against the sovereign, for such a decree would be simply nugatory. And certainly if a court of Chancery should ever undertake to render such a decree against a foreign sovereign, it would never think of doing so against its own sovereign without the permission of the latter formally given. (1 Dan. Ch. Pr. 18 and 132 ; Sto. Eq. Pl., sec. 55.)

In England the King and Queen, although they may sue, are not liable to be sued, and in America a similar exemption belongs to the government or state. In England, upon a petition of right, the crown ordinarily directs that right be done to the party. "In America no such general remedy by a petition of right exists against the government, or if it exists at all it is a privilege created by statute in a few states only." And the Supreme Court of the United States have invariably held that no remedy lies against the United States by an individual, either as plaintiff or defendant, except by statute. Even a just set-off is never allowed a defendant when sued by the United States, except under an act of Congress, principally the act of the 3d of March, 1797, ch. 74, *United States* v. *Wilkins*, 6 Wheat, 135, 143; Brightley's Fed. Dig., p. —. (1 Dan. Ch. Pr., 132; Sto. Eq. Pl., sec. 69.) *Avery* v. *United States*, 12 Wall., 307; *Perrin* v. *United States*, 12 Wall., 315.

The original bill in this case seeks no relief against any of the defendants. It simply calls upon them to come in

and have their claims ascertained. The State was, in fact, a mere nominal complainant, not at all necessary to the suit. The act of the Legislature, under which the bill was filed, did not require the State to be made a party, and its name ought not to have been used at all. It asked no relief, much less relief against these defendants. No cross-bill would, therefore, lie against it at the instance of any defendant, for a cross-bill being a mode of defense, and there being nothing to defend, it would not, of course, lie. That it subjected itself by such an unnecessary use of its name, to a positive demand at the hands of the defendants to the amount of millions of dollars, cannot be maintained either on principle or authority.

Thus far the argument has been made as if a regular cross-bill had been filed. But the answer was, in this case, filed as a cross-bill under section 4323 of the Code. That section only permits an answer to be filed as a cross-bill, not as an original bill. If, therefore, a cross-bill might, for any purpose, or under any circumstanes, be filed as an original bill, that is, be extended beyond the province of a cross-bill proper, it does not follow that a like privilege would be conceded to an answer filed as a cross-bill. Such a pleading owes its existence to the statute, and must be limited to the provisions of the statute. We have no decision on the subject, but in the State of Mississippi, where they have a similar statute, from which ours was in fact borrowed, they have held that their statute does not permit a new party to be brought in by a cross-bill in that form, *Lardner* v. *Ogden*, 31 Miss., 332, that is, that an answer cannot be filed as an original bill under a statute which only permits it to be filed as a cross-bill.

We submit, therefore, that the demurrer of the State to the (so-called) cross-bill of McKennie and others, ought to have been sustained on the foregoing grounds, all of which are properly assigned therein.

But a still graver difficulty stands in the way of the cross-

bill of these defendants. The State, as we have just seen, is a mere nominal party to the original bill. After the demurrer to the cross-bill was argued, and before it was decided by the learned Judge who heard the argument by interchange with the Chancellor, it was determined by the Attorney-General for the State to dismiss the original bill so far as the State was concerned, and it was intended to make the motion for this purpose as soon as the learned Judge took his seat to deliver his opinion. In the meantime, however, a rumor was spread that the Chancery Court (the then Chancellor being about to resign) might adjourn at any moment. Under the apprehension of such a contingency, the counsel for the defendants hastily drew up a decree in accordance with the views of the learned Judge who had heard the argument overruling the demurrers, and granting an appeal which he knew would be taken. *This decree was not submitted to the counsel for the State, nor was it ever read in open court, or acted upon by the Judge in open court.* But it was, by the learned counsel, without, however, any wrong motive on his part in any way, handed to the clerk and entered upon the minutes, and the entry was signed by the learned Judge out of court. As soon as these facts were known by the counsel for the State, they applied to the learned Judge to take his seat upon the bench in order that the contemplated motion might be made to dismiss the suit so far as the State was concerned. The learned Judge accordingly took his seat at the same term, whereupon a motion was made by the Attorney-General to set aside the entry made and signed out of court as aforesaid, but the motion was disallowed except as to the prayer for an appeal, which not having been made at the instance of the State, was set aside and annulled. The residue of the entry was allowed to stand because the decree was in accordance with the opinion of the court, and because " the entry and signing of the decree was in accordance with the usage of the court."

The Code, sec. 4101, is, "the minutes of the court shall be read each morning *in open court,* and signed by the Judge." It is obvious that this provision contemplates a proceeding *in open court,* of which all persons interested are bound to take notice; not a secret signing out of court without any notice to the parties interested, even if there should be of any particular court a usage to the contrary; a usage, if it exist, more "honored in the breach than in the observance." It was, we submit, clear error, upon an admission of the facts afterward in open court, as was done, not to have set aside the entry thus irregularly, although, let it be distinctly understood, not wrongfully made—that is, not made with any wrong intent. Neither the eminent counsel who drew the order and had the entry made, nor the learned Judge who signed it, had the least idea of doing anything wrong. There was, therefore, nothing morally wrong in what was done. Nevertheless we submit, as matter of law, that the entry thus made, the facts being admitted, was void, and it was error not to have set it aside on motion.

If it had been set aside, the motion to dismiss the original bill, so far as the State was concerned, would have been made as determined upon by the Attorney-General, before any entry of the decree on the demurrers, and there would have been an end of the matter.

And if the entry as made was void, because not in compliance with the statute, there is also an end of the matter.

The motion to dismiss was made as soon as the prayer for an appeal was set aside, and was continued for argument, and was, after argument, allowed, "subject, however, to any right which may have been heretofore acquired by the defendants in the cross-bill, if any such exist."

The right of a plaintiff to dismiss his suit, or enter a *nolle prossequi,* before judgment or decree upon the merits and fixing rights, is a necessary corrollary of the right to sue, and has certainly never been denied under the common law, either in its legal or equitable branch. It is recognized by

statute, Code, sec. 3199. The decree overruling the demurrers was not such an adjudication as would prevent the complainant from dismissing his bill. But if there should be any doubt upon this point, the appeal vacated the decree, and the State is now entitled to renew, and does renew its motion.

So, in any event, the State may be considered as no longer a party to the suit, and any supposed advantage to the defendants, growing out of the fact that it was nominally a party, is put an end to. The cross-bill, therefore, so far as it seeks positive and independent relief against the State, is subject to the fatal objection, raised by the demurrer, that it is an effort, under the guise of a cross-bill, to file an original bill against the State, and the demurrer ought to have been sustained.

If we are correct in the conclusions to which we have come in the foregoing argument, then it follows:

1. That McKennie and others are mistaken in supposing that they could, by means of an answer filed as a cross-bill, go beyond a defense to the matters of the original bill, and the demurrer to the cross-bill ought to have been sustained whether the State is a party to the original bill or not.

2. That the State is no longer a party to the original bill, and of course no cross-bill can be filed against it.

3. That the (so-called) cross-bill, so far as it seeks independent relief against the State, is, if it be anything, an original bill, which cannot be filed in the form which has been adopted.

4. That an original bill will not lie against the State, unless expressly authorized by law.

If the court should be of opinion that either of the first three of these conclusions is sound, then it becomes unnecessary to consider the allegations of the cross-bill which attempt to show why our fourth conclusion is not equally conclusive.

These allegations are, in substance, that the provision of

the Code authorizing suit to be brought against the State is still in force, because the act which repealed it was not read on three different days in each house, but, as the Journals show, only once.

I feel so thoroughly satisfied that the court will not, by reason of the mode of proceedings adopted by the defendants in this case against the State, find it necessary to go into this constitutional question, that I shall treat it very briefly.

The act of the Legislature which contained the repealing clause was signed by the Speakers of both Houses, after regular enrollment, and published as the law of the land. We know as matter of history, as well as because the habit has been alluded to by this court in one of our decisions, that it has been the common practice of our legislative bodies, since the organization of the State Government, to amend its bills by new provisions tacked on at any state in its passage, and whether the provision was germane to the main object of the bill or not. Fully one-half of the acts in our statute books are evidences of the fact. The practice has become sanctioned by uniform and undisputed usage, and it is now too late in the day, after a new constitutional provision has effectually put an end to its longer continuance, to have it authoritatively denounced by the courts. A decision to that effect would throw doubt on one-half of the laws in the statute books, and would only produce confusion, without doing the least good. The contemporaneous and practical construction which has thus been put upon this constitutional provision is conclusive on the courts. See Cooley on Const. Lim., 67, *et seq.*

The weight of judicial opinion upon this point will be found in favor of the view that the constitutional provisions in reference to three readings of a bill on three different days are directory to the Legislature itself, and not mandatory. These provisions, as well as the provision in relation to introducing a bill to the same effect as a bill already de-

feated at the same session, are addressed to the discretion of the legislative bodies themselves.   They go, not to the substance of the law, but simply to the mode of its adoption. Accordingly, the courts have refused to supervise the legislative action in such cases.   See Cooley on Const. Lim., 80, 81, 139, 140, and cases cited.

Let me repeat, so that we may see what progress we have made.   The State is no party to the case of Atchison and Duncan, because they came in simply by answer, and have taken no exception to the action of the State in dismissing the original bill so far as it was concerned.

The State is no party to Mark R. Cockrill's cross-bill, because no relief is asked against it, and because the State was abandoned as a defendant in the court below, and is now out of court.

The State is also out of court by its own dismissal, as far as the McKennie answer and cross-bill are concerned.   And even if it were not it could not be brought into court for positive and independent relief beyond the scope of the original bill, by a cross-bill, which is a mode of defense, nor a fortiori, by an answer filed as a cross-bill.   The demurrer ought to have been sustained on these grounds in the court below.

And if such pleading could be sustained as an original bill, the demurrer was still well taken, because the State cannot be sued by original bill.

Let us now see if there is anything in the relief sought against the State, even if it were properly before the court, as a party defendant to the bill of McKennie and others.

The positive relief asked as against the State, may be stated in brief thus:

1. That it made good the deficiency in the capital stock of the bank.

2. That it pay the eight per cent war bonds, or the consideration paid by the bank for them.

3. That it be not subrogated to the rights of noteholders

until it makes good the deficiencies, and pays up all its liabilities to the bank.

The charge in the cross-bill upon the first of these points, is: "And complainants, depositors, do charge that the Legislature of the State of Tennessee did undertake and agree to make up any deficiency in the school fund, surplus revenue, or in the sums raised by the sale of state bonds, and to indemnify depositors and all other creditors against all losses by reason of any such deficiency," and complainants did deposit their money under said engagement, etc.

This charge is based upon the supposed meaning of the first section of the act of the 19th of January, 1838, ch. 107, under which the bank was chartered. That section reads as follows: "That a bank shall be, and is, hereby established, in the name and for the benefit of the State, to be known under the name and style of the Bank of Tennessee, and the faith and credit of the State are hereby pledged for the support of the said bank, and to supply any deficiency in the funds hereinafter specifically pledged, and to give indemnity for all losses arising from such deficiency."

The second section fixes the capital stock at five millions of dollars, and defines the ways and means by which it is to be raised.

The act itself is entitled "An act to establish a state bank, to raise a fund for internal improvement, and to aid in the establishment of a system of education." The main objects of the bank were, therefore, education and internal improvement.

· Now, it will be noticed that there is no pledge on the part of the State that the capital shall be five millions of dollars. The language of the second section is merely an expression of the legislative expectation and intention at that time, that the capital should be of that amount, but there is no pledge that it shall be, much less is there any pledge that the State will "indemnify for all losses arising

from such deficiency." It is only by mingling the language
of the first section, where it has a different meaning alto-
gether, with the language of the second section, with which
it has no connection, that the position assumed in the charge
of the cross-bill can be said to have any plausibility. But
this mingling of the language of the two sections is not
justified by the context, and is in clear violation of the leg-
islative intent.

The words of the first section chiefly relied on, and which
are printed in italics and capital letters in one of the cross-
bills, are: "And the faith and credit of the State are here-
by pledged   *   *   to supply any deficiency in the funds
*hereinafter specifically pledged,* and to give indemnity for all
losses arising from such deficiency." Now, what are the
funds "hereinafter specifically pledged?" and for what
purpose are they pledged? Not the funds constituting the
capital stock of the bank, for the subsequent sections of
the act show no pledging of these funds for any specific
purpose. The funds "hereinafter pledged" were the divi-
dends to be annually set apart for common schools and
county academies. The eighth section of the act reads
thus: "That of the dividends which shall be declared by
the bank, one hundred thousand dollars shall be annually
set apart for common schools, *and the faith of the State is
hereby pledged* for an annual appropriation of said amount
to common schools, to be applied as the General Assembly
may direct. Of the dividends of the bank remaining,
there shall be annually appropriated for thirty years, and
no longer, or not so long if the bank should not continue
so long in operation, eighteen thousand dollars to county
academies, to be applied as the General Assembly may di-
rect, and the faith of the State is hereby pledged for the
annual payment of said sum."

Here, then, we have plainly "the funds hereinafter spe-
cifically pledged" to supply any deficiency in which "the
faith and credit of the State are hereby pledged." This is

clear upon the plainest rules of construction, and needs no authority to support it. But, fortunately, to exclude all doubt and render unnecessary any long discussion of the point, this court expressly so decided in *State* v. *Central Turnpike Company,* 10 Hum., 388, 403.

It remains to be considered what meaning is to be given to the other part of the clause contained in the first section of the act, namely, "the faith and credit of the State are hereby pledged for the support of the said bank." This court, in the case just cited, considered the pledge to be for the benefit of the noteholders and other creditors of the bank, and to imply an engagement that the notes should be redeemed and all contracts "punctually fulfilled." It is obvious, however, that inasmuch as the Central Turnpike Company and its stockholders, parties defendant to that suit, were not creditors of the bank within the meaning of the act of incorporation, the opinion was merely incidental, and not an adjudication of the point. It might be plausibly urged that, inasmuch as the words in question were a part of the entire clause, they equally related to the deficiency in the funds "hereinafter pledged." But take it that they inured to the benefit of subsequent creditors, what do they mean? Does a general pledge, of such vague and indefinite language, imply so stringent a contract as suggested? It seems to me that such a construction strains the words beyond any legitimate meaning which can be fixed to them. A similar pledge upon the part of the stockholders of a stock bank would simply imply an engagement on their part to do all that could be reasonably required of them in conducting the business of the bank, not a pledge personally binding upon them, in a monetary crisis or a contingency by which loss was incurred without any blame attaching to them, to redeem the notes, and punctually fulfill all the contracts of the bank. And there is no rule by which a different interpretation, in such cases, can be put upon the same words when used by individuals, and when

State, and Watson, Trustee, *v.* Bank of Tennessee.

used by a state.   The Supreme Court of the United States have always held that the United States are entitled to the same rules of interpretation and the same measure of justice as individuals in like cases.    *Floyd's Acceptances,* 7 Wall., 666.   The words simply imply a pledge of good faith in the conduct of the business of the bank so far as the State was concerned, and in the legislation which might subsequently be enacted in relation to the bank.

Besides, the very fact that the capital stock is fixed by the charter necessarily implies, in the absence of any positive provision to the contrary, that the State as a stockholder, or as *the* stockholder, intends to restrict its liability to that amount.   And if, as was done in the case of the Bank of Tennessee, the amount of capital stock is openly reduced by public legislation, the liability, as to all persons subsequently dealing with it, would be reduced to the like extent.   Persons who deal with a chartered institution must, at their peril, take notice of the provisions of its charter.   And it need scarcely be added that a state, by becoming a stockholder of a bank, while it sinks its sovereignty *pro hac vice,* is entitled to all the privileges of such a stockholder in the way of limitation of liability.   *Briscoe* v. *Bank of Kentucky,* 11 Pet., 257; *United States* v. *Planters Bank of Georgia,* 9 Wheat., 904; *Bank of Kentucky* v. *Wister,* 2 Pet., 124.

The next ground of positive relief against the State is to charge the State with eight per cent bonds issued under the act of the 6th of May, 1861, and bought by the bank, or with the amount of money taken from the bank to pay for them.

These bonds were authorized by the Legislature after the State had undertaken to secede from the Union, the act itself, which authorized them, specifying that they were to be issued to arm and equip troops for defense.   The court judicially knows that the bonds were issued, and the money raised upon them for the express purpose of aiding in the

rebellion then flagrant between the United States and the Confederate States. If we were allowed to decide upon the obligation of these bonds by the circumstances which attended their issuance, no one of us might be justified in casting the first stone at them. But might makes right, as well as law, in this best of all possible republics; and the question is no longer an open one, and such obligations have been pronounced null and void by the highest judicial arbiter upon the question—the Supreme Court of the United States (*Hanauer* v. *Doane*, 12 Wall., 342); and also by the highest political arbiter, in the 4th section of the 14th amendment to the Constitution of the United States. It would be a useless consumption of time to dwell upon the subject further.

Let us now see what are the rights, if any, of the complainants in the cross-bills, as against the assets of the Bank of Tennessee in the hands of S. Watson, trustee.

These complainants are depositors, or holders of the "new issue." The greater part, if not all, of the depositors are claimants upon deposits made after the 6th of May, 1861. Such depositors fall in the same category with the holders of the "new issue," and the claims of both may be, to a certain extent, treated together, considered as claims created after the 6th of May, 1861.

My first position in regard to these claims is, that they were void in their inception, if the lawful government chose so to treat them, and that the political departments of both the state and general government have chosen so to treat them, and the courts cannot go behind their action.

The people of the State of Tennessee undertook to separate from the United States and join the Confederate States. This was accomplished, as far as it could be done, by the act of separation and the legislation of the 6th of May, 1861, and the effect of what was done was to bring the State, as then controlled, and especially its legislative and executive branches, and the bank of Tennessee as their fis-

cal agent, into rebellion and war with the United States. It has been repeatedly decided by the courts of the United States, that war is a state of facts, and needs no proclamation of the President or act of Congress to establish it; but that if anything was needed, it was supplied by the President's proclamation of the 15th of April, 1861, declaring the existence of an insurrection. *The Prize Cases*, 2 Black., 635; Lawrence's Wheat, 535.

"As a civil war," says the Supreme Court of the United States in the Prize Cases, "is never publicly proclaimed, *eo nomine*, against insurgents, its actual existence is a fact in our domestic history, which the court is bound to notice and to know."

"All persons residing within this [insurrectionary] territory, whose property may be used to increase the revenues of the hostile power, are in this contest liable to be treated as enemies, though not foreigners. They have cast off their allegiance and made war on their government, and are none the less enemies because they are traitors."

In the case of *Luther* v. *Borden*, 7 How., 1, the Supreme Court of the United States held that the same principles and rights applied to a rebellion within a state, where a new (or illegal) government undertakes to overthrow an old (or legal) government. The Legislature of the old government had in that case established martial law, and Chief Justice Taney, in delivering the opinion of the court, observed, among other things, that "if the Government of Rhode Island deemed the armed opposition so formidable and so ramified throughout the State as to require the use of its military force and the declaration of martial law, we see no ground upon which we can question its authority. It was a state of war, and the established government resorted to the rights and usages of war to maintain itself and overcome the unlawful opposition."

This language is quoted by Nelson, J., in his opinion in the Prize Cases, with approbation.

Now, what was the effect of the status brought about by the acts of the rebellious government in this State on the 6th of May, 1861, and afterwards, until the lawful authority was restored, upon the acts of the rebellious government with its citizens, and upon the acts of the citizens as between themselves? It is upon the answer to this question that the correctness of our first position must, in a great measure, depend.

Here is what Chief Justice Taney says on the subject in *Luther* v. *Borden*, 7 How., 1, 39, and he is borne out by all the elementary text writers :

"The laws passed by its Legislature during that time [during the time a state is in rebellion] were nullities; its taxes wrongfully collected ; its salaries and compensation to its officers illegally paid ; its public accounts improperly settled, and the judgments and sentences of all its courts in civil and criminal cases null and void, and the officers who carried the decisions into operation answerable as trespassers, if not in some cases as criminals."

"It rests," he says, "with the political power of a State to pronounce upon the legality or illegality of the government acting for the time being."

"Moreover," he adds, "the Constitution of the United States, as far as it has provided for an emergency of the kind, and authorized the general government to interfere in the domestic concerns of a state, has treated the subject as political in its nature, and placed the power in the hands of that department." 7 How., 42.

The Dorr rebellion of Rhode Island, which was the particular rebellion under consideration, was not a rebellion of a part of the State against the whole. It was a rebellion of the whole State by holding conventions elected by, it was claimed, a majority of the people, and by a Legislature chosen in like manner, and its successful and continued organization would, as C. J. Taney said, have made the acts of the old government illegal and void. It is the political

department of the government that survives the rebellion, without reference to the abstract question of right or wrong, which is clothed with the power "to pronounce upon the legality or illegality of the government acting for the time being." And this, whether the rebellion be of a whole State, as in the case just mentioned, or of a part of a State, as in the case of the Franklin Government presently to be noticed, and whether the rebellion continue for only two or three years as in both these instances, only for a few months as in the case of our own rebel State Government, or for twenty years as in England during the great revolution which ended with the Protectorate of Cromwell.

To the same effect as *Luther* v. *Borden*, is one of our own early cases, *Ingram* v. *Cocke*, 1 Tenn., 19, in relation to the acts of the Franklin Government. The court say in that case: "When governments *de facto* cease to exist, the former or legitimate government, by their legislative acts, usually furnish the grounds upon which municipal courts proceed in giving an opinion." In other words, to use the language of the Supreme Court of the United States, *White* v. *Hart*, 13 Wall., 651, "the result (to the rebel citizen) depends upon the rule as defined in the law of the sovereign against whom he has offended." The action of the political department under which the judges hold their offices, upon anything done pending the rebellion, is conclusive upon the courts. See also *Rose* v. *Himely*, 4 Cr., 273; 3 Wheat, 324, 364; 13 Pet., 420; *White* v. *Hart*, 13 Wall.. 649.

By turning to Mr. Meigs' Digest, sec. 988, it will be seen that the Franklin Government adopted a Constitution on the 14th of December, 1784, and ceased to exist about September, 1787. It will be seen also that the Legislature of Tennessee passed several acts, from time to time, validating proceedings under the Franklin Government, such as the granting of letters of administration, probate of instruments, and even marriages. Some of these acts are cited by Judge Haywood, in delivering the opinion in *Townsend*

11—VOL. 5.

*v. Townsend,* Peck 1, as restropective laws which were valid.

The right of confiscation by the successful belligerent may be referred to in this connection. " The question of what shall be done with enemy's property, says Ch. Kent, is one rather of policy than of law, and is one properly addressed to the consideration of the Legislature, and not to the courts." 1 Kent's Com., 60.

"Respecting the power of government (to confiscate enemy's property), said Marshall, C. J., no doubt is entertained. That war gives the full right to take persons, and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will." *Brown* v. *United States,* 8 Cr., 110, 143.

This doctrine was applied in all its rigor, without reference to their personal loyalty or disloyalty, to the citizens of the Confederate States as enemies in *Miller* v. *United States,* 11 Wall., 268.

I do not understand that there is any conflict of authority on these two points; that it belongs to the political department of the successful government to say what laws, and what acts of the rebellious government, or of its citizens, shall be valid or invalid, and to determine whether any and what property of the rebels shall be confiscated or destroyed, and that, in the language of C. J. Marshall, "the judicial department must give effect to its will."

With these principles distinctly before us, let us see now what has been done in the premises by the political departments of the State and United States Governments.

The fifth section of the schedule to the Constitutional amendments passed in February, 1865, while the war was

still flagrant, by a convention and under a state government recognized by the Government of the United States, provides: "All laws, ordinances and resolutions, as well as all acts done in pursuance thereof, under the authority of the usurped State Government, after the declared independence of the State of Tennessee, on or after the 6th of May, 1861, are unconstitutional, null and void from the beginning," with a proviso in favor of judicial decisions made pursuant to the laws enacted previous to that date, and between parties in court and litigating their rights.

Section sixth is: "All laws, ordinances and resolutions of the usurped State Government, passed on or after the 6th day of May, 1861, providing for the issuance of state bonds, also all notes of the Bank of Tennessee or any of its branches, issued on or after the 6th of May, 1861, and all debts contracted in the name of the State by said authority, are unconstitutional, null and void; and no Legislature shall hereafter have power to pass any act authorizing the payment of said bonds or debts, or providing for the redemption of said notes."

The act of the Legislature of the 16th of February, 1866, ch. 28, provides for the winding up of the Bank of Tennessee, and directs an assignment to be made to secure, first, the school fund, and second, the remaining creditors of said bank, "excluding all claims and demands of all kinds after the 6th of May, 1861, as absolutely null and void."

By the joint resolution of Congress of the 24th of July, 1866, restoring Tennessee to its rights in the Union, the adoption of the Constitutional amendments whereby "all ordinances and laws of secession and debts contracted under the same, are declared void," is referred to, and made the ground in part of the restoration of the State to its rights.

And by the fourth section of the 14th amendment to the Constitution of the United States, it is declared that "all debts, obligations and claims incurred in aid of insurrection and rebellion against the United States, shall be held illegal

and void," and the United States and any state are forbid to assume or pay the same.

The sixth section of the schedule to the Constitutional amendments of 1865, expressly designates the new issue of the Bank of Tennessee as illegal and void, and also the claims of the depositors of the bank by deposits made after the 6th of may, 1861, if such claims are, as contended for on the other side, debts of the State. And the act of the Legislature of the 16th of February, 1866, expressly puts the seal of condemnation on the claims of these depositors. This was an act of the political department of the government shortly after the State had again come under the control of a loyal government, and before the proclamation of the President of the United States, which declared the insurrection in Tennessee at an end. And whether we construe the act as the exercise of the war power of confiscation, or as a legitimate designation of the invalidity of certain acts for the guidance of the courts, is immaterial. In either event it was within the competency of the political department of the government, and conclusive on the courts.

The effect of the constitutional amendments of 1865 was to designate as void all laws, etc., passed after the 6th of May, 1861, but impliedly to leave all previous laws in full force and effect, and to validate everything done under them. So the designation of certain particulars as void by the sixth section in like manner left the courts to infer that they might treat as valid every thing not thus specially designated. And, inasmuch as every act of the rebellious government, or its subjects, was, as we have seen, illegal and void at the option of the legitimate government, the schedules to the Constitution of 1865 were more merciful than could have been reasonably expected from a victorious government. Whether the selection of the acts to be treated as void was wise or just or proper, was for the political department to determine. This action of the political department of the successful State Government was, in effect, sanctioned

by the political department of the United States Government, both by recognizing the State Government and afterwards by the resolution of Congress of the 24th of July, 1866.

The schedules to the Constitution of 1865, and the act of the Legislature of the 16th of February, 1866, are not, in this view, attempt to impair the obligation of contracts, which is the argument on the other side, and which we concede cannot be done, but are legitimate acts of the political departments of the State and United States Governments, strictly within their competency, designating among the various proceedings which took place during the rebellion, and all of which were illegal and invalid, so far as the legitimate government was concerned, such of them as should be treated as void, and impliedly validating all others, thus giving the courts, in the language of our Supreme Court in *Ingram* v. *Cocke*, 1 Tenn., 19, "the ground upon which they should proceed."

We agree that the annulling of a valid contract by a subsequent legislative act or constitutional amendment would be void, because in conflict with that provision of the Constitution of the United States which prohibits the impairing of the obligation of a contract. But that provision of the Constitution can certainly have no application to contracts entered into under a usurped government, by and between persons in insurrection and rebellion; and, *a fortiori*, to contracts between the usurped and rebellious government itself, through its fiscal agent, and its rebel subjects. All such so-called contracts are at the mercy of the legitimate government, when restored. It is for the political department of the government to say how they shall be treated by the courts. The rights of the rebel states and their citizens under the Constitution were, as said by the Supreme Court of the United States in *White* v. *Hart*, 13 Wall, 651, "suspended," and the extent of the punishment, either of person or property, depended upon the rule as defined in the law

of the offended sovereign. Those states, as said by the same court on the same page, were at no time out of the pale of the Union. Their citizens had not the rights, therefore, of a foreign enemy who has been subjugated, but only such rights as the offended sovereign might see proper to extend to them.

This point is more fully brought out in the opinion of the court in the case of *Texas* v. *White,* 7 Wall., 727, as delivered by Chief Justice Chase. "It is," he says, "by no means a logical conclusion from the premises which we have endeavored to establish, (namely, that·Texas continued to be a state of the Union, notwithstanding its acts of secession and· rebellion,) that the governmental relations of Texas to the Union remained unaltered. Obligations often remain unimpaired, while relations are greatly changed.. The obligations of allegiance to the State, and of obedience to her laws, subject to the Constitution of the United States, are binding on all the citizens, whether faithful or unfaithful to them ; but the relations which subsist while these obligations are performed, are essentially different from those which arise when they are ·disregarded and set at nought. And the same must necessarily be true of the obligations and relations of states and citizens to the Union. No one· has been bold enough to contend that, while Texas was controlled by a government hostile to the United States, and in affiliation with a hostile confederation, waging war upon the United States, senators thereof, elected by her Legislature, or representatives elected by her citizens, were entitled to seats in Congress; or that any suit instituted in her name could be entertained in this court. *All admit that, during this condition of civil war, the rights of the State, as a member, and of her people, as citizens of the Union, were suspended.* The government and the citizens of the State refusing to recognize their constitutional obligations, *assumed the character of enemies,* and .incurred the consequences of· rebellion."

In the opinion of the Chief Justice, it is too clear for argument, that, while the State was in rebellion, and its citizens refusing to recognize their constitutional obligations, both the State and its citizens lost their rights under the Constitution of the United States. They could not claim the latter, while they themselves were openly repudiating the former. They became "enemies" to all intents and purposes, besides incurring the consequences of rebellion, and might be so treated accordingly, at the option of the government.

To the same effect is the language of the court in the Prize cases (2 Black), quoted ante, p. 31. All persons residing in the insurrectionary territory are liable to be treated as enemies, though not foreigners. They have cast off their allegiance and made war on their government, and are none the less enemies because they are traitors."

How an enemy can claim the benefits of the Constitution he is combatting, it is difficult to imagine, if the government he is resisting chooses to deprive him of them. As an enemy, he can claim only such rights as the political department may see proper to concede to him, or, more accurately, such rights as the political department may see proper not to take away.

The learned Chancellor, in his opinion in the court below, seemed to think that there was a distinction between contracts entered into under ordinances and laws of secession, or directly with the rebel authorities or agents, and contracts between private citizens, and that the ban of invalidity could only be predicated of the former. But I do not understand that any such line of distinction exists. By the rebellion, those who became parties to it, either voluntarily or through coercion of circumstances, are placed at once out of the pale of the law, and everything they may do, either with their rebel government or between themselves, is tainted with illegality and void, if the legitimate government chooses so to treat it through the action of its political

department. Of course, modern usages do not ordinarily result in such indiscriminate condemnation of all acts, public and private. But, to use the language of C. J. Marshall, already quoted: "The mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself." And certainly, no just complaint can be made upon the score of the unmerciful exercise of the right in this State. The condemnation was limited to a class of claims, which, to say the least, were open to grave suspicion, if not clearly guilty of direct aid of rebellion.

Moreover, even if the obligation suggested were well founded, it could have no application to the "new issue" of the Bank of Tennessee. That issue may be literally said to have been put into circulation "under the ordinances and laws" of the rebellious State Government. Except for the fact that four millions of state bonds were authorized by that government to be issued for war purposes, and that a military board was organized to arm and equip troops, and purchase military stores in aid of the rebellion, and the bank, as the property and fiscal agent of the State, was required to lend its assistance, and did so lend it with full knowledge on the part of its officers of the unlawful purpose, not a dollar of the "new issue" and less of the "old issue" would have been used. If, in order to stamp this "new issue" with illegality, it should be deemed necessary that it should owe its issuance to a law or ordinance of secession, and to the direct act of the rebel authorities, these are not wanting. Any person who dealt directly with the bank during that period, dealt with the repel State Government, just as much so, under the proof, as if it had dealt directly with the military board, or the Governor, or the Treasurer of the State. The legislation shortly before May, 1861, in view of secession, and the legislation of and after the 6th of May, 1861, changed the character of the institu-

tion from that of a bank for ordinary banking purposes to that of the fiscal agent of a formidable rebellion. That legislation is exhibited in the following acts and resolutions of the General Assembly:

By the act of the 31st of January, 1861, ch. 5, the Bank of Tennessee is *directed,* and the other banks respectfully requested, to extend their line of discount so as to accommodate the people.

By the act of May 6th, 1861, ch. 3, entitled "an act to raise and equip a provisional force, and for other purposes," the military board was organized, and the issuance of five millions of the eight per cent. war bonds authorized. Sec. 11 provides: "That banks and branches purchasing said bonds from the Governor shall have the privilege of classing the bonds so purchased, in the classification of their assets, as specie funds."

By the joint resolution of May, 1861, number 25, it was, among other things, "*Resolved further,* That the supervisors of banks, by and under the concurrence, in writing, of the military and financial board, may temporarily suspend the operation of any provision of the bank code, when, in their judgment, the public good demands it. The suspension to date from the time they file with the Secretary of State their written resolution to that effect."

By the act of the 27th of June, 1861, ch. 14, to authorize the issuance of treasury notes, etc., it is provided by sec. 3: "That said treasury notes * * * may be received on deposit, or in payment of debts, by all the banks of Tennessee, and paid out at the counter, the same as gold or bank paper."

The act of the 1st of July, 1861, ch. 25, was an act to authorize the Bank of Tennessee to receive and pay out the treasury notes of the Confederate States, and for other purposes. By sec. 4, it is enacted: "That the policy of the Bank of Tennessee, in retiring and diminishing their circulation, is detrimental to the public interests; and that they

be *required* to reverse their policy and increase their circulation, so as to answer the public want: *provided, however,* that such increased circulation shall not exceed two dollars for one of paid capital stock."

The act of the 20th of November, 1861, ch. 55, was an act to establish an ordnance bureau, and for other purposes, and provides by sec. 10: " That in order to carry the foregoing objects into effect, the Bank of Tennessee is hereby directed to pay, from time to time, upon the written order of the chairman of said bureau, such sums as may be required, not exceeding $300,000, and that said bank may be re-imbursed, the Governor is hereby authorized to issue to the president and directors thereof, coupon bonds to the said amount, having thirty years to run, and bearing interest at the rate of six per cent. per annum, payable on the 1st of January and 1st of July, of each year."

By the act of the 18th of March, 1862, ch. 26, entitled " an act to raise, organize and equip a provisional force, and for other purposes," it is provided by sec. 18: " That said act (of November 20, 1861, ch. 55, to establish an ordnance bureau) be so amended as to give the bureau, or the Governor and Superintendent, authority to remove the armory to such points, in or out of the State, as shall be thought necessary, and that the Governor is hereby authorized to draw upon the Bank of Tennessee to meet the present emergencies of the bureau, not to exceed $20,000."

It will be seen that the General Assembly were at first cautious in the language used in these acts, becoming gradually more and more outspoken. Practically, as shown by the evidence, the legislation was as effective at first as in the end, and the bank was the mere tool of the rebel government. The two last acts cited drop the mask entirely, and the Legislature controls the assets of the bank, without going through the form of consulting the officers or directors.

It is too weak a phrase to say that the bank was the right

arm of the rebel State Government—it was the government itself, and its every act was the act of that government. As well might you attempt to shield from the charge of illegality acts of the military board, because those acts were between private citizens, as the acts of the Bank of Tennessee. And no one will pretend that the acts of the rebel government, and all its branches and agents, were not void. See *U. S.* v. *Keehler*, 9 Wall., 83; *Hickman* v. *Jones*, 9 Wall., 193.

My argument, let it be distinctly understood, does not call in question any decision of this court heretofore made. It concedes their correctness to the full extent to which they have gone. For, while I contend that all acts of the rebel government and of its citizens while in rebellion were illegal and void, because done without the pale of the Constitution and laws from which they had withdrawn, I concede that all of those acts were amnestied and validated by the action of the political department of the United States, and of the lawful State Government, except those specially excepted, and except also such as were in their very nature treasonable, and therefore void. I may concede also, that ordinary contracts between individuals, not made with the rebel authorities or their agents, and not tainted with illegality by their very nature, are ordinarily considered as validated by the silence of the conquering government in regard to them. The courts would feel at liberty to treat such contracts as valid by the modern usages of war, unless specially directed by the political department of their own government to treat them otherwise. This is the only case which has come before this court where the act brought in question was the direct act, as we contend, of the rebel State Government, and positively declared to be illegal and void by the political department of the loyal State Government, and, as we insist also, by the political department of the United States' Government. It raises, therefore, a question not heretofore brought before the court in reference to acts and contracts

done and entered into pending the civil war, and that is, whether the action of the political department of the government in regard to any such acts and contracts is not conclusive upon the courts. My argument is based upon the conclusiveness of such action.

But, it may be said, the schedule to the constitutional amendment is abrogated by art. 11, sec. 1, of the Constitution of 1870. That section is in these words: "All laws and ordinances now in force and in use in this state, not inconsistent with this Constitution, shall continue in force and use until they shall expire, or be altered or repealed by the Legislature. But ordinances contained in any former Constitution, or schedule thereto, are hereby abrogated."

This section was, no doubt, intended to annul the provisions of the schedule of 1865, upon which I have been commenting, and thereby, as far as possible, to produce the same result as if no such schedule had ever been enacted. If, however, the acts condemned by the schedule were, in the language of C. J. Taney, already quoted, "nullities," the mere abrogation of the schedule without more, and without any legislation to carry out the change, would scarcely have the effect intended. And, were it otherwise, it may safely be claimed that such abrogation cannot divest rights vested under the laws, while the schedule of 1865 was in force, such as those acquired under the deed of trust of the Bank of Tennessee. The subsequent abrogation might revive the liability of the bank if the bank were ever liable, but it could not deprive third parties of vested interests acquired during the time when the liability of the bank was constitutionally annulled. This would be directly in the teeth of *White* v. *Hart*, 13 Wall., 646, and *State Bank* v. *Knoop,* 16 How., 369. For, it would be to hold that a contract, valid at its inception, could be impaired by a subsequent constitutional provision, which, we all agree, cannot be done.

Besides, the provision of the new Constitution does not

abrogate the act of the Legislature of the 16th of February, 1866, nor the resolution of Congress restoring Tennessee to its rights. It did not require a constitutional amendment or ordinance to express the will of the political department of the State Government on the subject. An act of the Legislature was equally efficacious. And this act, if the point be at all material, was passed before the 2d of April, 1866, when the President of the United States officially announced, by proclamation, that the insurrection in Tennessee was at an end.

It is obvious, therefore, that the abrogation mentioned can have no effect upon the question we have been discussing.

If we are right in our argument, the courts have no option except to pronounce the claims under consideration illegal and void, leaving the parties to apply to the Legislature for redress.

The question of the illegality of the claims of these depositors, growing out of the facts which have been introduced in regard to the "new issue," does not arise as the record now stands. The case of the depositors comes upon demurrer, and, of course, no evidence has been taken on this point.

If we are wrong in our argument, the question still remains, so far as the "new issue" is concerned, whether it is not illegal and void because, as a matter of fact, issued in aid of the rebellion, and under the fourth section of the 14th amendment to the Constitution of the United States.

The proof is that a military board was established on the 24th of April, 1861, by the rebellious State Government for the purpose of arming and equiping troops, and purchasing military stores in the war then flagrant between the United States and the rebellious states; that this board drew from the Bank of Tennessee and used for the purposes aforesaid, in the year 1861, the sum of $4,625,460.48, the president,

cashier, other officers and directors of the Bank of Tennessee knowing at the time that the military board was organized to aid the rebellion, and that the money drawn from the bank by the board was to be used, and was used, for this purpose. It further appears that the "new issue" was put into circulation by the bank after the 6th of May, 1861, and in order to meet the demands of its regular business and of the military board. The charter of the Bank of Tennessee shows that the bank belonged exclusively to the State, and was its fiscal agent. The court, moreover, knows judicially that the State joined the other Confederate States in rebellion, and that all its resources were used by the rebel State Government for the purpose of aiding the rebellion, and that the Bank of Tennessee was especially made an instrument to this end.

The statement of the business of the bank in 1861, in connection with the demands made upon it by the military board, shows that the new issue was put into circulation to meet the extra demand for currency occasioned by the calls of that board. The drafts of the board and of the rebel State Government are far more than enough to cover the new issue. No amount of testimony could make it plainer that the bank was forced to resort to the new issue by the draft upon its resources for war purposes. If so, it is obvious, that being issued for an illegal purpose, they are void in whatsoever hands they may come. *Thomas* v. *Richmond*, 12 Wall., 349; *Hanauer* v. *Doane*, 12 Wall., 342; 2 South Rev., p. 73.

In *Weith* v. *City of Wilmington*, 68 N.C., 24, it was held that bonds (or coupons cut therefrom), given, after the war, in renewal of a bond issued by a municipal corporation, for money borrowed to be used in aid of the rebellion, were void in the hands of an innocent purchaser for value and without notice, and this upon general principles. And in *Hanauer* v. *Woodruff*, 15 Wall., 439, it was held that bonds issued in aid of the rebellion were not validated by

being used as a circulating medium in a portion of the territory occupied by the rebels.

The argument against this view is, that some of the business of the bank in 1861 being of the usual character, it is impossible to distinguish between the legal acts and the illegal, and that the doubt will inure to the advantage of the holder. But, as matter of fact by the evidence, the " new issue " must be taken to have been put in circulation solely by the pressue on the bank occasioned by the demands of the military board and rebel government. No doubt, some of the old issue, which otherwite would have lain in the vaults, was used on account of the same pressure. The old issue thus used cannot be identified, the new can. *It is not the consideration upon which it was actually issued that constitutes its illegality.* Some Confederate money may have been issued to buy food for women and children. It is the fact that the money was issued at all that makes it illegal; its use being shown to have arisen by reason of the exigency of the war. No one could contend that Confederate money was not void as between the holder and the maker, the Confederate Government, although it may have been issued, in some instances, upon an innocent consideration, and may have constituted a good consideration in contracts between individuals. So, we insist, that no matter what may have been the actual consideration for the issuance of any part of it, the " new issue " is illegal as between the holder and the bank, as the fiscal agent of the rebel State Government. See *Thorington* v. *Smith,* 8 Wall., 1, 11, as commented on in *Naff* v. *Crawford,* 1 Heis., 123.

And even in the most favorable view for the noteholder, it is a case of " partial illegality." But " partial illegality " is as fatal as " total illegality." See Mr. Daniel's article in 2 South Rev., p. 85, where the authorities are collected.

If, under the circumstances, it were material to show the nature of the particular transaction in which the notes were put into circulation, there is enough in the record to make

out a *prima facie* case of illegality, and to throw the burden upon the holder.

It is difficult, moreover, to see how the "new issue" can escape the sweeping provision of the 4th sec. of the 14th amendment. That provision is: "But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, . . . but all such debts, obligations, and claims shall be held illegal and void." And whether this prohibition is to be considered as restricted to "debts, obligations and claims" of states, or is extended to such debts, etc., between individuals, is immaterial. For if this be a valid debt of the Bank of Tennessee, it is clear that it is a debt of the State of Tennessee, both because the State is sole owner of the bank, and because, if the notes are a valid issue of the bank, the State is bound to receive them in payment of taxes under *Furman* v. *Nichol*, 8 Wall., 44. That the notes were issued partially in aid of rebellion, is conceded by the agreed case. In the case supposed, therefore, the State would be compelled to pay claims "incurred in aid of rebellion," contrary to the express prohibition of the constitutional amendment.

If the claims of the defendant should be held to be valid against the Bank of Tennessee, it would still remain to be considered whether they have any, and what right against the trust assets. The discussion of these questions I propose to leave principally to the learned counsel for the bank. But a brief summary of the line of argument which has occurred to me, may not inappropriately close my labors.

Atchison and Duncan having filed no cross-bill, must, if their claims be pronounced valid, be left to such course as they may hereafter be advised to take. Perhaps, however, as an incident to to the validity of their notes, the question may be considered whether, notwithstanding the deed of assignment to Watson, the notes are a valid tender in pay-

ment of debts due to the bank and included in the assign-ment.

The learned counsel of these defendants insisted in his argument, and the Chancellor so held, that the trustee is bound to receive the "new issue" in payment of the debts due the bank. The argument and decision are based ex-clusively on the 30th section of the act of February 6, 1860, a general act passed to regulate banks and banking. For it was conceded in the court below, and such is undoubtedly the law, that at common law, and in those states where there are no statutory provisions to the contrary, a billholder can-not set off the bills of the bank unless he held them when the suit was brought against him by the bank; and, in the case of an insolvent bank, unless he held them when the bank became insolvent, or the assignment was made. And this for the very reason that were it allowed the equality provided by insolvent laws and the preferences given by an assignment would be rendered nugatory. This court de-cided in the case of *Marr* v. *Bank of West Tennessee,* 4 Col., 471, that, when a bank becomes insolvent, the officers of the bank hold the assets in trust for the creditors of the bank in the order of priority fixed by law, but to be divided equally among all the claimants of one class, if insufficient to pay all of that class. If, now, the assets of a bank, at the date of insolvency, be in the form of discounted notes and bills, as they ought to be, and amount to $100,000, and the outstanding circulating notes of the bank amount to $200,000, it is obvious that to allow the debts due to the bank to be paid in such circulating notes, would be to de-prive one-half of the noteholders of any share in the assets. Accordingly, it is well settled that after insolvency the right to pay in the notes of the bank does not exist. But in this State the act of 1860, sec. 30, is supposed to have changed this just rule. That section reads thus: "In case of the insolvency of any bank or banking association, the bill-holders thereof shall be entitled to preference in payment

over all other creditors of such bank or.association; and no transfer or assignment of any note, bill of exchange, or other evidence of debt by the bank, shall prevent the debtor from paying the same in the hands of the assignee in the currency of such bank."

In *Miller* v. *Andrews*, 3 Col., 381, which was the case of the transfer by the Planters Bank of one of its discounted notes on the 14th of May, 1865, it was correctly ruled that the maker of the note might still pay it to the assignee in the circulating notes of the Planters Bank, because the assignment was made before the act of the 8th of June, 1865, presently to be mentioned.

It is now sought to extend this ruling to the case of a general assignment of the assets of the bank. But the object and language of the statute are satisfied by being confined to such assignments as was before the court in *Miller* v. *Andrews*. To extend the clause would be, in effect, as we have already shown, to make the provision of that clause effectually destroy the provision contained in the first clause. The first clause is that the billholders, in the case of insolvency, shall be entitled to preference—that is, as was held in *Marr* v. *Bank of West Tennessee*, all the billholders shall be entitled *pro rata*. But if you allow the debts due the bank to be paid in its own notes, it is very obvious some of the noteholders will be deprived of any share of the assets, unless indeed the assets should eventually prove sufficient to pay all the notes. It is impossible to give effect, in every contingency, to each of the clauses of this section except by confining the "transfer or assignment" in the second clause to cases of transfer or assignment of specific evidences of debt to specific individuals, or to transfers or assignments made previous to actual insolvency.

The learned counsel for the defendants seems, too, in his argument in the court below, to have confounded this provision of 1860, section 30, with the provision contained in the charter of the Bank of Tennessee, by which the State

agreed to receive the circulating notes in payment of taxes. Because the latter provision has been held to be a contract, the former provision seems to have been thought a contract also. But the two cases are not parallel at all. The one was a continuous offer or guaranty by the State of the notes of its own fiscal agent, by which it was, of course, bound. The other is a police regulation, by general law, applicable to all banks. There is nothing in the latter to prevent the Legislature from repealing it' at any moment, either as to all banks or any one or more of them. And that is precisely what was done in regard to all banks, the Bank of Tennessee inclusive, by the act of the 8th of June, 1865, chapter 55, and again in regard to the Bank of Tennessee separately by the act of the 16th of February, 1866.

The first of these acts, by its second section, expressly provides that "each and every bank in the State is hereby authorized and empowered to make an assignment of the effects of said bank or banks, to any trustee or trustees, receiver or otherwise," with a proviso giving a preference to the billholders. [This section is carried into Thompson & Steger's Revisal, sec. 1829c, but by a typographical error the words, "*and each and every bank in the State,*" are omitted.]

The act of the 16th of February, 1866, is the act to wind up the Bank of Tennessee, and expressly authorizes the bank to make the deed of assignment which was made.

These acts are, it is obvious, incompatible with the provisions of the 30th section of the act of 1860, and necessarily repeal that section, and especially so, if it admits of the construction contended for on the other side, that the right of tender under it exists, notwithstanding the insolvency of the bank, and a general assignment of its effects.

Another error into which the counsel for the defendants and the learned Chancellor seem to have fallen, may be noticed in this connection. They seemed to think that the objection on our part of the statute of limitations was intended

to apply to the right of action of the noteholders against the bank, and they have, in somewhat of a tone of triumph, replied that by sec. 2779 of the Code the provisions of the statute of limitations do not apply to bills or notes put in circulation as money, and they refer to the decisions in *F. & M. Bank* v. *White*, 2 Sneed, 482, as covering the case. But without pausing to consider what effect the continuous insolvency of a bank and the public repudiation of a class of notes may have on persons who take them with notice, it is sufficient to say that whatever may be the effect of time as between the noteholders and the bank, the question is altogether different between the noteholder and a trustee holding property under a trust assignment which, upon its face, expressly repudiates such claims. The title of such a trustee is undoubtedly subject to the ordinary statutes of limitations, and it is for this reason that I have already more than once said, and now again repeat, that Atchison and Duncan having come in by answer, without filing a cross-bill, they have no right to attack the deed of assignment to Watson, and even if the notes are held to be valid they must be left to such further remedy as they may be advised to take, as against the trust assets.

The deed of assignment by the bank to Watson was authorized:

1. By the act of 1865, ch. 55, sec. 2, cited above.

2. By the act of the 16th of February, 1866, to wind up the bank.

3. By the general power inherent in banking corporations.

The act of the 8th of June, 1865, ch. 55, sec. 2, expressly conferred upon the Bank of Tennessee, and all other banks in the State, the power of making a general assignment, if there were any doubt of the right independently of the act. The act provides for a preference in favor of the noteholders, but it is obvious that no creditors other than the noteholders could take exception to the deed for a failure to give this preference; and if the noteholder be, as in this case, secured

otherwise by the right to use the notes in the payment of taxes, and does not complain, the assignment would be good against every other class of creditors. Besides, the act of February 16, 1866, impliedly repeals the proviso in favor of the noteholders so far as the Bank of Tennessee is concerned, and no person has a right to question the validity of this repeal except the noteholder. The assignment in controversy is, therefore, good under the statute, and there is no person now before the court authorized to contest any preference given by it, if the claim preferred be a genuine debt of the bank. Whether the school fund is such a debt I will consider presently.

This court held, in *Hopkins* v. *Gallatin Turnpike Company*, 4 Hum., 403, 410, that the power to make a general deed of assignment for the benefit of creditors, was incident to all corporations. And it is only necessary to refer to Abbot's Digest of the Law of Corporations, p. 43, to see that it has been invariably held by the courts, whenever the question has been raised, that bank corporations have this right. If, now, the 30th section of the act of 1860 has been repealed by the act of February 16, 1866, so far as the Bank of Tennessee is concerned, as it undoubtedly was as to it and all other banks by the act of 1865, chapter 55, but with a proviso giving preference to noteholders, then the deed of assignment to Watson is, except for matter on its face (it not being attacked for actual fraud) *omni exceptione major*.

But were it otherwise, and actually void for fraud (of which there is no pretense), the possession and acts of the trustee under it would be good until set aside in due course of law, and his title would be protected and become perfect under the statute of limitations. *Peacock* v. *Tompkins*, Meigs, 316; *Schroeppel* v. *Corning*, 6 N. Y., 105.

The deed of trust is attacked by the cross-bills of both Cockrill and McKennie for fraud in law in this, that it undertakes to give a preference to the debt due to the common school commissioners. The objection goes upon the ground,

if I understand it (there being some difference in the statements of each bill), that the State had the right to dispose of the school fund as it saw proper, and did vest it in the capital stock of the bank, and that the Board of Common School Commissioners must be considered in the light of a stockholder, not to be secured until the debts are paid. The idea, if I have caught it, seems to have been unnecessarily confused by dropping the School Board, and speaking only of the Common School Fund. If now we keep the two separate, as I think we must do in view of the provisions of the Constitution of 1834, much of the difficulty will disappear.

The Constitution of 1834 provided that the "common school fund, and all the lands and proceeds thereof, dividends, stocks and other property" heretofore or hereinafter appropriated for the use of common schools, "shall remain a perpetual fund, the principal of which shall never be diminished by legislative appropriation. . . . And it shall be the duty of the General Assembly to appoint a Board of Commissioners for such term of time as they may think proper, who shall have the general superintendence of said fund," and who shall make report of the condition of the same from time to time, etc.

The Constitution sets apart the common school fund as a perpetual fund, to be under the superintendence of a constitutional Board of Commissioners. The State was undoubtedly entrusted with the general supervision of the fund and the board, but it will scarcely be contended that it had any more right to trench upon the fund, or interfere with it to its detriment, than the humblest citizen. Its acts as a trustee for the protection of the fund would be valid, its acts, on the contrary, in violation of the constitutional provisions, would be void, and the Board of Commissioners might follow the fund into whosesover hands it might come. This is the rule which would govern ordinary trusts, and it assuredly would not be less rigidly enforced in the case of a constitutional trust.

The third section of the act of January 19, 1838, ch. 107, under which the Bank of Tennessee was chartered, provides that the money belonging to the common school fund "shall be handed over to the President and Directors of the Bank of Tennessee as capital in said bank, and said President and Directors, or a majority of them, shall be authorized and required for and on behalf of the State, and with a pledge of the public faith and credit, to issue to the superintendent aforesaid state stock or certificates of debt, for such sum or sums as may be from time to time paid over by the said superintendent to the President and Directors." The residue of the section speaks of the issue to be made to the superintendent as "certificates of stock," and of the vesting of the fund in stock in said bank. It is the rather loose wording of the entire section which seems to have misled the learned counsel for the defendants. The true nature of the transaction may be easily gathered from the section taking it altogether, when coupled with the first section of the act and the constitutional provision already quoted. The first section of the act commences thus: "That a bank shall be and is hereby established in the name and for the benefit of the State."

The plain intent and obvious meaning are that a bank is created exclusively belonging to the State, the whole of the stock of which shall be owned by the State; but as part of the capital stock the superintendent of the common school fund, as its constitutional custodian, is directed to pay the fund to the bank, receiving therefor, not the certificates of the capital stock of said bank, as erroneously supposed by the learned counsel of defendants, but, in the plainest and most unambiguous language, "State stock or certificates of debt," to be issued by the President and Directors of the bank, "for and on behalf of the State," and as its agents, "and with a pledge of the public faith and credit."

The legal effect of this is as plain as the language used. The State takes the fund and invests it, as its own, in the

capital stock of the bank, and the bank becomes debtor of the Board of Commissioners, backed by the State for the amount, which should have been evidenced, whether it was or not, by a formal instrument described as "state stock or certificates of debt." There is not the least pretense for saying that the Board of Commissioners of the common school fund was ever a stockholder in said bank. It was a creditor of the bank and the State, according to the clear intent of the Legislature, and had an undoubted right to be secured out of the property of the bank as has been done. And even if there were a doubt as to the intent, the fact is patent that the fund went into the bank, of which the State was the sole stockholder, and the board would have a right to follow it.

All persons who dealt with the bank did so with the fact patent upon the face of the bank charter, and with full knowledge of the constitutional provisions. The Board of Common School Commissioners, as a constitutional body, were and are entitled to look both to the bank and the State for this sacred fund, and it was the duty of the bank, the State and the General Assembly to see that the fund was secured as has been done.

In this view there is no ground for attacking the deed of assignment as fraudulent in law. If, as I have already contended, the 30th section of the act of 1860 was repealed by the act of February 16, 1866, authorizing the execution of this deed, then no one has a right to except to the preference given by the deed to the school fund. And even if that section is not thus repealed, there are no billholders now before the court in a condition to attack the deed on this score, the defendants, Atchison and Duncan, even if their notes be held valid, not having filed any cross-bill for the purpose.

There are no billholders before the court to set up a preference under the act of 1860, and were such a contest made, in the case supposed, it might safely be urged that a

debt created by the taking of a fund, made perpetual by the Constitution of 1834, and charged on the bank by the very charter of its incorporation, stands upon higher ground than the claim of a noteholder, whose priority was only given by an act in the year 1860, containing general police regulations.relating to all banks.

The only remaining question is the right of the State to be subrogated to the rights of the holders of.the old issue of the bank under the trust, and this I consider too plain for argument. If the whole stock of the bank had been owned by a private individual, and he had seen proper to give his personal guaranty for the redemption of the paper, and had, on that guaranty, redeemed it, he would, undoubtedly, stand in the shoes of the noteholders as against the bank as a corporation; or, to put the case more convincingly, if one out of many stockholders had given such a guaranty, the right of subrogation would be beyond dispute. The State is certainly entitled, as I have before shown, to all the privileges of an individual in like circumstances.

The State, as a stockholder (even as the sole stockholder), bears the same relation to the bank as any other stockholder. *Briscoe* v. *Bank of Kentucky*, 11 Pet., 257; *United States* v. *Bank of Georgia*, 9 Wheat., 904.

In conclusion, let me remark, I have confined my argument to the discussion of the facts and the legal principles which must control the decision upon them. I have not undertaken to discuss the abstract right or wrong of any question growing out of the position of the parties, or otherwise. These are discussions foreign to the legal forum, and cannot possibly aid us in our conclusion. What the State ought to do is not for the courts to decide. They can only declare the law, leaving the parties to such other proceedings before the political department of the government as they may be justly entitled to, with the hope and the belief that a great state will not leave any of its citizens without proper and prompt redress.

State, and Watson, Trustee, *v.* Bank of Tennessee.

ARGUMENT OF J. B. HEISKELL, ATTORNEY GENERAL.

The character of a concluding argument in a great case, where so much of the ground has been occupied by counsel of the ability of my associates in this case, and much of the argument of the adverse counsel has had their attentive consideration, is, necessarily, somewhat fragmentary and desultory. It is more so in the present case, that I have endeavored not to occupy, further than I could avoid, the ground covered by my associates, except where I could see an opportunity further to enforce their views, or to present new views on points not fully discussed, or where the last argument of the counsel for the depositors is to meet its only reply, unless so far as it has been anticipated. This is my apology, if this argument shall seem disjointed and ill-arranged.

### CHARTER AND REDUCTION OF THE CAPITAL.

The Bank of Tennessee was chartered in 1838, with a capital of $5,000,000. By reference to a collection of bank reports which I have before me, it appears that in the year 1839 William Nichol, then president of the bank, reported to the Legislature that one million of dollars of the bonds issued for a portion of the capital stock had been disposed of, and that the proceeds were then in use as capital of the bank, and that the residue of the bonds, one thousand five hundred in number ($1,500,000), were remaining in bank undisposed of.

By act of that session, p. 157, ch. 75, entitled "An act to provide for a reduction of the State debt," the president of the bank was directed to return the fifteen hundred bonds to the Secretary of State, and the Governor was directed to cancel and destroy them. The act further repealed so much of the act to charter the bank as authorizes the Governor to issue bonds for that purpose. These bonds were accord-

ingly destroyed, and the capital stock was thus by public act reduced from $5,000,000 to $3,500,000, and upon this basis the bank ever after did business.

This act, I am informed, was drawn by the Hon. George W. Jones, then and ever since distinguished in the State for devotion to the public welfare and for his public services.

A reference to the bank reports shows that from this time forth the capital stock fluctuated—sometimes increased by profits, sometimes diminished by losses, but remaining in approximation to the sum thus fixed. It was, really, if the school fund is to be regarded as stock, considerably in excess of that sum, at one time amounting to $4,128,812.24. This was when the bank had received the stock in the Union and Planters Bank, and the school fund deposited with them. I append a statement found in a report of the president of the bank, of date February 27, 1858, showing the capital, etc., from 1838 to 1857. It is thus clearly shown that the stockholders in this bank, by solemn act, equally valid and public, with the original act of subscription, gave notice of this withdrawal of the subscription to the amount of $1,500,000.

But it is said that a subscriber cannot withdraw his subscription, and the analogy by which this is supposed to be proved is with chartered banks. This analogy is inexact. There the freedom of the parties to the contract is hampered by the charter of the bank, which makes the capital stock of the bank a fixed thing. But in regard to an individual, under a tree system of banking, how would the law be? Suppose the law to be that individual liability, as the rule, was abrogated, and people were left free to bank upon a pledged capital, but no restrictions were placed upon the enlargement or diminution of that capital from time to time. By what principle could a court determine, that if A opened a bank with $500,000 capital, which he afterwards publicly reduced one-half, B dealing with him after the re-

State, and Watson, Trustee v. Bank of Tennessee.

duction, and with notice of it, could say that he was not affected by the reduction? It is too plain for argument. But the very principle has been held in the Supreme Court of the United States in *Woodruff* v. *Trapnall*, 10 How., 26, where the court say that a repeal of a law pledging the State to take certain bank notes in payment of taxes is effectual as to after issued notes, though not as to those previously issued.

NEW ISSUE—EFFECT OF THE WAR—STATUS OF TENNESSEE.

My conclusions in regard to the status of Tennessee at the close of the war, may be modified by a strong political feeling, but they reach the same result that my learned friend Mr. Cooper has attained, and I feel they cannot be far wrong. I leave out of view my belief as to the right of the Federal Government to prosecute a war for the coercion of states as not pertinent to this question. I leave out of view any question of the *right* of Congress to dictate to states, with any authority but that of usurped power; but I admit that they have the right to judge of the qualification and admission of their own members, and so that their *jurisdiction* of that question is rightful, though it may have been exercised without regard to duty, or consistency, or the rights of states. But I deny that any right exists in Congress or the United States Government to control our internal affairs, or to assume to say that our Constitution is valid or void. They might, in the exercise of *rightful jurisdiction* over the question of admitting Congressmen, act rightfully or wrongfully—as a court, in the exercise of a rightful jurisdiction, may make erroneous decisions. Their jurisdiction is unquestioned. (To obtain a clear idea of the distinction of rightful jurisdiction and its rightful exercise, see *Decatur* v. *Paulding*, 14 Pet., 599, and cases there cited.) But further than this, the acts of Tennessee stand or fall upon its own sovereign right, over which Congress has no rightful jurisdiction, more than the Queen and

Parliament of Great Britain. I derive nothing, therefore, in my deductions from the ratification of the Congress, or the assumed protectorate of the United States over the states. Except so far as the United States is the agency of the states, to transact that part of their joint business which has been delegated, I ignore her right altogether. Where the great constitutional compact comes in, I recognize her rightful authority. Beyond that I recognize the mailed hand of power, to which we submit in silence when compelled, but to which we yield no jot or title of allegiance or acknowledgment.

But with all that, I am bound, as a lawyer and as a man, to acknowledge certain principles as true. When two parties in a state submit the issues of political strife to the arbitrament of arms, the result of that appeal must determine something. It is needless to look back to discuss theoretical right. The race is not always to the swift, or the battle to the strong. The question is, who shall prevail—who has prevailed? In 1861 Tennessee, with her then state government on the one side, and on the other a party aided by power from states beyond her borders, made the mighty issue. Whatever she might have done, aside from this inference, the right or wrong of which does not enter into this problem, the result was that the then acting state government was overthrown by revolution, and the new government established by arms and upheld by power. We acknowledge its establishment, and our inability to overturn it, and submit to its authority—not, perhaps, as rightful or just, but as an existing fact. "*Un fait accompli.*" That revolutionary and successful government of 1865 then became the Government of Tennessee, and that former government of 1861 perished. From the time the issue was tendered and accepted, the revolutionists of Tennessee, with aid from abroad, denied the right of the then government. On that issue they fought, and they succeeded in driving the government of 1861 from the State. As the successful

revolutionists in the civil war, they have, by the universal law of nations and of states, certain rights, one of which is to say what acts of the uprooted government are valid, and what are void. In other words, the right to say that none of the acts of the government overthrown are acts of a lawful government, and so are all invalid, which, of course, involves the right to ratify what they choose. This is decided in *Ingram* v. *Cocke,* 1 Tenn., 27.

I agree that modern usage has recommended to the successful party in every revolutionary struggle to recognize the acts of governments *de facto,* though afterwards overturned; but this usage has always appealed to the policy of the successful government, and no author denies that the power exists to repudiate every act of the unsuccessful government from the time the issue of war arose. When, therefore, by aid from abroad, the Government of Tennessee was overthrown, though modern usage called upon the successful revolutionists in the State to recognize and respect the acts of the late government, it called upon them not with the force of inhibition, but with the example of practice and of policy, and it admitted the unquestioned validity of any act of power repudiating the contracts of the late government. To test this to the satisfaction of any one, suppose that the government of 1865, after its establishment, had been overthrown by the government of 1861, would that government have been bound by any law but that of moderation and self-denial to pay the fraudulent debts of the years 1865 and 1866, and to admit the validity of the contracts of that government? They would have had the right to say it had never been a government, and so could not bind the people. The same result must be admitted, though it was their bull that gored our ox.

It has been said tnat the Convention of 1865 was a mob. All the first steps in the organization of a new government are the acts of mobs. The convention of 1865, by adventitious assistance, imposed their government on an unwil-

ling majority, and organized and kept in force all the para-phernalia of executive and legislative authority—of courts, and offices, and laws—and we to-day enforce statutes passed by their authority. They assumed, with the power I have already admitted as part of the law by which civil wars are regulated, to define what acts of the late government were void, and to make that declaration of perpetual obligation, they put it into the Constitution of 1865. The Legislature olso acted in virtue of the organic act, and declared the same by statute. Such act not being in contravention of any constitutional restriction anywhere, was valid until re-pealed, and irrepealable until the Constitution was changed. When the Constitution of 1870 was made, it became re-pealable, but it remained in force, and remains still unre-pealed upon the statute book. It is said this is a mere reg-ulation affecting the bank and the assignment. This an-swers the purpose as well as any other statute. If it was then valid, it authorized the assignment on the terms of excluding the contracts of the bank after the 6th of May, 1861, and its subsequent issues. And the assignment then being lawful, with that exclusion, remains valid. Without any such express stipulation in the deed, the act itself would have the effect of that stipulation—being the authority un-der which the act was done, and the actual declaration of the trust. The repeal, then, of the prohibitory clause in the Constitution does not affect this assigument, or the stat-ute under which it was made. It only places it within the legislative control.

In regard to Congress, the other states, by their repre-sentatives in Congress, refused to accede to our demand for representation there until we had done certain things. We may be regarded as treating with Congress as the represent-ative of the other states for the readmission of our mem-bers; and if, for the purpose of obtaining the supposed advantage of a vote in that great council of the Federal States, we chose, or were obliged, to submit to conditions,

good faith requires that we shall fairly adhere to the terms and recognize them as binding. Nations and states are bound to treaties extorted by arms, until they can resist by arms. I recognize, then, in these transactions, only the acts of independent and sovereign states, and deduce from them only the results which the civilized nations of the world would fully recognize in regard to themselves, and in regard to wars purely internecine.

### CONSTITUTION OF THE UNITED STATES—CONTRACTS.

Into all this, the Constitution of the United States, affecting contracts, does not enter. Suppose a suit was brought between two parties in a municipal corporation to determine which is the proper authority, and pending the suit each party claims to act and does act for the municipality, when the suit comes to be decided, and this court comes to hold that one party was the .rightful party, and that the others had no claim of right to bind the corporation, does it impair the obligation of contracts? No more does it impair the obligation of contracts than it does when it declares that my attorney in fact, who has made a contract *ultra vires*, has not bound me. Now, a civil war is but a grander *lis*, a wager of battle. When this is decided, and one of the parties to it declares that the other was never the rightful government, it is not the .impairing of contracts which happens, but it is a mere declaration of the result—that the overthrown government had no authority to make the contract.

But it is said that the State must take all the contracts of the Bank of Tennessee or none. I deny that any such condition is imposed by the laws of nations upon states. When the United States sued in the courts of Great Britain for the funds of the Confederate States in the hands of British subjects or residents, did Great Britain or her courts stop to ask whether the United States intended to pay all the debts of the Confederate States? By no means. Did she

even require her to apply any portion of the funds to pay the British creditors of the Confederate Government? Not at all. This is a precedent of the highest authority for our guidance here. The present state government can recover the debts of the late state government without subjecting herself to any conditions whatever. So she can claim the benefit of any contracts of the bank as the fiscal agent of the State, though made without authority, and is not bound at all by other acts done without authority. If a trespasser makes rails on my land out of my timber, I may keep the rails, but surely I am not bound to pay his hands. I take the benefit of his wrongful act, but do not render myself liable for his act by which the benefit was accomplished.

The following language is held by the court in *United States* v. *McRae*, 8 Law Rep., 84, Eq.: "The moneys, goods and treasure, which were at the outbreak the public property of the plaintiff, and which were seized by the rebels, still contiaued their moneys, goods and treasure, their rights of property and rights of possession being nowise divested or defeated by the wrongful seizure of them. And if, at the end of the rebellion, any of such moneys, goods or treasure, or the produce thereof, capable of being identified or earmarked, could be traced into the possession of any person, the rightful owners would be entitled to apply to the proper tribunal having jurisdiction over such person to award restitution. If such person were an accomplice, a *particeps criminis*, or had received the property with full notice of the title of the rightful owner, the latter would be entitled to an order for restitution *simpliciter*. If he had received it as an innocent factor, banker, or other agent, the right to restitution would be, or might be, of a more qualified or limited kind. It would be, or might be, subject to any claim or lien which in his character of innocent bailee without notice he might have." The rights would depend upon the law of bailment, etc.

The case of *White* v. *Texas*, 7 Wal., 700, cited by the

counsel for the depositors, is not one of a contract repudiated by the government of the State, but one in which a defendant was seeking to screen himself from liability, because the contract which he made was with the government subsequently overturned, and it clearly establishes the right of a state to claim the benefits of the act of a government since overthrown. But it will hardly be insisted that every expenditure of that uprooted government is of binding force upon the present State of Texas.

It is said the policy of courts is to restrict the effects of war within the narrowest limits possible. This is not denied; but the disposition of courts is one thing, and their power, theoretically at least, quite a different one. They may and ought to have the disposition to restrict, but it is not for them to fix the limit, when the political power has set a boundary for them.

The principle that there can be no interregnum is true in one sense. It is utterly misleading in the sense in which the counsel for the depositors uses it. It is true courts and laws recognize *de facto* governments, but it is not true at all that they are bound by the positive law of nations to abide by everything they do. It is a part of the law of England that a man, by adhering to a king *de facto*, does not incur the penalty of treason. But does that statute of Henry VIII go any further? It would be rather a more liberal construction than the law authorizes, to hold that by reason of this statute a nation was bound by any contract which a government established for a day might make.

But it is said the bank is a mere trading corporation, and not the State. I by no means admit this in the broad sense in which it is stated. But I do admit that the bank is a corporation, just to the extent that it is subject to suit, and it may make such contracts as the State has, by its charter, directed, or as it may by statute direct. Otherwise than for the purpose of suit, and of holding property, it is not

separate from the State. It is a mere *state agency*, controlled by the State; its acts directed by the State; every act responds to the pulses of the State itself. Whenever the State is overthrown, the acts of the State are overthrown, and the acts of this agency, under the direction of the uprooted party in the State, go with the party. It was authorized by that party, and by that alone. If they prevail, the acts are valid; if they sink, the acts, as legal, binding acts, sink under the wave that submerges their author. The acts of *their* agent are not the acts of the lawful state bank; the contract is not hers. They may be the acts of the bank of that uprooted government, but they are not the acts of the bank of that State Government which now stands upon the ruins of the old. This is what the schedule of 1865 declares. This is what the act of 1866 (Feb. 16), ch. 28, sec. 5, carries into the assignment.

The Bank of Tennessee is as much the creature and agent of the State as if it was the treasury itself; as much so as the fiscus of the German States, where the treasury is what we would call a corporation, subject to suit. Of course, such an ideal existence must have its legal existence with the government of which it is part, and be subject to its fate. It is supposed that this argument is like that which was urged against the bank when it was first chartered, that it was not a valid corporation, because it had no individuals named as corporators. In truth, the view I take and that are antipodal. I look exclusively at the substance that stuck in the bark. I say the Legislature might declare the *treasury safe* subject to suit, or the treasury, and it would be so. As to the bank, it sets apart a particular fund, and allows that fund to be reached by a suit in a particular form against the bank. But the suit is, in substance, against that particular fund of the State, and so far a suit against the State, in substance, but not in form. It is clothed with certain incidents appertaining to individuals by the law of its creation, but it has only a formal existence separate from

the State. Subject the treasury to suit, and it will be separate to the same extent, nearly.

It is just on this point that the acts of the bank and those of individuals differ. Natural persons may, in a state of war, make contracts among themselves, which are binding and obligatory, without reference to who prevails in the contest, and such contracts cannot be disturbed; but where the validity of the obligation depends upon the power to make it, and the power to make it depends upon which party the war decides to be the government, the principle to be applied differs *toto cœlo*. Here the case of *White* v. *The State of Georgia* is distinguished from the present case. That was a contract before the war, and valid. Of course the war could not affect it, and the obligation not depending on the result of the war, the State could not pass any law to impair it after the war was over. The distinction is between impairing the obligation of a contract, and declaring a contract void for want of authority to make it.

Take the instance of the Franklin government, and suppose it to have seized upon the trustee of one of the counties it had assumed to control, and had, through him, attempted to force the county in contracts, would North Carolina have been bound to respect such contracts, or was it at liberty to say such are not the contracts of the county, but only of your agents therein, and they are not binding.

### WAR BONDS.

The war bonds are, of course, void. under the amended Constitution of the United States.

But it is said that the depositors are innocent, and not subject to the forfeiture of the Constitution of the United States. The policy of this repudiation by the requirement of the United States is not a matter of punishment; of *delictus;* but simply an exercise of the power in the successful party to disown the acts of the government which has been overthrown. No man—however little he sympathized

with the Confederates States, or how reluctant soever he might be to buy a bond—could recover on the bond, or the consideration he gave for it.    That does not reach or affect the basis of the refusal.    The prohibition is universal and indiscriminate.    The prohibitions of a statute cannot be applied by the courts to A, and turned aside from B, when both are equally within its terms, because one is obnoxious to its policy, and the other is supposed to have acted from motives not within its policy.

ASSIGNMENT ACT OF 1866 LEGISLATIVE, NOT JUDICIAL.

The counsel for the bank, Mr. Trimble, says, the acts of 1866, authorizing the assignment, is not legislative, but judicial.    Just as much judicial as the preference of one creditor over another by an embarrassed debtor.    If all acts must be judicial or legislative, now which does the debtor perform?    I leave that to the counsel for the bank to solve.

STATE NOT SUBJECT TO SUIT.

The suit as against the State cannot be maintained.    The rule that a state is not subject to suit without its own consent is laid down by Mr. Kent, 1 Com., 316 n, citing *Michigan State Bank* v. *Hastings,* Walker's Ch. (Mich.), 9, where it is said: "This is an attribute of sovereignty and universal law."    1 Kent, 316 n.; Puffendorf's Law of Nature and Nations, b. 8, ch. 10; Locke on Government, part 2, sec. 205; Vattel b. 1, ch. 4, secs. 49, 50; 1 Bl. Com., 243.

No sovereign state is liable to be sued without her consent. *Briscoe* v. *Bank of Com. of Kentucky,* 11 Pet., 321, 324, 344; *Darrington* v. *State Bank of Alabama,* 13 How., 17; *Hill* v. *United States,* 9 How., 389; *Rhode Island* v. *Massachusetts,* 12 Pet., 721; *Cohens* v. *Virginia,* 6 Wheat., 378; *United States* v. *The Planters' Bank,* 9 Wheat., 904.

The principle is so simple that it is wonderful that any one should mistake it.    We have a government with defined powers, legislative, judicial, executive.    How is the juris-

diction of each defined. 1st. By the Constitution. 2d. By statute. The Constitution declares that the judicial power of the State shall be vested in the Supreme Court, and such circuit, chancery and other inferior courts as the Legislature may from time to time ordain and establish. There is nothing here defining the jurisdiction of the Chancery Court.

Code, sec. 4279: "The Chancery Court shall continue to have all the powers, privileges and jurisdiction properly and rightfully incident to a court of equity by existing laws."

Now by what existing law, independent of sec. 2806 of the Code, allowing suit directly against the State, was any such suit part of the jurisdiction incident to a Chancery Court? Certainly no statute can be produced, nor can any principle of the common chancery law be found, for the English law is unquestionable that no suit lay against the crown except by express consent. The petition of right was the only mode of suing the Crown. The consent must be given. Of course, with that restriction, the law is so here, and so our cases where the State has been sued and relief granted against it, except those arising under the Code, are all cases of this sort. But this admits that the suit is not brought and does not lie of common right.

McLean, J., in *Briscoe* v. *Bank of Com. of Kentucky*, 11 Pet., 321, says: "No sovereign state is liable to be sued without her consent." In the same case, quoting from *United States* v. *The Planters' Bank of Georgia*, 9 Wheat., 904: "Many of the states of the Union who have an interest in banks are not suable even in their own courts."

Thompson, J., argues the case in a concurring opinion on the assumption that a state is not subject to suit; and Story, J., in a dissenting opinion, says: "It is admitted that he could not have any redress because the state is not suable."

Chief Justice Marshall says: "The universally received opinion is that no suit can be commenced or prosecuted

against the United States; that the Judiciary act does not authorize such suit." *Cohens* v. *Virginia,* 6 Wheat., 411, 412. In *United States* v. *Clark,* 8 Pet., 444, he says: "As the United States are not suable of common right, the party who institutes such suit must bring his case within the authority of some act of Congress or the court cannot exercise jurisdiction over it." The counsel for the United States contends that George F. Clark has not by his petition made a case in which the United States have consented to be sued, and consequently, that the court of the district has no jurisdiction.

In *Kendall* v. *United States,* 12 Pet., 611, Thompson, J., says: "The United States could not, of course, be sued, or the claims in any way enforced against the United States without their consent obtained through an act of Congress, etc."

Catron, J., in *Decatur* v. *Paulding,* 14 Pet., 520, in a dissenting opinion, argues this question with much force, but I do not quote it, because, being a dissent, it may be regarded as not being authority, but he certainly points out the evils most clearly.

It is well settled that no action of any kind can be sustained against the government itself for any supposed debt unless by its own consent under some special statute allowing it. *Reeside* v. *Walker,* 11 How., 290, citing *Briscoe* v. *Bank of Commonwealth of Kentucky,* 11 Pet., 321; 4 How., 288; 9 How., 389.

In *Gaines* v. *Thompson,* 7 Wall., 351, the court say: "It is clear she had no other legal remedy. The United States could not be sued. The secretary could not be sued in any other form of action than mandamus."

It is said that Vattel has declared it to be the practice of all enlightened governments to allow their citizens a right of suit, and that Mr. Story applauds the doctrine; and this is true, but Mr. Story does it in lamenting that the United States has failed to make such a provision, and so was an

exception to this practice, and not to show, as the counsel does, that the courts could do it without legislative aid. Story's Com., sec. 1672, cited in Curtis' Com., sec. 57, n.

### CASES IN TENNESSEE.

In the case of *Willams* v. *The Register of West Tennessee*, Cooke, 217, 218, 219—a case argued by Haywood, Whiteside and Cooke for plaintiff, and by Balch for defendant— Overton, Judge, says: "This part of the Constitution as to compelling the State to do an act, which in morality and justice it ought to perform, must be viewed as a dead letter until some mode of proceeding shall be pointed out by the Legislature." As yet no method has been pointed out.

"The obligation contracted by the State     *     *     * we have no doubt the State is morally bound to comply with; but does the Constitution or the nature of our government furnish the means to the judicial department to compel an observance of this contract in issuing a grant, when the State has expressly said it will not issue one. The State has, by its act of 1809, prohibited its officers from issuing a grant or grants on this warrant. Is it proper that the judicial department should order these officers to do an act that is forbidden?     *     *     * Political considerations may interfere to prevent a state temporarily from discharging a moral obligation.     *     *     * The court cannot but perceive, that to grant a mandamus in this case, would in effect sanction the idea that the State may be sued. *     *     *     * On general principles, the idea of an individual citizen or subject compelling the sovereign to do an act is repugnant to every idea of sovereignty. It is true the Constitution has said the Legislature shall have power to provide a remedy. This, however, they have not done; and until it is done, it is not in the power of the court to do that to which the Legislature are competent. Suppose the State indebted to an individual, this court

could not grant a mandamus compelling the treasurer to pay it."

"There is an obligation, morally speaking, but it is an imperfect one, and the Legislature has not thought it proper to give to the judicial department any power or means to compel the performance of it. Until the power shall be communicated, there can be legal power whatever vested. For the purpose of administering justice, the Constitution has vested in the different departments certain powers. Each department has its province marked out, within which, as within their respective orbits, each must move without collision; then the Constitution will be preserved from destruction. An assumption of power by one branch of the government, which properly belongs to another, weakens the main pillar on which it rests. By repeated acts of assumption, the fabric totters, falls; and with it all that is valuable. (See, to the same effect, *Rhode Island* v. *Massachusetts*, 12 Pet., 721, 722.)    *    *    *    *    It is the province of the judicial department to determine between man and man; and not between the State and its citizens, where there is no vested perfect right to a grant, legal or equitable.    *    *    *    With the view we now possess of this subject, the act of 1809 seems to be void on account of its repugnance to the provisions of the Constitution, but this court cannot perceive that it possesses any physical power to compel the State to issue a grant."

The case of the *Justices of Cannon County* v. *Hoodenpyle*, 7 Hum., 146, is a very instructive one on the subject of the power and jurisdiction of courts over public bodies, for which reason I quote the words of the opinion. That was an application for a mandamus to compel a County Court to levy a tax: "The power is given—granted to the justices, and not the duty imposed; within their limited sphere they have a discretion to exercise of the same character with that of the Legislature itself. They will inquire into the state of

the debts of the county public, and into the means of the same public. It is their moral and political duty so to exercise this power as to preserve good faith, and to maintain the public credit in a healthful condition. If they omit to do this, the corporation must be sought for among their constituency in enlightened and honest public sentiment. There is no principle upon which the judicial department can compel the exercise of this subordinate taxing power, which would not justify the same mandatory supervision over the taxing power of the Legislature itself. *No one would claim this for the courts.* They have no more power to assess, or command the assessment of taxes, than the Legislature has to adjudge or to command the adjudication of lawsuits. And while the courts, as is their duty, shall firmly maintain themselves with reference to the other departments in the exclusive exercise of the judicial power, it becomes them to avoid encroaching upon the other departments of the government in the discretionary exercise of political power. It would be a great evil, deeply to be deplored, if the Legislature should at any time fail to sustain the public faith and credit, by fully discharging the debts of the State, but that evil cannot be averted by the courts awarding against them a peremptory mandamus, to assess taxes adequate to the payment of the public debt; because, to attempt this would be going beyond the sphere in which judicial power is properly exercised. It is an evil of less magnitude, but still a great evil, for a county to omit to provide for the payment of its debts; but that evil cannot be corrected by compulsory steps on the part of the courts to enforce assessment of taxes. If, owing to the pressure of the times, the general embarrassment of the community, or the like cause, influencing the exercise of the taxing power by the County Court, they should abate the county assessment below the limits of their power, every creditor, for whatever sum, might, upon the principle upon which this mandamus was issued, file an application in the Circuit Court, ascertain his

debt, and obtain his order on the County Court to levy a tax and pay his debt."

"But it is argued very strenuously that these relators are entitled to some remedy, and that there is no other remedy except that furnished by mandamus. Many grievous wrongs may be imagined as possible to result from the exercise or non-exercise of political power, in the legislative and executive departments, which cannot find a remedy in the courts of justice."

The foregoing cases contain an answer to the question raised upon the clause in the Constitution, that the courts shall be open, etc. That clause is found in immediate connection with the power conferred on the Legislature to provide for suits against the State. Of course this is conclusive that it is not in regard to suits against the State that the courts are imperatively required to be open, but only as to the ordinary subjects of litigation between citizen and citizen.

This is clearly taught in the case of *Devine* v. *Harvey*, 7 T. B. Monroe, 440, hereinafter quoted, and there, of a Constitution which makes it imperative on the Legislature to provide for suits against the State. In our Constitution, the keeping the courts open is imperative, but the jurisdiction over the State is optional with the Legislature. It is impossible that the Convention intended to include the optional in the imperative.

The case of *Lowry* v. *Francis*, 2 Yer., 536, is a recognition of the want of jurisdiction over the State or its officers. The court says: "It is useless to examine with minuteness the question of jurisdiction, as it is the object of the State and the parties interested generally to have the opinion of the court upon the power of the Legislature to sell the school lands. This was requested at our hands by *resolution at the last session*, which we will comply with in this opinion."

The case of *The School Commissioners* v. *The State*, 7

Hum., 115, is also a case in which the Legislature gave the right to sue to the commissioners, and the court held that the jurisdiction being conferred, they would proceed according to law and give "appropriate damages." They disobey a statute which attempts to change the rule of damages, but they rely upon the fact that the statute giving the jurisdiction is not repealed.

The case of *A. R. Crozier, Compt.*, v. *The State ex rel.*, is a case, brought amicably, to determine the question what was the proper compensation for a certain judge. It was placed upon its merits purely by the Attorney-General, and decided without any question of jurisdiction being raised.

The only other case found, in which the State is a party defendant, is *The State* v. *Crutchfield*, 3 Head, 118, brought under the act of 1855, Code, 2807, which, of course, can throw no light on this question.

In *Fry* v. *Britton*, 2 Heis., 606, 609, this court held that a suit brought to enjoin the State by service on the District Attorney and sheriff was a nullity, both on the ground that the State could not be sued, and on the ground that the suit was not in proper form.

In *Devine* v. *Harvey*, 7 T. B. Monroe, (Ky.) 440, the court says: "It seems to be conceded on all hands that the State cannot be made a party defendant, and is not suable in her own courts."

Although the Constitution has declared that "the General Assembly *shall* direct by law in what manner and in what courts suits may be brought against the commonwealth;" yet that body never complied with this direction, but has hitherto kept in their power the granting of justice to the creditors of the State on petition. This voluntary grant of the State to individuals is the only judgment and execution to which the State is subject. Whatever then, the claims of Devine may be against the State, and however clearly they may be acknowledged, the State cannot become a garnishee, and we cannot suppose that this act granting juris-

diction to the Chancellor was intended to make the State suable.', (The statute applied to all "choses in action belonging to any debtor.")

"Nor do we conceive that the Auditor and Treasurer are proper parties to the controversy, or that they can be used as a substitute for the State. "They are not officers appointed to defend, etc.   *   *   *   As the State is not suable, and the Auditor and Treasurer are not proper parties in lieu of the State, it remains to inquire whether *   *   *   the Chancellor ought or ought not to compel Devine to transfer the claim;" and they held against this, though they held that it was such a claim as Devine might compel the Auditor and Treasurer to pay, there having been a specific appropriation by law to pay him that money, bringing the case within a class that I will discuss further on.

In Seymour v. Milford & Ch. T. Co., 10 Ohio, the court say: "The State as such cannot be subjected to an action at the suit of one its citizens, and of course its property cannot be subjected to an execution, for there can be no execution unless there is first an action and a judgment. But if the State becomes interested as a stockholder in a corporation, such interest will not protect the corporation from suit, nor will it protect the property of the corporation from execution. But the State may lend its aid to a corporation, under such laws, and under such circumstances, that its interests in the corporation shall not be subject to the ordinary process of execution."

This case is also valuable as defining clearly the extent to which a state is liable to suit as a corporation, and serves to correct some less accurate statements in other decisions on this subject.

Curran v. The State of Arkansas is not of any avail as to the right to sue the State. The jurisdiction was gained under the Constitution of the State, which gave the right to sue the State as an inalienable right of the citizen. Of

course it did not stand upon any principle akin to the general law on the subject of the right to sue. When jurisdiction was obtained, and a question arose in the state courts which involved the Constitution of the United States, a writ of error lay to the Supreme Court, and its jurisdiction followed of course.

Foreign sovereigns are not liable to suits in the courts of this country.

And this is the universal principle. *DeHuber* v. *Queen of Portugal*, 7 Eng. Law and Eq., 340, citing *Duke of Brunswick* v. *King of Hanover*, then recently decided in the House of Lords, for the proposition, that an action cannot be maintained in any English court against a foreign potentate for anything done or omitted to be done by him in his public capacity as representative of the nation of which he is head, and that no English court has jurisdiction to entertain any complaint against him in that capacity, p. 350. This is precisely the reverse of the position for which the case was cited by my learned friend, (Mr. Humphreys.) This case is decided in 6 Beav., 1, by the Master of Rolls; and reported 13 Law J. Rep., (N. S.) Chanc., 107, either on the same hearing or a subsequent one before the Lord Chancellor probably, and finally in 2 House of Lords Cas., 1. See also, to the same point, *Nabob of the Carnatic* v. *East India Co.*, 1 Ves. Jr., 371, 387; s. c. 2 Ves. Jr., 56, 60; s. c. 4 Brown, C. C. 180; s. c. 3 Brown, C. C. 292, 310.

This matter stands upon a different principle entirely from that on which a sovereign is exempt in his own court. One is upon the law of nations, and the principle that it would be impossible to maintain friendly relations between nations, each of which was claiming, without consent to adjudge in its courts claims against the other. The power of the Supreme Court of the United States, as the arbiter of states, has proved so odious that a constitutional amendment prohibited it. It would be much more so with independent states.

It is true a foreign government may come into the courts of this country and sue. To grant such relief, is a duty which each nation owes, in comity, to every other towards which it maintains friendly relations. But it would certainly be most unwise for a nation to open its courts to the claims of another nation upon its own citizens, or others residing or sojourning within its borders, without making such rules and regulations as would protect the defendants from oppressive suits. Therefore every court, in allowing such suits to be brought, has required as a condition to granting any relief, that the foreign government shall submit itself to its jurisdiction, so that justice may be done fully. But see how fully the principle of exemption from suit is recognized in that very case. In the case of the *Colombian Government* v. *Rothschilds,* 1 Simons, 94, the court refused to take the jurisdiction until some person subject to the jurisdiction should be named who could be served with process, and against whom a judgment could be rendered; a strong recognition of itself of the rule that the nation was not subject to a cross suit, and so must put some one forward who was subject. See also the later cases: *Smith* v. *Weguelin,* 8 Law Rep., 198; *Gladstone* v. *Musurus Bey,* 1 H. & M., 495; *United States . Prioleau,* 2 H. & M., 559; and *Gladstone* v. *Ottoman Bank,* 1 H. & M., 505.

In the earlier cases, such suits were only entertained upon an express undertaking to submit to cross-bill and cross relief, putting the case on the foot of voluntary submission. But when this came to be perfectly understood among the nations, the courts dropped the form of the express agreement, and said it might be implied. Here then we have the true foundation of this practice in the principle of exemption.

But in regard to the power of the courts over their own government, the very idea of this agency assuming to control not only its co-ordinate branches, declared by the Constitution to be separate and independent, but to assume to

control the State itself, the grand aggregate is for the creature to assume to control its creator.

The organization of courts is a matter of positive law; their jurisdiction is defined by law, and when that jurisdiction is not conferred it does not exist.

The interference in favor of a foreign state being optional, and a matter of comity with the State, they ought to make it a condition of their action, that they be placed in a condition to do complete justice, and therefore they do hold that they will only take jurisdiction where they can do complete and full justice. To render a decree in favor of a foreign government for its claim, and remit the citizen to a petition to that foreign government which had denied him the defense, would be the very Quixotism of comity.

But in regard to the right of the State to sue her citizens or officers, it is an absolute right fixed by law. One of the purposes for which courts were instituted was to enforce the policy of the State in regard to her revenue. But the same state, as part of the same system of policy, has reserved to herself the right to be exempt from having her liabilitities declared by the same judicial agencies, and reserved to the legislative council, or her accounting officers, the settlement of claims against herself.

The Constitution guarantees to the people of the State the right to do these things in such manner as the Legislature may deem proper. It is a matter of state policy whether she is subject to suit or not, and the State having adopted the policy of standing on her natural exemption, and designated no means by which she may be sued, the result is that she cannot be. Nor can the courts, in administering the absolute and statutory right of the State to sue, assume to place any conditions upon the exercise of the functions which the Constitution and laws have assigned to them, or place their action or non-action on any basis but that of obsolute obligation.

The court is referred on this point to *The Justices of Cannon* v. *Hoodenpyle*, 7 Hum., 146, 147.

The complaint is made of the want of a remedy. On this point, I quote the last sentence of the opinion in 7 Hum., 147 : "But it is argued very strenuously that these relators are entitled to some remedy, and that there is no other remedy but that furnished by mandamus. Many grevious wrongs may be imagined as possible to result from the exercise or non-exercise of political power, in the legislative and executive departments, which cannot find a remedy in the courts of justice. Whatever may have been decided in other countries or governments, under a different organization and distribution of political power, we are satisfied that by our Constitution and laws the remedy attempted to be adopted and enforced on behalf of the relators in this case does not exist."

A court, therefore, stands as to its own government in a different relation entirely from that which it occupies towards a foreign state. To the former, its duty is defined by positive law to which it has no right to affix conditions; to the latter, as its duties are optional, it may affix conditions, such as are necessary to enable it to do complete justice.

The comparison of this country with despotic countries, as a means of casting odium on the view here presented, is entitled only to a passing word. In all other countries, government has had attached to it the idea of personal power, and as personal power in the sovereign has often developed into tyranny, there is much that is odious in the idea of imperial power. In such a government, exemption from suit might well become odious. But the very fact that our government is, so to speak, impersonal, that our only idea of it is a grand aggregate of individuals constituting the State—each advocating or supporting only such laws as he is willing to submit to and be governed by in his own person and property—deprives the rule of the majority

14—VOL. 5.

of that odious feature which exists where the governor is not subject to the law of the governed.

If the people of a great state prefer, as individuals, that their rights against the community should be left to the legislative will for enforcement, rather than that their fiscal policy should be embarrassed by suits at periods when they would not be able to meet the obligations of their creditors at home and abroad, then no odium can attach to the grand aggregate who, as individuals, concur in this policy; and the Fourth of July talk about republican ideas to the reverse, does not arise to the dignity of common sense. The outcry of the foreign creditor, who holds many millions of our bonds, might well be justified if made; but the creditors abroad, against whom this policy is aimed, are patient. The citizen at home, who is compelled to enforce this rule, chiefly on account of the heavy bond debt, has no ground of complaint when his own policy affects his own interest. Whenever the citizen makes a law for others, he must submit himself to that law; and he has no right to complain that his own rule of policy, applied to others, interferes with himself. Let kings and potentates be held in odium if they refuse justice to their subjects; but let republics submit, if they choose to adopt a rule which imposes hard conditions on themselves.

A learned and able opinion of Judge Nott, of the Court of Claims, placed in my hands by the Hon. Sam'l Milligan of that court, is worthy of careful consideration, as it seems to be an exhaustive review of the authorities; but it serves to strengthen my view, from the very fact that it brings forward nothing at all inconsistent with it.

It is delivered in the case of *Elias & Morris Brown* v. *The United States.* The case itself merely decides that the law of the United States vesting in a special tribunal the power to adjudge cases against the United States, and granting to it to "generally exercise such powers as are necessary to carry out the powers herein granted to it" (pp. 9, 18),

was a grant of power to enforce the decrees of the court by appropriate writs and process against officers of the United States. Now, what application has this, or can it have, to a state which has erected no such court, and made no provision of similar, or of any character, in regard to any court existing?

The decision is able and discriminating, but it certainly proves nothing in favor of a right of suit where no means are provided by law. On the contrary, it holds that as our powers are strictly bounded by the act which grants its powers, and that it only extends to contracts (p. 18), it does show much, and is of great value as a collection of authorities on the subject of the liability of states and officers to suits; but the suits will be found to be in every case, where they have been sustained against officers, cases of individuals holding official position, who, by color of their offices, have injured the citizen by their acts, in violation of his right, and in violation of their official duty. These cases sue the individual for the wrong which he has committed, and hold him responsible as an individual for the wrong which he is unable to justify by his official authority. And in this class of cases, it is held that in nations subject to be sued, suit cannot be maintained against the State, but the individual alone. *Tobin* v. *The Queen,* 16 Scott, C. P. R., 210. *Madrazo* v. *Wills,* 3 B. & Ald., 353.

*Walker* v. *Congreve* is of this class, for the act of the ordnance office infringing this patent was a wrongful act (p. 5). Carpmael Patent Cases, 356 : Lord Elden had got his blood up, but he dissolved the injunction in that case.

The Court of Exchequer in England, like our Court of Claims, is instituted as a treasury court, and has an established jurisdiction and practice, just as the other courts have. But we have no court with the same or similar powers; and until we have a Court of Claims, there is nothing in our system analogous to the Court of Exchequer, and no light can be drawn from it. It is stated in that

case " that where money is recovered in the Court of Exchequer, the treasurer and chamberlain are personally responsible if they do not pay it out of the first money that comes to their hands." Will any one pretend that any court in Tennessee is vested with such a power by which they can overrule the direction of the Legislature to devote all moneys for the time being to the immediate and current expenses of the government? Yet it may as well be said that this citation justifies that result, as that it proves that a state is liable to be sued without any law on the subject, or any court clothed with the jurisdiction of such a suit, or any machinery instituted in view of such suits. The case cited of *Gidley* v. *Lord Palmerston*, 3 Brod. & Bing., p. 275, distinguishes between cases where the act of the officer is tortious and wrongful, and those in which, being invested with a discretion, he improperly exercises his discretion. In such a case, the holding is that the officer is not to be subjected to the multiplicity of suits which a rule allowing him to be sued would give rise to. He is, therefore, held exempt. This court has, in a recent case, applied this very principle to officers of municipal corporations in suits by garnishment. Surely it applies to the officers of a state with much more reason, where the State has withheld the right to sue it at all.

It has been held that the highest officers of the government may be compelled to perform a merely ministerial act at the suit of the person injured by the refusal. But what are the cases given as ministerial? Where the amount of a debt is settled by judgment, the act of collecting or the act of paying is ministerial merely. The Governor, Comptroller and Treasurer, with large discretionary powers in general, may have duties to perform which are merely ministerial, as, where a sum of money is ordered by the Legislature to be paid from the treasury to A. The act of issuing the warrant and making the payment is simply an act in obedience to a specific mandate of the superior power—

ministerial, as the act of a sheriff is ministerial in executing a writ. But if the direction is to pay to such as have performed certain services, the exercise of the power to ascertain who constitute the class to be paid, brings into play new qualities and powers, which it would seem would become executive, if not judicial, or *quasi* judicial. When it gives the power to audit accounts and make final settlements obligatory on the parties, the power to control these settlements is vested in no other department than the legislative. The courts cannot, by mandamus or injunction, compel or prevent the settlement, or control the amount of it, simply because the law has not conferred the power. It might have conferred it, or it may at any time confer it; but until it has done it, the want of power is a bar to its exercise. The first of these points, that an executive officer may be compelled to perform an act simply ministerial, was substantially held in *Kendall, P. M.*, v. *The United States*, 12 Peters, 527; but even that has been questioned in 14 Peters, 520, by Mr. Justice Catron. But the other set of cases are numerous and uniform, holding that the right does not exist where there is any discretion conferred. *Brashear* v. *Mason*, 6 How., 92; *Reeside* v. *Walker*, 11 How., 272; *United States* v. *Guthrie*, 17 How., 284; *United States* v. *Commissioner of the Land Office*, 5 Wall., 563; *Gaines* v. *Thompson*, 7 Wall., 347; *The Secretary* v. *McGarraghan*, 9 Wall., 298. For convenience, I quote portions of these cases. In *Gaines* v. *Thompson*, 7 Wall., 351, the court say: "The United States could not be sued. The Secretary could not be sued in any other form of action than mandamus." * * * Quoting from *The Com'r of Patents* v. *Whiteley*, 4 Wall., 522, they say: "The head of an executive department of the government in the administration of the various and important concerns of his office, is required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he is required to act. If a

suit should come before this court which involved the construction of any of those laws, the court certainly would not be bound to adopt the construction given by the head of the department, and if they supposed his decision to be wrong they would of course pronounce their judgment. * * * The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorizes him to exercise judgment or discretion. Nor can it, by mandamus, act directly upon the officer, and guide and control his judgment and discretion in the ordinary exercise of his official duty." * * * The court then, in substance, restate the proposition quoted: "Certain powers and duties are confided to those officers, and to them alone, and however the courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of their acts after the matter has once passed beyond their control, there exists no power in the courts by any of its processes to act upon the officer, so as to interfere with the exercise of that judgment while the matter is properly before him for action. The reason is, the law reposes this discretion in him for that occasion, and not in the courts. The doctrine, therefore, is as applicable to the writ of injunction as it is to the writ of mandamus.

In the one case, the officer is required to abandon his right to exercise his personal judgment, and to substitute that of the court by performing the act it commands. In the other, he is forbidden to do the act which his judgment and discretion tell him should be done. There can be no difference in the principle which forbids interference with the duties of these officers, whether it be by writ of mandamus or injunction." *Gaines* v. *Thompson*, 7 Wall., 353. He then cites the case of *Mississippi* v. *Johnson*, 4 Wall., 475, in which the point is precisely the same.

This doctrine dates back to a period when it could not be suspected of being warped by political motives, for in the

case of *Hill* v. *The United States*, 9 How., 389, the court say: "The question (of the right to enjoin a judgment of the United States), without any necessity for recurrence to particular examples, would seem to meet its solution in the regular and best settled principle of public law. No maxim is thought to be better established or more universally assented to than that which ordains that a sovereign, or a government representing the sovereign, cannot, *ex delicto*, be amenable to its own creatures or agents employed under its own authority for the fulfillment merely of its own legitimate ends. A departure from this maxim can be sustained only on the ground of permission on the part of the sovereign or the government expressly declared, and an attempt to overrule or impair it, on a foundation independently of such permission, must involve an inconsistency and confusion, both in theory and practice, subversive of regulated order and power. Upon the principle here stated, it has been held that in cases of private grievance proceeding from the Crown, the petition of right (see *Chisholm* v. *State of Georgia*, 2 Dall., 429, for a learned review of the English law on this subject) in England has been the nearest approach to an adversary position to the government, that has been tolerated, and upon the same principles it is, that in our own country in instances of imperfect land titles special legislation has been adopted, to permit the jurisdiction of the courts upon the rights of the government." He then cites *United States* v. *McLemore*, 4 How., 286, as having "broadly laid down as the law, that a circuit court cannot entertain a bill on the equity side of the court praying that the United States may be perpetually enjoined from proceeding upon a judgment obtained by them, as the government is not liable to be sued except by its own consent given by law."

"It will not do to say that the result of the proceeding by mandamus would show the title of the relator to his pay, the amount, and whether there were any moneys in

the treasury applicable to the demand; for upon this ground any creditor of the government would be enabled to enforce his claim against it through the head of the proper department by means of this writ." *Brashear* v. *Mason,* 6 How., 102.

Mr. Justice Field, in the case of *"The Siren,"* 7 Wall., 153, says: "It is a familiar doctrine of the common law that a sovereign cannot be sued in his own courts without his consent. The doctrine rests upon reasons of public policy—the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition of the means required for the proper administration of the government. The exemption from direct suit is therefore without exception. This doctrine of the common law is equally applicable to the supreme authority of the nation—the United States. They cannot be subjected to legal proceedings at law or in equity without their consent; and whoever institutes such proceedings, must bring his case within the authority of some act of Congress."

This case cites the admiralty cases, the most numerous class I have yet found, to show the extent of that immunity from suit. Cootes' New Admiralty Practice, 31 ; *The Athol,* 1 W. Robinson, 382 ; *The Clara,* 1 Swabey, 3 ; *The Swallow, ib.,* 30 ; *United States* v. *Brig Malek-Adhel,* 2 How., 233 ; *The Lord Hobart,* 2 Dodson, 103, per Sir Wm. Scott; *Brigs* v. *Light Boats,* 11 Allen, 157 ; 2 Atk., 223 ; *Hodge* v. *Attorney General,* 3 Younge & Col., 342.

To recapitulate. The cases on this subject are properly to be classed under four heads.

1. Suits against the State directly. These were provided for by the Code, since repealed. They may be brought by express permission of a special act, as the case of *The Com-*

*missioners* v. *The State*, 7 Hum., 113. Or, by resolution of the Legislature, as in *Lowry* v. *Francis*, 2 Yor., 536. Or, perhaps, by consent of the officers of the State to obtain judicial direction, as in *Crozier, Compt'r,* v. *State, ex rel.*, 2 Sneed, 410. This is the course in England, where the leave to prosecute a petition of right is granted by the Crown. The suits in the United States Court of Claims belong to this general class, as the court is instituted and its powers defined by statute.

2. Suits against officers of the State for acts done under the direction of law, or of a statute. This is, in effect, to sue the State, and by indirection to do what cannot be directly done. For, as all acts of a state must be done through human agencies, if every citizen acting for a state is liable to be stopped or interfered with judically, the exemption is unavailing. Of this class is *Williams* v. *Register of West Tennessee,* Cooke, 213.

3. Suits against officers for acts done by them *colore officii*, but not authorized by law. This is not in any sense a suit against the State, for it seeks only to compel the officer to account out of his own means for his act not authorized by the State. This is a numerous class in England, but not fully understood in this country, where the instances are few. See *Mostyn* v. *Fabrigas,* Cowp., 161, 173, which is put upon the ground of abuse of authority; and see Lord Bellemont's case, 2 Salk, 625. *Way* v. *Yally,* 6 Mod., 195.

4. Where an officer, bound by law to perform a ministerial duty, refuses to perform it, the courts will compel the performance. As, where the law requires that the Comptroller shall issue a warrant to A, on his refusal to perform this duty, a court will compel him. *Kendall* v. *United States,* 12 Pet., 612. This is merely to compel the officer to obey the State, not to compel the State.

5. Where an officer is clothed by law with a discretion to do certain acts, or to judge of certain conditions or pre-

requisites on which he is to act, there his discretion is not to be controlled by the act of the courts.

But the Code, sec. 2807, gave, at one time, the right to sue the State. This was repealed by act of 1865, ch. 36, sec. 34.

This repeal has been attacked on the ground that the journal shows that that provision was put on an appropriation bill on the third reading, and it is insisted that therefore the bill was not three times read, and so the law is not passed according to the Constitution.

The legislative practice, from the organization of the government, has settled the above as the parliamentary law of this State. It has been the practice from the earliest times.

The repeal has been treated as valid by the Constitution of 1870, which assumes the necessity of legislation to confer the right. It has been universally treated as the law, and it would disturb the whole policy of the State now to hold that the State was subject to suit.

The Convention of 1870 discussed this subject, and made the provision that the State might provide for suits; and the discussion showed that the convention understood this act as being in force. It is expressly held in *Fry* v. *Britton*, 2 Heis., 608.

Another objection has been urged to the law. That it was passed after a protest on the journals shows that the same proposition, in effect, was proposed and killed. This is not the proof that the case would require, if any proof could answer.

The provision prohibiting the Legislature from passing a second bill to the same effect, after one had been rejected, although in the Constitution, is merely a rule of parliamentary law to save time, by preventing renewals of a proposition once disposed of; but it must, from its nature, come within the class of provisions found in every constitution and system of laws, which the courts cannot enforce, which are essentially directory, and disobedience to which, how-

ever wrong, cannot be cured. The time is taken, and it is impossible to regain it. It is absurd to throw away the fruits.

The labor has been done in one direction, when the Constitution regarded another, or other directions as proper ones, in which the Legislature should work; but being done, where is the profit of throwing it away? Certainly it would be a most unreasonable construction which would result in this way. Every provision to which the consequence of nullity is not expressly attached by law, should be held to be directory whenever to make the acts done in violation of it void would defeat its purpose, or would not tend to carry out its objects. A statute is held directory, because not affixing in terms the consequence of nullity. *Crowder* v. *Sims*, 7 Hum., 259. Constitution held directory, etc., *Ford* v. *Farmer*, 9 Hum., 160; 2 Col., 17. See also *Ferguson* v. *Min. & Man. Bank*, 3 Sneed, 624–5.

To return to the objections under the first clause. It is said that the fact that the amendment is not germane to the bill, is a fatal objection. What is germane or not is a matter of legislative judgment; and their judgment as to their own practice, is as exclusive and as conclusive as the judgment of this court as to its practice. It might well be regarded as germane to an appropriation bill to raise the ways and means to meet the appropriations, or to divert means from some other source, or to prevent means being diverted by repealing laws for that purpose, or to exempt the State from liability to be sued.

But the rule as to what is germane and what is not, and for putting on amendments germane only, is one which no legislative body ever adhered to strictly. It is one which the Constitution of 1834 did not institute or enforce, and one which the Legislature, as one of its own rules, might dispense with, as it might with any rule made by its own authority, and the violation of it could not affect the validity of its act.

The Constitution provides that every bill shall be read three times, etc. Now, what is a bill? What constitutes its identity? The purpose of reading a bill is to perfect it by amendments, etc., but every amendment, whereby a bill is changed, leaves it no longer in all respects the same. How far may this change go? Parliamentary practice of the strictest kind allows a total change in every word of the bill after the enacting clause. A very common motion is to strike out all after the enacting clause and insert. Now, is this new matter the same bill in the sense of the Constitution. If it is—and certainly no one can hesitate on this point—then it results that the identity of a bill is something very technical and very different from actual identity, or identity of words and figures, or even of ideas. It would remain the same bill, though every idea in it were reversed; and what was prohibited in the bill as proposed, were permitted or enjoined in the bill as amended, and what was required as a duty at the outset, were made crimes of by the bill on the last reading. So the only feature by which the bill may be identified may well be the number in the margin, for even the title is usually settled after the bill has passed.

It results that unless the parliamentary rule as to matters germane is part of the Constitution, the new matter may be germane or not, as the Legislature pleases; for if it be a mere rule for the transaction of business, to be disregarded when the House chooses, then its identity is not affected by the subject matter, and that may be wholly changed also. The Constitution of 1870 regards this an evil, and attempts, in some degree, to correct it. It is said the rule is intended to give the members fair notice. No notice is worth anything to the member of a legislative body but the constantly watchful eye and ear. If you have notice that a bill suits your views, you must be constantly on the watch of it through all its stages, to see that it stays in a shape to suit. If you know that a complete reversal of its whole policy

is within the range of possible contingencies, why are you
to be taken by surprise at any minor change adding some
new feature germane or of no relationship whatever? The
Constitution of 1834 never had such a construction while it
existed; to give it now, when it has passed away and a new
one has taken its place, would be to disturb the basis of our
statutory law, and set us anew to tearing up the foundations
of laws on the statute books for years to come. Who knows
but we have condemned prisoners, divested estates, annulled
marriages, built railroads, established banks, builded cities,
established courts and made judges, under laws of this very
character? It will be well to look to the foundations of the
edifice of statutory law before we interfere with a rule of
practice, however bad it may be, which has been understood
and practiced on for many years, and on which so much has
been done.

An additional reason why such a rule is not to be adopted
now is, that it has been rendered unnecessary for the future
by the Constitution of 1870, which provides additional re-
strictions upon legislation. The operation of the rule would,
therefore, be retrospective only, and, so far as we can see,
evil only. If we refuse to disturb a rule of property be-
cause rights may have been acquired under it, shall we not
much more hesitate to break down a rule or practice which
may not only involve rules of property, but rights to life
and liberty. Rights to franchises, of values incalculable,
would certainly be found to be involved, and we may well
believe that the derangements of business and rights would
be incalculable if every act was to be scrutinized, and the
matter not germane to the original purpose of every bill was
to be sifted out and declared void, because it had failed of
any one of the six readings which the Constitution requires.
The pandoras box of void judicial sales would be a trifle
compared to this, and an immortality would attend those
who established such a principle more deserved and lasting
than enviable.

State, and Watson, Trustee *v.* Bank of Tennessee.

### THE REPEAL DOES NOT IMPAIR CONTRACTS.

Another objection taken to this repeal is, that it impairs the obligation of contracts. Here is a complete confusion of ideas. The mode of enforcing contracts against the State is so different from that against individuals, that the reasoning which applies to the one has no application whatever to the other. The only mode of collecting a debt against the State is by means of a legislative appropriation to pay it. Now, if you have an accounting officer to ascertain and report debts and claims to the Legislature, it certainly does not impair the obligation of the State's contract to abolish that office, and to return the business to a committee on claims. The courts, when a suit could be brought against the State, were perfectly powerless to enforce it. No execution could go against the treasury. No mandamus lay to compel officers to pay out money which the Legislature had appropriated to pay officers, in discharge of judgments for which no appropriation had been made. The action of the courts was, therefore, only that of an accounting agency, and in no sense a remedy, a compulsion to pay or to appropriate, or to raise the money by taxation.

This was held as to counties, before the acts of 1855 and 1857, in the case of the *Justices of Cannon County* v. *Hoodenpyle,* 7 Hum., 145. *A fortiori,* or, perhaps, more properly for precisely the same reason, the power is wanting as to the State. Indeed, the case puts it upon this precise ground at page 147.

But the Legislature, at its present session, has passed an act to which I respectfully ask the attention of the court, declaring the repeal valid, and enacting that no court in the State has the jurisdiction to render judgment against the State or its officers:

### AN ACT TO PROTECT THE STATE FROM SUITS AND JUDGMENTS.

"WHEREAS, By act of 1865, ch. 36, sec. 34, the General

Assembly of the State of Tennessee repealed sec. 2807 of the Code of Tennessee, giving a right of suit against the State; and whereas, the validity of that repeal has been questioned; therefore,

"SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That the said 34th section of the act of 1865, chapter 36, be held valid and in force from the date of its passage, and that the said section 2807 of the Code was by said act effectually repealed.

"SEC. 2. *Be it further enacted,* That no court in the State of Tennessee has, or shall hereafter have, any power, jurisdiction or authority to entertain any suit against the State, or against any officer of the State, acting by authority of the State, with a view to reach the State, its treasury, funds or property, and all such suits now pending or hereafter brought shall be dismissed as to the State or such officers, on motion, plea, or demurrer of the law officer of the State, or counsel employed for the State.

"SEC. 3. *Be it further enacted,* That, the public welfare requiring it, this act take effect from and after its passage.

"Passed February 21, 1873.

"W. S. McGAUGHEY,
*"Speaker of the House of Representatives.*

"A. T. LACEY,
*"Speaker of the Senate.*

"Approved February 28, 1873.

"JOHN C. BROWN,
*"Governor.*

"CHAS. N. GIBBS,
*"Secretary of State."*

An act taking away jurisdiction pending a suit against a State or the United States, leaves the court without power to proceed. See *Assessors* v. *Osborne,* 9 Wall , 567; *United States* v. *Fermenting Tubs,* 1 Abb., U. S., 269, 274; 3 Burr., 1456; 13 How., 429; *Insurance Company* v. *Ritchie,* 5 Wall., 541; The Orono., 1 Gall., 137.

In *Stevenson* v. *Doe*, ex dem. Wait, 8 Blackford, 508, it was held that upon a repeal of a statute authorizing the issue of a foreign attachment, without a saving clause as to pending suits, a suit pending by attachment was at end, and all subsequent proceedings were void. This case cites *Hunt* v. *Jennings*, 5 Blackf., 195, and *Butler* v. *Palmer*, 1 Hill, 324, where the subject was fully examined.

The repeal of a statute conferring jurisdiction takes away all right to proceed under the repealed statute, even in suit pending at the time of the repeal, unless they are saved by a clause in the repealing statute. *Illinois & Mich. Can.* v. *City of Chicago*, 14 Ill., 336, citing Miller's case, 1 W. Blacks., 451; *Butler* v. *Palmer*, 1 Hill, 324; *Springfield* v. *Overseers of Highways*, 6 Pick., 501; Matter of Road in Hatfield, Tnp., 4 Yeates, 392; *Hunt* v. *Jennings*, 5 Blackf., 195; *Commonwealth* v. *Beatty*, 1 Watts, 382; Fenelon & Masters' Pet., 7 Barr., 173; See also *McRae* v. *Heirs of* ———, Jackson, June, 1873, and cases cited.

Much discussion has been had of the relation of a State as a corporator, and much ingenious misapprehension is presented to this court as to the law on this point. The general statements of judges, made with a view to states in that character, are torn from their contexts, by which the generality of their phrase is necessarily controlled, and they are put forth in a connection entirely different from that in which they stand in the cases to which they belong.

A state, acting as a bank, is liable to be sued as a bank, is all the courts intend to convey. The object of making the corporation is to enable it to sue and be sued; and when it is made with that power, to hold that it cannot be sued is to deny to it the very character in which it is created. It is to repel the claim that the corporations thus created in the several cases cited were not subject to suit, because it was to sue the State to sue them that the courts are deciding. And when the courts use brave words, as courts sometimes will, these are taken up, and on them it is thought

that an argument can be sustained which will allow a direct suit against the State as a stockholder. Now, to sue the bank, and thus indirectly, and as to the property of the bank reach the State, is not the same as to sue the State *eo nomine,* and in that character to reach assets of the State. See the doctrine admirably stated in Story on Const., sec. 1687. Suppose a foreign minister, exempt from suits in your courts, upon his contracts or torts. He appoints a servant to contract as his agent, who is subject to suit, and puts funds in his hands, on the faith of which persons contract with him. When you sue the agent in that case, you sue the minister, in the same sense that you sue the State in suing the bank. He lays down his exemption as to this; but suppose his agent fails, and you want to go against him, how is his exemption affected? You may sue the agent still, and thus, in a sense sue him, but only in that mode. Now the exemption of the State is absolute, and when she says I put forward a figure-head here subject to suit, and defines the extent and matters as to which suits shall lie, she only subjects herself to suit in that form and to that extent. When she says you may sue me in my capacity of bank, she does not say, also, as stockholder, also as guarantor. Neither has any court said so. They have used figures of speech in their opinions, but the gentleman here has undertaken, seriously, a difficult horticultural feat —to mature seed and fruit from flowers of rhetoric.

In *Briscoe* v. *Bank of Commonwealth of Kentucky,* 11 Pet., 351, it is said: "No sovereign state is liable to be sued without her consent. Under the articles of confederation, a state could be sued only in cases of boundary."

"The bank could be sued." Per McLean, J.

In the same case, quoting from the case of the *United States* v. *The Planters' Bank,* 9 Wheat., 904, (opinion by Marshall, C. J.,) it is said: "It is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as it concerns the

15—VOL. 5.

transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus many states of the Union, who have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The State of Georgia, by giving the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as it respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation than are expressly given in the incorporating act.    *    *    The State does not, by becoming an incorporator, identify itself with the corporation."

Again, in the same case, quoting from the *Bank of the Commonwealth* v. *Wistar*, 3 Peters, 318, opinion by Mr. J. Johnson, the court say: "If a state did exercise any other power in or over a bank, or impart its sovereign attributes, it would be hardly possible to distinguish the issue of the paper of such banks from a direct issue of bills of credit."

These extracts, say the court, show that a state, when it becomes a stockholder in a bank, imparts none of its attributes of sovereignty to the institution, and that this is equally the case whether it own the whole or a part of the stock of the bank.    *    *    The funds of the bank, and its property of every description, are held responsible for the payment of its debts, and may be reached by legal or equitable process. In this respect, it can claim no exemption under the prerogatives of the State.

Mr. J. Thompson, in a concurring opinion, contrasts bills of credit which could in no way be enforced—their credit

·d.·pending solely upon the faith and voluntary will of the State—and bank bills issued on a fund provided for their redemption, and by a corporation which can be sued and payment enforced in courts of justice in the ordinary mode of recovering debts. He goes on to say, that though the State is sole owner of the stock, and all private interest is expressly excluded, and "the State has the sole and exclusive management and direction of its concerns, the corporation is the mere creature of the State, and entirely subject to its control, yet the notes were not bills of credit." On this fact, too, Mr. J. Story, p. 344, relies in his dissenting opinion.

In the same dissenting opinion, Mr. J. Story says, p. 344 : "Suppose the State should choose, as it well might, to assume the whole agency and funds of the corporation to itself, could the creditor have any redress against the State? It is admitted that he could not have any redress, because the State is not suable. (This is a direct authority on the liability of Morrow, the treasurer, to suit.) It is said that the bills are not taken on the credit of the State, because the State has not promised in terms to pay them. If it had so promised, the State not being suable, the holder could here have no means of redress against the State. But I insist that, if the State were suable, a bill in equity would lie against the State as the real debtor—the real principal."

This shows clearly that the character in which the State was regarded as suable was virtually in the name of the corporation, and not actually or in her own name. Mr. J. Story's statement shows this beyond question, and his view is no where questioned. His case is stronger than that of a stockholder, for he regards the liability as a direct one on the paper, and not a secondary one as stockholder. If the right to sue had any reference to any suit but one against the bank, it would be for a stronger reason on the note than on the liability as stockholder.

But further, on p. 359, he, speaking of the State banks

in which the State is a partner, says: "a state owning a portion of the funds, and having paid in its share of the capital stock, is treated like every other stockholder, and is understood to incur no public responsibility whatsoever. It descends to the character of a mere corporation, and does not act in the character of sovereign. That was the doctrine of this court in the case of the *United States* v. *The Planters' Bank of Georgia*."

In *Darrington* v. *State Bank of Alabama*, 13 How., 17, the court say: "A bill of credit emanates from the sovereignty of a state. It rests for its currency on the faith of the State, pledged by a public law. The State cannot be sued, ordinarily, on such bill, nor payment exacted against its will. * * * The State as a stockholder held its property as a corporation or individual could hold it, in the Mobile bank. The specie in its vaults, notes taken in discounts, and every description of property managed by the directors of the bank, were subject to judicial process by its creditors. And in such a procedure, the State in its sovereign capacity, could not interfere. Its powers would be no greater than the powers of individual stockholders of a bank under similar circumstances.

### STATE HAVING SUED DOES NOT RENDER HERSELF SUABLE·

It is said, with equal accuracy, that the fact that the State comes into this case to wind up a trust, and, therefore, she has laid down her sovereignty, and must take pot-luck with individuals. The Legislature did not authorize the State to be made a party to the suit. It authorized the Attorney-General to file a bill to execute the trust. The State, in one event, was a beneficiary. It might properly have been made a defendant as a creditor, but in no other way, and for no other purpose was it a proper party at all. If a trust is made, and the trustee files a bill to ask the aid of the court in executing the trust, does every defendant who comes in to claim as a creditor subject himself to a cross-

State, and Watson, Trustee v. Bank of Tennessee.

bill to obtain active relief against him as to matters outside of the trust? A makes a trust to B on a machine, which is so complicated that B wants the aid of a clerk and master and a chancellor to wind it up. He files his bill against the claimants, and says to A: You are entitled to the surplus, if any; and A says, yes. Then others come in as creditors and set up their claims; and, in addition, say that A owes them other debts, which he has other property to pay, and so, under pretense of administering the trust of B, you administer the estate of A. This certainly would be a rare piece of chancery practice. But let A be our foreign minister, as supposed above, and the absurdity of his waiving his exemption by consenting to take the crumbs in that limited litigation, is strikingly apparent. So of the State.

As to the extent of the relief where a State sues.

Mr. Justice Field says, in "The Siren," 7 Wall., 154 : But although direct suits cannot be maintained against the United States, or against their property, yet, when the United States institutes a suit, they waive their exemption so far as to allow a presentation by the defendant of the set-offs, legal and equitable, to the extent of the demand made, or property claimed, and when they proceed in rem, they open to consideration all claims and equities with regard to the property libelled. They then stand in such proceedings, with reference to the rights of defendants or claimants, precisely as private suitors, except that they are exempt from costs, and from affirmative relief against them beyond the demand or property in controversy."

This is exactly to the point. See, also, the cases stated in this brief on pages 25, 26 and 57, which are very much to the point, for if the State submits to the jurisdiction by suing, it certainly submits to the court controlling the judgment.

The cases on the subject of set-off in the United States courts, are based upon a statute of the United States expressly allowing the set-off. Act of March 3, 1797, ch. 74,

sec. 3. *United States* v. *Wilkins*, 6 Wheat., 134, 143, which is the leading case. *Walton* v. *United States*, 9 Wheat., 651; *United States* v. *McDaniel*, 7 Pet., 16; *United States* v. *Ripley*, 7 Pet., 28; *United States* v. *Ringold*, 8 Pet., 163; *United States* v. *Robeson*, 9 Pet., 319; *United States* v. *Hawkins*, 10 Pet., 125; *Same* v. *Bank of the Metropolis*, 15 Pet., 377.

It is said that this court, upon a plea of set-off, has held that the plaintiff cannot dismiss his suit. If this court has done so, and I believe it has, it has simply adopted a rule upon a statute which gave no direction as to the particular point. It has not thereby overturned the whole law as to the rule in equity, settled before this was a State, and adhered to ever since, that in equity a party may dismiss his bill at any time before decree, notwithstanding a cross-bill. This is a rule too well settled to be overthrown by the adoption of a different rule in a new case.

An illustration of the mode of reasoning adopted in this case is found in the citation of Judge Baldwin's remarks on the submission of cases by states. Judge Baldwin is meeting an objection that the controversy between Rhode Island and Massachusetts being one of boundary, is a political and not a judicial question. He is showing that the true test by which a question is characterized is the mode in which and the tribunal before which it is presented. That a question discussed between states by arms or treaty is political, and the same question presented to a court is judicial. In speaking of this he points out the distinction in the mode of proceeding between the judicial and the political power. The sovereign decides by his own will, a court according to law. A submission to a court without presenting any rule of decision is a power to decide according to the appropriate law of the case. From the time of such submission the question ceases to be a political question, and comes to a court to be decided, and is, therefore, judicial. Such is the purport of the language quoted to show that a reference

of a question to a court precludes all further action of the political power. He goes on through many pages to illustrate this idea by reference to authorities and instances. In the course of it he states at page 741 the case of *The Nabob of the Carnatic* v. *The East India Company*, 1 Ves. Jr., 371. This case is a happy example to show the nature of the jurisdiction of courts over sovereignties. The East India Company is a peculiar institution. It is a chartered trading company, but it has also sovereign power. It is subordinate to Great Britian, but it rules more millions of people and a wider extent of territory than England itself.

This case held therefore two things, that the trading corporation was subject to suit but the sovereign was not.

In that case there was no mode of distinguishing which was the capacity in which the company acted but by the nature of the act, and they held that when she traded she was suable, when she treated with the Nabob she was not. Now, Tennessee is in no sense both a trading and a political corporation, and the name fixes the character of her acts. If she trades in the name of the Bank of Tennessee, she is suable under that name and to the extent that the corporation has her property. But when you say the State traded, it gives you no jurisdiction of her political entity; when you say the State is the stockholder, there is an end to the question as to her. To make the case of the State at all parallel with that of the East India Company we would suppose the State to have created the bank simply by her own name, the State of Tennessee. Then a suit might be maintained in that name, but it would be only on claims due from the bank, and not on any thing done in her State capacity, and it would then bind only the bank effects.

The counsel for McKennie and others fails to discriminate in his attacks upon the bank and the State, between the different aspects of the case.

State, and Watson, Trustee v. Bank of Tennessee.

### TREASURER NOT SUBJECT TO SUIT.

It involves a suit by injunction against the Treasurer, to stay his hand in relation to funds placed by the State in his care. Now I deny the right of the courts to enjoin the officers of the State from doing what the legislative power has enjoined on them to do. To take such jurisdiction is to sue the State, and the authorities on the point are full. I do not deny the right of the court by decree to declare the rights of the several parties to that fund, as a part of the assets of the bank, nor to decide whether the trust deed and its provisions are valid or void. That is directly involved, and so far the right of the court to decide the question is clear. But as to a decree that the Treasurer shall disobey the legislative direction, I respectfully submit that is not within the jurisdiction of any court.

As to any decree whatever, in regard to the liability of the State, declaratory or otherwise, my position is that it is not a matter of which the court has any more jurisdiction than it has over the Piegan Indians. It is wholly beyond the existing jurisdiction of this court.

### NO PERMISSION TO SUE.

Counsel contend that the act of February 16, 1866, ch. 28, sec. 6, gives jurisdiction in the words of the fiat on a petition of right. I have admitted, and do now admit, that this would be good if it was true. But the consent is not given to the extent or in the sense contended.

The bill is to be filed " to execute the deed of trust and trusts," making publication " to the end that all interested therein may come in under one decree, and equal justice be done to all." This is as clearly confined to the deed and the trust as it can be in English, and its object is that equal justice in the distribution of the fund may be done, not complete justice in regard to every thing outside of that fund. I am willing that the court may solve doubts in favor of its own jurisdiction, but to solve a doubt in its own favor,

when there is no doubt to solve, would be as indelicate as it is indefensible. The intent of the Legislature being plain, no court in overweening anxiety to add to its powers should overstep the bounds of decency and moderation, and assume to decide what the Legislature clearly did not mean to submit. I think I can calmly repose upon the certainty that no such usurpation will ever stain the ermine of this court. Courts should never shrink from the exercise of lawful jurisdiction, or assume that which is not lawfully committed to them.

In conclusion I wish to say a word about the depositors. Mr. Cooper has demonstrated in a few sentences the right of the State as holder of the notes of the bank to preference under the bank code. This will exhaust the fund even if the school fund is despoiled of it. The new issue, if of any value, is a preferred fund. Their interest, therefore, is so remote, contingent and problematical, that considerations of hardship are of little weight. The hardships will in all probability be the same whether the depositor be cut off by the claim of the State as a noteholder, or possibly the new issue holders, or the school fund. It is scarcely possible to guide his little bark among these breakers, so that he may ride it out safe over so many contesting and superior rights.

### RECAPITULATION.

I have, in this argument, attempted to establish these propositions:

1. That the capital stock of the bank was reduced to $3,500,000 by public act, and by constantly repeated declarations in legislative reports. So that the State is not liable for the $1,500,000 of stock claimed.

2. The State is not liable for the new issue, because it was issued during the war, for war purposes, by the government overthrown by the war, and was repudiated by the successful government.

3. The war bonds are repudiated by the amendment to the Constitution of the United States.

4, If the State was liable in equity, and by the clearest law, to all these claims, she is not liable to suit in her own courts without her consent.

5. Her Treasurer is not liable to any suit for acts done by him by direction of the Legislature.

6. If the State was liable to suit for want of a sufficient repeal of the Code, 2807, the repeal since takes away all jurisdiction, and the suit can no longer proceed.

7. The fact that the State has sued does not render her liable to a cross suit. But she is not a party complainant— the bill having been unnecessarily filed in her name, and having been dismissed as to her.

State, and Watson, Trustee *v*. Bank of Tennessee.

STATEMENT OF THE NOMINAL AND ACTUAL CAPITAL OF THE BANK OF TENNESSEE, DURING EACH YEAR.

| Years. | Nominal Capital. | Actual Capital. |
|---|---|---|
| Ending July 1, 1839..... | $1,092,393 71 | $1,092,393 71 |
| "        "     1840..... | 2,292,757 38 | 2,292,757 38 |
| "        "     1841..... | 3,065,043 80 | 3,065,043 80 |
| "        "     1842..... | 3,130,646 20 | 3,130,646 20 |
| "        "     1843..... | 3,166,155 45 | 3,166,155 45 |
| "        "     1844..... | 3,170,470 53 | 3,071,820 65 |
| "        "     1845..... | 3,169,745 16 | 2,866,121 08 |
| "        "     1846..... | 3,192,715 09 | 2,749,353 80 |
| "        "     1847..... | 3,180,177 67 | 2,664,187 80 |
| "        "     1848..... | 3,188,117 86 | 2,640,737 55 |
| "        "     1849..... | 3,199,613 57 | 2,344,652 54 |
| "        "     1850..... | 3,193,939 31 | 2,344,652 54 |
| "        "     1851..... | 3,194,202 79 | 2,344,652 54 |
| "        "     1852..... | 3,190,825 49 | 2,344,652 54 |
| "        "     1853..... | 2,759,001 00 | 2,389,652 54 |
| "        "     1854..... | 2,637,282 74 | 2,389,652 54 |
| "        "     1855..... | ................ | 2,358,832 49 |
| "        "     1856..... | ................ | 3,267,061 34 |
| "        "     1857..... | ................ | 3,361,131 44 |
| From July 1, to Jan. 1, 1858, (6 mos.)........... | ................ | 3,367,737 32 |

Subsequent reports July 1, 1859, and July 1, 1861, and October 1, 1861, show Capital Stock, $3,679,068 33.

State, and Watson, Trustee, *v.* Bank of Tennessee.

STATEMENT OF CAPITAL STOCK OF THE BANK OF TENNES-
SEE, SHOWING DATE OF RECEIPT AND SOURCE
WHENCE DERIVED.

| Date | Source | Amount |
|---|---|---|
| June 4, 1838 | By State Bonds.............. | $1,000,000 00 |
| | SCHOOL FUND. | |
| Aug. 29, " | Dep'd by Sup't Pub. Instruc'n | 71,167 09 |
| Oct. 2, " | " " " | 10,726 62 |
| Aug. 9, 1839 | " " " | 14,750 00 |
| Oct. 11, " | " " " | 2,181 80 |
| Jan. 22, 1840 | " Oct. 2, 1838 | 10,500 00 |
| Feb. 21, " | " " " | 6,202 96 |
| July 15, " | " " " | 5,377 85 |
| Dec. 31, " | " " " | 10,450 00 |
| July 27, 1841 | " " " | 28,916 95 |
| Oct. 1, " | " " " | 6,857 42 |
| Nov. 6, " | " " " | 3,751 90 |
| July 20, 1842 | " " " | 26,230 39 |
| Sept. 21, 1843 | " " " | 5,956 79 |
| Feb. 3, 1845 | " " " | 11,785 45 |
| June 17, " | " " " | 1,407 96 |
| Dec. 19, 1842 | Sch'l fund, sale U. S. pub. land | 11,703 32 |
| | SURPLUS REVENUE. | |
| Jan. 7, 1839 | Deposited........................ | 305,490 96 |
| Jan. 9, " | " ........................ | 355,517 70 |
| Feb. 26, " | " ........................ | 17,364 46 |
| Jan. 10, 1840 | " ........................ | 17,273 20 |
| Feb. 13, " | " ........................ | 657,563 13 |
| | SCHOOL FUND, OCOEE. | |
| Jan. 29, 1839 | Rec'd per Sup't Pub. Instruc'n | 163,720 00 |
| Feb. 27, " | " " " | 138,869 62 |
| May 21, " | Athens check.............. | 31,244 86 |
| Sept. 4, " | " ................ | 27,355 06 |
| Nov. 25, " | " ................ | 141,869 11 |
| Mar. 23, 1840 | " ................ | 70,848 70 |
| June 18, " | " ................ | 11,144 25 |
| July 22, 1841 | " ................ | 15,354 72 |
| Nov. 2, " | Per Superintendent......... | 4,431 69 |
| | Com. Sch'l fund, (say paid '40) | 45,621 18 |
| | *Stocks transf'd by Legislature.* | |
| | Union Bank of Tenn....... | 664,494 00 |
| | Planters' Bank of Tenn..... | 232,700 00 |
| | Aggregate amount of capital stock paid in.................. | $4,128,812 24 |

ARGUMENT OF R. McP. SMITH FOR THE NEW ISSUE.

The answer of T. A. Atchison and W. M. Duncan raises the question, as against the Bank of Tennessee, of the validity of what is popularly known as the "new issue"—the issues of the bank after May 6, 1861—those branded as void by the constitutional amendment of 1865 (Schedule, sec. 6), of the origin of which the following is the account contained in the record:

In April, 1861, shortly after the refusal of Tennessee to respond to the President's call for troops, a Military Board was organized here for the purpose of raising, equiping, and supplying troops for the rebellion. To raise the sinews of war, the State issued what were known as its "war-bonds," of which $4,300,000 were purchased at par by the Bank of Tennessee, and the price placed to the credit of the State. The bank afterward sold $1,077,000 of these bonds. The Military Board checked out of the bank, from time to time, $4,625,460.48, which were, of course, rebelliously applied.

These checks were a heavy drain upon the bank, whose regular business in 1861 was as large as it had been previously; and in order to meet the additional demands of this business, it issued $1,646,299 additional currency—the new issue—of which the mother bank issued $869,639, and the branches $766,660.

The military board checked upon the mother bank exclusively; so that if any of the new issue was paid out upon its checks, it must have been part of the mother bank's issue.

But it does not appear that any part of even this was, in fact, so issued. As ciphered out by the Chancellor below, the bank needed not have paid out any of it thus, for the proceeds of the war bonds sold by the bank plus the old issue and the notes of other banks on hand, amounted to $1,384,807 more than the aggregate of the military board's

State, and Watson, Trustee *v.* Bank of Tennessee.

checks—not to mention the specie in the vaults, shown to have been $446,719.70.

Of course it is impossible to demonstrate that none of the mother bank's portion of the new issue was emitted upon the checks of the military board. But if that which was launched in this manner must be condemned as guilty, at any rate the remainder, paid out in discounting the ordinary paper of regular customers, must be acquitted. The guilty notes could not taint the innocent. Every note must stand or fall upon its own merits. Now there is no pretense that any of the notes of Atchison or Duncan have been implicated as issued to the military board. These notes, therefore, can be assailed only upon general grounds applicable to the entire new issue.

The special counsel of the State says that the entire new issue must be avoided as having originated in the exigencies of the rebellion. The argument is, that but for the drain of the rebellion upon the bank the new issue would not have been emitted; *ergo*, the new issue was emitted in aid of the rebellion. But would this argument be applied to the obligations of other banks, or of individuals, standing in the same category? The Union Bank and the Planters Bank also bought large amounts of war bonds, and, doubtless, had to issue additional circulation to supply for their ordinary business the deficit produced by these purchases. Were these notes, issued in regular discounts, void as having originated in the exigencies of rebellion?

Suppose a patriotic individual had invested all his available means in war bonds, and afterward had had to borrow money on his note for the support of his family, would this note have been void as having originated in the exigencies of the rebellion? The foregoing argument against the new issue would reach this note also. It would, equally with the new issue, have originated in an exigency of the maker occasioned by his rebellious investments; and the special counsel, if consistent, would have to call it the offspring

of a rebellious exigency, and as such to condemn it as void.

The counsel says: " It is not the consideration upon which it (the new issue) was actually issued that constitutes its illegality. Some Confederate money may have been issued to buy food for women and children. It is the fact that the money was issued at all that makes it illegal, its use being shown to have arisen by reason of the exigency of the war."

The Confederate Government, in the view of the victorious Federal Government, a view now established by its success as the law of the matter, never having been even a government *de facto,* Confederate notes must now figure as the promises of a nonentity. But the Bank of Tennessee and the State of Tennessee were entities, antedating the rebellion, and never annihilated. If the occasion of its issuance was the only vice of Confederate money, then that which was issued to buy food for women and children would not be void.

The mere explication of the foregoing argument sufficiently disposes of it, and, obviously, not much reliance was placed upon it by its author himself.

The stress of the attack upon the new issue rests upon other grounds. Unable to implicate the money itself as guiltily issued, our opponents strike at the capacity of the issuer. They also direct against us a novel theory of the omnipotence of the reorganized State in 1865.

The counsel of the bank argues that the bank was a mere organ of the State, and that its officers were essentially State officers; and he insists that upon the attempt of Tennessee to break her federal tie, *ipso facto,* instantaneously, all legitimate official authority perished within her borders, that of the bank officers among the rest, and that their subsequent emission of the new issue was, therefore, void. He regards the annulling section of the constitutional amendment of 1865 as declaratory only. The special counsel for the State does not go quite so far. He does not regard what

was done during the rebellion as utterly void. Yet he will not concede its unqualified validity. He strikes a diagonal between the two lines of thought. He says: "By the rebellion, those who became parties to it, either voluntarily or through coercion of circumstances, are placed at once out of the pale of the law, and every thing they may do, either with their rebel government or between themselves, is tainted with illegality and void, if the legitimate government chooses so to treat it through the action of its political department." And he regards the annulling section of the constitutional amendment of 1865 as the expression of such choice.

In other words, every thing that is done during a rebellion, private transactions included, lies at the mercy of the legitimate government when triumphant; that is to say, rebellion exonerates the government, as to the rebel district during the rebellion, from every constitutional restraint, and expands its power thereover into omnipotence; but whatever this omnipotence refrains from smiting, will stand. But in the present case it has seen fit to smite the new issue.

The counsel cannot ignore the separate existence of the bank from the State, but he asserts that the legislation of May, 1861, changed it from a bank for ordinary banking purposes to the fiscal agent of a formidable rebellion. But the foregoing is the special ground of his contest against the new issue.

The Attorney General cannot find any such transforming legislation, and so after a further year of reflection he tacitly pronounces the device of a transformation in 1861 "too thin," and insists that the bank always was merely an organ of the State; the drift of which is, that its acts during the rebellion were those of the State itself, and as such obnoxious to the annulling power of the reorganized State in 1865.

It has been taken for granted by the counsel of the bank and the Attorney General, that if the emission of the new issue was the act of the State during the rebellion, or of a mere state agency, and so essentially of the State, it might

therefore be avoided by the reorganized State in 1865. · But the special counsel of the State evidently felt dubious as to the sureness of this sequence from the imputation to the State of the acts of the bank during the rebellion. His studies have familiarized him with the authorities sustaining mere *de facto* official action, and it passed through his mind that the action even of the State during the rebellion, not in itself objectionable, might be as hard to obliterate as that of a private individual. He deemed that nothing would effectually answer his purpose short of the omnipotence of the reorganized State over the entire period of the rebellion, and hence he took a position commanding absolutely every transaction during that period, those of private individuals included, in order, among the rest, to reach the transactions of the State, against which nothing could be said except that they occurred during the rebellion.

He says: "The learned Chancellor, in his opinion below, seemed to think that there was a distinction between contracts entered into under ordinances and laws of secession, or directly with the rebel authorities or agents, and contracts between private citizens, and that the ban of invalidity could only be predicated of the former. But I do not understand that any such line of distinction exists." He then advances the proposition already quoted, of qualified invalidity at the option of the triumphant legitimate government.

The Attorney General is at variance with both of his coadjutors as to the nature of what occurred in Tennessee in 1861. They regard this as a rebellion in which the State authorities were implicated, but he takes quite a different view of the matter. According to him, Tennessee merely assumed to dissolve an alliance with other sovereignties, whereupon the Union party in the State rebelled, and being aided from without, finally this rebellion against legitimate government succeeded in becoming a revolution; and he insists that the successful revolutionists had the right to

16—VOL. 5.

carry out their revolutionary principles, and to repudiate all the acts of the legitimate government during the contest, and, among the rest, those of the bank as a mere State agency; an anomalous and highly original feature about which argument is that it exacts the phenomenon of the adoption and application by the victors of the very theory they had just suppressed—this in order to deduce for them an absolutism now to be wielded in the interest mainly of the conquered, to save them from the burden of their own action. Lest I may be suspected of caricaturing the position, I quote the language used:

" In 1861, Tennessee, with her then State Government on one side; and, on the other, a party aided by power from States beyond her borders, made the mighty issue, . . . the result was that the then acting State Government was overthrown by revolution, and the new government established by arms and upheld by power. We acknowledge its establishment, and our inability to overturn it, and submit to its authority, not perhaps as rightful or just, but as an existing fact.

" From the time the issue was tendered and accepted, the revolutionists of Tennessee, with aid from abroad, denied the right of the then government. On that issue they fought, and they succeeded in driving the government of 1861 from the State. As the successful revolutionists in the civil war, they have, by the universal law of nations and states, certain rights, one of which is to say what acts of the uprooted government are valid and what are void."

This is certainly a curious conception of the late unpleasantness; that in Tennessee it consisted in a unionist rebellion against legitimate state authority. The United States Supreme Court have regarded it as a territorial civil war in which all Tennesseeans were involved in law as public enemies of the United States—the unionists as well as the secessionists. *Prize Cases,* 2 Black, 635; *Mrs. Alexander's Cotton,* 2 Wal., 417; *The William Bagaley,* 5 Wal., 407;

*The Ouachita Cotton*, 6 Wal., 527; *McKee* v. *United States*, 8 Wal., 166, etc. This has been the view of the other courts also.

From the declaration of the Attorney General that he accepts the reorganized government of 1865, not as rightful or just, but merely as an accomplished fact, I infer that he does not, as I do, regard the present government as the regular offspring of that one; for the law officer of a government would hardly, before its Supreme Court, assert the illegitimacy of its parent. Then he must regard the proceedings of 1870 as a counter-revolution—a getting back to the legitimacy of 1861 overthrown by triumphant rebellion in 1865. Then, if the revolution accomplished in 1865 invalidated the obligations of 1861, how is it that the counter-revolution of 1870 has not invalidated the invalidation, and revived the repudiated obligations? Corresponding mental states, normal or abnormal, connect together in memory. The lucid state of 1870 should remember the obligations of the lucid state of 1861, and forget the aberrations of 1865.

The Constitution of 1870, repealing the Schedule of 1865, restored the previous condition of whatever, if anything, was affected by the latter.

. . . . . . . .

In opposition to these views I maintain :

1. That the State Government of 1861 was at least a *de facto* government, and its action as such, unless repugnant to the Constitution or laws of the United States, or the Constitution of the State, or tainted with hostility to the United States, as valid and binding as if it had been a government *de jure;* from which it will, of course, follow that even if we could contemplate the Bank of Tennessee as a mere state agency, and the emission of the new issue as in substance the act of the State, the new issue would not on this account be liable to be avoided by the reorganized State in 1865.

2. That, however, the Bank of Tennessee was no more

anything else than "a bank for ordinary banking purposes" than any of the other banks of the State; and that hence the new issue stands upon the same footing as the issues of the other banks under similar circumstances.

3. That the rebellion did not operate to confer upon the reorganized state in 1865 any exceptional power over the transactions of individuals, corporations, or even the State itself, during its pendency; that the obligations contracted during this period, whether by individuals, corporations, or the State itself, unless in themselves objectionable, were as well entitled to the protection of the Constitution of the United States against impairing state legislation, as if the rebellion had not existed at the time they were originated; from which it will follow that the new issue, if not shown to have been emitted in aid of the rebellion, or in violation of some law of the United States, or the State, must be adjudged valid and binding.

Now I concede that the Union theory triumphed with the Union arms, and that the view entertained by the government of the Union of the nature of the State Government of 1861, is to be taken as the law of the matter to-day.

According to that view, when the State Government assumed a hostile attitude towards the Union, it ceased to be a government *de jure*, and became liable to be removed by the Union, and to have a loyal state government substituted in its room. When rightful government in a state is overthrown, it is, according to that view, incumbent upon the Union, under the clause of the Constitution of the United States guaranteeing republican government to the states, to take the initiative in its reconstruction.

This was done in Tennessee through the military governor as an appropriate organ. In other states it was done under the auspices of the military commanders under acts of Congress prescribing details.

In the case of every rebel state, certain modifications of

its fundamental law were adopted, of the character required to bring the State into harmonious relations with the Union; and when such relations were deemed to have been established, the admission of the representation of the State into Congress completed the process.

I. But our first concern is with the view entertained by the United States Supreme Court of the *status* during the rebellion of the rebel state governments.

This view will be found fully set forth in *Texas* v. *White*, 7 Wall., 700. The court there held, that whilst the rebel states, being out of peaceful relations with the Union, could not enjoy all the privileges of states preserving such relations, yet at no moment did they cease to be states; that the Constitution looks to "an indestructible Union composed of indestructible states"; that the obligations of the States as members of the Union, and of their citizens as citizens of the Union, were never impaired; and that their legislatures, being departments of governments established in hostility to the Union, could not be regarded as lawful legislatures. So far, everything suits our opponents very well; but note what succeeds. The court add:

"And yet it is an historical fact that the Government of Texas then in full control of the State was its only actual government; and certainly if Texas had been a separate state, and not one of the United States, the new government, having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a *de facto* government, and its acts during the period of its existence as such would be effectual, and in almost all respects valid. And to some extent this is true of the actual Government of Texas, though unlawful and revolutionary as to the United States.

"It is not necessary to attempt any exact definitions within which the acts of such a state government must be

treated as valid or invalid. It may be said perhaps with sufficient accuracy that acts necessary to peace and good order among citizens, such for example as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts *which would be valid if emanating from a lawful government,* must be regarded in general as valid when proceeding from an actual though unlawful government; and that *acts in furtherance or support of rebellion against the United States, etc.,* must in general be regarded as invalid and void.

The last two italicized clauses go to the pith of the matter. Legislation unobjectionable in itself would be valid; but if in hostility to the United States, it would be void.

So, likewise, of course, with any other sort of State action.

In *In White* v. *Cannon,* 6 Wall., 443, the action of the Supreme Court of Louisiana after the secession was held valid. If judicial officers might act validly after the secession, so, likewise, of course, might any sort of officers; for there is no room for any distinction in this regard between the officers of different departments. Rebellion decapitated either all or none.

In *City of Richmond* v. *Smith,* 15 Wall., 429, the city was sued in the United States Circuit Court for action done pursuant to an ordinance passed just before the Federal occupation in 1865. It would have been a perfect defense that the ordinance was not the act of the city. And this defense might have been made out by any argument establishing that the *State* Government at the time was a mere usurpation. But the city was held liable for the act of its then authorities. If they could implicate the city the state authorities at the time could equally have bound the State.

*The Sequestration Cases,* 30 Texas, 700, is an interesting discussion of the subject in hand. The court there say:

" It was neither usurpation of the rights and authority of the United States as they existed before the war, nor in contravention of any expressed policy during its existence, for the insurgent states to perform such acts of local legislation as are permitted to the states by the Constitution of the United States. The public law of nations does not deny to a people engaged in rebellion and civil war, however wrongful, against the rightful sovereign, civil organization and administration. . . . It is repugnant to every principle of reason and sound policy, and to the modern usage and public law of nations, to hold that all laws, without political significance, enacted in this or any other of the Confederate States, are to fall at a single blow, and with them all the innumerable rights which have grown up and been fairly acquired under them."

In *Pepin* v. *Lachenmeyer*, 45 N. Y., 29, the suit was brought upon the transcript of a Louisiana judgment, rendered February 7, 1863. The following extract will convey the view taken of the Louisiana court at that date (p. 33):

" The stress of the appellant's argument is this: Louisiana was a state in the Union, but in flagrant rebellion against the Federal Government; it had organized a state government in opposition to the national government, in which was included a judicial system; the court of the sixth judicial district, etc., was a Confederate court, etc. . . . It is sufficient to say that in our view the sixth district court, etc., was a court of the State of Louisiana; that the rebellion against the national government in which the people of that state were involved, did not annul that court, its power, or jurisdiction, etc."

Let us turn aside for a moment to see, perhaps superfluously, how liberally courts concede *de facto* official character.

Two very elaborate discussions of the *de facto* doctrine, citing a legion of authorities, are *State* v. *Carroll*, 38 Conn.,

449 (9 Am. R.), and *Griffin's Executor* v. *Cunningham*, 20 Grat., 31.

In the first of these, a person acting under a void appointment as judge was held a judge *de facto*. In the second, the judges of the Court of Appeals of Virginia appointed under the reconstruction laws but holding after their official character had perished, were held to have been during this time judges *de facto*, and their decisions as valid as if they had been *de jure*. On p. 72 of this case, the court refer to a decision of Chief Justice Chase in the United States Circuit Court, that a judge disqualified by the 14th amendment was yet a *de facto* officer.

They also mention Sir Randolph Crew's case, where the action of judges after their commissions had terminated, through the demise of the Crown, was held valid.

Also, *Knight* v. *Corporation of Wells*, Lutwyche, 508, where an ineligible mayor's action in affixing seal to bond of the corporation was held binding.

In 9 Wis., 264, judges elected before the law creating their offices went into effect, held *de facto* offices.

In 9 Mass., 231, sheriff appointed for new county before the law creating it went into effect, held *de facto* officer.

In 3 J. J. Marshall, 401, county court clerk accepted the office of paymaster in the United States army, which, under the laws of Kentucky, *ipso facto* vacated his office; but performed some acts afterward, and these were held valid as acts of an officer *de facto*.

In *Bate* v. *Dyer*, 9 Hum., 162, defaulter elected sheriff in spite of act of 1848, providing that the election of a defaulter should be void; held, sheriff *de facto*.

In *Blackburn* v. *State*, 3 Head, 690, John P. Murray under thirty years of age held, in spite of the constitutional prohibition, to have been judge *de facto*.

In *Calloway* v. *Sturm*, 1 Heis., 768, held that whilst Governor Brownlow may have had no right to appoint Mr. Maynard a supreme judge while he was a member of Con-

gress, yet the appointment constituted him a *de facto* judge. *Smith* v. *Normant*, 5 Yer., 271, overruled, as previously by *Venable* v. *Curd*, 2 Head, 586.

In *State* v. *McLean*, Jackson, October 11, 1873, MS., assessors appointed by county commissioners (themselves not even *de facto* officers), held *de facto* assessors.

The court here say: "It is a mistake to assume that to constitute a good officer *de facto* he must be appointed or elected by the proper authority."

The true distinction between the *status* of Confederate and state officers may be illustrated from this case. The court say that the county commissioners were not *de facto* officers (although they acted and were regarded as such), because the law creating their offices was unconstitutional. In other words, there were no such *offices* as they assumed to fill. There is no such thing as a *de facto* office. A *de facto* officer presupposes a legally established office. Simply the incumbent's title to the office is defective. Now the Confederate States must be held, according to the theory of the United States which, by their success, has become the law of the matter, never to have been a legal organization. The Confederate offices were not, therefore, legally established offices, any more than the aforesaid county commissionerships, and so none of their incumbents were *de facto* officers, any more than the county commissioners. But the states *were* legally established, "indestructible" organizations. *Their* offices *were* legally established offices, and the incumbents of these during the rebellion were *de facto* officers.

The definition of a *de facto* officer given by Lord Ellenborough in 6 East, 368, is said in *Griffith's Executor* v. *Cunningham*, 20 Grat., 31, and in *State* v. *Carroll*, 38 Conn., 449, to have been adopted by the courts and text writers, and to be accurate and expressive.

"A *de facto* officer is one who has the reputation of being the officer he assumes to be, and is yet not a good officer in point of law."

As to the validity of his action, this court say in *Venable* v. *Curd*, 2 Head, 585: "No principle is better settled in English and American law than that the acts of officers *de facto* are valid when they concern the public, or third persons who have an interest in the acts done."

In *Smith* v. *State*, 13 Conn., 493, the court say: "No principle is better settled than that public officers *de facto* acting *colore officii*, are held to be as well qualified to act while they remain in office as if legally appointed and duly qualified."

In *People* v. *Collins*, 7 John, 549, Kent, Ch. J., observes that this is too well settled to be discussed, and in point of fact no one disputes it.

Were it *res integra* I should unhesitatingly say that the rebel state officers during the rebellion were not only officers *de facto*, but *de jure* also; for I never could see how a wrench merely in the federal relations of the State could affect the official character of the State officers.

According to the theory of our government that triumphed in the late unpleasantness, the states consolidated themselves to a certain extent into a composite state, called the United States. To this they surrrendered certain of the functions of government. But they retained the remainder unimpaired. As to these they preserved their separate autonomy. Now suppose certain states assume to break away from this arrangement and to form a new one. They erect a new central government, substituting its offices for the similar ones of the former central government. But they do not undertake to remodel their state organizations. Not a single state officer is removed. Not a single office is altered. Everything internal goes on just as before. The same governor, legislature, judiciary; the same justices, sheriffs, constables, clerks, registers, etc., etc.—performing the self-same functions precisely as before. The attempt is a failure. But what was the attempt? It was merely to set up a new central government. It was not to

remodel the state governments. The new central government being a failure, its offices of every description will be held by the victorious former government to have been spurious. But how has the attempt to create merely new central arrangements in anywise affected the former state arrangements, which were left untouched? True, the state governments may have been temporarily operated in the interest of the new usurping central government, and the former central government will treat their action in this regard as void as in defiance of its own paramount authority; and it may even punish the state officials for thus wielding the state machinery, if in this any law of its own has been violated. But where was the law written that hostility to the United States wrought *ipso facto* extrusion from state office? If the officers of a county should lend their aid to insurgents against the state authority, whilst for this they might be criminally punished, would it operate to vacate their county offices, or, in default of statutory provisions to that effect, even furnish a basis for proceedings for their *ouster?* If county rebellion against the state would not vacate county offices, how should state rebellion against the Union vacate state offices?

Indeed, since the Confederate offices were in nearly every instance counterparts of the corresponding former federal ones, generally, too, the same persons remaining in them, federal district judges, district attorneys, marshals, postmasters, etc., being now called Confederate ones, but discharging the same functions, throughout generally the same territorial areas, it might have been plausibly contended that in many cases the Confederate officer was a *de facto* Federal officer, the former Federal office remaining unchanged in contemplation of law though miscalled for a time, and the incumbent never having got out of it.

But overwhelmingly beyond all question, the rebel state officers were at least such *de facto.* Their declining to take the oath to support the Constitution of the United States

did not invalidate their action. ·In *Farmers and Merchants Bank* v. *Chester,* 6 Hum., 458, a deputy clerk acted in defiance of the act of 1794, requiring an oath of office as a prerequisite; and in *Margate Pier* v. *Harman,* 5 Eng. Com. . L. R., 278, a person acted as a justice without taking the oath prescribed, notwithstanding the statutory prohibition; and in both cases ·the action was held valid as that of officers *de facto.* Cases might be multiplied to the same purport.

Since, therefore, the State Government of 1861–2, as a *de facto* government, might act within constitutional limits as validly as if *de jure,* our adversaries would make no progress in their attack upon the new issue by establishing, even if they could do so, that its emission was in substance the act of the State itself.

Suppose the State had during the rebellion, but without the remotest reference to any object connected therewith, issued its bonds, under the internal improvement laws, to a turnpike company, does any one doubt that these would have been valid obligations?

We have seen that in *Texas* v. *White,* the United States Supreme Court recognize the capacity of the rebel state legislatures to perform unexceptionable legislation;—in other words, regard the character of the action itself as the criterion of its validity. So that even conceding that the emission of the "new issue" was the act of the rebel state, it would be valid unless void on account of the character of the emission itself; and we have seen that the notes involved in the present case are untainted.

II. I come now to the next proposition. It seems odd at this late day to meet with the old misconception so often disposed of by adjudication, that a state bank is identical with the State that owns it. Were this so, to sue the bank would be to sue the State; the statute of limitations would not run against the bank; the bank would enjoy the State's

priority in the administration of insolvent estates; and the notes of the bank would be bills of credit issued by the State. All these positions have been fully disposed of by the courts.

The earliest case upon the subject I have found is *Bank of the United States* v. *Planters' Bank of Georgia,* 9 Wheat., 904. It was urged here that the State being a corporator, and therefore a party in interest, to sue the bank was to sue the State. The reasoning of Chief Justice Marshall in reply to this has been adopted in all subsequent cases. I quote his language:

"It is a sound principle that when a government becomes a partner in any trading company it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates, and to the business which is to be transacted. . . . . As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other powers in the managsment of the affairs of the corporation than are expressly given by the incorporating act. . . . The government, by becoming a corporator, lays down its sovereignty so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter."

True, here the State owned only part of the stock; but this did not affect the principle. Suppose the State had by successive purchases come to own all the stock, at what point would a transformation have occurred in the character of the bank?

And if the State grants itself a bank charter, does this bank stand upon a different footing from one where the charter was granted to individuals and afterwards the stock bought up by the State? There can be no difference here.

In *Bank of Kentucky* v. *Wister*, 2 Peters, 124, the State was the sole proprietor of the stock, and it was again urged that the suit was against the State. The court said:

"This court is of opinion that the question is no longer an open one. The case of the *United States Bank* v. *Planter's Bank of Georgia*, 9 W., 904, was a much stronger case for the defendants than the present; for there the State of Georgia was not only a proprietor but a corporator. Here the State is not a corporator, since, by the terms of the act incorporating this bank, 'the president and directors' alone constitute the body corporate, the metaphysical person liable to suit.'"

This is precisely the case with the Bank of Tennessee. The language of the charter (sec. 6, Nicholson's Sup., p. 21), is: "The twelve persons so nominated and confirmed shall constitute the directors, one of whom shall be president, who are hereby incorporated and made a body politic and corporate by the name and style of 'The President and Directors of the Bank of Tennessee,' . . . and by that name shall sue and be sued," etc.

But it is not only "truth crushed to earth" that "will rise again." Some fallacies are of wondrous tenacity; and to this class belongs this one of the substantial identity between a state bank and the State. In *Briscoe* v. *The Bank of the Commonwealth of Kentucky*, 11 Pet., 257, the very same point was again pressed, and it was further insisted that "the Bank of the Commonwealth, in emitting the bills in question, acted as the agent of the State, and that consequently the bills were issued by the State" (p. 316), and so were bills of credit forbidden by the Constitution. On page 317, it will be seen that counsel were borne onward by their logic to insist that the notes of all state incorporated banks were essentially bills of credit, which evinces their feeling that no substantial distinction could be maintained between the case of a bank owned solely by the State and any other bank incorporated by the State.

The Bank of the Commonwealth of Kentucky was entirely similar in all respects relevant to the present controversy to the Bank of Tennessee.

The first section of the charter provided that a bank should be established in the name and behalf of the Commonwealth of Kentucky, under the direction of a president and twelve directors, to be chosen by joint ballot of both houses of the General Assembly. The second, that the president and directors of the bank, and their successors in office, should be a corporation and body politic by the name and style of the "President and Directors of the Bank of the Commonwealth of Kentucky," and should be capable in law to sue and be sued, etc.

In the third section it was declared that the stock of the bank should be exclusively the property of the Commonwealth of Kentucky.

The fourth section authorized the president and directors to issue notes. The fifth provided that the capital stock should be $2,000,000, to be paid as follows: "All moneys hereafter paid into the treasury for the purchase of the vacant land of the Commonwealth—all moneys paid into the treasury for the purchase of land warrants," etc., etc., etc.

The president was required to make a report to each session of the Legislature. The treasurer of the State was authorized to receive the dividends of the bank.

The notes of the bank were received in payment of taxes and of all debts due to the State.

The similarity of the bank to the Bank of Tennessee in every essential feature is perfect. I will quote such portions of the language of the court as will sufficiently illustrate their views upon the questions involved in the present case. They say, (p. 219):

"The president and directors were incorporated and vested with all the powers usually given to banking institutions. They were authorized to make loans on personal

security, etc. . . . . . Provisions were made, and regulations common to all banks, but there are other parts of the charter which it is contended show that the president and directors acted merely as agents of the State. . . . The president and directors were elected by the Legislature. The capital of the bank belonged to the State, and it received the dividends.

"These and other parts of the charter, it is argued, show that the bank was a mere instrument of the State to issue bills, etc.

"Where these notes issued by the State?

"Upon their face they do not purport to be issued by the State, but by the president and directors of the bank. They promise to pay to bearer on demand the sums stated.

"Where they issued on the face of the State?

"The notes contain no pledge of the faith of the State in any form. They purport to have been issued on the credit of the funds of the bank, and must have been so received in the community.

"But these funds it is said belonged to the State, and the promise to pay on the face of the notes was made by the president and directors as agents of the State.

"They do not assume to act as agents, and there is no law which authorizes them to bind the State.

"The State of Kentucky is the exclusive stockholder in the Bank of the Commonwealth, but does this fact change the character of the corporation? Does it make the bank identical with the State? And are the operations of the bank the operations of the State? Is the bank the mere instrument of the sovereignty to effectuate its designs, and is the State responsible for its acts?

"The answer to these inquiries will be given in the language of its former adjudications."

The court then quote from the *Bank of Kentucky* v. *Wister*, and *United States Bank* v. *Planters' Bank of Georgia*,

the remarks already set forth by me when citing these cases, and add:

"These extracts cover almost every material point raised in this investigation. They show that a state, when it becomes a stockholder in a bank, imparts none of its attributes of sovereignty to the institution, and this is equally the case whether it own the whole or a part of the stock of the bank. . . . . As a stockholder, in the language of this court above cited, it can exercise no more power in the affairs of the corporation than is especially given by the incorporating act. It has no more power than any other stockholder to the same extent.

"This court did not consider that the character of incorporation was at all affected by the exclusive ownership of the stock by the State. And they say that the case of the Planters' Bank presented stronger ground of defense than the suit against the Bank of Kentucky. That in the former the State of Georgia was not only a proprietor but a corporator, and that in the latter the president and directors constituted the corporate body. And yet in the case of the Planters' Bank the court decided the State could only be considered as an ordinary corporator, both as regarded its powers and responsibilities.

"If these positions be correct, is there not an end to this controversy? If the Bank of the Commonwealth is not the State, nor the agent of the State; if it possesses no more power than is given to it by the act of incorporation, and precisely the same as if the stock were owned by private individuals, how can it be contended that the notes of the bank can be called bills of credit in contradistinction from the notes of other banks?

"Under its charter the bank has no power to emit bills which have the impress of sovereignty, etc. It is a simple corporation acting within the sphere of its corporate powers, and can no more transcend them than any other banking

institution. The State as a stockholder bears the same relation to the bank as any other stockholder."

This decision, it would seem, should have disposed of the notion of the identity of a state bank with the State, now resurrected by our opponents. But in *Woodruff* v. *Trapnall*, 10 How., 190, counsel ventilated it again, and again the court rebuked it, citing *Briscoe* v. *Bank of the Commonwealth.*

But it reared its head again in *Darrington* v. *The State Bank of Alabama*, 13 How., 12, counsel probably relying for a distinction between this and former cases upon a clause in the charter of this bank pledging the credit of the State for the ultimate redemption of the notes. The State was the sole stockholder of this bank.

The court say: " The directors, though elected by the Legislature, performed their duties under the charter, and like all other directors of banks, derived their powers and incurred their responsibilities from the law under which they acted. It is not perceived that their action was not as free as those of directors who are elected by individual stockholders," etc.

They add: " But it is said that the State employed the bank as an agency through which its bills should be circulated for the profit of the State. The State, as a stockholder, received a profit, if any profit was realized through the operations of the bank. But this is the condition of individual stockholders in all banks. And as well might it be said that the individual stockholders of a bank issue its notes as that the State of Alabama issued the notes of the branch bank at Mobile.

" A bank in either case acts under its corporate powers, and the directors derive their powers and incur their responsibilities under the law which governs them. The State, as a stockholder, held its property as a corporation or individual could hold it, in the Mobile bank. The specie in its vaults, notes taken in discounts, and every description

of property managed by the directors of the bank, were subject to judicial process by its creditors. And in such a procedure the State in its sovereign capacity could not interfere. Its powers would be no greater than the powers of individual stockholders of a bank under similar circumstances."

In *Curran* v. *State of Arkansas*, 15 How., 309, the court reiterate the same views. They say:

" That a state, by becoming interested with others in a banking corporation, or by owning all the capital stock, does not impart to that corporation any of its privileges or prerogatives; that it lays down its sovereignty· so far as respects the transactions of the corporation; and exercises no power or privilege in respect to those transactions not derived from the charter, has been repeatedly affirmed by this court in the *Bank of the United States* v. *The Planters' Bank*, etc., etc., etc.

This court, in 1 Sneed, 354, *Fields* v. *Creditors of Wheatley*, refer to and approve 9 Wheat., 904; 2 Peters, 323, etc., deciding in that case that the Bank of Tennessee was no more than any other bank entitled to the State's priority in the administration of insolvent estates. The court say:

" The corporation, though belonging exclusively to the State, is subject to be sued; is within the operation of the statute of limitations; and in the collections of debts can assert no priority or right over other creditors."

In *Bank of Tennessee* v. *Dibrell*, 3 Sneed, 380, the bank recovered judgment against the treasurer of the State, and sought to have his salary retained by the State in satisfaction, upon the ground that, inasmuch as the State was the sole owner of the bank, the judgment of the bank was the judgment of the State, which might offset this against its indebtedness to its officer on account of his salary. As to this notion of identity the court say:

" If it were true that the Bank of Tennessee and the treasury of Tennessee were identical, there would be much

plausibility in the ground taken by complainants. In that case, the act of 1835, ch. 27, sec. 6, would authorize and require the retention of the salary, and its application to the debt due to the State. But the assumption upon which the bill in that aspect is based is unsound and fallacious. The fact that the bank is the creature and property of the State does not make it identical with, or even an integral part of, the State sovereignty. It is a distinct fiscal corporation, enjoying a separate existence, with its own chartered rights, obligations and powers. The doctrine that when a State becomes a common carrier by means of railroads owned by itself or otherwise, or banker, or in any other mode enters into the common avocations of citizens, or private companies or corporations, it throws off its sovereignty, has become too well established to allow of argument at this day. In such cases, the same rules of liability apply, and no superior advantages are enjoyed."

Now collate with the doctrine of these decisions the language of the Attorney-General:

"Otherwise than for the purpose of suit and of holding property, it is not separate from the State. It is a mere state agency, controlled by the State: its acts directed by the State; every act responds to the pulses of the State itself. . . . . The Bank of Tennessee is as much the creature and agent of the State as if it was the treasury itself; as much so as the fiscus of the German States, where the treasury is what we would call a corporation, etc., . . . it has only a formal existence separate from the State. Subject the treasury to suit, and it will be separate to the same extent nearly."

Was the Attorney-General then innocent of a knowledge of these decisions? His well-known learning repels the surmise. Has he any authority to oppose to them? None whatever. He merely reiterates in their teeth the misconception they expose and refute. Truly he conducts a forlorn hope with a hardihood worthy of a better cause.

We have seen that this unsupported *ipse dixit* is contradicted by the Attorney-General's associate, the special counsel of the State. He says:

" The Legislature of May, 1861, changed the character of the institution (the Bank of Tennessee) from that of a bank for ordinary banking purposes," etc. Before May, 1861, he says it was "a bank for ordinary banking purposes."

· Why does not the counsel cite some of this legislation? It must lie in a narrow compass. Why not give chapters and sections of acts, with book and page? This is what he would regard as lawyer-like, and not to refer the court to " the legistation of May, 1861." *Dolus latet in generalibus.* Let us have the details of the transmogrifying legislation.

The Attorney-General evidently cannot discover it; and he does not venture to follow his associate to the position. that the reorganized State in 1865 had absolute power over all transactions during the rebellion; and so, unable to make the schedule of 1865 crush the new issue on any better theory, he is driven to the old fallaciousness that the bank was identical with the State, so often struck down by adjudication, and yet so persistent in rearing again its head that it seems as if its essence, like that of Milton's angels, " can not but by annihilating die."

It is sufficiently plain that the Bank of Tennessee was no more identical with the State than the Union or Planters' Bank would have been had the State bought up all its stock, and it is clear that this would not have transformed the nature of either of these banks from what it was before the stockholders sold out to the State.

It has not been difficult to show that even if the emission of the new issue was the act of the State, it was not merely upon that account void;—was valid unless the emission itself was tainted with illegality, of which there is no pretence of proof; nor to show further that the emission was not, however, the act of the State, any more than the

issues of the Union or Planters' Bank were the act of the State.

III. I come now to my third position—adverse to the omnipotence over transactions during the rebellion claimed for the reorganized State in 1865. I maintain that this had no power to avoid the valid contracts during the rebellion of either the State or of corporations or individuals.

I repeat here that I am willing to look at this matter from the point of view of the victorious United States Government, whose triumph established its theory as the law of the contest. According to this theory, the constitutional amendments of 1865 possessed no exceptional potency to over-ride past transactions. They were merely the act of the people of the State, so altering the fundamental law as to bring the State into harmonious relations with the Union. All rightful government, and therefore republican government, being overthrown in the State, it lay with the Union, under the guaranty clause in the Constitution, to take the initiative in its reconstruction. This was done through the Federal agent, the Military Governor. He draughted certain amendments and submitted them to the people of the State in their primary capacity. They responded by adopting them. This was the substance of what was done. In other States the Federal initiative was taken through the agency of the military commanders, under laws of Congress prescribing details of manner, etc.; which in Tennessee were left to the Military Governor. In both cases the process was the same—the action of the people in response to the initiative taken by the Union through selected agencies. The Convention of 1865 cut no figure in the matter, legally considered. They were merely a number of gentlemen called together by the Federal agent for consultation. It does not alter the case that neither he nor they appear to have clearly grasped the true theory of the proceedings.

A constitutional amendment postulates merely the action

of the people of the State upon a proposition validly submitted to them.   In 1861, the Legislature submitted directly to the people the so-called declaration of independence, under the assumption that the Constitution of the United States being merely a part of the Constitution of each State, the amending power in each state might expunge this part of its Constitution.   Ordinarily, conventions are called to consider amendments to the constitution, but no such intermediaries are necessary, and usually they have submitted their work to the popular action.

There must, of course, be a valid submission to the people; for only then are they brought under the operation of the principle which makes the action of those who choose to vote that of the whole people—those who stay at home thereby electing to abide by the action of those who attend at the polls.   In such case, not to act is to act.   But if the submission to the people is not authorizedly made, then no notice need be taken of it, and the result is not binding upon any one, even if a large majority do attend at the polls—as was perhaps the case in the Dorr movement in Rhode Island.

Now in ordinary cases of amending the Constitution, the submission to the people is made by the existing state authorities, usually through the medium of conventions called by them; but in the extreme case of the overthrow of government in a state, the now established doctrine is that it then lies with the Union to take the initiative in reorganizing the State Government, under the guaranty clause in the Constitution of the United States, by making the submission to the people of the State of the necessary measures to that end.   The submission to the people of the amendments of 1865, by the Military Governor, acting in the premises as the agent of the Union, was therefore authoritative, and the action of the people in response thereto was valid.   This is the philosophy of the amendments of 1865.

The bearing of all this is, that the amendments of 1865 were not, as our opponents seem to imagine, a cataclysm of exceptional, spasmodic power over past transactions; but were the result of the normal action of a power stored up in the recesses of the Constitution of the United States for the emergency. All that was Federal about them, however, was the submission of the measures to the people of the State. So it was held in the case of the reconstructive Constitution of Georgia, in *White* v. *Hart,* 13 Wallace, 646, where precisely this point was involved. The amendments of 1865, being the action of the people of the State, could effect only what was within the compass of their power. They could not impair the obligation of a contract. Congress could not by express enactment have enabled them to accomplish that. So expressly say the court in *White* v. *Hart.*

The attempt of the Attorney-General to isolate Tennessee, and to regard what occurred here as a rebellion of the Tennessee unionists successful through foreign aid, if not intended as merely a piece of intellectual sportiveness seeking to look at the case topsy-turvy, as one can not help suspecting, evinces a feeling of the necessity of some exceptional, uncontrollable agency—some *deus ex machina*—to obliterate the new issue. The attempt confesses the necessity which inspired it, and in order to supply that necessity advances a theory which must have been contemplated by its own parent with a smile.

After confusing the Bank of Tennessee with the State, so as to blend the new issue with the contracts of the State, it is urged that the reorganized State in 1865 did not undertake to impair the obligation contracts of the pre-existing State, but only to decide that this was not legally the State.

I will quote the Attorney-General's language. He says: "Suppose a suit was brought between two parties in a municipal corporation, to determine which is the proper authority; and pending the suit each party claims to act, and does

act, for the municipality; when the suit comes to be decided, and this court comes to hold that one party was the rightful party, and the other had no claim of right to bind the corporation, does it impair the obligation of contracts? No more does it impair the obligation of contracts than it does when it declares that my attorney in fact who has made a contract *ultra vires* has not bound me. Now a civil war is but a grander *lis*—a wager of battle. When this is decided, and one of the parties to it declares that the other never was the rightful government, it is not the impairing of contracts which happens, but it is the mere declaration of the result—that the overthrown government had no authority to make the contracts."

Here is truly a valuable contribution to the tactics of repudiation. Our State finds it inconvenient to owe its present large debt. It cannot directly expunge the liability. That would impair the obligation of contracts. But let the people, who have to bear the burden, agitate, and set on foot a movement to result in the formation of a new constitution which shall emphatically denounce as illegitimate all pre-existing organizations of the State, and let this constitution, through the supineness of the existing authorities, or otherwise, foist itself into "*un fait accompli*" (to quote the French of the Attorney General), and the desired end is accomplished. In the language of the Attorney General, "it is not the impairing of contracts which happens, but it is a mere declaration of the result, that the overthrown government had no authority to make the contracts."

Could the Attorney General only patent this invention it might make him rich in fame. But, alas, though apparently useful, the idea is not new. Nor has it been heretofore found even useful. The invention would not work.

In *State Bank* v. *Knopp*, 16 How., 369, a state attempted by means of a similar dodge to get rid of its contract exempting a bank from taxation. It did not undertake through its Legislature to repeal the exemption. Clearly that would

not do. It decided, through the instrumentality of its Supreme Court, that the contract was not a contract at all. But the United States Supreme Court unfortunately held that it was.

Similarly another State undertook to enable its municipalities to expunge their liability for subscriptions to railroads, not by fulminating legislatively against the bonds issued, but through the instrumentality of its Supreme Court, composed of judges elected upon the very issue, who blandly decided that the bonds were void because the statutes authorizing the subscriptions were not laws at all—were unconstitutional and void from the beginning. But in *Gelpeke* v. *Dubuque,* 1 Wal., 175, the United States Supreme Court said that such judicial repudiation was as much an impairment of the obligation of contracts as a legislative repudiation.

See also *Havemeyer* v. *Iowa County,* and *Thompson* v. *Lee County,* 3 Wal., 303 and 327, etc.

The passage last quoted from the Attorney Generals' argument is singularly inapposite. If he must have a municipal illustration, why not suppose a case somewhat analogous to that in hand? *e g.,* where one party was in the undisturbed possession of the entire municipal administration in all its ramifications, and there were not even any rival functionaries, and the officials in possession were afterward adjudged not to have been *de jure* officers, but yet to have been *de facto* officers. For during the entire period of the emission of all of the new issue except the $177,000 issued after the removal of the assets of the bank south, there was no other government or *soi disant* government in Tennessee than that under whose auspices, according to the Attorney General, this money was issued. There were not two parties, each acting for the State. Even in the fantastic view under consideration, the unionist rebels did not claim to have any unionist state government. The appoinment of the Military Governor by the United States

(he was not elected by the Tennessee unionist rebels) was after the emission of the new issue, except the $177,000 aforesaid, the character of which is not involved now. Then, for the first time, were there conflicting governments in the State.

In the analogous municipal case supposed by me, the acts of the *de facto* officials would not be affected by the subsequent denial to them of a *de jure* character. The numerous cases I have cited overwhelmingly establish this.

The exigency of the Attorney General requires that his municipal authorities, having after a scrimmage got into possession, should themselves be competent to pronounce void the contracts of their *de facto* predecessors, made while they were in the full and undisputed possession of the administration. But the judiciary of the State would prevent this.

A revolutionary government in France or Spain, though it would not dare such turpitude, might declare its predecessor to have been a mere usurpation, and its engagements void, because of the absence of any restraining power. But we have in the Constitution of the United States certain restraints upon the states which have been well termed a bill of rights for all the people of the United States; and of these the most valuable is that which forbids the States from passing any law impairing the obligation of contracts. And this cannot be evaded by the artifice of deciding the contract not to have been a contract, or by a process of State self-stultification—the State deciding its former self not to have been the State. This court will not countenance such dishonesty; and if hereafter any State Supreme Court should do so, the Supreme Court of the United States would reverse its action. A state of the United States is restrained by the Constitution of the United States from doing what France, or Spain, or the United States itself might do—impairing the obligation of contracts. If the new issue did consist of obligations of a *de facto* State Government, not

objectionable in themselves at the time of their origination, the Constitution of the United States, as operative during the rebellion as before or since, protected these obligations against subsequent state impairment in any guise or shape.

It is wholly immaterial in what light the amendments of 1865 saw fit to regard the pre-existing State Government. The question is, in what light ought it to have been regarded —in what light must this court now regard it?

If the result of the war in Tennessee was the triumph of the unionists, certainly they did not set up the very view of the contest over which they had triumphed—that they were the rebels, and the national forces their foreign auxiliaries. They regarded the war as waged between, not themselves and the State Government, but the government of the United States and an organized rebellion against that government. Their theory was the same as that held by the Supreme Court of the United States, that never for one moment was the Constitution of the United States inoperative in Tennessee, and that every valid contract in Tennesse, as well during the rebellion as before or since, anchored itself as soon as made upon the rock of that Constitution, from the shock of subsequent state impairment.

The amendments of 1865 simply assumed as unquestionable the emission of the new issue in aid of the rebellion.

The argument of the Attorney General reduced to syllogistic precision is as follows:

*Major*—The State in 1865, might avoid the acts of the State in 1861–2.

*Minor*—The emission of the new issue was the act of the State in 1861–2.

*Conclusion*—*Ergo*—The State in 1865 might avoid the new issue.

Both premises are required for the conclusion, and neither is sound.

We have seen that the State authorities of 1861–2, during the period of the emission of the new issue, except the

$177,000 emitted after the removal south, the character of which is not involved here, stood, in proximity to *de jure* character, in the very front rank of *de facto* officers, and that their contracts not void in themselves were as exempt from subsequent state annulment as those of individuals.

We have also seen that the emission of the new issue was no more the act of the State than was the emission of similar issues of other banks.

The special counsel for the State, unable to ignore the at least *de facto* character of the State authorities during the emission of the new issue, or the logical consequences of that character as to their acts on behalf of the State; and, aside from this, placing little reliance in his May, 1861, transformation theory, to show that the Bank of Tennessee ever was anything other than "a bank for ordinary banking purposes," or his rebellious exigency argument against the emission itself; and feeling therefore that the new issue —contracts between a bank and its ordinary customers— could be reached only from a position commanding absolutely all the transactions of individuals during the period involved; hence, found himself driven to occupy that bold position, whither his co-adjutors have not ventured to follow him, dreading apparently the inevitable inference as to the desperateness of a conclusion exacting such a premiss for its support; and so the special counsel fights there alone, in the "last ditch" of the contest.

The position in question is, the omnipotence of the reorganized State in 1865 over all the transactions of every character within the State during the rebellion.

The insight of the special counsel was unerring as to the exigencies of his case. Only reorganized state omnipotence could crush the new issue.

Had not eminent counsel formally propounded this doctrine of reorganized state omnipotence, I should have supposed it a *reductio ad absurdum* of any conclusion to show that it required such a premiss. But a celebrated philoso-

pher has remarked that there is no error, however preposterous, that has not been maintained by some able pen. This is at least as true of legal positions as of philosophical opinions.

The doctrine in question is certainly far from self-evident. Let us see what arguments are relied upon to impress it upon the mind of the court. The following lengthy quotations from the counsel's argument become necessary for this purpose:

.   .   .   .   .   .   .

"The people of Tennessee undertook to separate from the United States and join the Confederate States.   .   .   .   . The effect of what was done was to bring the State as then controlled, etc., into rebellion and war with the United States. It has been repeatedly decided by the courts of the United States that war is a state of facts, etc. *Prize Cases*, 2 Black, 635, etc.

"'As a civil war,' says the Supreme Court of the United States in the Prize Cases, 'is never publicly proclaimed, etc., its actual existence is a fact in our domestic history which the court is bound to notice and to know.

"'All persons residing within this (insurrectionary) territory whose property may be used to increase the revenue of the hostile power, are in this contest liable to be treated as enemies though not foreigners. They have cast off their allegiance and made war on their government, and are none the less enemies because traitors.'

"In the case of *Luther* v. *Borden*, 7 How., 1, the Supreme Court of the United States held that the same principles and rights applied to a rebellion within a state where a new (or illegal) government undertakes to overthrow an old (or legal) government. The Legislature of the old government had in that case established martial law, and C. J. Taney, in delivering the opinion of the court, observed, among other things, that 'if the government of Rhode Island deemed the armed opposition so formidable, etc., as

to require the use of its military force and the declaration of martial law, we see no ground upon which we can question its authority. It was a state of war, and the established government resorted to the rights and usages of war to maintain itself and overcome the unlawful opposition.'

"This language is quoted by Nelson, J., in his opinion in the Prize Cases, with approbation.

"Now what was the effect of the status brought about by the acts of the rebellious government in this State on the 6th of May, 1861, and afterward, until the lawful authority was restored, upon the acts of the rebellious government with its citizens, and upon the acts of the citizens as between themselves.     .     .     .     .     .     .     .     .

"Here is what C. J. Taney says on the subject in *Luther* v. *Borden*, 7 How., 1, 39, and he is borne out by all the elementary text writers: 'The laws passed by its Legislature during that time (during the time a State is in rebellion) were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its public accounts improperly settled, etc.

"'It rests,' he says, 'with the political power of a state to pronounce upon the legality or illegality of the government acting for the time being.

"'Moreover,' he adds, 'the Constitution of the United States, as far as it has provided for an emergency of the kind, and authorized the general government to interfere in domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department.'

"The Dorr rebellion of Rhode Island, which was the particular rebellion under consideration, was not a rebellion of a part of the State against the whole. It was a rebellion of the whole State, etc., and its successful and continued organization would, as C. J. Taney said, have made the acts of the old government illegal and void. It is the political department that survives the rebellion, etc., which is clothed

State, and Watson, Trustee, *v.* Bank of Tennessee.

with the power 'to pronounce upon the legality or illegality of the government acting for the time being.' . . . .

"To the same effect as *Luther Borden*, is one of our own early cases, *Ingram* v. *Cocke*, 1 Tenn., 19, in relation to the acts of the Franklin Government. The court say in that case: 'When governments *de facto* cease to exist, the former or legitimate goverments, by their legislative acts, usually furnish the grounds upon which municipal courts proceed in giving an opinion.' In other words, to use the language of the Supreme Court of the United States, *White* v. *Hart*, 13 Wal., 651, 'the result (to the rebel citizen) depends upon the rule as defined in the law of the sovereign against whom he has offended.' The action of the political department under which the judges hold their offices, upon every thing done pending the rebellion, is conclusive upon the courts. See also *Rose* v. *Himely*, 4 Cr., 273; 3 Wheat, 324, 364; 13 Pet., 420; *White* v. *Hart*, 13 Wal., 649. . . . .

"'The right of confiscation by the successful belligerent may be referred to in this connection. 'The question of what shall be done with the enemy's property,' says Ch. Kent, 'is one rather of policy than of law, and is properly addressed to the consideration of the Legislature, and not to the courts.' 1 Kent's Com., 60.

[*Brown* v. *United State*, 8 Cr. 110, and *Miller* v. *United States*, 11 Wal., 268, are referred to in this connection.]

"I do not understand that there is any conflict of authority on these two points; that it belongs to the political department of the successful government to say what laws and what acts of the rebellious government or of its citizens shall be valid or invalid, and to determine whether any, and what, property of the rebels shall be confiscated or destroyed; and that, in the language of C. J. Marshall, 'the judicial department must give effect to its will.'

"With these principles distinctly before us, let us see what has been done in the premises by the political departments of the State and United States Governments."

Then the schedule of 1865 is referred to, annulling the acts of "the usurped State Government," and repudiating the new issue. The act of Feb. 16, 1866, in pursuance of the schedule, excluding from the assignment directed to be made by the bank, "all claims, etc., after may 6, 1861, as absolutely null and void," and the joint resolution of Congress of July 24, 1866, restoring Tennessee to her rights in the Union, are also referred to, the latter as having made the adoption of the amendment of 1865, "whereby all ordinances and laws of secession, and debts contracted under the same, are declared void"—the ground in part of the restoration of the State to its rights."

Also, the 14th Amendment to the Constitution of the United States is referred to, avoiding "all debts, obligations, and claims, in aid of insurrection and rebellion against the United States;" but as none of the notes involved in the present case are shown to have been issued in aid of the rebellion, we need not bring the 14th Amendment into a controversy in which there is no basis of facts for its application.

It is claimed that the political department of the reorganized State in 1865, before the rebellion had terminated, had the right not only to disregard whatever acts of the rebel State Government were, according to the triumphant theory now established as law, null and void from the beginning; but to reach forth its hand and strike down any transaction even of private citizens with each other; e. g., to invalidate a promissory note given by John Smith to Tom Jones for the price of a cow, or a barrel of flour.

This, it is said, would not be impairing the obligation of a contract, but merely "giving the courts, in the language of our Supreme Court, in *Ingram* v. *Cocke*, 1 Tenn., 19, 'the ground upon which they should proceed.'"

It is added: "All such so-called contracts are at the mercy of the legitimate government when restored. It is for the political department of the government to say how

18—VOL. 5.

they shall be treated by the courts. The rights of the rebel states and their citizens under the Constitution were, as said by the Supreme Court of the United States in *White* v. *Hart*, 13 Wal., 651, 'suspended,' and the extent of the punishment, either of person or property, depended upon the rule as defined in the law of the offended sovereign. Those ·states, as said by the same court on the same page, were at no time out of the pale of the Union. Their citizens had not the rights therefore of a foreign enemy who has been .subjugated, but only such rights as the offended sovereign might see proper to extend to them.

"The learned Chancellor in his opinion in the court below, seemed to think that there was a distinction between contracts entered into under ordinances and laws of secession, or directly with the rebel authorities or agents, and contracts between private citizens, and that the ban of invalidity could only be predicated of the former. But I do not understand that any such line of distinction exists. By the rebellion those who became parties to it, either voluntarily or through coercion of circumstances, are placed at once out of the pale of the law, and everything they may do, either with their rebel government or between themselves, is tainted with illegality and void, if the legitimate government chooses so to treat it through the action of its political department."

The conception of the status of transactions during the rebellion involved here, is that they were voidable at the subsequent election of the legitimate government. But in the subsequent portion of his argument, the special counsel, attempting to escape from the inference that if the Schedule of 1865 invalidated the new issue the abrogation of the invalidating Schedule by the Constitution of 1870 must.have restored its validity, propounds a different view. He says in that connection : "The provisions of those sections (the annulling portions of the Schedule of 1865) did not annul ‚the laws ordinances, acts, and proceedings, specially men-

tioned.  They were illegal and void before.  The true effect of those sections was by implication to validate all acts done during the rebellion except those set apart and designated."

The amendments of 1865 would appear to have been as fond of indirection as the old lady who preferred to take her tea by stratagem.  They went about their work of validation by superflously invalidating what was already void. But what concerns us is that everything needed to be somehow validated.  In other words, all transactions were originally void, and would have remained so but for the affirmative efficacy of that negative pregnant, the invalidating-validating Schedule of 1865.  Truly, these amendments "builded better than they knew.".

And conversely, the Convention of 1870 were unwitting architects of chaos.  For hear the special counsel:

" The abrogation (by the Constitution of 1870) of the sections (the annulling sections of the Schedule of 1865) may invalidate what was impliedly validated, thereby, but it cannot render that valid which was from the beginning void."

Everything was of itself " from the beginning void," but the Schedule of 1865, by superfluously avoiding certain enumerated things, already void, impliedly validated everything else.  But the Constitution of 1870, by abrogating the impliedly validating Schedule of 1865, recalled the previous condition of universal invalidity; for it remitted to invalidity what the Schedule had evoked therefrom, but could not evoke therefrom what the Schedule had left there.

Let us gather the full significance of this, before returning from this digression.  If the new issue was originally valid, but invalidated by the Schedule of 1865, then the express abrogation of this Schedule by the Constitution of 1870 restored the validity taken away by the Schedule.  So to avoid the conclusion of the present validity of the new issue, which follows even upon his own theory, the special counsel is driven to alter his premiss, and pro hac vice to contend for the original invalidity of the new issue.  But as

he can draw no line between the new issue and the issues of other bank, or the notes and contracts of individuals, the original invalidity of the new issue involves that of all transactions. The counsel is compelled to accept this, but he replies that the superfluous invalidation by the Schedule of 1865 of what was already void, impliedly validated everything else. But then he is obliged to hold that the Constitution of 1870, by abrogating the Schedule, plunged every transaction during the rebellion which the Schedule had rescued, back into invalidity. And this he is willing to do;—willing to annul contracts, destroy wills, dissolve marriages, bastardize children, upset the myriad transactions of years, in order to get rid of paying the new issue.

The unexpectedness of the counsel's elaborate deduction as to the effect of the adoption of the Constitution of 1870, irresistably suggests the result of Professor John Phœnix's trigonometrical measurement of the distance from Fort Point to Saucelito, which was, by means of a complicated process of triangulation, determined to be exactly 324 feet. "This result," wrote the Professor, "differed very much from our preconceived ideas, and from the popular opinion, the distance being generally supposed to be some ten miles; but," he adds, "I will stake my professional reputation on the accuracy of our work; and there can, of course, be no disputing the elucidations of science, however incredible they may appear *per se.*"

According to these views, had the work of 1865 merely restored to action the machinery of the State Government without more, all the transactions during the rebellion would have slumbered in their graves of invalidity. The resurrection blast of the Schedule called them into life. But resurrection presupposes a corpse to be revivified. The transactions in question must have enjoyed once some sort of existence to have supplied a basis for subsequent validation. For to validate what never did really exist, would involve special creation.

The position of reorganized state omnipotence over transactions during the rebellion is desperate enough. But the position that all transactions during the rebellion were void of themselves, and could become valid only through the quickening power of the reorganized state extended to raise them from the dead, is one that I need not take the trouble to refute. We have seen that in *Texas* v. *White; White* v. *Cannon; The Sequestration Cases; City of Richmond* v. *Smith; Pepin* v. *Lachenmeyer*, etc., acts of even the rebel authorities are regarded as having been valid, where devoid of political significance, etc.

The case of *Luther* v. *Borden*, 7 How., 1, cited by the special counsel, is utterly irrelevant here. It was there decided that the Federal courts must accept the decision of the political department of the Federal Government as to which of two rival state governments is the rightful one, this being a political question.

The court said : "In the case of foreign nations the government acknowledged by the President is always recognized in the courts of justice. And this principle has been applied by the act of Congres to the sovereign states of the Union."

The court also held that a state government might use its military force to put down an insurrection ; which probably never was doubted.

A little scrap is quoted from the opinion of the court, as to the consequences that would follow from holding the charter government not to have been rightful, under the circumstances of the case in Rhode Island ; which, however, has not the remotest application to the case of Tennessee during the period of the emission of the new issue, with her *de facto* state government exercising unquestioned sway throughout the State, without any rival government. But the character of the State Government during this period has been sufficiently illustrated.

The next case referred to by the counsel, *Ingram* v. *Cocke*, 1 Tenn., 19, so far as it has any bearing here, tells against

his ideas; for in this case the proceedings of a Franklin court were upheld, the Judge of which was not even a *de facto* officer; since the office he assumed to fill had no legal existence; and, as we have seen, a *de facto* officer presupposes a legal office: nor was this altogether upon the strength of the North Carolina act of pardon and indemnity; for whilst the court said: "Consistently with propriety, or the usage of nations, North Carolina could not declare the government of Franklin lawful, nor the proceeding of its courts matters of record;" yet, upon the next page they also said: "Though the erection of the State of Franklin was in opposition to the sovereignty exercised by North Carolina, yet a state of society might exist by social compact, in which the members would be bound by the acts of the government when substantial justice had been attained."

The court, even independently of the North Carolina act, could not bring themselves to view the action of the officer of a mere usurpation as null, and does the counsel imagine that they would have regarded as void the ordinary transactions of individuals with each other?

These transactions, neither North Carolina nor Tennessee thought it worth while, even out of abundant caution, to validate. The former did validate the judgments of the Franklin courts; and the latter, by acts passed in 1801, 1803 and 1815, (Car. and Nich., pp. 349, 350) validated administrations granted, marriages solemnized, and acknowledgments and registrations of instruments made, under the authority of the Franklin government. But whilst it was thought proper to validate the acknowledgments and registrations, there was no provision for the instruments themselves; which, according to the counsel's argument, impliedly invalidated the instruments, if indeed they were not, as he must hold, previously invalid. And so we have North Carolina and Tennessee involved in the absurdity, either of validating the registrations and leaving void the instruments registered; or, worse still, of impliedly

State, and Watson, Trustee *v.* Bank of Tennessee.

invalidating the instruments registered by expressly validating the registrations. For if the Schedule of 1865 validated everything not mentioned as invalidated; similarly, the acts in question of North Carolina and Tennessee invalidated everything not mentioned as validated.

But we see that nothing was imagined by either North Carolina or Tennessee to require validation, unless its validity exacted, as an essential ingredient, the legality of official action. It was never suspected that ordinary individual contracts were void.

The counsel is welcome to whatever aid and comfort he may be able to derive from this case and the reflections it suggests.

He cited it for the sake of the following remark, made preliminarily by the court: "History affords various instances of governments *de facto;* when they cease to exist, the former or legitimate governments, by their legislative acts, usually furnish the ground upon which municipal courts proceed in giving an opinion;"—as if this were an authority for the position that the reorganized State in 1865 had unrestricted power to furnish whatever rule it pleased as to the transactions during the rebellion,—*i. e.*, was absolute over these transactions.

It may be quite true that upon the suppression of temporarily successful rebellion, governments have usually cut the Gordian knot of resulting complication with the convenient sword of legislative enactment; for these governments have usually been such as were competent to enact whatever seemed right in their own eyes, unhampered by constitutional restrictions; and this was the case with North Carolina at the time when the Franklin rebellion collapsed in 1788; for North Carolina did not enter the Union, and become bound by the restraints of its Constitution, until 1790, up to which time she might have passed laws impairing the obligation of contracts, *ex post facto* laws, bills of attainder, etc., etc., as freely as the Parliament of England; for under

the Confederation, and until she adopted the Constitution of the United States, North Carolina was as completely sovereign as Great Britain. But all this she could do without having her power expanded by suppressed rebellion. What we want to know is how Tennessee in 1865 came to have more power over the transactions of 1861-2, unobjectionable in themselves at the time of their origination, than she, with her constitutional restrictions, would have had if there had been no rebellion.

Had there been no rebellion, then of course Tennessee could not in 1865 have annulled the contracts of banks or individuals in 1861-2. By what process did the rebellion operate to loose her constitutional fetters? No answer is possible. In the next case, unaccountably cited by the counsel, *White* v. *Hart*, 13 Wall., on page 652, the Supreme Court of the United States say:

"Georgia, after her rebellion, and before her representation was restored, had no more power to grant a title of nobility, to pass a bill of attainder, an *ex post facto* law, or law impairing the obligation of contracts, or to do anything else prohibited to her by the Constitution of the United States, than she had before her rebellion began, or after her restoration to her normal position in the Union. It is well settled by the adjudications of this court that a state can no more impair the obligations of a contract by adopting a constitution than by passing a law."

Upon page 649, the court say, with reference to the provision of the Georgia Constitution annulling debts for the price or hire of slaves:

"We may add that if Congress had expressly dictated and expressly approved the proviso in question, such dictation and approval would be without effect. Congress has no power to supersede the National Constitution."

In the cases of *Rose* v. *Himely*, 4 Cr., 273, and 3 Wheat, 324, next referred to, it was decided that it belongs exclusively to the political department to recognize foreign new

states, and in 13 Pet., 420, (the next citation), that it also belongs to that department to determine for the courts the jurisdiction of foreign states, but what bearing these cases have upon the question of the power of Tennessee to avoid, by constitutional amendment in 1865, the transactions of 1861–2; is, I confess, a mystery to me. For all I can see, the Rule in Shelley's Case might as relevantly have been cited.

Nor can I divine why reference is next made to the power of confiscating enemy's property, which, we are told, "was applied in all its rigor, without reference to their personal loyalty or disloyalty, to the citizens of the Confederate States, as enemies, in *Miller* v. *United States*, 11 Wal., 268."

It is intelligible how the United States might confiscate, during the rebellion, as enemies' property, the property of Tennesseeans, loyal and disloyal; but how Tennessee in 1865 could by constitutional amendment confiscate as enemies'. property the new issue, irrespectively of its ownership, surely transcends finite human comprehension. Who were the enemies whose property it was thus sought to confiscate? What as to the portion of the new issue otherwise held? And then, confiscation is an appropriation by the State to its own use, and here the attempt was merely to destroy the new issue,—to relieve the bank of a portion of a portion of its indebtedness,—to take indiscriminately the property of neutrals, friends, and foes, and give it not to the State, but to the bank.

The counsel says that he does not understand that there is any "conflict of authority" upon the point, that it belongs to the political department of the successful government to say what laws and what acts of the rebellious government or of its citizens shall be valid or invalid. There is no "conflict of authority" upon this point. That implies conflicting authorities, and there is no vestige of "authority" for the point. The counsel himself is probably the

State, and Watson, Trustee v. Bank of Tennessee.

first who was ever inspired by the exigencies of a forlorn case with desperation adequate to its maintainance.

But even if the position were sound, what then? "The successful government" in the late unpleasantness was that of the United States. It was not that of reorganized Tennessee in 1865. That was not the antagonist, still less the conqueror, of anything. It was born out of the triumph of the Federal Government, and had to be nursed by that government through a weakly infancy. At the time of, and for some time after, its inauguration, its every official was in the eye of the law, equally with the rest of the citizens of Tennessee, a public enemy of the United States, whose property was liable to confiscation as enemy's property, as the counsel himself points out, citing *Miller* v. *The United States*, 11 Wall., 268.

Now the political department of the successful Federal Government has never undertaken to avoid the new issue. The language of the joint resolution of July 24, 1866, restoring Tennessee to representation, to which the counsel refers, as having made the adoption of the annulling Schedule of 1865 "the ground in part of the restoration of the State to its rights," is as follows:

" . . . Whereas, the people of the State did, on the 22d of July, 1865, by a large popular vote, adopt and ratify a constitution of government whereby slavery was abolished, and all ordinances and laws of secession and debts contracted under the same were declared void; and, whereas, a state government has been organized under said Constitution, which has ratified the amendment to the Constitution of the States abolishing slavery, and also the amendment proclaimed by the thirty-ninth Congress, and done other acts proclaiming and denoting loyalty; therefore, &c."

This resolution, whilst it mentions approvingly other things done, refrains *ex industria* from countenancing the repudiation of the new issue, the significance of which si-

lence I need not explain to counsel familiar with the principle,—*expressio unius*, &c.

But the resolution referred to what had been done in Tennessee merely as the manifestations of a harmony then existing between the State and the Union, as the last clause superfluously shows.

And even if this was otherwise, the whereas-ing of the joint resolution could not infuse any Federal potency into the Schedule of 1865, enabling it to compass what was beyond the unaided capacity of the State. This point was expressly decided by the Supreme Court of the United States with reference to the reconstructive constitution of Georgia, in *White* v. *Hart*, 13 Wall., 651, a stronger case than the present, because there it did seem as if Congress had impliedly approved the clause involved, which annulled all contracts for the price or hire of slaves. For when the Constitution was submitted to Congress they objected to portions of it, but not to the annulling clause (*expressio unius*, &c.), and afterwards the objectionable portions were disposed of, and the Constitution again submitted with the annulling clause, and it was pronounced satisfactory. But the court said that the Constitution must be regarded merely as the act of Georgia, and that even if Congress had expressly dictated and approved the annulling clause, this would not have helped it, since Congress could not set aside the constitutional restraints preventing a state from impairing the obligation of contracts.

Ever since Mr. Pinkney's great argument on the Missouri question, it has been given up that Congress cannot impose any restraints upon a state at the time of its admission; that it must come in, if at all, upon perfect equality with the other states, subject only to the restrictions of the Constitution of the United States;—that else it would not be, in the sense of the Constitution, a "State" such as Congress is authorized to admit. Still less could Congress, by imposing conditions of restoration additional to the restric-

tions of the Constitution, impair the state-hood of an equal member of the Union.

And clearly Tennessee has not felt herself swathed in a congressional straight-jacket; for in 1870 she abrogated the Schedule of 1865.

Not only has "the political department" of the successful Federal Government not undertaken to avoid, or to enable Tennessee to avoid, the new issue, but the attempt, if made, would have been futile.

But the Schedule of 1865 was not the act of "the political department" of any government.   It was the act of the people in their primary capacity.   In order to have something to stand under his favorite phrase, "political department of the successful government," the counsel, in addition to distorting the reorganized state government into "the successful government," had to call in the act of its Legislature of February 16, 1866, directing the bank to make an assignment excluding the new issue from participation therein (the Schedule, though as organic law ranking higher, not answering to the phrase), the particular phrase being in demand to establish a connection with premises misapplied from international law (inapplicable here) to evolve the remarkable conclusions desired by the counsel.

The fallacy tainting the whole substance of the counsel's argument upon this subject—a fallacy judiciously not allowed to appear in its unmixed state, but held in strong solution, and the compound stirred to prevent a precipitation into explicitness, which would be fatal to it—is that the war resulted somehow in the conquest of Tennessee; and that afterwards the conquerors had all the rights conceded by international law over conquered countries.

But not even from the concession of this position could the much longed for conclusion be reached.   For the inquiry would not stop at the rights of conquerors under international law.   A further question would be, what powers may the particular conquering government exercise under its own organic law?

International law would concede over conquered countries identical rights to the Russian and to the Federal Government. But within the rules of international law their powers would differ as widely as the powers of a despotism and of a constitutional republic over their respective citizens. The Czar might apply, within these rules, his despotic power to the situation; but the Federal Government must act within the limitations of its own Constitution. The idea is thus well expressed by the Supreme Court of the United States in *Scott* v. *Sandford*, 19 How., on pages 449 and 450:

" . . . The power of Congress over the person or property of a citizen can never be a mere discretionary power, under our Constitution and form of government. The powers of the government and the rights and privileges of the citizen are regulated and plainly defined by the Constitution itself. And when the territory becomes a part of the United States, the Federal Government enters into possession in the character impressed upon it by those who created it. It enters upon it with its powers over the citizen strictly defined and limited by the Constitution, from which it derives its own existence, and by virtue of which alone it continues to exist and act as a government and sovereignty. It has no power of any kind beyond it, etc."

The court say, by way of illustration, that Congress could not deprive the people in the newly acquired territory of the right to keep and bear arms; the right of trial by jury; the right not to be compelled to testify against themselves; the right not to be deprived of life, liberty, or property, without due process of law; the right not to have soldiers quartered upon them in peace, or in war except as prescribed by law; the right not to have private property taken for public use without compensation, etc.

So far as international law is concerned, " the political department of the successful government " might decide whether or not it was proper to allow the subjugated people

to bear arms, etc.; but if this were the Federal Government, it would enter upon the conquered territory, as the Supreme Court say, "with its powers strictly defined and limited by the Constitution from which it derives its own existence." And it could not impart to a state government powers beyond its own.

But international law forbids conquerors to do more than "displace the sovereign and assume dominion over the country;—that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged if private property should be confiscated and private rights annulled." 7 Pet., 87; 12 Pet., 436; 3 Col., 272. And this even if the municipal powers of the conquering government were (as here they are not) adequate to the step.

So that even with Tennessee upon the footing of a conquered country, the obligation of the new issue cannot have been impaired by the Schedule of 1865, still less by the act of February 16, 1866; since not only has the Federal Government not attempted to authorize these enactments, but, as decided in *White* v. *Hart*, it had no power to do so. Both federal and state governments have ever been incapable of transcending in Tennessee their constitutional limitations.

But then there was, of course, no conquest of Tennessee, unless as the Dutch captured Holland. If the counsel persist in regarding the reorganized state government as "the successful government" whose view of the contest has been established by arms, let him refer to the decision of its highest exponent, in *Galbraith* v. *McFarland*, 3 Col., 272, where it was declared that merely a rebellion had been suppressed; that there had been no conquest: that no new sovereignty had been acquired; but simply all the rights that previously existed had been maintained.

To the same effect are the declarations of the United States Supreme Court in *The Venice*, 2 Wall., 278. They

say that the Federal Government sought "the re-establishment of the national authority, and the ultimate restoration of states and citizens to their national relations, under better forms and firmer guaranties, without any views of subjugation by conquest."

And in *Texas* v. *White*, 7 Wall., 726, they declare that the secession of the State was "absolutely null." They add:

"The obligations of the State as a member of the Union, and of every citizen of the State as a citizen of the United States, remained perfect and unimpaired. . . . If this were otherwise, the State must have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for subjugation and conquest."

Every act of Congress, and every proclamation of the President, from the very beginning of the rebellion, having reference to the subject, has breathed the same tone,—that the contest was a rebellion, waged against the United States by its own citizens, who were liable to punishment therefor unless exempted by pardon and amnesty, the granting of which involved the same view.

This is the view whose triumph amid the shock of arms has established it as law to-day. The Attorney General appears to think that those whom he regards as the successful party in the conflict, had the right after their triumph to do what they pleased, and he makes them please to right about and apply to the situation the very doctrines they had just overthrown. But their right was to establish and act upon their own theory of the contest. By that standard everything must now be judged from first to last. It has by the ultimate decision of the God of battles, after a sanguinary discussion, been solemnly pronounced to have been the correct rule from the beginning, just as by the decision of this court the victorious litigant is held to have been right from the beginning.

According to that view, Tennessee was never out of the Union; the Constitution of the United States was never for a moment inoperative in Tennessee; no contract made in Tennessee at any time was outside of its insurance against state impairment.

And such impairment is not more impossible by direct enactment, organic or ordinary, than by the *hocus pocus* of "the political department" furnishing the courts with "the ground upon which they should proceed," or the dodge of the State's illegitimizing its former contracting self (in the case of the State's contracts), or pronouncing through the courts the contract to have been originally void, or any other of the multiform devices of ingenious dishonest indirection.

We have seen that not one of even the paths selected by our opponents themselves will lead to their desired conclusion,—the invalidity of the new issue; that the denial of a *de jure* character of the State authorities during the time of its emission will not,—even with the impossible concession that the bank was merely an organ of the State, and its officers virtually state officers, and so the notes themselves substantially the obligations of the State,—because the State authorities at the time involved were at least in the foremost rank of the very highest grade of *de facto* officers, whose acts, unobjectionable in themselves, were as valid as if they had been *de jure* officers, and there is not a vestige of any evidence to taint the new issue.

And here let it be noted that the only portion of the period of the rebellion with which we are concerned is the year 1861, within which were emitted all of the notes in the present suit; and, indeed, all of the new issue except the $177,000 put forth after the removal of the bank south.

But we have also seen that the new issue was no more anything other than the notes of "a bank for ordinary banking purposes," than the issues of other banks, and that therefore the question of the *status*, at the time of the emis-

State, and Watson, Trustee v. Bank of Tennessee.

sion of the new issue, of the State officials, is irrelevant to the present controversy,—as irrelevant as it would be if the controversy were upon an individual promissory note,—the invalidity at the time, of official action, not involving that of the transactions of banks or of individuals.

And, lastly, we have seen that the Schedule and the act, relied on to crush the new issue, were futile for the purpose ; that Congress did not undertake to infuse extra state potency into them, and could not have done so if they had attempted it.

The inevitable conclusion is, that unless the new issue was originally invalid, because issued in aid of the rebellion or for some other illegality (of which it is not even pretended that there is any evidence), it now rests secure behind the impenetroble ægis of the National Constitution.

ED. BAXTER, SOLICITOR FOR DEFENDANTS, DUNCAN AND ATCHISON.

STATEMENT OF CASE.

After the return of the assets of the Bank of Tennessee to Nashville at the close of the late war, the General Assembly of the State, on the 9th of June, 1865, passed an act that the funds then in coin belonging to the bank be invested by the Governor, Secretary of State, and Comptroller, in United States or Tennessee Bonds, and be subject to future legislative control.  Laws of Tenn., 1865–6, 1st Sess., p. 53.  On the 16th of February, 1866, an act was passed directing that the Bank of Tennessee should no longer carry on or do a banking business, but should be placed in liquidation, and its business and affairs should be settled at as early a day as practicable ; and for that purpose a President and Board of Directors were appointed (Acts 1865–6, 2d Sess., p. 37), who were directed " to cause an assignment and deeds of trust " of all the assets and property of said bank (including $618,250 of United States bonds in

19—VOL. 5.

which the coin fund aforesaid had been invested), to be made and executed in the name and behalf of the Bank of Tennessee for the uses and trusts following:

1. "To secure the full sum of $1,500,000, the amount of the common school fund deposited in the Bank of Tennessee by acts of the Legislature, which shall be a preferred claim with interest accrued since May 6, 1861," and "the said sum of $618,250 in United States 7-30 bonds shall be placed in the hands of the Treasurer of the State as a part of the common school fund originally deposited in the Bank of Tennessee."

2. After said school fund, as above named, with interest, has "been fully secured to the State, the remainder of all assets, real, personal or mixed, shall be assigned for distribution *pro rata* to secure all remaining just creditors of all kinds, excluding all claims and demands of all kinds of date after 6th of May, 1861, as absolutely null and void." Acts 1865-6, 2d Ses., p. 38.

The Attorney General of the State was authorized to file a bill in the Chancery Court to execute the deed of trust, and without security to enjoin all creditors from suing said bank; making all the creditors parties by process, or publication, that all might come in under one decree, and equal justice be done to all. Acts 1865-6, 2d Sess., p. 39.

On the 4th of May, 1866, the President and Directors of the Bank of Tennessee, "in obedience to said act, and in pursuance of all its provisions," executed and caused to be registered an assignment or deed of trust to Samuel Watson as Trustee, conveying to him the property and assets of the bank upon the trusts and according to the directions of the act of the Legislature last referred to.

The said Watson accepted said office of trustee, but owing to the amount of the statutory bond, he never qualified as trustee under section 1974, *et seq.*, of the Code.

On the 16th of May, 1866, "the State of Tennessee and Samuel Watson, Trustee, filed a bill in the Chancery Court

at Nashville against "the President and Directors of the Bank of Tennessee," the Governor, Secretary of State, and Comptroller, against certain named creditors of the bank, and against all persons who were or claimed to be creditors of the bank, and after reciting substantially the facts as above set forth, the bill states that " large numbers of persons and bodies corporate claim to be creditors of said bank, and the holders of its issue and many such have already commenced suits against the bank, while others were preparing to do so. That this would entail large and unnecessary costs and expenses; that said bank was insolvent, and said assignment was ordered by the Legislature, and was made and executed in view of said fact of insolvency; that many legal questions present themselves to the trustee in executing said trust with the creditors of said bank, being the holders of its issue, or bank bills, and holders of bills, notes, and bankbooks of deposit, made, issued, or indorsed by said bank, that said creditors were too numerous to mention, and were unknown to complainants by name or residence."

The bill therefore prayed that "in order to close up said trust with the aid and under the supervision of the court, the parties named be made defendants by process;" that publication be made "for all other persons claiming now, or hereafter claiming, to be creditors of said bank, and that such as would not come in and become complainants be made defendant, and required to file his, her, or its claim in full, giving its origin and consideration, and when and how it arose, and when said persons became the owners thereof, and the creditors of said bank." That an injunction issue enjoining all persons or corporations from suing out any writ against said bank or its trustee, either original, intermediate or final, and from commencing any legal proceedings whatever against either, in any court of law or equity in the State of Tennessee, or elsewhere; that all proper accounts be taken of the trust funds, between said bank and trustee, between the school fund and said bank, between

said bank and its creditors, and the amount of its indebtedness ascertained, that a rate bill be declared, and said trust be closed up under the orders and decrees of the court, according to the uses and trusts of said deed of assignment and acts of the Legislature.

The injunction was granted as prayed, and the said Watson was, by decree of court, "appointed receiver of all the assets and effects embraced in said assignment, and acting trustee thereof, to go on under the orders and decrees of this court to the execution of said trust."

A great number of the creditors of the bank have made themselves parties defendant from time to time, some by way of answer merely, and others by way of answer and cross-bill. Without going into the allegations of their different pleadings, it will be seen that they raise the following questions, which will have to be settled by this court, before any distribution of the assets of the bank can be made:

1. Did the bank have the right, in the assignment which it made, to secure "to the State" $1,500,000, with interest from May 6, 1861, as a preferred claim out of the assets of the bank, to be paid before the creditors of the bank received anything?

It is not necessary to inquire whether a solvent bank may make an assignment for the benefit of creditors, either with or without preferences. For the purposes of my argument, I can concede that a solvent bank does have such power.

I can also concede that an insolvent bank may make an assignment, but I deny its power to make preferences; for "after the admitted insolvency of the bank, its officers and agents, in whose hands the assets remain, hold them as *quasi* trustees for the creditors (4 Col., 485), who are entitled to be paid *pari passu*" (4 Col., 485), and stand on the same ground as to the common fund. No one creditor can, by any superior diligence, appropriate it all to his own benefit, and thereby totally defeat all the others; and the officers of the bank, so far from having the right to give all of the

fund to any one creditor, are bound in equity to defend the right of all the creditors, as against the attempt of any one to enrich himself at the expense of the others. 4 Col., 485, 486. As the bank was certainly insolvent before the act authorizing it to make the assignment was passed, the vested right of the creditors to have its assets distributed ratably, could not be divested by the act in question; and besides, the act is special and partial in its operation in this, that it undertakes to single out this bank from all the other banks in the State, and authorize it to make a preference which no other insolvent bank could make.

I repeat, that if the officers and agents of a bank should, as a matter of convenience and dispatch, select some one individual, and convey to him all the assets on hand to distribute ratably among all the creditors, this, even in the case of an insolvent bank, would not be objectionable, because it would only be doing what the law would make them do, and it could be done with less trouble and expense than if all the officers had to join in the execution of the trust. It is only to the right of an insolvent bank to make a preference that I object.

But in this case the State of Tennessee was not a creditor, but a stockholder, in the bank to the amount of the school fund. The question, therefore, is not whether an insolvent bank may prefer one creditor over another, but can it prefer one stockholder over all the creditors?

It is true that the act of February 16, 1866, speaks of the common school fund as having been "originally deposited in the Bank of Tennessee," and it was argued in the lower court that the State of Tennessee was, on that account, as much a creditor as was any other depositor, and as such creditor, might well be preferred by the bank.

But the fact is, that the school fund was never deposited in the bank; it was put into the bank as capital. The language of the charter is, "that the capital of said bank shall be five millions of dollars, to be raised and constituted as

follows: the whole of the common school fund," etc., together with certain other funds, "shall constitute a part of the capital of the Bank of Tennessee;" it was to be "handed over to the President and Directors of the Bank of Tennessee as capital in said bank," and "certificates of stock" were to be issued to the Superintendent of Public Instruction. Nich. Sup., p. 18, 19; Code, sec. 965; 5 Cold., 180; 3 Col., 448. Therefore, in securing to the State the amount of the school fund, the bank was simply preferring a stockholder over its creditors.

But the counsel take higher ground, and insist that even if the school fund was put in the bank as capital, the State being a mere trustee of that fund, had no right to invest it in the capital stock of a bank; that every one dealing with the bank was bound to know that such investment was a breach of trust; that the school fund could not be diminished by legislative action, and that they have a right to follow the fund and appropriate the whole assets of the bank to its repayment.

If this position is sound, the school fund will absorb all the assets of the bank, whether the preference in the assignment is valid or not.

It is true that Judge Shackelford (3 Col., 180) and Judge Hawkins (5 Col., 448) have said, by way of *obiter dictum*, that the State was a trustee of the school fund; but there was nothing whatever in the cases before them to call for even an examination, much less a decision of the point now in controversy.

It is certainly true that as to a very small part of that fund, the State was a trustee, but the part held by the State in trust was a mere fraction of the entire fund.

On the 18th of April, 1806, Congress ceded to Tennessee all the land north and east of the congressional reservation line, subject to certain conditions. 5 Col., 448. But the only reservations in favor of educational purposes were 100,000 acres for colleges, 100,000 for academies, "and 640

acres in each six miles square for the use of schools for the instruction of children forever."

In other words, only 1-36th of this territory was reserved for the use of schools, the remaining 35-36ths were the property of the State, subject to certain conditions not necessary to mention, as none of them were in relation to common schools.

As to the 1-36th reserved for schools, the State was a trustee; but the Supreme Court, in 1831, decided that the State could not sell these lands, and enjoined the State Treasurer from selling them. Meigs' Dig., sec. 1212; 2 Yer., 534, 535. They remained in their original condition unsold, when the Constitution of 1834 was adopted, and no part of their proceeds could possibly have been part of the common school fund at that time. In fact, it was not until 1843 that Congress, the creator of the trust, authorized the State to sell them. 1 Head, 175. As to how much money has been received by the bank from the sales of these lands does not appear, but the bank was directed to invest the proceeds as fast as received, in the bonds of this State, and and the interest on said bonds was to be paid over to the townships to which the lands had belonged. Nich. Suppl., p. 93. These bonds were clearly a trust fund, and may be followed wherever found; and the Legislature, by act of 1870, ch. 101, directed the trustee of the bank to pay them over to the county trustees of the respective counties in which the lands that had been sold were situated. Thomp. and Steg. Code, sec. 946a.

It will thus be seen that none of the proceeds of the school lands were ever deposited, or invested as capital, by the State in the Bank of Tennessee. All such proceeds as were received by the bank, we suppose, were invested in bonds, which were held in trust for the schools, and they must look for their indemnity to the bonds. If the bank has misappropriated the bonds, it may create a debt against the bank, but such debt would not affect the assets of the

bank with any trust, and would not be entitled to any priority of payment out of the general property of the bank.

In 1823, the State put on the market all of her own portion of the lands ceded by Congress as aforesaid, and directed their proceeds to be paid into the old Bank of Tennessee, to the credit of the common school fund, to be loaned and used as other money belonging to said fund. Meigs' Dig., sec. 474; Caruth. & Nich., p. 171.

This was the first provision made by Tennessee for the creation of a common school fund; and all of the money thus donated belonged to the State absolutely, unaffected by any trust whatever.

In 1827, certain other funds were added to the school fund, viz.: 1st, all the capital of the old State Bank; 2d, all the stock owned by the State in the old bank of the State at Knoxville; 3d, certain donations made to the State by Mason Lee and John Rice; 4th, escheated lands and personal effects of intestates dying without kindred; 5th, all vacant lands owned by the State, the proceeds of the Hiwassee lands, and all lands previously appropriated in the State to the use of schools; and 6th, the rents and profits of the school lands. King's Dig., sec. 10,627. •

It will be seen that all of these funds except the rents of the school lands were the absolute property of the State, and had never been affected by any trust in favor of common schools, either through Congress or in any other way whatever. Up to the adoption of the Constitution of 1834, these legislative appropriations to the common school fund, though expressed to be "for the support and encouragement of common schools forever," were merely "a legislative promise that it should be held sacred," "not legally binding on subsequent Legislatures" (5 Hum., 285); a promise which could have been revoked at any time, and the fund applied to any other purpose whatever. The Legislature continued to have the same control over that fund that it did over funds "set apart for internal improve-

ments, banking operations" (5 Hum., 284), or other public charities.

Then clearly no such trust as is claimed existed in relation to the fund up to the adoption of the Constitution of 1834.

That Constitution, as decided by this court, made but two changes in its status (5 Hum., 285); one was to prohibit future Legislatures from diverting it to any other use than that of common schools; the other was "to appoint commissioners to superintend it." "All other things are left as they were previous to the adoption of the Constitution; that is, subject to the control and discretion of the Legislature." 5 Hum., 286.

In McEwen's case it was argued by Mr. Fogg for the State that this fund was "pledged to a particular purpose," that it was vested for the benefit of common schools;" that "legislative control was taken away," and, therefore, that the resolution of the Assembly authorizing a compromise with McEwen whereby a portion of the fund was lost, was unconstitutional and void (5 Hum., 273, 283); but the court held that the State still had the same right to compromise and settle with McEwen that it has to compromise a debt due from a citizen "to the general treasury of the State" (5 Hum., 286); and that it might "surrender a portion of the fund in order to secure the balance." 5 Hum., 287. They further held that the Legislature of the State was the "proper guardian and protector of its funds, no matter for what purpose appropriated, and that as such, it was its duty to watch over them to see that they are properly secured, vested and applied;" that this power on the part of the Legislature is supreme, and when exercised can not be revised or called in question by any power whatever." 5 Hum., 284. This language is wholly incompatible with the idea that the Constitution reduced the powers of the State over the fund to those of a mere trustee; or that the State, in the management or investment of, the

fund, is to be hampered by the rigid rules which courts of equity throw around the conduct of private individuals.

Certain it is that the Constitution does not, in express terms, declare the State a trustee, nor that the fund shall be a trust fund—all it does is to declare that "it shall be inviolably appropriated to the support of common schools;" it is only a constitutional "pledge of the faith of the State that this fund should not be diverted from the object contemplated;" such a pledge as decided by this court, in the case of the *State* v. *Union Bank,* 9 Yerg., 168, 169, does not deprive the State of the right to continue to control the collection, safe custody and disbursement of such funds. It is said that whenever England creates stock, she hypothecates some particular branch of the revenue at the same time as a sinking fund; but did it ever enter into the head of the holder of her government stock that it imposed a trust in his favor upon that branch of the revenue which he could enforce by collecting her customs through a receiver in Chancery? (9 Yerg., 168), and yet is it not equally absurd to question the right of the State to make such an investment of her own funds as she may have appropriated to common schools when she has decided through her Legislature that it was the safest and most profitable that could be made?

Suppose, however, that the school fund was a trust fund in the strictest sense of a court of equity, it would not follow that its investment as capital in the state bank was a breach of trust.

The Constitution made it the duty of the Legislature to appoint a "Board of Commissioners," who should "have the general superintendence of said fund," and who should report its condition from time to time. As the Constitution provided that the "interest" on the fund should be inviolably appropriated to common schools, it is evident that the board must have had the power to invest it in some such way as to make interest. A trustee always "takes an estate

co-extensive with the duties to be performed, and with the purposes which the trust requires." 1 Head, 64; 8 Hum., 568. And " when a trust fund is placed in the hands of a trustee for accumulation, he not only has the right to invest it, but if he permits it to remain unproductive he is accountable for the profits it should have made." 9 Yerg., 120; Hill on Trustees, 376, 428; Perry on Trusts, sec. 462. In McEwen's case, he was a superintendent of this very fund, and was charged with interest on all sums which he could have invested but failed to invest. 5 Hum., 269.

But it will be said that a trustee has no power to invest the fund in bank stock; we admit this is the rule in England and some of the States, but it cannot be said that the weight of American authority is to that effect; in fact, New York and Pennsylvania are, perhaps, the only States in which the strict English rule is holden. In other states it is expressly held that trustees may invest in bank stock (9 Pick., 446; 20 Pick., 116; 25 Miss., 422); they say that such stocks are subject to no greater fluctuations than government securities, that they are as safe as real securities which may depreciate in value or the title fail; that claims against banking corporations can be enforced at law, while government funds can only be enforced by supplicating sovereign power.

The Constitution did not direct how the funds should be invested to produce interest; and the rule is, that " in the absence of such directions in the instrument creating the trust, the trustees must be governed by the " statutes and laws of the State in which the trust is created" (Perry on Trusts, sec. 452); now, the charter of the Bank of Tennessee, which was the only statute of this State on the subject, not only authorized but expressly directed that the Superintendent of Public Instruction should invest the school fund in the capital stock of the bank. Nich. Suppl., p. 18. I am at an utter loss to know why this statute is not conclusive on this point. But if for any reason it were invalid,

State, and Watson, Trustee, *v.* Bank of Tennessee.

then the commissioners were left without any statute to guide them; and the rule is, that where "there are no directions in the instrument creating the trust nor statutory provisions in relation to investments, trustees must be governed by a sound discretion and good faith." Perry on Trusts, sec. 452.

Tested alone by the rules of "sound discretion and good faith," I ask what better investment could the commissioners have found in 1838 for the investment of $1,500,000 of money?

There were no United States bonds on the market; the General Government was then distributing from its plethoric coffers the surplus revenue. The bonds of the State bore but six per cent., which would have paid but $90,000 per year interest; whereas the school fund was to be paid $100,000 per year, whether its dividends amounted to that much or not (Nich. Suppl., p. 21); and the public faith and credit of the State were as much pledged to supply any deficiency in the school fund subscribed as stock in the bank, as it is to pay any bond that now bears the impress of the great seal of the State.

If the fund had been invested in state bonds, it would have stood the danger of repudiation; and unless the State repudiates its obligation to the school fund, it is not now in any danger of being lost. A great deal of *ad captandum* was gotten off in the court below, and much cheap patriotism displayed in behalf of the poor children of the State. It was prophesied that if the assets of the bank were honestly appropriated to the payment of its creditors, the children of the country must go uneducated, and grave surmises were ominously thrown out as to whether the people would submit to such a result. This attempted intimidation of its own judiciary comes with bad grace from the State of Tennessee. If she will but redeem her own solemn pledge of the faith and credit of the State to supply any deficiency that might be occasioned to the school fund by

its being invested in the stock of the bank, there will be no danger of the poor children being left uneducated; and the State will occupy a much more honorable position in the eyes of the world than she now does, in attempting to snatch from the creditors the assets of the bank which she had established in her name and for her benefit, and for the support of which we have her plighted faith and credit.

The next point taken was, that suppose it were true that the Legislature did have the right to direct the fund to be invested as stock in the bank, yet, as the Constitution had ordained that it should remain "perpetual," and "never be diminished," every one dealing with the bank must be presumed to have known that it could suffer no diminution; and must be supposed to have agreed, that come what might, this sacred fund should still be safe.

The framers of the Constitution were not so fain as to order that it should remain perpetual, as against fire, flood, robbery and war; nor even as against the vicissitudes of commerce.

They could well say, that it should never be "diminished" by being "diverted" from common schools to other objects; but they had sense enough to know that money can not make interest without being invested, and that when invested, it must take its chances with the balance of such investments. To suppose that the fund was placed in the bank as a "decoy duck," to induce people to trade on the faith of its responsibility, and then withdraw it when the danger came, would make the framers of the Constitution a pack of knaves. To suppose that there was ever any such implied contract on the part of the public, as that it might be withdrawn at the very time it was most needed, would be to vote the world to be one vast aviary of fools. If the Constitution did not expect that when it was invested it should bear its losses like all other funds, why appoint a board of commissioners "to superintend it, and report its condition from time to time?" Why care about its condi-

tion if it was always to be safe, and bear a charmed existence which was to free it from all the ills that money is heir to? Where was this potent charm when the crash of 1837 came, inflicting upon this fund the heavy losses detailed in McEwen's case? and where was it when the State directed the $618,250 of United States bonds to be deposited in Rutter's bank at Memphis? Where be your resulting trusts, and whither will you follow that fund?

It must be obvious, that the Constitution intended no more than to guarantee it from being diverted, or diminished, by "legislative appropriation;" trusting it, as they were bound to do, to the hazards and accidents of commerce.

The idea that the present assets of the bank can be claimed on the principle of a resulting trust, is equally untenable. There is no pretense that the assets now on hand were the identical assets originally constituting the school fund; nor is it pretended that the assets now on hand were purchased with what was the original school fund.

The capital of the bank did not consist alone of the school fund—in fact, that fund did not amount to as much as one-half of the entire capital. We have then the case of a bank having in its possession what is called a trust fund, which it is now unable to repay. It also has certain property and assets which it has accumulated through a period of twenty years, and it is sought to infer from the mere fact of its having such trust fund, that it purchased said property with that fund; but this court have held that "it must be clearly established that the property upon which the trust is sought to be fastened has been paid for out of the specific trust fund. It is not sufficient to prove that the purchaser of the property had a fund belonging to another in his hands, unless the employment of that particular fund in the purchase be also proved." 11 Hum., 460.

We conclude, on this branch of the case, that the school fund was not a trust fund, and therefore, there could not

have .been a breach of trust in vesting it as capital in the bank; and no resulting trust can be fastened upon the present assets of the bank.

It is next insisted that the act of February 16, 1866, to wind up the bank, expressly declared "all claims and demands of all kinds, after May 6, 1861, to be absolutely null and void," and, therefore, even if the attempted preference of the school fund was invalid, all creditors whose claims originated after May 6, 1861, it is insisted, are excluded from participation in the assets of the bank.

We need not cite authorities to show that if the contracts between the creditors and the bank were valid when made, no subsequent legislation can impair their obligation.

The questions which I have discussed to this point, are questions in which all the creditors are interested, whether they be depositors or noteholders; but the record also presents the question of the liability of the bank for its notes issued after May 6, 1861, and which are known in the popular parlance of the day, as

NEW ISSUE.

The facts under which these notes were issued are as follows:

On the 6th of May, 1861, the Legislature passed an act "to raise, organize and equip a provisional force for the defense of the State," authorizing the Governor to take charge of the military, direct the defense of the State, organize and equip the military, and with the assistance of the Military Board, to make contracts for arms, etc.    Acts 2d., Ex. Sess., 1861, pp. 21, 22.

For the purpose of carrying out said act the Governor was authorized to issue and dispose of $5,000,000 of "bonds of the State of Tennessee similar in all respects to the bonds of the State heretofore issued," except that they were to to bear eight per cent. interest and mature in ten years. "The public faith and credit of the State was pledged for

State, and Watson, Trustee, v. Bank of Tennessee.

the payment of the principal and interest on said bonds," and a heavy tax was laid upon the property of the State " to be set apart and held sacred " for the payment of said bonds. *Ibid*, pp. 23, 24.

The banks of the State were authorized to invest their means in said bonds, and the bonds themselves were exempted from taxation. *Ibid.*, pp. 24, 32.

It is agreed that the Military Board, in order to enable them to carry out the provisions of said act, and the purposes of their organization, received from the State, bonds of the character authorized by the act, to the amount of $4,-300,000, which were transferred by them to the Bank of Tennessee at par, about the time they were received from the State.

It is agreed that the purposes of said board were the arming and equipment of troops, and the purchase of military stores in the war then flagrant between the United States Government and the Confederate States—that said board continued to do business from the date of their organization until sometime in January, 1862, and during that period made orders in favor of different parties for the purposes for which the board was organized, upon which orders checks were drawn for the funds called for in the orders on the Bank of Tennessee, signed by the president and countersigned by the secretary of the board, and the sums of money appropriated by said board and paid by check on the Bank of Tennessee, were used for the purposes afosesaid, and in payment of the salaries of the Military board and its officers.

It is further agreed that the officers and directors of the Bank of Tennessee knew that the purposes for which the Military Board was organized were such as are above set forth, and that the money drawn from the bank upon the orders or checks of said board was to be used and was used for the purposes aforesaid.

But there is no proof that the bank purchased the bonds

in order to aid the State in the rebellion; on the contrary, Mr. Torbett, the president of the bank, says "the transactions with the State were in good faith and were believed to be for the best interest of the bank. I, as president, was opposed to negotiating for long time six per cent. securities, but proposed negotiating for short time eight per cent. security, believing the bonds of the State to be undoubted security, and eight per cent. remunerative to the bank; we therefore bought them," etc.

It is admitted that the ordinary and then issues of the Bank of Tennessee and its branches, were insufficient "to meet the usual banking business of the bank in 1861, and the drafts or checks drawn upon the bank by the said Military Board, and that the bank was compelled, in order to meet its regular business, and the demands of said board, to resort to the issuance of the bank notes in controversy, known as the "new issue" of said bank, which were all put into circulation after the 6th of May, 1861, and for the purposes aforesaid."

In discriminating between the checks drawn by the Military Board and checks drawn by private individuals on the bank, we do so for the convenience of the discussion, but without admitting that the checks of the board were not as much a part of the "regular" businesss of the bank as were those of the individuals; and we could not refuse to admit that it was necessary to increase the circulation of the bank in order to meet the demand for currency raised as well by the checks of individuals as of the board, without at once assuming that the notes issued after May 6, 1861, were unnecessarily and improperly issued by the officers of the bank.

We do not admit that the notes were issued to meet the demands of the military board, for we prove that up to and including the 31st of August, 1861, the military board had drawn out of the Bank of Tennessee $4,195.54—100 more than the $3,800,000 of war bonds passed to its credit, while the amount of "new issue" issued up to the 31st of August,

State, and Watson, Trustee, v. Bank of Tennessee.

1861, was only $329,160 : so that $3,470,840 of the eight per cent. war bonds must have been paid for in old issue of the bank, or in other currency in circulation at that time. And therefore to the extent of $3,470,840 of the "demand created by the checks of the military board," we know that the new issue was not issued to meet it.

It is also agreed that the military board had no account with, and drew no checks upon, any of the branches of the Bank of Tennessee, but did all their business with the mother bank at Nashville. And by reference to the table showing the issues of the bank it will be seen that $776,660 of the new issue was issued by the branches, and therefore we know that this amount of the new issue was not issued "to meet the demands of the checks of the military board."

The mother bank paid ckecks of the military board to the amount of $4,625,460.48, and yet she never issued but $869,639 of the new issue from first to last, and while it is doubtless true that some of the new issue was paid out on the checks of the military board, it is utterly impossible to tell how much of it was, and still more impossible to tell which of it was.

So far from it being necessary to make the new issue to meet the demands of the military board, it can be demonstrated that the bank could mave met all of their demands without increasing its circulation a dollar.

The total amount paid out to the
    military board's checks was, as
    above shown..........................        $4,625,460 48
The total amount of war bonds sold
    to the bank by the board was...$4,300,000
The bank sold off these bonds until
    there was left only.................. 3,223,000
                                                        _____
Showing that the bank sold of these bonds,   1,077,000 00
                                                        _____
                                              $3,548,460 48

State, and Watson, Trustee, *v.* Bank of Tennessee.

As the bonds were taken by the bank at par, they were doubtless sold at par for Confederate notes and other currency, and their proceeds, which were used by the bank in meeting subsequent checks of the board, deducted from the gross amount paid out to the military board left, to be provided for by the ordinary assets of the bank, only the sum of................................... . $3,548,460 48

To meet this the bank had, of its
own circulation, old and new....$4,533,666
Deduct "new issue"................. 1,646,299
                                   _____

Shows that its "old issue" amounted
to ...................................... 2,887,367
It had notes of other banks......... 2,045,000
                                   _____

Making a total of unquestioned
currency.............................. 4,932,367 00
With which they could have "met
the board checks"................... 3,548,460 00
                                   _____

And had a margin to spare of...... $1,383,907 00

Without ever touching the new issue or its specie, which amounted after the war to $446,719.70, and was doubtless double that before the bank left Nashville.

We have thus shown that the bank could have easily met the demands of the military board without making any new issue, and that she would have had a surplus to spare of $1,383,907 ; in other words, that the new issue was not necessary to meet that demand.

I will now show the demand which I think it was made to meet.

On the 26th of November, 1860, the Southern banks, following the example of the Northern banks, suspended specie payment, (Acts 1st Ex. Sess., 1861, p. 21,) and on 31st January, 1861, the Legislature passed an act relieving them of the penalties of the bank code, and requested them

"that in order to more effectually relieve the people of all sections of the State from their present pecuniary distress in extending their line of discount, they would equalize the accommodations to all sections, (*Ibid.*, p. 22,) etc., etc.

This was before Tennessee assumed a hostile attitude. The banks saw it was a dangerous time to expand too far, but the charge that has been made against the Bank of Tennessee that, after January, 1861, she practically ceased to do business as a legitimate bank, and converted herself into a mere financial agent of the State, is utterly unfounded in fact. While she properly abstained from a reckless expansion, she, in order "to relieve the people," and as directed by the law above quoted, kept up the line of her discounts, and her statement shows that her "notes and bills discounted" on December 31, 1861, exceeded those of the same day in 1860—$81,982 23.

Her "notes and bills discounted"
    amounted on Dec. 31, 1861, to
    the sum of ............................          $4,273,968 10
To make these discounts she had
    the surplus above shown of......$1,383,807
The amounts received from deposi-
    tors.... ..............................  1,663,789
And the "new issue"................. 1,646,299
                                        ————— 4,693,995 00

                                                   $420,027 00

Showing that the "demand which it was necessary to meet with the new issue was the legitimate business of the bank in discounting bills and notes, and that there was a surplus only $420,027 left after meeting that demand; this surplus was more than exhausted in paying the ordinary expenses of the State, and for which the State owes the bank $465,487.77, these are the ordinary "peace establishment" expenses, and their legitimacy is not questioned.

As further evidence that the primary object in making

the new issue was not to "meet demand of the military board," it will be seen from the table showing the issues of the bank from 1853 to 1862 inclusive, that the issues in 1853, 1854 and 1857, all exceeded the issue of 1861; that the issue in 1858 was nearly equal to that of 1861; that the issues increased and diminished by periods of two years; that the years 1859 and 1860 being years of small issues, it was in strict accordance with the custom, and should have been expected that the issue for 1861 should have exceeded them. The issue for 1862 was smaller than for any of the preceding years, and this too when the State needed money worse than ever; verily, it would not seem that the bank officers were lending the bank to the miltary purposes of the State.

So far from the "new issue" being made for the special purpose of paying for the war bonds, we show that those bonds, or the checks based on them, were paid in such funds as happened to be on hand, without regard to issues, and without making any distinction between Tennessee banks and the banks of other states that were then bankable; and on the other hand, there is "no evidence whatever that the new issue was issued or paid out in aid of the rebellion." The whole truth is, that they were "issued for circulation," and were used as other currency in the ordinary legitimate business of banking. They were issued to enable the bank to keep up its line of discounts, to facilitate its increasing business, and to supply the place of its mutilated issues which had been retired and charged off and deposited in its vaults or burned. They were issued in the usual and regular course of business, and for legitimate and lawful purposes, and were used in the ordinary business transactions; they were not issued in aid of the so-called rebellion.

It is certainly true that the condition of the country, caused by the war, necessitated an increase of banking facilities in Tennessee, as elsewhere, and that the increased circulation of the Bank of Tennessee in part met that de-

mand. The bank aided the rebellion by this increase of circulation just as the farmer, merchant and other branches of trade and industry aided it by increasing their various stocks in trade, but not otherwise.

The new issue was so much like the old issue in its appearance, that the officers of the State appointed to burn the old issue have burned a considerable amount of new issue for old. The difficulty of distinguishing the two is greatly increased by the fact that a large amount of the new issue, though actually issued after may 6, 1861, bears date prior to that time.

In fact, the new issue was printed on the same plates, with same style of paper and ink, and the bills were exact *fac similes* of the same denomination of old issue. Said notes were payable on demand in specie to bearer; there was nothing on their face to indicate that they were issued for an illegal purpose, and my clients purchased them for their full market value without the slightest notice that any of the notes held by them were ever issued for any illegal purpose whatever. All of said notes were in circulation prior to January 1, 1865, and therefore prior to the amended Constitution of 1865, and the legislation of the State directing that they shall not be paid by the bank.

We further show that they were issued under the authority of the legal board of directors, regularly qualified and appointed in 1859; that they were made from time to time, and charged to the cash account when made, and consequently turned over to the cashier to be paid out by him upon any checks that might be presented. The books of the bank show no difference in the issuance and paying out of notes prior and subsequent to May 6, 1861, and there is no entry in the account books or records of the bank showing that the new issue was paid out in aid of rebellion, or that it was not paid out like all other issues of the bank. Neither do they show that said notes were received by any person or persons with any knowledge that they were issued and paid out in aid of the rebellion.

State, and Watson, Trustee v. Bank of Tennessee.

They were issued in the usual way, by receiving the signatures of the president and cashier, then passed into the teller's cash, and paid out promiscuously with all other bankable funds, as money, to all who had the right to check on the bank. The signing and issuing was done in strict conformity with the charter and laws, as the board understood them, and the amount issued did not exceed the amount authorized by the charter and capital of the bank.

We further show, that in 1861, when these notes were issued, there was no distinction made in the issues of the bank, and that up to the adoption of the amendment of the Constitution in 1865, no difference was made in the money market, but the issues of the Bank of Tennessee were bought and sold without regard to dates; and yet, such was the effect of this legislative adjudication, "that they fell to one cent on the dollar." In fact, it was not until after the war that the distinction between the old and new issue was made; and even the name of "new issue," now in such common use, was not known until after the war.

So, far from the public at large having anything to warn them of the illegality of the notes, if any such existed, we have the testimony of the officers of the bank that they had no evidence, and knew of none, that said notes were issued or paid out in aid of the rebellion.

We concede that our clients became the owners of the new issue notes in controversy after the act of February 16, 1866, ch. 28; after the proclamation of Andrew Johnson, Military Governor of Tennessee, of February 25, 1865; and of course, after the constitutional amendment of January 8, 1865.

We concede, that since February 25, 1865, new issue has been at a heavy discount, much heavier than the discount on old issue; that we bought it at from 30 to 52 cents on the dollar, knowing that it had been declared void by the Constitution of 1865, and knowing that the Constitution had no right to make any such declaration.

### ARGUMENT ON NEW ISSUE.

It will be argued that these notes are made void by sec. 4 of the 14th amendment to the Constitution of the United States.

If said notes were valid contracts between the bank and the holder when issued, the question as to whether they could be invalidated by a subsequent amendment to the Constitution of the United States, any more than by such an amendment to the Constitution of a state, is one which I need not stop to consider, because it is clear that the 14th amendment did not attempt to invalidate contracts made between private individuals and private corporations.

The language is, "neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slaves; but all such debts, obligations and claims shall be held illegal and void." Paschall's Const., p. 280.

Said amendment also provides that the national debt of the United States incurred in suppressing the rebellion "shall not be questioned."

Mr. Paschall, in discussing this section, after alluding to the fact that the Confederate war debt, and the value of the emancipated slaves, amounted to over $4,000,000,000, remarks, that "every one will judge for himself of the influence of such a debt, combined with the danger of having so large a national debt questioned or repudiated. Viewed from the standpoint of extraneous influences upon Congress, no one can now fully comprehend its dangers." Paschall's Const., p. 292. And he concludes that the section amounts to no more "than an organic guaranty in respect to the national debt, and an organic repudiation of the rebel debt." Paschall's Const., p. 293.

From the "Credit Mobilier" investigations now on hand, I am inclined to suspect that the projectors of the 14th

amendment had grounds to fear that Congress might be "accessible to extraneous influences." But I spurn with indignation the base insinuation that the Legislature of Tennessee would be willing to pay one dollar of her war debt, however honestly it may have been contracted, so long as they can protect themselves behind the 14th amendment, or any other subterfuge that will serve this purpose.

But suppose that the 14th amendment does apply to debts due from one individual or corporation to another, and suppose it were valid, yet it only applies to debts incurred "in aid of insurrection against the United States."

Rather than have the delay of an appeal to the Supreme Court of the United States, we would prefer that this case should go off upon the point of fact as to whether the notes in controversy were issued in aid of insurrection, and we will say no more on this point than to refer to the "Statement of Facts," *ante.*

It will also be urged that the notes in suit are declared void by sec. 6 of the Schedule to the amendment of the Constitution of 1865.

If the notes were valid when issued, their obligation as contracts could not be impaired by any subsequent amendment to the State Constitution. 2 Heis., 480; 1 Heis., 280; 9 Yer., 490; 1 Sneed, 119.

But it is said, that though in the character of a mere amendment to the Constitution, it could not impair the obligation of contracts; yet, as Congress, in "re-admitting" the State to all its rights in the Union, referred to said enactment as not only legal and proper, but as a necessary step to secure the restoration of its rights, the courts cannot go behind these acts of the political departments of the State and the United States.

It is argued that all acts and contracts of every nature and kind done under the usurped authority, were void if the legitimate government afterwards chose so to treat them; that all such contracts are at the mercy of the legit-

State, and Watson, Trustee v. Bank of Tennessee.

imate government when restored, and it is for the political department to say how they shall be treated by the court.

I concede that the Supreme Court of the United States did decide in *Luther* v. *Borden*, 7 How., 1, 43., that where there is an armed conflict in a state, and both parties claim the right to the government of the State, the President has the power to decide which is the duly constituted government of the State, and the courts are bound to follow his decision; that this power was conferred on the President by the act of February 28, 1795, and that Congress got its power to pass the act under the clause of Federal Constitution, which provides that the United States shall guarantee to every state a republican form of government, and protect them from invasion and domestic violence. 7 How., 42; 7 Wall., 730. So that court has repeatedly held that the courts cannot take judicial notice of a foreign government which is not acknowledged by the political department (7 How., 57; 3 Wheat., 324; 4 Cranch, 272; 13 Pet.,`420); and that they cannot acknowledge even the belligerent rights of the subjects of a foreign government in arms against it, until their rights have been accorded by the political department of this government. 7 How., 57. They have also held that they have no jurisdiction to try the question whether the political body which passed a particular law was a state (5 How., 343), for it is only a statute of a "state" which can be thus re-examined.

In *Texas* v. *White* they held that it was necessary for that state to have been restored to peaceful relations with the United States before she could maintain a suit in the Supreme Court of the United States (7 Wall., 701); and in *White* v. *Hart* they held that the question as to when those relations had been restored was for Congress, and cannot be inquired into by the judicial department. 13 Wall., 649.

In *Ingram* v. *Cooke*, 1 Tenn., 19, this court held that upon the abolition of the Franklin Government, it was competent for North Carolina to enact that judgments ren-

dered under the Fraklin Government were good, if substantial justice had been obtained; that when governments *de facto* cease to exist, the former or legitimate governments usually furnish by legislative acts the grounds upon which the courts proceed.

The above is a fair statement of the points actually decided in the authorities cited against us on this branch of the case; and conceding that they were all well decided, it is apparent they do not touch this case.

We can admit that the political department was the only one that could decide when Tennessee should be restored to her political relations to the General Government; but as it is admitted on all hands that she is now restored to those relations, the question as to whether it was done by one department or another is a matter of the past, and not now at all material.

The question is, did the inhabitants of this State, while the late civil war was on hand, have a right to make contracts with one another? If so, were they binding contracts, or subject to be declared void at the close of the war by the new state organization, or the General Government, or by both combined?

The war was conducted by the United States either for conquest or for the preservation of the Union.

It is very "unusual even in cases of conquest for the conquerors to do more than to displace the sovereign and assume dominion over the country; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged if private property should be confiscated and private rights annulled." 7 Pet., 87; 12 Pet., 436.

By this substitution of a new supremacy, although the former political relations of the inhabitants are dissolved, their private relations, their rights vested under the government of their former allegiance, or those arising from contract, or usage, remain in full force and unchanged, except

State, and Watson, Trustee *v.* Bank of Tennessee.

so far as they are in their nature and character found to be in conflict with the Constitution and laws of the United States, or with any regulations which the conquering authority should ordain. 20 How., 177.

But the United States have at all times disclaimed the idea that the late war was one of conquest; they have always said that the war was for the "re-establishment of the national authority, and the ultimate restoration of states and citizens to their national relations" (2 Wall., 278); that "the ordinances of secession were absolutely null and without operation in law; that the obligations of the states as members of the Union, and of every citizen of the State as a citizen of the United States, remained perfect and unimpaired; that the states did not cease to be states nor their citizens to be citizens of the Union" 2 Wall., 278; 7 Wall., 726; 6 Wall., 450); that "at no time were the rebellious states out of the pale of the Union; their rights under the Constitution were suspended, but not destroyed; their constitutional duties and obligations were unaffected and remained the same; a citizen was still a citizen, though guilty of crime and visited with punishment." 13 Wall., 651, 652. They further held that nothing was necessary to bring the reconstructed states back into full communion with the loyal states but to permit them to restore their representation in Congress.

Accordingly, they held, in a case where Georgia in her reconstructed Constitution had declared that no court should enforce any debt created for the sale or hire of slaves, that at no time during the rebellion could the states pass a law impairing the obligation of a contract, any more than before the rebellion or since, "and, therefore, that the clause of the Constitution of Georgia above referred to, had no effect on a contract made previous to it, though the consideration of the contract was a slave." 13 Wall, 646, 647. They made the same decision on the Constitution of Arkansas. 13 Wall., 656.

We rely on these cases as absolutely decisive of the very point in issue.

A moment's consideration will show that we must be right. The State of Tennessee, when the amended Constitution of 1865 was framed, was either in the Union or she was out of it. · If she was in it, then art. 1, sec. 10, cl. 1 of the Constitution of the United States forbade her passing any law impairing the obligation of contracts; if she was out of the Union, then she was a member of the Confederate States, and sec. 10 of art. 1 of the permanent Constitution of the Confederate States is an exact copy of the same provision in the Constitution of the United States. Moore's Rebellion Record, vol. 2, p. 324. So let her turn which way she will, there has never been an instant of time from her organization as a state in 1796, that Tennessee could impair the obligation of a contract.

To claim that all the contracts made by private citizens in the Confederacy during the war were void, or even "at the mercy" of Congress, would lead to monstrous results; Congress could have bankrupted a whole people, and bastardised the issue of any marriage made during the war. The Supreme Court of the United States admit that even such acts of the rebel Legislatures were valid as "sanctioned and protected marriage and the domestic relations, regulated the conveyance and transfer of property real and personal, and provided remedies for injuries to person and estate, and other similar acts. 7 Wall., 733. In *Thorington* v. *Smith,* a contract made during the rebellion, and payable in Confederate notes, was enforced through the Federal Courts.

The court say that transactions in the ordinary course of civil society, though they may indirectly and remotely promote the ends of unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the courts of the

United States, after the restoration of peace, etc. 8 Wall., 12. In *Corbett* v. *Nuff* they say, "no people can exist without exchanging commodities, there must be buying and selling, and exchanging in every community, or the greater part of its inhabitants would have neither food nor raiment; and yet the argument, if good for anything, goes to this extent, that all sales, transfers and conveyances of the property of the vast numbers engaged in the late rebellion, constituting the great majority of many towns, cities, and even of several States, were utterly null and void; that even the commonest transactions of exchange in the daily life of these people were tainted with invalidity. It is difficult to conceive the misery which would follow from a legislative decree of this wide-sweeping character in any community where its execution was conceived to be possible, or confidence was reposed in its validity. 10 Wall., 480. And in *Thorington* v. *Smith* they held, that while Confederate notes had no real value, yet they were made current by irresistible force. They were the only measure of value which the people had, and their use was a matter of almost absolute necessity. 8 Wall., 13.

If then, contracts made during the rebellion, in the ordinary transactions of life, were valid, and if the constitutional amendment, as such, could not impair their validity, if they have been rendered invalid at all, it must have been through the action of Congress.

Where does Congress get the power to impair the obligation of a contract made between two private citizens of a state? And if Congress does not possess the power, how can it confer such power on the Constitutional Convention of a State? In the case of *White* v. *Hart*, it was argued that the reconstructed Constitution of Georgia was adopted under the dictation and coercion of Congress, and that as Congress can pass a law impairing the obligation of contracts, the enactment could take effect as an act of Congress, even though it was imperative as the act of a state. The

Supreme Court deny as a fact that Congress used any coercion in the matter; they say that Congress authorized the State to frame a new Constitution, and she elected to proceed within the scope of the authority conferred, and they add, "that if Congress had expressly dictated and expressly approved the proviso in question, such dictation and approval would be without effect; Congress has no power to supercede the national Constitution." 13 Wall., 649. And in *Osborn* v. *Nicholson,* where it was argued that the 13th amendment to the Constitution of the United States had the effect to invalidate a note given for the price of a slave, they say, that the proposition in effect would take away one man's property and give it to another, and that "this is forbidden by the fundamental principles of the social compact, and is beyond the sphere of the legislative authority, both of the State and the nation." 13 Wall., 662.

The mere fact that the amended Constitution of 1865 contained the clause annulling the notes of the Bank of Tennessee, when it was presented to Congress, is no evidence that Congress regarded it as a condition precedent to the restoration of the political rights of the State. Nothing of the sort is expressed in the act of Congress, and "the doctrine of the destruction of vested rights by implication is unfavored in the law;" it is never admitted "unless the implication is so clear as to be equivalent to an explicit declartion." Every doubt should be resolved against a construction so fraught with mischief. 13 Wall., 662.

In the Georgia case, she had presented a Constitution to Congress with the slave clause, and several other new clauses in it.

No objection was made by Congress to the slave clause, but it did object to several others. The Constitution was then modified in the particulars complained of, and returned again to Congress with the slave clause still in it, and in this shape was accepted.

Stronger evidence of the implied approbation by Congress

of that clause could not be imagined, and yet the Supreme Court held it inoperative.    18 Wall., 648.

In our case the amended Constitution of 1865 undertook to abolish slavery, to declare void all laws and ordinances of secession, and debts contracted under the same, and to annul all notes of the Bank of Tennessee issued after a certain day.    The act of Congress refers to the abolition of slavery, to the ordinances of secession, and debts contracted under the same, but makes no mention of the Bank of Tennessee notes whatever.    14 U. S. Statute at Large, 364. The implication would be that part of the Constitution was rejected and ignored.

But a glance at the resolution will satisfy the court that the features in the Constitution abolishing slavery, and abrogating the secession ordinances, were only looked to by Congress as satisfactory evidence that the State was sufficiently loyal to be allowed to resume her delegation in Congress; that they were intended to fix the rights of any private citizen, and that they were certainly not intended to prevent the people of Tennessee, forever, from the exercise of that sovereignty which resides in the people of every state "to alter and change their form of government at their own pleasure," subject to the sole condition that it shall remain republican in form.    7 How., 47.

This sovereignty was exercised by Tennessee through her Constitutional Convention of 1870, when it was declared that "ordinances contained in any former Constitution, or schedule thereto, are hereby abrogated."    Cons. 1870, art. 11, sec. 1, and that an act validating an invalid contract is not unconstitutional.    See 2 Pet., 380; 8 Pet., 88.    This clearly abrogated the ordinance of 1865, and if it needed any recognition from Congress, it is given in the fact that we have been allowed to retain our members in Congress, and the present State Government organized by and under the new Constitution of Tennessee is recognized every day by every department of the United States; and as the

political department has not complained that we have violated the terms of our restoration, and has not pretended that we have forfeited our rights, or offered to reconstruct us because of our change in that part of the Constitution, I will commend back the authorities of our opponents, to the effect that the judiciary are bound by the action of the political department, and cannot go behind it.

It is argued, that although contracts made by private individuals in the seceded States during the rebellion were valid, yet that contracts made by the seceded States themselves were void; that the Bank of Tennessee was owned and controlled by the State, and was its fiscal agent; that, therefore, it must be regarded as a branch or department of the State government, and its contracts must be regarded as if made by the State itself.

This court has said, that in creating the Bank of Tennessee the State has invested it "with none of its rights or prerogatives, none of its powers or sovereignty; but has in this respect placed it upon the same footing as other corporate bodies, and the same principles are applicable to it." 1 Sneed, 354. Though "the bank is the creature and property of the State, this does not make it identical with, or even an integral part of, the state sovereignty. It is a distinct fiscal corporation, enjoying a separate existence with its own chartered rights, obligations and powers." 3 Sneed, 381.

It is argued, that as a fact, the bank, after May 6, 1861, was used by the rebel State Government, or by its officers and persons then in control of the executive and legislative departments of the State, with the connivance and consent of the officers of the bank, as a fiscal agent to aid in the rebellion.

This charge, though frequently made in the newspapers, and on the hustings, for political effect, has no foundation in the history of the times, and certainly none in the proof in this record.

21—VOL. 5.

State, and Watson, Trustee v. Bank of Tennessee.

No officer of any department of the State, whether executive, legislative or judicial, ever attempted to control the officers of the bank, or to make the officers of the bank do one single act for or against the rebellion. The State desired to sell $5,000,000 of eight per cent. bonds, to raise money to equip a provisional force, but the act did not even squint at compulsion—the Governor was authorized to "issue and dispose" of them, and the banks were authorized to "purchase" them. Acts 2 Ex. Ses. 1861, 23, 24. The Governor had been previously requested by the Legislature "to make inquiry of the different banks in the State whether or not they were willing to loan the State money in the then crisis of affairs; and if so, how much, and upon what terms." Acts 1 Ex. Ses. 1861, 46. The Bank of Tennessee, so far from being required to purchase the bonds, is not even mentioned in the act, but in all the legislation was treated just as the other banks, and with all of them the application was to be for a loan of money or a purchase of bonds—no force was threatened towards any. And Mr. Torbett, the president of this bank, swears positively that the bank bought the bonds in good faith as a remunerative investment.

Let us now take the case in the strongest possible light against the notes in controversy. Suppose that they were in fact issued for the express purpose of paying for the eight per cent. bonds issued by the State?

I insist that the State of Tennessee, under the peculiar circumstances then surrounding her, had the right to raise and equip a provisional force for her own defense, without violating any provisions of the Constitution of the United States.

I am not about to raise the question of the right of a state to secede from the Union. I regard that as settled by the stern arbitrament of war.

Neither shall I argue that Tennessee was justified in the exercise of the right of revolution, for under the doctrine

State, and Watson, Trustee *v.* Bank of Tennessee.

that "might makes right," that point has also been decided against her.

Neither do I expect to override that section of the Federal Constitution which provides that "no state shall, without the consent of Congress, * * * * keep troops or ships of war in times of peace, or engage in war unless actually invaded, or in such imminent danger as will not admit of delay." Const. U. S., art. 1, sec. 10, cl. 1, 2. Upon this section Judge Story says: "A state may be so situated that it may become indispensable to possess military forces to resist an expected invasion or insurrection. The danger may be too imminent for delay; and under such circumstances, a state will have a right to raise troops for its own safety without the consent of Congress. After war is once begun, there is no doubt that a state may, and, in-indeed, it ought to possess the power to raise forces for its own defense." Story on Cons., sec. 1404. The United States Supreme Court say: "The power is essential to the existence of every government; essential to the preservation of order and free institutions; and is as necessary to the States of this Union as any other government. The State itself must determine what degree of force the crisis (7 How., 45) demands."

The Constitution of the United States further provides, that "a well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." Art. 2d Amends. U. S. Const. This clause, says Mr. Paschall, has reference to a free government, and is based on the idea that the people cannot be oppressed or enslaved who are not first disarmed;" (Paschall's Const., p. 256) and Judge Story remarks that it is impossible to keep the people duly armed without some organization. Story on Const., sec. 1897.

In 1857 the Legislature had repealed the militia laws, and from that time to 1861, the State had no military organization whatever. In his message to the Legislature the

Governor called their attention to this fact as early as January 7, 1861, remarking that independent of the impending crisis he regarded a thorough reorganization of the militia as imperatively demanded by every consideration of prudence and safety, and recommended such an organization as would secure to the State at all times, and under all circumstances, an efficient and reliable military force. Acts 1st Ex. Ses., 1864, p. 11.

On the 19th of January, 1861, the Legislature passed an act to refer the question of "Convention or no Convention" to the people, to be voted upon on February 9, 1861, but were careful to provide that no ordinance that might be adopted by said Convention should change the relations of the State towards the Union until it was submitted to the people. Ibid, p. 17.

On the 16th of January, 1861, they passed a resolution requesting the President of the United States on the one hand, and the authorities of each of the Southern States on the other, to preserve the then *statu quo* of affairs, to the end that if possible peace might still be preserved. Ibid, p. 45.

On January 22, 1861, they proposed certain amendments to the Federal Constitution which they hoped would compromise the national controversy. Acts 1st Ex. Ses., 1861, p. 49.

On the 9th of February, 1861, the people of the State, by an overwhelming majority, voted against even the calling of a convention; the result, as Gov. Harris expressed it, of the "ardent devotion of our people to the preservation of the Union, and originating with their great loyalty to the Government."

As late as April 18th, some of her most distinguished and influential citizens published an address to the people, in which they took the ground that Tennessee should maintain a position of independence, "taking sides with the Union and the peace of the country against all assailants, whether

from the north or the south.    Moore's Rebellion Rec., Vol.
1, p. 72 (Doc).    That this address met the views of a large
majority of our people at the time cannot be controverted.
But while her voice was "still for peace," she found herself
in the midst of the contending factions, upon the very line
of threatened battle, her territory likely to be made the seat
of a long, bloody, barbarous and devastating war, in which
her citizens were to be exposed to the rapine and insolence
of the soldiery of both armies; she saw that the State of
Illinois had raised an army of her own, stationed her troops
at Cairo, and seized a vessel of one of our citizens while
lawfully proceeding on her voyage.   She saw that every
state north and south of her were raising State forces for
their individual protection; that home guards and minute
men were being organized in every county in the land; and
yet, in the midst of this warlike preparation going on around
her, she was still wholly unarmed.

Under these circumstances, the act of May 6, 1861, was
passed to raise, organize and equip a provisional force for
the defense of the State.    Tennessee was still in the Union;
the ordinance of secession was not even voted upon until
June 8, 1861.

Who has ever questioned the right of the northern states
to raise their separate armies? and who would ever have
questioned our right, if the people had voted in June as
they did in February, and these forces had been turned over
to the federal instead of the confederate army?

I maintain that every State in the Union, whether north
or south, had the perfect right, under the Federal Consti-
tution, to raise and equip such a force as she deemed neces-
sary for her own defense as a state.

While she may have had no right to make war against
the United States, and could not treat an approach of federal
forces as an invasion in the sense of the Constitution, still
she had the right to protect her own citizens from the out-
rages and insults of even the national soldiery, and had the

State, and Watson, Trustee v. Bank of Tennessee.

unquestioned right to resist an invasion by any other state; she was the sole judge of the imminence of the danger of such an invasion, and when she saw all the other states arming around her, she was well justified in the course she took.

If, then, she had the right to raise and equip the force, her bonds issued to raise money with which to do it, were not issued in aid of rebellion, but were issued for her defense as a State, and are just as lawful as they would have been if issued to defray the expenses of her patrol and constabulary forces. If the issue of the bonds was legal their purchase was legal, and could not be rendered illegal by the subsequent use which the State made of the forces.

But suppose the State had no right to raise the provisional army, and had no right to engage in the war. Yet she did engage in the conflict, and was recognized by the United States as a belligerent. This court has expressly held at the present term that as such belligerent she had the right to purchase such war material as was necessary to render her belligerent rights effectual; and if she had the right to purchase, she had the right to issue her bonds to raise the money with which to purchase, "and the citizen had the right to contribute to the lawful act of his State." *Bank of Tennessee* v. *Cummings*, Nashville, Dec. 1872, MS.

Admit, however, that the purchase of the bonds by the bank was illegal, what would have been the legitimate consequences? The bank, after getting the bonds, might have refused to pay their price to the State, or the State, after getting the money from the bank, may refuse to pay the bonds, as she now most dishonestly does; but admitting all this may be done, upon what principle of law or common sense does it make void the money which the bank paid to the State for the bonds?

Suppose the bank had paid for the bonds in gold and silver, would those metals have dissolved and melted from sight of commerce simply because they had been used as a medium in the discharge of an illegal contract? We have

demonstrated that nearly $3,500,000 of the money which the bank did pay for the bonds, was the old issue and notes of other banks—now if the mere use of the new issue in payment of the bonds made it illegal and void, why was not the same effect produced upon the old issue and the notes of other banks that were used in precisely the same way? What would be the effect upon commerce if such a doctrine were maintained?

Suppose that the purchase of the bonds by the bank from the State was illegal, and that the bank could afterward have refused to pay for them; yet if the bank saw proper not to avail herself of this defense, and preferred to pay as she had agreed, the payment should be valid, and vest in the State the title to the money used in the payment; (11 Hum., 10, 11) *a fortiori* the State could pass a good title to the party from whom it purchased the military supplies; and with a still greater reason could that party pass a good title to the innocent holder who knew nothing of any of the previous transactions.

The bank officers did not buy the bonds for the purpose of aiding the rebellion, their object was to procure a remunerative investment for the bank; and this court holds that mere knowledge of the illegal use to which the proceeds were to be applied will not make the contract illegal; (11 Hum., 16; 2 Sneed, 455; 1 Heis., 319, 111, 128; 2 Heis., 68; 6 Col., 43, 44; and see case decided by this court referred to in Sou. Law Rev., Vol. 2, pp. 164, 165, *Planters Bank* v. *Jones,* April Term, 1872,) if, then, the purchase of the bonds was legal on the part of the bank, she owed the State the amount which she had agreed to pay; she accordingly gave the military board credit on her books for the amount, and was of course bound to pay any checks drawn by the board upon that fund. A bank has no right to inquire as to what will be done with the money proposed to be drawn from her on a check, if she owes the money she is bound to pay it when demanded; and even if she has direct

and positive knowledge that the money will be applied to an illegal purpose, it would furnish her no defense for not paying what she owed. 11 Wheat, 274; 17 How. (U. S.), 236, 237.

The court will bear in mind that the military board made all the purchases of military supplies and paid for them by checking on the fund belonging to the State in the bank, arising from the sale of the bonds.

But even if the bank had never bought any bonds, and had not owed the State anything, and had cashed the checks of the board as a mere accommodation, the result would be the same, for this court hold that "if one person pay the debt of another at his request, an action may be sustained to recover the money, though the original contract was unlawful, and that fact known to the plaintiff when he discharged it for the defendant." 11 Hum., 16; 2 Sneed, 455; 11 Wheat, 272, 273; 17 How. (U. S.), p. 236.

In other words, if you throw the purchase of the bonds entirely out of the case, and put it solely on the ground that the bank, in paying the checks of the military board, was in effect loaning the State so much money with which to pay the parties from whom the military supplies were bought; and if you say further that the purchase of such supplies was an illegal act, still I maintain, in the express language of the United States Supreme Court, "that the money lent would constitute a new consideration, and be the foundation of a new contract which could not be vitiated by a knowledge of the purpose for which the money was lent." 11 Wheat, 276. The case of *Hanaur* v. *Doane*, decided by that court in 1870, is cited against us on this point; that case is opposed to the previous cases decided by the same court, and is in direct conflict with all the cases decided by this court; but even in that case the court admit that if Hanaur had borrowed money from Hunter & Oakes to redeem the duebills himself, the transaction would have been different, "and the loan of money would have been legal,

although Hunter & Oakes had known for what purpose Hanaur wanted the money." 12 Wal., 345.

The State, through its military board, buys from A. B. one thousand Enfield rifles with which to fight the United States, and for which she agrees to pay $10,000; grant that this is an illegal debt, and that A. B. could not have recovered it from the State, but the State desires to pay it, and having no money of her own, goes to the bank and borrows $10,000 with which to pay it, notifying the bank of the character of the debt which she wishes to pay; now by all the authorities (*Hanaur* v. *Doane* included), this loan by the bank would be valid, and she could recover it from the State.

In the case cited, Hanaur, as purchasing agent for the Confederate States, had given his duebills to various parties for supplies purchased by him for the confederacy, which duebills the court held to be illegal, and Hunter & Oakes, instead of loaning Hanaur the money for him to take up his duebills, they took up the duebills for him, whereby " they became the holders of the duebills, knowing for what purpose they had been issued, and hence their title, in the opinion of that court, was no better than that of the original holders; but in our case, the bank did no such thing; the purchase was made by the military board, who gave orders in favor of the vendor, which orders may be regarded in the same light as the duebills given out by Hanaur, but the bank never paid any of these orders; never took any of them, and never claimed title through or under them, but the vendor took the orders to the president and secretary of the board, who drew checks upon the bank in payment of those orders; and the bank now holds those checks, not as evidence of the debt which the State owed to the vendor, but as evidence of so much money loaned by her to the State, with which the State might pay her illegal debt to the vendor. The whole transaction, whether legal or illegal, between the State and vendor was fully complete and

ended before the bank was ever called upon ; and all she did was to loan the State the money with which to pay off the debt, taking the check of the State as evidence of the loan.

Suppose, however, that the notes known as "new issue" were issued ·under such circumstances as to render them illegal in the hands of the parties to whom they were first issued, it would not follow that they would be void in the hands of an innocent holder. The·proof shows that from 1861 to 1865 they remained in the active circulation of the country, commanding an equal rate with the old issue of the bank. How many times each note was subsequently returned to the bank and re-issued by it, it is impossible to ·tell; how many thousands of times it may have passed from one man to another in the business relations of the people from 1861 to 1865 we cannot tell, but it is a matter of history that the notes of this bank, without regard to date, were not only current during that time, but were the favorite currency with` most of our people; and that up to 1865 no one had any notice, or suspicion, that they had been issued illegally, or that any other defense existed against them.

It is certainly true that there are a class of cases, like that of *Thomas* v. *Richmond* (12 Wal., 349), which hold that where a corporation is prohibited from issuing bills to circulate as currency, and the receiving, as well as issuing, .of such bills is prohibited by law, the bills issued by such corporation are void, even in the hands of innocent holders; for as every one is bound to know the law which declares them illegal, no one can be admitted by the law to be an innocent holder of them. So, in some countries, notes infected with usury, or given in stock-jobbing transactions, are, by express statute, declared absolutely null and void, even in the hands of innocent holders. These statutes, though strictly construed, are sometimes enforced by the courts. So notes executed under duress, or by persons *non compos,*

State, and Watson, Trustee *v.* Bank of Tennessee.

or *non sui juris*, are void in the hands of innocent holders, upon the ground that owing to want of legal capacity in the maker, they are in fact not notes at all, and never were. But in this case it is not pretended that the Bank of Tennessee was not authorized to issue circulating notes, or that there was any legislation declaring any of its notes void until years after the new issue had been in active circulation. This leaves the question before us to be governed by the general principle that "the bona fide holder for value, who has received the paper in the usual course of business, is not affected by the fact that it originated in an illegal consideration." Daniels' Negotiable Inst., 2 Sou. Law Rev., pp. 79, 81. "Mere illegality of consideration will not vitiate the instrument in the hands of a bona fide holder." 1 Am. Lead. Cas., 333. Bank notes "are issued and put in circulation with the avowed intention that they shall pass from hand to hand, and circulate as money as long as possible. The policy of the bank is that they shall be returned for redemption as seldom as possible, and in this view the liability of the bank remains as a continuing promise to pay, until actual refusal of payment upon demand made at the counter of the bank." 2 Sneed, 484, 485. Some American cases hold that a note payable on demand is overdue in a reasonable time after its date, but this court hold that the date of a bank note is no evidence whatever of the time at which it was actually issued (5 Hum., 592), and that as long as it remains away from the bank it is to be regarded as not due, and as being "a continuing promise to pay" until the holder sees proper to demand payment. In this position our court is sustained by all the English authorities. " The principle that a note payable on demand may become discredited by mere lapse of time, is not recognized in England. And in this country the principle is not considered applicable to bank notes or bank post notes." 1 Am. Ldg. Cas., 337; Redfield & Bigelow Ldg. Cas. on Bills of Exchange, 214.

Our clients having purchased the notes before maturity, for a valuable consideration, *i. e.,* their full market value, and without notice of any illegality, they will be protected. It is true they had notice that the amended Constitution of 1865, and subsequent legislative enactments, had undertaken to declare these notes void, but as men of sense they were bound to know that all such enactments were themselves nullities. The State did not pretend to declare the notes void on the ground that they had been issued in aid of the rebellion, or for any other illegal purpose. Neither the Constitutional Convention, nor the Legislature, nor the Bank of Tennessee, have ever announced the fact to the public that these notes were issued for an illegal purpose. They have based their right to nullify these notes upon no other principle of law or fact than that of *"Sic Volo, Sic Jubeo,"* and such a notice no citizen of a free country is bound to regard for a moment.

"A bill or note, by its very character as such, imports to have been executed for a consideration sufficient in law, and carries with it on its face *prima facie* proof of its own consideration" (2 Sou. Law Rev., 57); "and the burden of proof lies on him who assails the right claimed by the party in possession." 1 Sou. Law Rev., 217; 2 Wall., 121.

But if the defendants could be charged with notice, their title will be good if the notes, after they left the bank and before they came to the defendants, at any time passed through the hands of any one who was an innocent holder, for that intervening consideration will support the defendant's title. 2 Sou. Law Rev., 59; 1 Sou. Law Rev., 228. As these notes were in active circulation from 1861 to 1865 before they were ever questioned by any one, they must have passed through the hands of thousands of innocent holders.

Again, suppose the notes when first issued were illegal in the hands of the original holder, yet the moment the orig-

inal holder passed them to another, such subsequent holder became himself a direct contractor with the bank.

The promise of the bank is to pay the bearer, and whoever is for the time being the bearer may maintain his suit against the bank in his own name, as if the original promise were running to himself. Every time a bank note is paid into the bank, and paid out again, the promise is renewed; and every time a bank note changes hands outside of the bank, a new contract and a new cause of action is created. Morse on Banks, 403, 404. It is manifest, therefore, that it will not suffice to show that the contract by which the original holder got the bill was illegal, but that it must also be shown that the contract by which the present holder got possession was illegal. This is not pretended.

It is also obvious that it will not suffice to show that some of the new issue was used for an illegal purpose; but it must be shown that the particular notes now in controversy were so used. It is demonstrated that all the notes issued by the branches of the bank were not so used, and it is impossible to tell which of those issued by the mother bank were used in that way. Surely, a bank cannot bastardize all its issue, by simply raising a suspicion of illegitimacy as to some of it.

The fact that notes of a particular bank have been counterfeited in considerable numbers, could not be proved in defense against a particular note sued on, the signatures to which are genuine, and the form of which is regular and fair on its face. Clearly, each note must stand or fall on the fact as to whether it is genuine and legal, and cannot be affected, favorably or unfavorably, by any other note issued by the bank.

But it will be argued that these notes are barred by the statute of limitations.

To this our answer is:

1. That the statute was suspended up to January 1, 1867;

that six years thereafter did not expire until January 1, 1873, and our answer was filed December 3, 1872, as well on behalf of defendants as on behalf of all others who may be owners of such notes, and who may see proper to come in and adopt the answer. This will prevent the statute from running against any of the noteholders who may come in under the decree. Angell on Lim., sec. 331; Hicks' Ch. Pr., App., 103.

2. The injunction granted on the original bill enjoins all creditors from suing the bank, either in law or equity, and this suspends the statute of limitations. Code, sec. 2756.

3. Watson is an express trustee; he admits the title of the creditors, and asserts his willingness to pay over to whomsoever the court may decide are the creditors of the bank. In such cases the statute does not apply. King's Digest, sec. 8488.

4. Watson never gave bond as trustee under the Code; he qualified as receiver of the Chancery Court at Nashville; the property is therefore in *custodia legis*, and the statute does not run. 10 Hum., 365; 2 Sneed, 369.

5. The statute of limitations does not apply to actions to enforce the payment of bank bills. Code, sec. 2779.

6. And the bank by suspending payment, and making an assignment, cannot "make a case" at its own pleasure for the operation of the statute. 2 Sneed, 486.

But it will be argued that the defendants cannot be allowed to claim as creditors of the bank, for more than they gave for the notes, with interest, inasmuch as they have become the owners of the notes since the assignment was made by the bank.

I concede that when it is proved that a note is obtained without consideration, or by fraud, the holder, though innocent, will not be allowed to recover more than he has paid, with interest; but the very gist of our defense is, that there is not a shadow of proof that any of the notes held

by us were issued illegally or without consideration, and therefore that class of cases does not apply.

The act of February 6, 1860, entitled "An act to reform and regulate the business of banking in Tennessee," provided that "every bank which now is, or may be incorporated, under the authority of this State, shall be subject to the liabilities and governed by the rules and provisions contained in this act." Acts 1859–60, p. 17, sec. 1. If there was any doubt as to whether the Bank of Tennessee was included in that act, the language of which is of the most sweeping character, we have direct evidence in sec. 3 of an act passed July 1, 1861, which is as follows: "That the banks of this State which are subject to the provisions of the bank code (the bank of Tennessee being included), shall resume specie payment simultaneously," etc. Acts 2d Ex. Sess., 1861, p. 50. One of the provisions of the bank code of 1859–60, is, "that in case of the insolvency of any bank, or banking association, the billholders thereof shall be entitled to preference in payment over all other creditors of such bank or association.' Acts 1859–60, p. 23, sec. 30.

This act was in force when these notes were issued and put in circulation.

The "obligation of a contract depends upon the laws in existence when it is made; these are necessarily referred to in all contracts, as forming a part of them, and as giving the measure of the obligation to perform them by the one party, and the right acquired by the other;" . . "the law defines the duty and the right, . . and if any subsequent law affects to impair that right it necessarily bears on the obligation of the contract," . . "hence any law which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is unconstitutional." Cooley Const. Lim., 295, 290, 201; 2 Wall., 10, 21; 2 Col., 386.

This stipulation in the law was intended as an assurance that the bills of the bank should be entitled to preference

in payment out of its assets, and like the guaranty given by the State in regard to receiving them for taxes, this guaranty was given in order to "afford additional inducements for the people to take them, and hold them as a part of the great circulating medium of the country." "This guaranty was in no sense a personal one; it attaches to the note, is a part of it, as much so as if written on the back of it; goes with the note everywhere, and invites every one to take it." 8 Wall., 60, 61. The fact that the notes were purchased at a discount, does not lessen or affect defendant's rights in the premises. The statute makes no discrimination against such purchasers. The notes are negotiable, and the purchaser takes (in regard to the right to payment) all the rights and equities of his vendor. 7 Col., 322, 323; 1 Wall., 392, 96; 1 Black, 386.

Now, let me ask, who is injured by this construction? The bank is not injured; for, at one time or another in the past, the bank has actually received the full face value of the notes from some one. "A note made in the course of a real business transaction, for which the original party has given a valuable consideration, is regarded as property, and like other property, the owner may sell it for the most he can get, and the purchaser is entitled to whatever profit he can make upon it." 3 Head., 727.

It does not matter with the bank whether it pays the note to the party from whom it received that value, or to some one to whom that party has transferred it.

If its affairs have since been so badly managed that the holder has been able or has been obliged to receive the bill as a representative of a less amount or value, this is not a matter which the bank can set up to diminish its indebtedness, which has long since accrued in consideration of full value received." 26 Geo., 17; 2 Sneed, 485.

The other creditors of the bank cannot complain; they made their contracts with the bank with full notice of the preference secured to the noteholders; and if the parties

who held the notes when the assignment was made were now the holders of them, the notes would unquestionably be entitled to preference, and the general creditors are in no worse position by allowing that preference to be given to the present holders, than if it had been given to those who held them when the assignment was made.

It takes no more of the assets of the bank to pay off the notes in the one case than in the other.

If the courts decide that purchasers subsequent to an assignment can claim only what they gave, with six per cent. interest, no one will purchase at the present value of money; the consequence will be that the original holders will be forced to retain them, and claim the preference out of the assets, so that at last the general creditors will get no more than if the courts had allowed the notes to remain an article of commerce. Whatever loss may have been sustained by the original holders, falls upon them, and not upon the general creditors; and the present holders occupy no such relation of trust or confidence towards the general creditors as would authorize the latter to claim any part of the profit that might arise from their investment, or to demand that they shall be deprived of any legitimate gain that may arise from the fair purchase of these notes for their current value in open market.

The State has no right to complain, because we are asking no decree against her; our decree is asked against the assets of the bank, and in the shape of instructions to be given the trustee in administering the trust funds in his hands.

The State, by her oppressive, unjust and unconstitutional legislation, has brought upon all parties all the loss that any of them have sustained or will sustain.

If, instead of robbing the bank under the hypocritical pretext of securing the school fund, she had left the coin in its vaults to pay its honest debts; if, instead of holding that notes given for Confederate money were void, she had al-

lowed the bank to recover the value of the Confederate money which she had loaned to her debtors; if, instead of attempting to prevent the trustee from receiving the new issue in payment of debts due the bank, she had allowed it to be absorbed in that way; and if, instead of attempting to repudiate her liability on the notes of the bank, she had proposed to the holders to fund them, or receive them gradually for taxes if preferred, the State would not only have averted all loss from the creditors and noteholders of the bank, but she could have met the debt which she owes to them without serious inconvenience to herself.

As it is, by the amendment of 1865, the "new issue" was in an instant reduced from an equality with the old issue to a mere nominal value in the market. The original holders scattered through the State found these notes "turned to ashes" by this infamous legislation, and it has been a positive benefit to them that the present value of the notes has been advanced to fifty-two cents in the dollar by the defendants risking their own money on their confidence in a returning sense of justice in the State authorities and the restored integrity of the courts.

### BRIEF—VALIDITY OF NEW ISSUE.

I. The 14th amendment of the United States Constitution does not invalidate them; because,

1. The Constitution of the United States cannot invalidate contracts between private citizens of a state.

2. Said amendment only applied to the United States and the different states.

3. It only applied to debts incurred "in aid of insurrection; and,

4. These notes were not issued for that purpose.

II. Said notes are not invalidated by sec. 6 of the Schedule to Amended Constitution of Tennessee of 1865; because,

1. A state, even through a constitutional convention, cannot impair contracts. 2 Heis., 480; 1 Heis., 280; 9 Yer., 490; 1 Sneed, 119.

2. Congress could not impair the validity of contracts, valid when made; if the war was for conquest, private rights were not interfered with. 7 Pet., 87; 12 Pet., 436; 20 How., 177.

3. But the war was not for conquest—it was for restoration of the Union. 2 Wall., 278; 7 Wall., 726; 6 Wall., 450; 13 Wall., 651, 652.

4. The states and their citizens were always in the Union; and at no time before, during or since the war could the states impair the obligation of contracts. 13 Wall., 646, 647, 656.

5. The contracts of private citizens made in the Confederacy during the war were valid. 7 Wall., 733; 8 Wall., 12, 13; 10 Wall., 480.

6. Congress, in restoring Tennessee, did not attempt to interfere with private contracts, and if it had so attempted, it would have had no such power. 13 Wall., 648, 649, 662; 14 U. S. Stat. at Large, 364.

7. And Congress could not prevent Tennessee from changing the Constitution of 1865, as she did do in 1870. 7 How., 47; Const. 1870, art. 11, sec. 1.

III. The contracts of the Bank of Tennessee were not the contracts of the State, and are not to be regarded as made by the insurgent State Government. 1 Sneed, 354; 3 Sneed, 381.

2. It is not true as a fact that the bank was used or controlled by the State in aid of the rebellion.

IV. I insist that Tennessee, under the peculiar circumstances surrounding her in May, 1861, had the right to raise an army for her own defense; it was not keeping troops in times of peace, but in times of war. Story Const., sec. 1404; 7 How., 45; 27 Calif., 221, 23 Calif., 175.

V. But even if she had no right to raise the provisional

army, and if she had no right to engage in the late war, yet as a belligerant, she had the right to purchase war material; this included the right on her part to issue bonds to pay for it, and the right on the part of the citizens to buy the bonds. *Bank Tenn.* v. *Cummings,* Nashville, 1872, MS.

VI. But if purchase of bonds by the bank was illegal, it would not make the bank notes void which were issued in paying for the bonds.

VII. The bank's object in buying the bonds was not to aid rebellion, but to make a remunerative investment—such a contract was not illegal. 11 Hum., 16; 2 Sneed, 455; 1 Heis., 111, 128, 319; 2 Heis., 68; 6 Col., 43, 44; 2 Sou. Law Rev., pp. 164, 165; *Planters Bank* v. *Jones,* April, 1872.

VIII. Even if the contracts between the State and the parties from whom war supplies were bought were illegal; the bank had no connection with them; she simply paid the checks of the State for what she owed the State, and had no right to inquire into the consideration of the contracts to pay which the checks were drawn.

IX. But even if the bank had loaned the State money with which to pay illegal debts, it would not make the contract between the State and the bank void. 11 Wheat, 272, 273, 274, 276; 17 How., 236, 237; 11 Hum., 16; 2 Sneed, 455.

X. Even if the notes were illegal in the hands of the original holders, yet from 1861 to 1865, they were constantly used in commerce, and passed through the hands of thousands of innocent holders. A *bona fide* holder is not affected by illegality of original consideration. 2 Sou. Law Rev., pp. 79, 81; 1 Am. Ld'g Cases, 333.

XI. A bank note is not due until presented for payment. 2 Sneed, 484, 485; 5 Hum., 592; 1 Am. Ld'g Cases, 337; Redfield & Bigelow Ld'g Cases, 214.

XII. And if the notes at any time since their issuance have passed through the hands of *bona fide* holders, that will

support our title. 2 Sou. Law Rev., p. 59; 1 Sou. Law Rev. p. 228.

XIII. Each time a note is transferred from one holder to another, and each time it is re-issued by the bank, a new contract is created between the last holder and the bank, (see Morse on Banks, 403, 404,) therefore, it must be shown that each of the contracts by which these notes have been transferred from hand to hand, has been illegal, or the notes are not illegal in our hands.

XIV. It will not do to show that some of the new issue was used for illegal purposes, but it must be shown that the particular notes in controversy were so issued.

XV. The statute of limitations does not apply; because,

1. Our answer was filed before January 1, 1873. .

2. All creditors have been enjoined from suing the bank. Code, sec. 2756.

3. Watson is an express trustee, and admits he holds for whoever may be the creditors of the bank. King Dig., sec. 8488.

4. Property is in *custodia legis.* 10 Hum., 365; 2 Sneed, 369.

5. Statute does not apply to bank bills. Code, sec. 2779.

6. The suspension and assignment does alter the case. 2 Sneed, 486.

7. Our answer being filed in time, and being in behalf of all holders of new issue, saves the bar as to all. Angell Lim., sec. 331; Hicks' Ch. Pr. App., 193.

XVI. The billholders are entitled to preference over all creditors. Acts, '59–'60, p. 17, sec. 1, p. 23, sec. 30.

Bank of Tennessee embraced by this act. Acts 2d Ex. Sess. 1861, p. 50.

This preference is part of the contract, and cannot be impaired. Cooley Const. Lim., p. 285, 290, 291; 2 Wall., 10, 21; 3 Col., 386.

It attaches to the note, and follows it everywhere. 8 Wall., 60, 61.

And that defendants purchased them at a discount, makes no difference. 7 Col., 322, 323,; 1 Wall., 96, 392; 1 Black, 386; 3 Head, 727; 26 Geo., 17; 2 Sneed, 485.

The bank may as well pay one holder as another.

The general creditor is in no worse attitude than he would be if the notes were now held by the original holders, as they would get the preference.

The State cannot complain, as we are seeking no decree against her.


ARGUMENT OF JOHN REID FOR DEPOSITORS.

The principal question, in this cause, discussed before this court at its last term, was different from the question now before the court. It was this : Had the assets of the Bank of Tennessee been rightfully seized by the Legislature as a part of the common school fund or were the said assets a trusts fund, which the bank must hold for the benefit of its creditors ? That was then the principal question. The principal question now to be discussed is the validity of the circulating notes of the Bank of Tennessee issued since the 6th of May, 1861, and known as the Torbett money or new issue. The point is distinctly raised in the amended answer and cross-bill of B. R. McKennie and others.

And allow me, also, to say, that the parties litigant no longer occupy the same relative position as in the former discussion. The State and the depositors in the bank are now no longer in antagonism, but stand upon the same platform and fight shoulder to shoulder in this contest. On the other hand the holders of these circulating notes, issued since the 6th of May, 1861, and the depositors in the bank now no longer fraternize and fight side by side as they did in the former discussion, but stand face to face as enemies. The State and the depositors insist that these circulating notes, which were issued by the bank since the 6th of May, 1861, were made for an unlawful purpose and were void in

their inception, and are now void. On the other hand the holders of this "new issue," as it is termed, insist that it was lawfully made and issued, and that they, the holders thereof, under and by virtue of the act passed 6th of February, 1860, sec. 30, are entitled to the preference in payment over all other creditors of such bank. The assets of the bank, according to the evidence of the trustee, (Samuel Watson,) will realize in any event considerably less than a million of dollars, and the amount of these circulating notes which were issued since the 6th of May, 1861, will perhaps, or did exceed one and a half millions of dollars. So then, if this "new issue" be valid and binding upon the bank, it is manifest that the holders thereof will not only consume all the assets of the bank, but the people of this State will have to be taxed heavily and perhaps upwards of $500,000 to pay the remainder. Of course then, as I have already stated, the State and the depositors stand upon the same platform, and are equally interested in disputing the validity of these circulating notes known as the new issue.

The Chancellor in the court below (Fleming) decreed that these circulating notes were valid and must be paid in preference to the other debts, and the State and the depositors have appealed from his decision to this court.

In discussing this question I wish to say in the outset, that I have always thought that, in any case, it was unjust to give a preference in payment to the holders of the circulating notes of a bank over the general depositors. It has always seemed to me to be hard, that the law should take the very money which had been placed in the bank by its depositors and give it to the holders of its circulating notes in preference to, and to the exclusion of, those who had placed it there. Some of these deposits belong to minors and to other persons not *sui juris;* some of these deposits are but the sweat of blood of honest toil and painful self-denial; and some of these deposits belong to others who are guiltless of any wrong. And allow me to say also, that

general deposits in a bank ought to be encouraged as a matter of public policy; because upon these deposits the usefulness of a bank to the community at large, in a great measure depends. It is true that, in contemplation of law, a general depositor is but a creditor of the bank; that when money is so deposited it becomes the money of the bank. But what more is the holder of its circulating notes? However, it is useless to dwell upon this point; "*Ita lex scripta est,*" and to it I bow in submission. But whilst I do so, the right will be assuredly conceded to me to demand of the other side proof, not only that they are *bona fide* holders, but also that the circulating notes so held by them are legal and valid according to the strictest letter of the law. Do not "show me the steep and thorny way to heaven" unless you are prepared to "reck your own read" and to follow what you preach; do not point me to the law when it is against me unless you are ready to submit to the law when it is for me.

Having said thus much, let us now, before commencing the argument, understand the circumstances under which and the purposes for which this "new issue was made. And I here state in the outset that this "new issue" was created to aid and assist the State to throw off its allegiance to the Government of the United States. I care not to whom these circulating notes were paid out nor for what consideration they were so paid out. I go behind their issuance and insist that their creation was illegal.

It is well known to this court that the Legislature of this State on the 6th of May, 1861, passed an act entitled "an act to raise, organize and equip a provisional force and for other purposes." It is well known to this court also, that on the day thereafter a league between the State of Tennessee and the Confederate States of America was made, by which the whole military force of the State, during the impending conflict with the United States, was put under the control and direction of the President of the Confederate

States of America, as fully as if the State of Tennessee were then a member of the Confederacy.  By the 9th section of the said act, the title to which I have just given, the Governor of this State was authorized to issue and dispose of the bonds of the State to the amount of five millions of dollars, the proceeds of which were to be used in arming and equipping the troops of the State.  Now, all these facts are admitted in the additional agreement, and made a part of the record in this case, and if they had not been so admitted, still they form a part of the history of this State, and as such will be judicially known to this court.  Well, these bonds were so issued, and were either sold to the Bank of Tennessee or deposited with said bank to the credit of the military board with the understanding and agreement that the said board should draw upon the bank for their amount, and to enable the bank to meet the drafts of the said military board this "new issue" was necessarily created.  But for this agreement or understanding between the military board and the Bank of Tennessee, this "new issue" would never have been created.

Samuel Watson (the trustee of the bank, and one of the complainants in this cause), tells us that the amount of the Tennessee eight per cent. war bonds now held by the bank is $3,223,000; that the whole amount of these bonds taken by the bank was $3,800,000, but that a part had been sold by the bank, and leaving still in the hands of the bank the amount already stated; that the said bonds were placed to the credit of the military board on the books of the bank; and that up to and including the 31st of August, 1861, the military board had drawn out of the bank $4,195.54 more than the $3,800,000 of the war bonds which had been passed to its credit on the books of the bank as before stated.

But the facts which I am now endeavoring to lay before this court, are more clearly and succinctly stated in the agreement between the parties, an extract from which I will now give, and which is in the words following:

"It is agreed that the said books and proceedings show that the purposes of the said military board were the arming and equipment of troops, and the purchase of military stores, in the war then flagrant between the United States Government and the Confederate or Rebellious States, and that the sums of money appropriated by them and paid by checks on the Bank of Tennessee were used for the purposes aforesaid, and in payment of the salary of the military board and its secretary and other officers.

"It is further agreed that G. C. Torbett was the president and John A. Fisher the cashier of the Bank of Tennessee during the year 1861, and that they are now both dead; that they and the other officers and directors of the Bank of Tennessee knew that the military board was organized for the purpose of raising, arming and equipping troops, and furnishing military stores and supplies in aid of the rebellion then flagrant against the United States Government, and that the money drawn from the bank upon the order and checks of said board was to be used and was used for the purposes aforesaid. That the ordinary and then issues of circulating notes of the Bank of Tennessee and its branches were insufficient to meet the usual banking business of the bank in 1861, and drafts or checks drawn upon the bank by the military board, and that the bank was compelled, in order to meet its regular business, and the demands of said board, to resort to the issuance of the bank notes now in controversy, known as the "new issue" of said bank, and said notes constituting the "new issue" were all put into circulation after the 6th of May, 1861, and for the purposes aforesaid."

And so it appears, incontrovertibly, that the president and directors of the Bank of Tennessee, well knowing that the old issue was insufficient in amount to enable it to accept and pay the checks of the military board, and well knowing that the money to be advanced would be applied by the military board in arming and equipping the troops

State, and Watson, Trustee *v.* Bank of Tennessee.

of the State to fight against the troops of the United States, yet, nevertheless, resolved to make and did make this " new issue" with the view of helping and giving aid and comfort to the State in the impending struggle.

But it may be said, and, doubtless, will be said, no—that it does not necessarily follow that the bank so agreed to do, to help and give aid and comfort to the enemy of the United States; that all the facts I have stated may be as I have stated them to be, and yet the bank may have bought the said bonds of the State, if it ever did buy them, or may have accepted and paid the checks of the military board if it only loaned the money to the State, by way of a speculation or only in the way of its ordinary business. The word necessarily is, I admit, a very strong word; but I insist, if the facts be as I have stated them to be, then the inference I have drawn therefrom is highly probable, and sufficient for us to act upon as true. It must be recollected that the Bank of Tennessee was a State institution, the stock in which was owned solely by the State. It must be recollected also, that the president and directors were officers who were nominated by the Governor and confirmed by the General Assembly, and that they continued in office but for two years. Of course then, under such a state of things, as long as human nature continued to be as it was and is, there would exist between the authorities of the State and the officers of the bank the most perfect sympathy and accord. When the authority of the State took snuff, the officers of the bank would probably sneeze. I say this would probably be the case even in ordinary times. But in the extraordinary times of which we speak—when the heart of the whole people was moved as it had never been moved, and when this very proposition of furnishing the necessary money to arm and equip the troops of the State was a question of life or death to the struggle, of course the president and directors of the bank would either act heart and soul with the authorities of the State, or would throw up their offices

and refuse the aid asked, according as they were in favor of or against the sundering of the State from the United States. To say that the bank, under such a state of things, may have bought the bonds of the State, or accepted and paid the checks of the military board merely as a speculation, or as a matter within the line of its legitimate business, is but empty sound, or the talk of a child, and needs no refutation.

But I go now to add other facts, which tend to show that the officers and the managers of the bank did, by making this " new issue," intend thereby to give aid and comfort to the State in the then impending struggle.

It is admitted in the written agreement drawn up by Mr. Trimble and signed by Mr. Baxter, and made a part of the evidence in this cause, that the officers of the bank at the time sympathized with the authorities of the State in the struggle then about to take place with the Government of the United States. It also appears, and being a part of the history of the State, would be judicially known to this court, that the officers of the bank, immediately upon the fall of Fort Donelson, not only fled from their homes in this State to within the lines of the Confederacy, but remained there during the war, and removed with them the assets of the bank from its banking house in Nashville. It also appears from the printed record, that these same officers actually issued $177,000 in the circulating notes of the bank after the assets of the bank had been so removed from its banking house at Nashville.

Now why should these officers have fled from their homes on the approach of the Federal army, and should have remained out of the Federal lines during the war, unless they had cast in their lot with that of the Confederacy? Or why should they, who were mere naked trustees, and who were not bound, either by their duty or by the law of the land, to remove these assets from the banking house at Nashville, do so unless to enable the State to continue to

provide for its troops? Or why should these same officers assume the responsibility of issuing and paying out so large an amount of money after the assets of the bank had been so removed unless to give aid and comfort to the State in the struggle against the United States? The bank did not then owe the State, but, on the contrary, the State at that time was largely indebted to the bank.

And so I say, that it is, as it seems to me, manifest to a mind open to the truth, that the bank from the beginning acted in accord with the authorities of the State. I do not, however, consider that this accord must be proved by us to have existed. On the contrary, I think its existence will be conclusively presumed in cases of this character from the bare knowledge of the uses to which the money would be applied.

And so, having thus stated the material facts, as I understand them, let me now also refer to what may be deemed material evidence by the other side. It is the evidence taken in the case of the *Bank of Tennessee* v. *R. H. Jamison*, administrator, and others—a case tried in the Circuit Court for Maury county, but the evidence in which was made a part of the evidence in this cause, by consent of parties. Watson (the trustee), in answer to the third question, says:

"The evidence that the books of the bank show that the notes issued after the 6th of May, 1861, were issued and paid out in the regular course of business, and that they were entered upon the books as all former issues of the bank had been. And there is nothing in the account books or records of the bank, showing that they were paid out in aid of the rebellion, or that they were not paid out like all issues of the bank."

And in answer to the next succeeding question he says:

"The books show no evidence that said bank notes were received by any person or persons with any knowledge that they were issued and paid out in aid of the rebellion."

It is as well to state here as elsewhere, that the evidence of Mr. Watson amounts to nothing when sifted, and when what is material is understood. He had no connection with the bank in 1861, when these circulating notes were issued, and knows no more about the causes which prompted their issuance than any other citizen—no, not half so much, if his answers are to be taken as the full expression of his knowledge. He simply says that the books of the bank do not show that these circulating notes were unlawfully issued or that the first takers knew that they were illegal. No indeed; and they would be very garrulous books' if they showed either fact. And yet it is distinctly admitted in the agreement, which I have already quoted, that these circulating notes were issued to enable the bank to meet the drafts of the military board drawn upon the bank, and known to be so drawn for the purpose of arming and equipping the troops of the State.

Granville C. Torbett was the president of the Bank of Tennessee at Nashville, and H. L. Claiborne was one of its clerks. They both tell us that the issuance of the "new issue" was regular in form, and according to the rules of the bank; but neither of them tell us why, or for what purpose this new issue was made. Mr. Claiborne distinctly admits his ignorance, telling us that he was not a member of the Board, and never present at its meetings, and therefore could not know the cause of the making of these notes.

Colonel Torbett could have told us, but did not, and thereby strengthens the conviction that they were made in aid of the rebellion.

Now this was all the evidence given by officers of the bank at Nashville. The depositions of the president and cashier of the branch bank at Columbia was also taken, and I will now quote from them.

Mr. Dunnington (the president) says as follows: "They" (the circulating notes or "new issue" of the branch at Columbia) "were signed and issued in the usual way by

State, and Watson, Trustee, *v.* Bank of Tennessee.

direction or permission of the mother bank, and in strict conformity of the charter and laws governing the institution, so far as our branch was concerned.   I can speak for no other."

In answer to question No. 5, he says: "Said notes were issued to enable the bank to keep up its line of discounts, to facilitate its increasing business, and to supply the place of its mutilated isues which had been returned and charged off, and deposited in its vaults or burned.   Such notes were paid out in the usual course of the business of the bank, such as discounting notes and bills, buying exchange, paying deposits, current expenses, etc."

He adds on the same page, and in answer to the next succeeding question, as follows: "The branch Bank of Tennessee at Columbia, as an institution, made no issue in aid of the so-called rebellion."

Mr. Rye (the cashier of the branch bank at Columbia) repeates in substance the evidence of Mr. Dunnington.   He also informs us that a part of the "new issue" were signed by the officers of the branch bank, under instructions from the mother bank at Nashville, and the remainder were signed by the officers of the mother bank, and sent to the branch at Columbia.

I have, as I believe, now quoted the pith or essence of the evidence in favor of the "new issue."   If I had quoted the whole of each deposition, in so doing I would have added nothing in strength to that side.   And having so done, allow me to make a few observations upon the testimony of Messrs. Dunnington and Rye.

Although it be true that the officers of the branches of the Bank of Tennessee could sign the circulating notes to be issued and used by that branch, yet this could be done only by permission of the mother bank.   In other words, the bank at Nashville usually sent circulating notes to its branches to be used by the latter, which notes were signed and complete in every respect.   But it could send to its

branches notes which were incomplete, and could authorize
the officers of its branches to sign and put the same in cir-
culation.    But I take it, that the branches had no discretion
as to the necessity of or the amount of the new circulation
except under the permission and authority of the mother
bank at Nashville.

.Now, under these circumstances, it might be true that the
branch Bank of Tennessee at Columbia needed, in the year
1861, an additional amount of circulating notes with which
to carry on its ordinary business, and yet that deficiency
may have been caused, and doubtless was caused, by the
very agreement into which the Bank of Tennessee at Nash-
ville had entered or expected to enter into with the State to
accept and pay the checks of the military board, drawn
upon it by that board in furtherance of the war.    If it be
true, as is admitted in the agreement between the counsel
in this cause, and which I have already quoted, that the cir-
culation of the bank at Nashville was insufficient to carry
on its ordinary business, and also to pay the checks of the
military board, how could it furnish its branches with
enough of its old issue to do their ordinary business?    It
would be necessarily forced either to make a new issue, or
authorize its branches so to do.    And so Messrs. Dunning-
ton and Rye might well say, in one sense, that the branch
bank at Columbia, as an institution, issued these new bills
to " keep up its line of discounts, to facilitate its increasing
business, and to supply the place of its mutilated issues,"
and yet, at the same time, it would be true, that the increase
of the circulation was made to further and aid the rebellion;
that would be its real and controlling cause.

However, I have said enough on this point.    If the testi-
mony of Watson, Dunnington and Rye tended to prove,
and was strong evidence, too, that the " new issue " was
legitimate because made for legal purposes, what would it
amount to in this case?    We would have had the right to
combat that evidence, and to overthrow it by other and

stronger evidence if we could. But we were prevented from exercising this right and making this proof by the agreement already quoted by me, in which it was admitted that the bank was compelled to make this "new issue" in order to enable it to accept and pay the checks of the military board, and at the same time carry on its ordinary business. Of course this admission will control, and no outside evidence will be allowed to contradict it.

So then I take the facts to be clear. No one can misunderstand or doubt as to what they are unless he wilfully closes his mind. The president and directors of the Bank of Tennessee at Nashville certainly did know that the military board asked for money to be used in arming and equipping the troops of the State. The president and directors of the Bank of Tennessee at Nashville certainly did make this "new issue" because the old issue of the bank and its branches were insufficient to enable the bank to advance to the military board the money it asked for, and also to carry on its ordinary business. These two facts are admitted in the agreement of counsel, and therefore are so clearly established as to admit of no controversy. I think it is also sufficiently clear to the mind of any one, who acts upon probabilities, that the president and directors of the bank made this "new issue"—I mean was moved or induced to do so—not to enable the bank to make a speculation or profitable investment of its funds, but to enable it to give aid and comfort to the enemy of the United States.

Having thus stated the facts, let us now apply to them the principles of law which may be applicable.

1. If all the facts be as I have stated and believe them to be, then I think it is clear that the "new issue," as it is called, is void. If the Bank of Tennessee increased the amount of its circulation to enable it to aid and assist the State in the late war against the United States, then the act so done by the bank would be an act expressly forbidden by the Constitution of the United States to be done. It

State, and Watson, Trustee *v.* Bank of Tennessee.

would not, therefore, be within the scope, or legally within the power of the bank to do such act. I take that clearly to be the law. "No principle of law is better settled," says Judge Green in the case of *Hale* v. *Henderson*, "than that no action will lie to enforce a contract made in violation of a statute or of the common law, or which is immoral in its character and against public policy." 4 Hum., 299. And if this be so, how much more imperative and binding should be the rule when a contract was made and an act, under that contract, done with the intent actually to overthrow the Constitution of the United States? Why neither Congress nor the Legislature of a state could pass a statute violative of that Constitution, and if either presumed so to do and under it any act was done, both the statute and the act, in contemplation of law, would be void.

Am I told in reply to this position, that no one now before the court is seeking to enforce the contract of the State made through its military board with the Bank of Tennessee; that although the contract between the State, through its military board, and the Bank of Tennessee may have been void because violative of the Constitution of the United States, yet the said bank transferred these Torbett notes, known as the "new issue," to third persons for a legal consideration, and therefore that the contract between these third persons and the said bank is legal and binding? To this I rejoin that the position, in one sense, may be sound. Although the notes may be void in their origin, yet, if subsequently transferred to an innocent person for a valuable consideration, the subsequent contract would be valid and could be enforced. But if it be meant that the notes themselves, although void in their inception, were by the subsequent transfer rendered valid, then I deny the position and insist that it is utterly indefensible if not absurd. If in this way the devil could be whipped around the stump, then the prohibition in the Constitution of the United States would be thereby rendered wholly nugatory.

State, and Watson, Trustee v. Bank of Tennessee.

Unquestionably the Torbett notes in their inception were void, because they were created for an illegal purpose. And to understand this point clearly, allow me, in addition to the evidence already referred to and cited, to make one extract from the deposition of Col. Torbett, the then president of the bank :

"The bills were issued in the usual way, by receiving the signatures of the president and cashier, then passed into the teller's cash, and was paid out promiscuously with all other bankable funds as money to all who had the right to check on the bank for money. The signing and issuing was done in strict conformity with the charter and laws as the board understood them."

Yes; these Torbett notes, known as the "new issue," were passed into the teller's cash as money. Their formal execution was complete and perfect. The president and directors of the bank did not contemplate, in making these notes, to pay them out to the military board exclusively or solely. On the contrary, they intended to create these notes a part of the funds of the bank, and to pay them out as such indiscriminately with all other kinds of money to any one "who had the right to check on the bank for money." The act of the president and directors of the bank was therefore consummate when these circulating notes were passed into the teller's cash as money. It has been decided that the note of a bank which has been signed by the proper officers and complete in its form, is property, and can be stolen even before put into circulation. 3 Hill's Reports, 194. I can see no material distinction between these Torbett notes after they were put into the teller's cash and other circulating notes of the bank, which had been put into circulation but which had been afterwards paid back into the bank. And it does seem to me clear, that if these Torbett notes had been created for a lawful purpose and were valid, then when they were put into the teller's cash, that the teller and the security on his bond would be

responsible for their safety and for their misapplication.
When they were put into the teller's cash, therefore, it was
constructively and in law an issuance.

Now, we say that these Torbett notes were unquestiona-
bly void down to the time they were put into and made a
part of the teller's cash and during all the time they re-
mained in his cash box, because they were made for an ob-
ject which the Constitution expressly forbade.  If this be
so, how could they be made valid by the act of the teller
in paying them out to the people?  If the teller had the
power, its exercise would be in the nature of a miracle—it
would be like calling Lazarus from the tomb to life.  But
we deny the power, and say that no such omnipotence is at-
tached to his office.  Suppose the law authorized a bank to
issue its circulating notes of the denomination of $10, but
forbade it to issue such notes for $5;  and suppose further,
notwithstanding this prohibition, the bank did issue its cir-
culating notes each for $5, or, rather, put them into the
cash of the teller promiscuously with other funds of the
bank and he paid them out to the community;  would that
make such notes legal?  Could they be sued upon and a
recovery had?  Unquestionably no.  Well, wherein is the
difference between the case supposed and that now before
this court?  I am aware of the legal principle, that all per-
sons are presumed to know the law, and therefore it could
be said that, in the case supposed, it would be presumed
that the taker of the five dollar bill knew that it had been
issued contrary to law and was void.  But we know as a
fact that many persons do not know the law, and no doubt
many of such bills would pass into the hands of persons
wholly ignorant of their illegality.  And yet, such persons
would not be permitted to aver and prove their ignorance
of the law in order to enable them to recover on such bills.
The presumption would be conclusive and upon the ground
of public policy.

Let me be understood.  I have already admitted, that

although these Torbett notes may have been void in their inception, yet if they were subsequently transferred to an innocent person for a valuable consideration, the subsequent contract would be valid and could be enforced. That was so held by this court in the case of *Naff* v. *Crawford,* and which I will examine more particularly hereafter. Yes; I go further, and say that if the first taker from the bank was ignorant of the purpose for which these Torbett notes were made, and paid to the bank for them a valuable consideration, he could recover from the bank. This would be done upon the ground that the bank would not be permitted to take advantage of its own wrong and thus defraud an innocent person. But how could he recover against the bank? Could he sue and recover upon the notes? No; unquestionably not. How could he sue upon that which was a nullity—upon that which was not? He could only sue for and recover back that which he had paid to the bank. The law would restore him back his own, or, if this could not be done, would give him the value of the benefit he had conferred upon the bank.

In the case of *Leavitt* v. *Palmer,* reported in 3 Comstock's Reports, Judge Bronson has expressed these principles with clearness and force. On p. 34 he says:

"As the issuing of the notes was expressly prohibited by law, it is impossible to maintain that they were valid securities. To hold that they can be enforced against the bank, would be going very far towards defeating the end which the Legislature had in view. That they were void has been adjudged in several of the cases already cited; and I am not aware of any authority to the contrary. The legal liability on account of which the notes were issued still remains, but the notes themselves are void."

But it may be said that the State and the Bank of Tennessee are estopped from averring and proving that these Torbett notes are void because made in violation of the Constitution of the United States; that the State and the said

bank are *particeps* of the guilt and received the benefit therefrom, and ought not now to be allowed to make this defense.   In reply to this I say, that if I understand the doctrine of estoppel, it does not, in any case, prevent a corporation from denying that it could legally do the act. The law was so held to be in the case of *Hood* v. *The New York and New Haven R. R. Co.*, reported in 22 Connecticut Reports, 508–9.   It was so held in the case of the *Pennsylvania, Delaware and Maryland Steam Navigation Company* v. *Dandridge*, reported in 8 Gill and Johnson's Reports, 248.   In the former case the opinion of the court was delivered by Judge Ellsworth, and was written with great care, clearness and force.   In the conclusion he says : "We place our judgment upon a plain principle of equity and law, viz : that these defendants are not bound by a contract they had no power to make, and are not estopped from setting up this matter in defense."   How could it be ruled otherwise ?   The estoppel which could be pleaded would be one *in pais,* and would be based upon the acquiescence or consent of the bank.   Of course, if the bank could not legally make the contract, no estoppel could arise.   Judge Ellsworth well says that "however individuals may be liable and estopped who untruly hold themselves out as clothed with power, the defendants cannot be estopped on any such principle of law known to this court."   Yes, the president and directors of the Bank of Tennessee could do just what the law allowed or permitted to be done and no more.   It would be a strange ruling, indeed, to hold that a bank could do indirectly what it could not possibly do directly.

In the case of *The City Council of Montgomery* v. *The Montgomery and Wetumpka Plank-road Co.*, 31 Ala. Reps. (new series), 88, the law is thus stated by Judge Stone :

"It is further urged in maintenance of this action, that inasmuch as the Plank-road Company has had the benefit of the city bonds, and obtained them on the faith of the con-

tract, which is the subject of this suit, the obligors on this bond should be held estopped from disputing the authority of the city to make the contract. If this doctrine be established, then corporations, no matter how limited their powers, may make themselves omnipotent. They have only to induce persons to contract with them beyond the scope of their powers, and their very usurpations have the effect of conferring powers on them which the Legislature has withheld. A proposition so erroneous can scarcely need argument to overturn it."

And allow me to say right here, that the State and the Bank of Tennessee are not the only parties interested in this question. If they were, public policy alone would forbid that they should be estopped from averring and proving that the contract sued upon had been made in violation of the Constitution of the United States. But the depositors are deeply interested as to how this question shall be decided. The bank is insolvent, and if the State and the bank are estopped from proving the illegality of this "new issue," all the assets of the bank will be swept from them. They had no hand in the issuing of these bills. Are they, too, estopped from proving the illegality? Could the directors of the bank, without their consent, and in violation of the law, thus deprive them wrongfully of their money, and the law deprive them of the right to prove it? Such a ruling would be execrable.

And now allow me, before passing from this the first point in my argument, to call attention to one part of the agreement of counsel already quoted. It will be observed that it is said therein that the old issue of the bank was insufficient "to meet the usual banking business of the bank in 1861, and drafts or checks drawn upon the bank by the military board, and that the bank was compelled, in order to meet its regular business and the demands of the said board, to resort to the issuance of the bank notes now in controversy, known as the new issue." In other words, the

agreement does not say that the bank made the new issue solely to meet the checks or drafts of the military board; but it does say that the new issue was made to enable the bank to meet said checks or drafts, and to carry on its ordinary business. That is precisely what it does say, and I now aver that the transaction was thereby rendered as vicious as if the sole or only motive of the bank had been to pay the checks or drafts of the military board. "A little leaven leaveneth the whole lump," and so does an illegality as to part taint or diffuse its poison through the whole transaction. This is a principle of law well established, and well known to the profession, and needs the citation of no authorities in its support.

And allow me also to add in passing from this point, that the illegality need not be a part of the consideration of the note. If the illegality be an inducement or necessary cause to the making of the note, that will suffice to make the note itself illegal. Judge Parsons, in his work on Promissory Notes and Bills of Exchange, vol. 1, p. 213, thus states the principle:

"It may be well to remark here as particularly applicable to illegalities of this kind, although by no means confined to them, that a contract which is intended to lead to and facilitate a breach of the law, is also void for illegality, unless it produces this effect indirectly and remotely. Thus if money is loaned to a man expressly to gamble with, and the borrower give his note for it, the note cannot be enforced."

And so I say if the facts be conceded to me as I understand them, then it is clear that these Torbett notes known as the new issue are null and void *in toto.* It would indeed be a strange, and, I think, unwholesome doctrine to rule otherwise. And can I be mistaken in the facts? It is certain that these notes were made to enable the bank to supply the State with the necessary money to carry on its war against the United States, because that fact is admitted in

the agreement. It is certain that the bank knew that the money so advanced would be so used by the State, because that fact is also admitted in the agreement. I think it does just as certainly appear from the facts in the record and already stated by me, that the bank, when it consented to enlarge its circulation, did so with the intent to assist the State in the struggle; that was its motive.

2. I go now to take a position which may be regarded by some as more doubtful, and, for that reason, I will look at it more closely, and will treat it at greater length than the first head of my argument. I now say that the law in cases of this character will conclusively presume that the officers of the bank intended to give aid and comfort to the State from the bare knowledge—which it is conceded they had—of the purposes to which the money would be applied. And inasmuch as this court has made several decisions which bear upon this point, it will be proper, in the first place, to examine these decisions and understand the extent to which they go.

The case of *Naff* v. *Crawford*, 1 Heis., is the leading case. In that case, on page 116, Judge Freeman is made to say as follows:

"We lay down the rule, as deduced from these illustrations, to be, that the agreement must be to do or further some illegal or immoral purpose, or some purpose in violation of public policy."

I observe in the first place that the facts developed in the case of *Naff* v. *Crawford* are totally different from the facts developed in this case. I yield my assent to the correctness of the principle which I have just quoted, when applied to the facts of that case, and I believe that decision has been sustained by the Supreme Court of the United States. In that case the illegality had been committed; the confederate notes borrowed by Naff from Crawford, and in consideration for which he had executed his own promissory note, had been issued, and at the time were in circulation.

These confederate notes so borrowed by Naff were, at the time, of value in the community, and were, of course, sufficient to support his promise. Neither Naff nor Crawford had anything to do with the illegality in issuing these confederate notes. And I might say the same of the case of *Random* v. *Toby*, reported in 11 Howard, to which Judge Freeman refers, and which is the most striking case to which he does refer. The negroes for which the notes of Random had been given had been previously brought into the State of Texas. The parties had no connection with the illegal transaction, and Judge Freeman clearly saw and made the distinction. In the paragraph next to the one I have quoted, he says as follows:

"The element that destroys the validity of the agreement is the purpose, by the agreement, to effect or aid the forbidden end, or else the consideration for the promise must have been to do or perform an illegal or immoral act. If this were not the rule, then a contract might be declared void as against public policy or public law, that did not stipulate for any violation of the one or the other."

Now, if I correctly understand the principle upon which the case of *Naff* v. *Crawford* was decided, so far from its being contradictory to, it is confirmatory of, the position I have taken and am now endeavoring to maintain. I say the purpose on the part of the bank was to effect or aid a forbidden end, and was to do an illegal act. I have already quoted from Parsons on Promissory Notes and Bills of Exchange to this effect:

"Thus if money be loaned to a man expressly to game with, and the borrower give his note for it, the note cannot be enforced." So it is laid down in Story on Contracts, as follows:

"So, also, a lease of lodgings for the purpose of prostitution is void." (Sec. 542.) If a man proposes to borrow of me money, and at the time states that he wishes to get the money to gamble with, or if he proposes to rent of me my

State, and Watson, Trustee, *v.* Bank of Tennessee.

house, and at the time states to me that he wishes to use it for a brothel, in either case it would be an assent on my part to the purpose if I yielded. In other words, it would be an agreement that the money borrowed should be used in gambling, and that the house rented should be used for the purposes of prostitution. But if, after the transaction, I sell the note of the borrower of my money, or of the renter of my property to another (given under the circumstances supposed), in that case the transferee, with or without notice of the illegality of the original transaction, could hold me liable as endorser. He could not hold the borrower of my money, or the renter of my property—in other words, he could not hold the maker of the note—liable, as I will attempt hereafter to show, but he could hold me bound upon the subsequent endorsement, even though he knew that the consideration for which the note had been given was illegal. That is the precise point decided in the case of *Naff* v. *Crawford*. Well, if I have correctly apprehended the principle laid down in the case of *Naff* v. *Crawford*, and if also it be the law that it would be unlawful, and the contract void, to loan money to gamble with, or to rent a house for the purposes of prostitution, how can it be made to appear that the new issue of the Bank of Tennessee is valid? It is admitted in the agreement of counsel, a part of which I have already quoted, and to which I have so often referred, that the officers of the bank at the time knew that the money asked for by the military board was to be used in arming and equipping the troops of the State, and knowing that fact, the notes of the bank known as the "new issue" was put into circulation after the 6th of May, 1861, "and for the purposes aforesaid"—that is to say, to enable the bank to meet its regular business and the checks of the military board. If the bank did not assent that the money to be advanced by it should be so applied, then it is difficult to understand what would constitute assent. It knew before it advanced the money for what purposes it was asked

and to what uses it would be applied, and knowing these facts, it agreed to advance and did advance the money.

And now let me call the attention of this court to the case of *Tedder* v. *Odom, et als.*, 2 Heis., 68. In that case the parties were private individuals, and neither of them an enemy of the United States in the legal sense of the word. The buyer had not entered into the service of the confederacy up to that time. In the language of Judge Nicholson, the buyer (Tedder) "being about to enter the cavalry service of the Confederate States, purchased of one of the defendants a horse to be used in that service." Of course there remained to him the *locus penetentiœ* until he did so enter into that service, and up to the time that he did so enter into that service it was perfectly lawful to sell to him. He might change his mind and never enter into that service. That was one step. But if he did enter into that service, he might not choose, or the government into the service of which he did so enter, might not allow him to so use the horse he bought. That was another step. At all events, it was perfectly lawful to sell to him whilst he remained a citizen of the United States, and until after he had thrown off his allegiance and had placed himself in antagonism to the Government of the United States. Suppose he had been indicted for treason—I mean, suppose the seller in that case had been indicted for treason—upon what principle of law could he have been convicted? How could it be said that in law he adhered to the public enemy, giving him aid and comfort? Or how could it be said that in law he had done that which was unlawful? In that case, Judge Nicholson might well say, as he does say, that the owner did not agree "to sell the horse in consideration that complainant would use him in the confederate service, but in consideration that complainant would give to him his note for $150, with two securities." But on the other hand, suppose that the owner had sold the horse to an officer of the confederacy—to one whose duty it was to purchase horses for the

confederacy—and it was known to the seller that he was purchasing the horse in that capacity, how would the case stand then? If I put into the hand of one of two combatants a club, knowing at the time that he intends to use it upon his adversary, am I not guilty of an assault and battery? Yes, guilty as a principal? Is not the inference irresistible and conclusive that I intended the injury to be inflicted, and to aid my friend? Could any words that I could use make this point clearer? Well, in the case now before this court, the sovereign State of Tennessee was one of the combatants. She had thrown off her allegiance, and had swung her fist in the face of the United States; she had entered into a league offensive and defensive with the Confederate States, and at the time was in the act of girding her loins for the mighty struggle. At this time the bank increased its circulation in order to enable it to furnish to the State the means to arm itself. Can anybody be found who would say that such an act was lawful?

The two cases which I have referred to show the extent to which this court has gone upon the point now under consideration. I believe all the cases decided by this court, and in which the opinion of this court has been published, may be classed under either the one or the other of the two cases to which I have called the attention of the court. It is certain that this court in two cases (*Story* v. *Dobson, et al.*, 2 Heis., 29; *Rogers* v. *Leftwich*, Ib. 480), decided at the same term as that of *Tedder* v. *Odom et als.*, refused to pass judgment upon the legality or illegality of the new issue of the bank, and if it has since done so I am not aware of the fact. If this be so, then the road is clear and free from all obstructions, and I think it can be shown beyond a peradventure, that in cases of the character of the case now before this court, the law will conclusively presume from the bare knowledge of the uses to which the money would be applied, that the officers of the bank, in making the advancement, intended thereby to give aid and comfort to the confederacy in its struggle against the United States.

I am aware that cases may be found in which it was held that a knowledge of the illegality does not render the transaction void as to him who did not otherwise participate. And I think that some of these cases may be successfully defended even upon the ground of sound morals. Take the case of *Naff* v. *Crawford* as an example. There the illegality had been committed. The confederate notes had already been issued, and was of value, and had been passed in the community as money. It was not, therefore, either illegal or immoral for one to buy or borrow such, and to execute one's own notes therefor. He could use these confederate notes as money, and with them buy property. Should he be permitted to hold this property or enjoy the use of the confederate money whilst it was of value without making compensation therefor to the former holder? And don't let us be misled by the specious idea that by taking these confederate notes the citizen thereby approved and encouraged their issuance. I meet the objection fully and squarely in the face, and deny the proposition. I say the citizen, as such, had nothing to do with furnishing to the country a circulating medium. That was no business of his. That was an affair solely of the government under which he lived, and he was bound, under the circumstances in which he was placed, to use such currency as was furnished him, whether it consisted of shells, or pewter, or brass, or paper, or gold and silver. In no sense, neither legally nor morally, could it be said that the citizen approved the act of the government, nor could he control its action. Other cases, perhaps, could be cited to show that a bare knowledge of the illegality would not invalidate and annul the transaction, and would be cited by me and the principle explained had I the time to do so. But it is equally clear that there are other cases in which a bare knowledge of the illegality does taint the whole transaction and render it null and void. Take the case put by Lord Chief Justice Eyre in the case of *Lightfoot* v. *Tenant,* 1 Bos. & Pull., 351–356. I use the language of his Lordship:

"But the man who sold arsenic to one who he knew intended to poison his wife with it, would not be allowed to maintain an action upon his contract. The consideration of the contract, in itself good, is there tainted with turpitude, which destroys the whole merit of it. I put this strong case," says he, "because the principle of it will be felt and acknowledged without further discussion. Other cases," he says, "where the means of transgressing a law are furnished, with the knowledge that they are intended to be used for that purpose, will differ in shade more or less from this strong case; but the body of the color is the same in all. No man ought to furnish another with the means of transgressing the law, knowing that he intended to make that use of them."

Judge Story in his work on the Conflict of Laws, in referring to this case, uses this strong language in commendation of the position:

"The wholesome morality and enlarged policy of this passage makes it almost irresistible to the judgment; and indeed the reasoning seems positively unanswerable." Section 253.

The doctrine of Lord Eyre has been expressly adopted in other cases. Thus in the case of *Langton* v. *Hughes*, 1 Maule & Selw., 593, a person was not allowed to recover upon a contract for drugs sold to a brewer, and which he knew the brewer intended to use in the poisoning of his beer. A stronger case could not, perhaps, be put to illustrate and enforce my position. Just think of it for a moment. A brewer of lager beer buys poison to put into his beer to make it more palatable, but which he knows will soon kill those who use it. He buys the poison of a druggist, to whom all the facts are made known, and yet, being overcome by his infernal thirst after money, and being callous to the sufferings of his fellow-creatures, the druggist sells to the brewer upon a credit. Do you say in such a case that a suit could be maintained by the druggist against the

State, and Watson, Trustee *v.* Bank of Tennessee.

brewer? Do you say that the druggist would be allowed to say in his defense that he sold the poison for its value, and in the line of his business, and not to aid the brewer in killing his customers? God protect us from such a ruling. Lord Ellenborough, in the said case of *Langton* v. *Hughes*, held to a different doctrine. He said in that case as follows:

"A person who sells drugs with a knowledge that they are meant to be so mixed, may be said to cause or procure, *quantum in illo*, the drugs to be mixed."

Many cases may be supposed in which the moral sense would be shocked if it were not so held, and that knowledge necessarily implied a participation in the illegality. Suppose that a traveller were to stop at an inn, and the innkeeper resolved to take his life for his money; suppose, further, that the innkeeper applied to a merchant to buy a pistol with which to take the life of his guest, and before he made the purchase he stated to the merchant the purpose for which he was going to buy the pistol, and the merchant knowing the facts, and believing that such was the intent, were nevertheless to sell to the inkeeper the pistol, could the merchant in the case supposed exonerate himself from guilt by averring that he did not colleague with the innkeeper to take the life of the traveller, but simply sold his pistol for its value in money? I think not but that he would be as guilty in morals and in law as the innkeeper. Well, if that be so, how could the merchant recover in a court of either law or equity the price of the pistol? If I apprehend and correctly state the law upon this point, then I say, for a stronger and higher necessity, the same principles would apply in a case where a citizen advanced his money or did an act, knowing at the time that the money so advanced or the act so performed would be used in taking the life of the government then over him. No government worthy of the name could tolerate any other principle. If there had been a combination of men banded together to overthrow the government of the State of Tennessee, and

State, and Watson, Trustee, *v.* Bank of Tennessee.

the Bank of Tennessee had created this new issue to enable
it to advance to this combination of men money with which
to arm and equip themselves against the State, who could
stand long enough to listen to the defense that is now made?

I well know that almost from the formation of the Fed-
eral Government down to the commencement of the late war,
two doctrines, diametrically opposite to each other, were held
as to the nature of the allegiance which the citizen owed to the
Government of the United States. One held that the alle-
giance which a citizen owed to the Government of the
United States was paramount; the other, that it was subor-
dinate to that of the State of which he was a citizen. The
latter as a consequence also held that a State could lawfully
secede from the United States, and if it did secede, then its
citizens were bound to yield to it their allegiance; the other
party held that a State could not lawfully secede, and if its
citizens attempted so to do, they would be guilty of rebel-
lion, and would be liable to the penalties of a crime of the
highest grade. We all knew these two theories, and in tak-
ing sides we made up our minds to take the chances. Now
the war decided this point, and decided that our resistance
was rebellion. And I say that the south, in laying down
its arms, accepted the doctrine that it was unlawful to re-
sist the United States, and that our allegiance to the United
States was paramount to that of the State in which we live.

But without reasoning further upon general principles to
establish this position, allow me now to say that the Su-
preme Court of the United States has decided the point,
and has placed the principle beyond further disturbance in
cases of this character. When I say, has decided the point,
I mean to say it has decided that the bare knowledge that
the money was to be used in aid of the rebellion, made the
transaction void *in toto.* And when I say, has placed the
principle beyond further disturbance, I mean to say simply
that the Supreme Court of the United States was created to
interpret the true and final meaning of the Constitution,

and I supposed that its decision would be yielded to by all other courts.

In the case of *Hanauer* v. *Doane*, 12 Wal., Judge Bradley delivered the opinion of the court, and on page 347 is made to say as follows:

"No crime is greater than treason. He who being bound by his allegiance to a government, sells goods to the agent of an armed combination to overthrow that government, knowing that the purchaser buys them for that treasonable purpose, is himself guilty of treason or a misprision thereof. He voluntarily aids the treason. He cannot be permitted to stand on the nice metaphysical distinction, that although he knows the purchaser buys the goods for the purpose of aiding the rebellion, he does not sell them for that purpose. The consequences of his acts are too serious and enormous to admit of such a plea. He must be taken to intend the consequences of his own voluntary act."

Nothing which I could further say on this point would add either clearness or strength to what I have already said. I shall therefore pass on.

3. But it is said that this new issue of the bank was put into circulation in the usual way. Col. Torbett, as I have before stated, tells us that these circulating notes were "passed into the teller's cash, and was paid out promiscuously with all other bankable funds as money to all who had the right to check on the bank for money." And allow me to say that this is the fact upon which this defense is mainly, if not solely, based. But in reply I say that I go behind the issuance or paying out of these circulating notes, and aver that they were void in their inception, because made for an unlawful purpose. That they were made for an unlawful purpose, and therefore void, I have already discussed. And now taking that for granted—that is to say, taking it for granted that these circulating notes were made for an unlawful purpose, and were consequently void—does the fact that they were passed into the teller's cash and pro-

miscuously with the old issue paid out as money, breathe into them the breath of life? If the subsequent issuance or paying out of this "new issue" would have such an effect, I confess I do not see upon what principle. I have already admitted, and now again admit, that if an innocent person took these notes from the bank for value, such person would have a claim against the bank, which would be legal, and which could be enforced in the courts. But he certainly could not sue upon the notes themselves, because they would be null and void. He could only sue for the value of the consideration he had paid for them. And this court will at once see the material distinction between suing upon the note itself and for the consideration which had been paid. As noteholder, he would be entitled to priority of payment out of the assets of the bank and to the exclusion of all other creditors of the bank, as owner of a claim or debt against the bank, he would stand upon the same platform as other creditors, and share equally with them.

And now allow me to ask upon what evidence do we infer that this new issue passed into the hands of innocent holders for value? The present holders certainly took this new issue with full knowledge of all the facts, and well knew that it had been made in aid of the rebellion. That fact is distinctly admitted in the agreement of counsel, to which I have so often referred. The last sentence of that agreement but one is in the following words:

"That the defendants, holders of such new issue as aforesaid, knew at the time they bought the same that they had been declared void by the 6th section of the schedule to the constitutional amendment as aforesaid, and because they were supposed to have been issued for the purpose of aiding the late rebellion."

But it may be said, that although the present holders may have had notice of the illegality, yet if there were, between them and the first takers, such innocent holders for value, they would be substituted to their rights. I admit

the law to be so. But I insist, and will attempt to enforce the position presently, that neither the first takers and no subsequent holder can acquire any rights to a note void in its inception. However, admitting, for the present, that the principle stated is applicable to the present case, I again ask upon what evidence in this record do we infer that this new issue passed into the hands of innocent holders for value? Certainly the law casts upon the holders of this new issue the burden of making such proof. In the case of *Paton* v. *Coit et als.*, 5 Michigan Reports, 505, Judge Christiancy, in delivering the opinion of the court, holds the following language:

"The rule as to the burden of proof is the same upon principle and authority at common law. Whenever the consideration of the paper between the original parties has been illegal, especially if in violation of a positive prohibition of statute, proof of such illegality throws upon the holder the burden of proving that he got it *bona fide* and gave value for it."

The same doctrine is laid down in the April number, 1872, of the Southern Law Review, p. 229, in an article written by Mr. Daniel, entitled "Negotiable Instruments, Rights of Purchasers, etc." Taking the law to be such, I again ask that the proof be pointed out. Who were these prior innocent holders for value? Not one name is given to us, and no proof is made upon which this court could act. I admit it is said that the new issue passed like the old issue at first—that the community made no distinction between them. But so did the Confederate notes. And yet who did not know that these latter notes were illegal? Who would say that the holders of such were innocent holders in the sense of the law? The truth is, and known to all, that if every man and woman in the State had known, when the war commenced, all the facts—that this new issue was made to aid and advance the cause of the Southern States—they would have taken it nevertheless as readily as gold.

I wish, however, to be understood. I do not say that there was no such innocent holders for value. I only say that if there were such holders, it was a fact to be proved; that the law cast the burden of proving this fact upon the present holders of this new issue; and that they have utterly failed to make this proof.

But I come now to say, that the doctrine of substitution is not applicable to the present case. I aver it to be the law, that a note void in its inception cannot be so transferred as to convey to the subsequent taker any rights against the maker. Between all parties subsequent to the maker, the transfer would be treated as a new contract, and would be valid if otherwise unobjectionable. That principle was so decided, as before stated, in the case of *Naff* v. *Crawford*. But certainly the maker of the note, as such, could not be made liable by the subsequent act of other parties. That proposition seems to me to be self-evident. Do not let us misunderstand the law upon this point, and confuse ourselves about a principle of law so plain.

If a note be complete and valid in its inception, and afterwards come into the hands of an innocent holder for value, in such case no intervening illegality—such as theft or other cause—would destroy the rights of the innocent holder. But where the note is void in its inception for any cause whatsoever, no subsequent holder, however ignorant of the illegality, could acquire any rights against the maker as such. Take, for instance, the promissory note of an infant, or of a married woman, or of a person of an unsound mind; could a subsequent holder for value, and who was ignorant of the age, or the coverture, or of the insanity of the maker—could such a person, I say, hold the maker liable? Unquestionably he could not, as every lawyer will admit.

But, without further argument, let us look to the law and hear what it has to say.

In Parsons on Notes and Bills of Exchange, the law is

thus stated:   "Where notes are made void by express stat-
ute, they cannot become good in the hands of subsequent
holders, and upon no such note can a subsequent holder
have a valid claim against the maker; but if he holds the
note for value and in good faith, he may have a valid claim
against his own endorser either as the maker of a new note
or drawer of a new bill, or else upon the consideration
which passed between them."   Vol. 1, p. 218.

Again he says, as follows:  "The *bona fide* holder of ne-
gotiable paper before dishonor is not protected against those
defenses which go to the essence of the paper, and either
by common law or statute annul and avoid the contract, or
which interfere with and prevent his acquiring a legal title
to the paper."   Vol. 1, p. 275.

And be it understood as we go along, that bank bills are
governed by the same principles of law.   The same author
(vol. 2, p. 107) says as follows: "We would add that bank
bills issued contrary to law or statute, or under an uncon-
stitutional law, are void *ab initio.*"   For this principle he
refers to the case of *Root* v. *Wallace*, 4 McLean, 8; *Davis*
v. *Bank of River Raisin*, 4 McLean, 387; and *Skinner* v.
*Denning*, 2 Ind., 558.

And so we come back to the starting point:   Are the
circulating notes known as the new issue illegal because
made to enable the bank to carry on its ordinary business
and to meet the checks of the military board, which checks
it knew at the time were drawn to raise money to arm and
equip the troops of the State?   Yes, are the circulating
notes of the bank known as the new issue void *in toto* for
that infirmity?   If so, it follows, like the demonstration of
a proposition in Euclid, that these same circulating notes,
known as the new issue, are now void in the hands of the
present holders.

4. My next and last position is, that the new issue of the
Bank of Tennessee is a debt incurred in aid of an insurrec-
tion or rebellion against the United States, and to decree

State, and Watson, Trustee *v.* Bank of Tennessee.

that it is valid would be directly in the teeth of the 14th amendment to the Constitution of the United States.

The latter part of the fourth clause of the said amendment to the Constitution of the United States is in these words: "But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave, but all such debts, obligations and claims shall be held illegal and void."

Now my position is, that to hold that this new issue of the bank is a valid debt is to nullify said amendment to the Constitution.

If the agreement of counsel is binding and the facts therein stated are to be taken as true, then it is true that the new issue is a debt of the bank contracted in part to aid the State in arming and equipping its troops. Now this amendment to the Constitution says that no such debt shall be assumed or paid either by a state or by the United States, but such debt shall be held to be illegal and void. The Chancellor, in his written opinion, says, in the view taken by him of the facts, it was unnecessary for him to inquire into the force and effect of this amendment to the Constitution. And his view of the facts was, that the new issue was not issued or paid out in aid of the rebellion. It seems never to have entered into his mind to go behind the issuance or paying out and to inquire for what purpose the new issue was made. He also tells us that it seemed to him that it might well be maintained that this amendment to the Constitution had reference entirely and exclusively "to the states and the United States and was never intended by the framers of it to embrace private individuals, or to operate as between them or between them and corporations." I quote his very words, and would not undertake to give the substance, because I do not know that I understand him. Had reference, he says, to the States and to the United

States entirely and exclusively!! What does that mean? And what does he mean when he says that the amendment was never intended by the framers to embrace private individuals or to operate between them and corporations?

Well, I think that the extract I have made from the 14th amendment to the Constitution of the United States is very clear and ought not to be misunderstood by anybody. Its meaning is so patent that it ought to be apprehended even by a little child. It means just what it says,—that no debt or obligation to an individual or corporation, whether due from an individual or a corporation, shall be assumed or paid by either a state or the United States, if that debt or obligation was incurred in aid of the rebellion. Certainly the State was morally bound as much to pay the debt incurred by the bank in order to enable it to furnish the necessary money to arm and equip the troops of the State, as it would be to pay to individuals and corporations the value of their slaves which it had emancipated. No other words which I could add would give either clearness or strength to this position.

Well, if this new issue were made to aid the State, would it not be a violation of the said amendment to the Constitution to make the State, willingly or unwillingly pay it? I say it would. And if this court were to decree, that although the new issue was made for the purpose I have stated, yet it was valid, would not the State thereby be made to pay it? Certainly the new issue, by such a decree, would be placed upon the same footing as the old issue. And we know that the Supreme Court of the United States in the case of *Furman* v. *Nichol*, 8 Wall., has decided that the State will be forced to receive in payment of its taxes the valid circulating notes of the Bank of Tennessee. And so this court would decide that this State should pay a debt made in aid of the rebellion and thus violate said amendment.

I have now made my argument. Before I take my seat,

however, I wish again to remind this court that the Federal Supreme Court—that court created to interpret the Constitution of the United States—has certainly decided that it was unlawful in a citizen of any of the states to do an act which, at the time, he knew was obtained from him to overthrow the Government of the United States; that to do the act, under such circumstances, would be a violation of his paramount duty which he owed to the Government of the United States, and it would be conclusively presumed against him, as a principle of law, that he intended and agreed to all the consequences which directly flowed from his act. And herein lies the difference between the act of a citizen done in the United States, and the act of one not a citizen and done out of the United States;—the latter would owe no duty to the Government of the United States, whilst the former would, and his highest duty would be to uphold the Government of the United States and to withhold his act if he knew it would be used against his government. And I apprehend that, upon examination, it will be found that most of the cases in which it was held that the bare knowledge of the illegality would be insufficient, would apply principally to cases of smuggling.

And allow me also to ask, who are the holders of this "new issue," who pat so lovingly the back of the late Confederacy? Who are they, who pretend that their debt is of so meritorious a nature that it is meet that the people of the State should be heavily taxed in order to make them whole? Duncan and Atchison, two of the holders, but who own but a small mite of this large claim, alone come to the footlights. The other holders still stand out in the shadow, afraid of the light. We know, however, that they are not the first takers, and that they do not belong to that class who received them for value whilst they circulated as money. No, these notes have long since passed out of the hands of the people, and have become the property of persons who bought them as merchandise, with a full knowl-

edge of all the facts and with the understanding to take their chances. They bought them at starvation prices—ranging from five cents to fifty cents in the dollar. Even Duncan and Atchison stand in this category, and what shall we say of the skulkers now out in the dark? There may be (and we believe holders of this new issue to a large amount are) non-residents, and were and are the sneering enemies of the cause to help which this new issue was made. I do not wish to be misunderstood. Be they who they may, they are entitled to the benefits of the law just as·it is written, but I deny that they have any right to our sympathy and those feelings of love which make us hunt out and strain after points to uphold their cause.

On the other hand allow me to ask, who are the depositors? I answer for them, and say that the names of every one of them stand upon the books of the bank, and most, if not all, are before this court. They are the very persons who put their money into the bank. They belong to all classes of the State—to the weakest and most helpless as well as to those who are able to bear their cross. They were subjected to heavy and grievous wrongs and losses during the war. They had laid up in the bank this money for their rainy day. They have been standing at the door for ten long years and more and knocking for their own in vain. Is it now, that they are here before the highest tribunal of their State, too much for them to ask and expect that the law, just as it is and without prejudice or partiality, shall be administered to them ?

State, and Watson, Trustee *v.* Bank of Tennessee.

ARGUMENT OF W. H. HUMPHREYS, FOR DEPOSITORS.

The Legislature, in January, 1838, incorporated the Bank of Tennessee. The State furnished the capital stock, appointed the directors, and appropriated the dividends to certain specified public purposes. The bank was put in operation, and, in 1865, the Legislature declared, by act, that the bank should no longer do business; that the president and directors thereof should make an assignment of the effects of the corporation, to a trustee, for liquidation; that the trustee should convert the effects into cash, and pay over to the Treasurer of the State, as proper custodian of the school fund, the sum of $1,500,000, as a preferred debt due to the school fund; that the remaining assets of the bank should be distributed *pro rata* amongst all creditors whose debts were contracted prior to the 6th day of May, 1861, and that all claims contracted subsequently to that period should be excluded from payment. The act further declared that if, in the judgment of the Governor, it was necessary to file a bill to carry into effect the assignment of the effects of the bank, the bill should be filed by the Attorney General of the State, making all creditors, and all persons who claim to be creditors, parties, in order that justice may be done to all.

The assignment was made, and the bill was filed, alleging the insolvency of the bank. It was filed in the name of the State and the trustee, making all persons who were creditors, or claimed to be creditors, parties, and enjoining them from sueing elsewhere, praying that all proper accounts be taken, and the transactions of the bank be closed, by decree of the court, in conformity with the instructions given to the trustee, to the end that all may come in under one decree, and that justice be done to all."

B. R. McKennie and others filed a cross-bill, stating that they deposited money in said bank in the years 1858, 1859, 1860, 1861, and 1862; that some of them have judgment

against the trustee of the bank, and others have not, and that they have been refused payment.

This cross-bill seeks to subject the State, as the sole stockholder in this bank, to a declaratory decree for moneys pledged as bank stock and not supplied, and for moneys withdrawn at different times, as in 1861 and in 1865, by the State and for general account.

The case stands now on a judgment on demurrer to the cross-bill, and on the motion to withdraw the name of the State as a party of record to the suit, made in the Chancery Court, after the judgment on the demurrer was given ; but, as is contended for the State, before the judgment on the demurrer was lawfully entered.

The State of Tennessee never did supply the capital stock pledged to be supplied by the charter, and never did reduce the amount of the capital stock subscribed by an act designed to reduce the pledged amount, and is now, at the demand of creditors, bound to supply the amount subscribed, and not paid.

The act of 1838 declared that a bank should be established in the name and for the benefit of the State.

That act pledged the sum of $5,000,000 as capital stock.

It pledged specifically the whole of the school fund as a part of the capital stock of the bank.

It specifically pledged, as part of the capital stock of the bank, the " surplus revenue," received from the Government of the United States, and declared that if the fourth installment should be received, it should be a part of the capital stock, and be in addition to the $5,000,000.

It pledged specifically that the State should raise $2,500,-000 by the sale of its bonds.

It pledged the faith of the State for an annual appropriation of $100,000 to common schools and $18,000 to colleges and academies, to be paid out of the dividends of the bank.

The act further pledged the faith of the State for the support of the bank.

State, and Watson, Trustee v. Bank of Tennessee.

It pledged the faith of the State to supply any deficiency in the funds specifically pledged, and to give indemnity for all losses arising from such deficiency.

These pledges were intended to give credit, confidence, and stability to the bank, to enable it to maintain its circulating notes and obtain the use of deposits. It is a well known historical fact that all the powers of the State were necessary to uphold, in full vigor, this bank at that time. They therefore pledged that the capital should be $5,000,-000; they pledged the "sacred" school fund to the creditors, and the dividends to the friends of popular education, and $18,000 to colleges and academies, with a view to rally that powerful interest in favor of the success of the bank; and they pledged the faith of the State for the safety of the school fund invested in the bank, and to indemnify all holders of the notes and creditors of the bank against loss arising from any deficiency in the funds pledged.

We have here the State going in as the sole stockholder in an incorporated bank, as commercial trader. This is a subscription of $5,000,000 of stock in a bank, creating a stock liability against the State for that amount, and a pledge that it shall be preserved and maintained during the existence of that bank for that bank for the purposes specified in the charter. There was no necessity for the Governor, or any officer of the State, to make an actual subscription, in a book, of the capital stock, as the same act required the Governor to subscribe for stock in internal improvement companies. The "State of Tennessee shall become a subscriber for one-half of the capital stock in all railroads and turnpikes," declares the act, and the Governor is authorized and required to make the subscription. But where the State furnished the whole of the stock, appointed all the directors, and received the whole of the profits, such actual subscription was wholly unnecessary. The ownership of the bank, the amount of the capital stock, the enumeration of the items thereof, the statement that it was in the

name of the State, for the benefit of the State, and that the State was bound to save harmless all persons dealing with it to the extent of $5,000,000, these declarations, made by statute, are far more explicit, gives far more certain and tangible information of the facts and obligations intended to be made known to the public than any mere subscription in the books of a chartered company.

The legislative sovereignty binds itself by a collective declaration, the most decisive of all modes of giving effect to its intentions and obligations. This charter, or law, constitues a positive engagement or covenant of the State, attaching as soon as creditors existed, that the capital stock of this bank should be, and continue to be, $5,000,000. It is an agreement, with the condition to pay in that amount, and to preserve that amount undiminished, for banking operations, as a guarantee against fraud or failure. It is not a mere agreement to save harmless or indemnify, in the case of failure to pay up the amount specified. It is a positive subscription liability, established by the charter, that the State should pay that sum as the capital of the bank, and that such should be the fixed and pledged capital stock of the bank, unless there was a subsequent law repealing the bank charter in that particular, and reducing its chartered obligations. This positive obligation to pay the amount, and hold itself liable for the amount, is not weakened by the covenant of the State to support the bank, or by the covenant to indemnify the creditors against loss by reason of a deficiency in the several funds specifically pledged. The penalty affixed to a bond does not weaken the obligation of the bond. It strengthens its moral and legal force.

If the State had executed its bond for $5,000,000, and directed it to be deposited in the hands of public officers to be preserved as collateral security for the performance of the covenant, it could not have gone further to have perfected its determination to make itself responsible according to the usages of banking operations throughout the civilized

world, than it has done by these repeated declarations that the capital stock of the bank should be $5,000,000, and by the precise specification of the several funds specifically pledged for banking operations.    The covenant to support the bank, that is, to see that its obligations to note holders and depositors and other creditors were all discharged, and the covenant to save harmless or indemnify all creditors, are such covenants as a court of chancery can and will de- cree the specific execution of when these are duly and legally supported by competent representatives. *Champion* v. *Brown,* 6 Johnson; *State Bank of Michigan* v. *Hastings,* 1 Douglas; St. Eq. J., sec. 730; see also 10 Hum., Central Turnpike Co.

They are not unmeaning generalities, incapable of definite executions.    They are definite propositions which became mature contracts when these depositors placed their money in the bank.    Contracts may be made by propositions ac- cepted, by legislative action, or by corporate action, or by individual action thereon.    As the business of a bank con- sists of a series of trading operations, this proposition and guaranty were open at all times during the existence of the charter, to acceptance by any person who chose to make a deposit.    These complainants placed their money in the bank on the faith of the solemn guarantees made on the face of the statute laws of the State, that the State stood pledged to the extent of $5,000,000 for the repayment of moneys deposited in said bank.

No modification or repeal of these provisions could have taken place, except by positive act of the Legislature de- claring that the capital stock was reduced to a given amount, or by some act which repealed it by implication on the ground that it was absolutely incompatible with the capital fixed by the charter.    No such statute has been enacted. The president and directors of the Bank of Tennessee had no right or authority to fix the amount of the capital stock. They declared again and again the amount of capital stock

which had been furnished them by the Legislature, but they never assumed to have the authority to change the amount of chartered stock fixed by the Legislature. The amount of the fixed capital stock, and the amount of paid capital available for operations, very widely differ in most incorporated companies, and no published report of bank officers could repeal or affect the amount of chartered capital stock pledged to creditors for the payment of obligations. Such a principle would open the door to oppression and fraud   The amount of stock paid in was very different at different times, and may have been reduced by legislative appropriation, but the Legislature did not intend to weaken the hands of the bank by reducing its chartered capital and its obligations, and no statute or resolution can be referred to which can be so construed. The sum agreed to be paid is the capital stock, not the sum actually paid. 27 Eng. L. and Eq., 572; 39 ditto, 576.

The act of 1839–40, page 157, does not repeal those provisions of the charter which fix the capil stock at $5,000,-000. The State had, by specific and independent sections, established and declared to the country the amount of the capital stock of the bank. It provided, by other sections, a mode of raising this stock. One mode was by the issuance of the bonds of the State. The sum of $1,500,000 was not sold. They remained on hand. They remained in the hands of the bank officers, subject to be lost or removed. By act of 1839–40, it was provided that the Governor of the State should cancel the unsold bonds. The second section of this act repealed so much of the act of 1838 as provides for raising funds by the issuance of bonds of the State. Unquestionably, the mode of raising funds by sale of the bonds of the State of the character which could not be sold, was repealed. It was a useless provision, and the bonds on hand were useless. This repealed one mode of raising the money. It did not repeal the stipulation in the bank charter that the capital stock should be $5,000,000. This was

State, and Watson, Trustee v. Bank of Tennessee.

permitted to stand, as the means of giving solidity and strength to the bank. This was a matter of great importance to the bank and the State. Though the capital stock was not paid in, or exactly provided to be paid by any specific mode of payment, yet the subscription to pay stood in the face of the charter. The Legislature stood under the obligation to provide it, so long as that subscription stood as a public pledge, if it should become necessary. The Leglature had the power to provide for its payment by direct payment, by sale of public lands, by hypothecating the public revenues, or by other and better and more saleable bonds. The repeal of a section which provides one mode of raising the stock, does not repeal another section which establishes the amount of stock. To repeal a law by a legislative act, its repeal must be expressly declared, or the section which repeals it by implication must be absolutely incompatible with it. This conflict must be so direct that both cannot stand. The Legislature must be construed to intend that it shall stand, unless they say that the capital stock shall be reduced. The cancelment of bonds, and the repeal of authority to issue bonds, are no declaration that the stock of the bank shall be reduced, or that they did not think it important that the bank should maintain its strength, as to pledge of stock to be raised, or the Legislature should provide, as all bankers do, for the payment of their subscriptions. If the Legislature had intended to reduce the capital stock, they would have said so in such express terms as to leave no doubt about their intention.

On this bill, for an account, the State is liable for the unpaid balance of its subscription.

The Legislature had the legal and constitutional authority to invest the school fund as part of the capital stock of the bank, and having so made it a part of the capital stock of the bank, the act of the Legislature of 1865, declaring it a debt against the bank, is unconstitutional and void, and the withdrawal of $460,000 in specie from the bank, as part of

the school fund, was without authority of law, and in viola-
tion of the rights of the creditors of the bank, and the State
is bound to account for the sum so withdrawn.

In order to sustain the authority of the Legislature in
this investment of the school fund, it becomes necessary to
refer the court to the legislation upon the subject of educa-
tional funds prior to the act of 1838, ch. 107, and to the
causes which led to the establishment of this bank and the
investment of the school fund therein.

It appears that in 1811 the Legislature incorporated
"the Bank of Tennessee," with a capital stock of $400,000.
The Governor was directed to subscribe for the sum of
$20,000, with right reserved to withdraw its portion of
capital stock at the end of ten years. Scott's Rev., vol 2,
p. 43. In 1817 the Legislature by act directed the collec-
tion of the college and academy moneys, which had been
loaned to individuals, and when collected, to be invested in
bank stock by the treasurer of East Tennessee and the
treasurer of West Tennesse, and declared that the moneys
so invested should constitute a part of the capital stock of
the bank, and that the dividends on the stock should be
paid over to the trustees of the institutions by the treasurers,
in whose name the stock was subscribed in trust. See
Scott's Rev., vol. 2, p. 433. In the same year the trustees
of colleges and academies were directed to invest all the
moneys received by them in the stock of the State or Nash-
ville Bank. 2 Scott, 272. In 1820 another bank was in-
corporated, called the Bank of the State of Tennessee, the
capital stock was fixed at $1,000,000. The bills were to be
emitted on the credit of the State of Tennessee, the whole
to be warranted by the State on the pledge of the proceeds
of the public lands and the credit of the ordinary revenue
of the State not otherwise appropriated. The bank was
placed under the management of a president and ten
directors, elected by the Legislature for two years. The
proceeds of the sales of the lands of the Hiwassee district

State, and Watson, Trustee v. Bank of Tennessee.

were directed to be invested, so far as necessary, to make up the capital stock. Scott's Rev., vol. 2, p. 624. The validity of the charter was passed upon by the Supreme Court and affirmed. See *Hays* v. *State Bank*, M. and Y., 179.

In 1827 a law was enacted enumerating the items of the school fund, and declaring that the same should be devoted to the use of common schools forever; amongst them were all the rents and profits of the vacant lands of the State, and the whole of the capital of the State Bank. This act also provides that all appropriations for the use of common schools, should be placed in the State Bank, and become a part of the capital stock thereof, for the use of common schools, the interest to be a fund for annual distribution. Cobb 23, 294.

In 1831 the Legislature enacted a law chartering a bank, capital stock two millions, the faith of the State pledged for the redemption of all the notes issued by the bank, and the payment of all debts of said bank in proportion to the amount of stock the State may subscribe in said bank, its notes to be receivable in payment of public debts, and public moneys to be deposited therein so long as the bank shall pay its dues in specie.

In 1832 the Union Bank of Tennessee was chartered, capital stock not to exceed three millions, with corporate existence till 1863. The State, by its Governor, was required to subscribe $50,000 of the capital stock, and issue its bonds therefor. The profits of the stock, after certain payments, to be appropriated to the use of common schools. Common school commissioners, county courts, trustees of literary institutions, and any incorporated body, were authorized to subscribe stock in said bank as other individual stockholders. At the same session an act was passed to close the transactions of the Bank of Tennessee, chartered in 1820, instructing the commissioners appointed to redeem the notes, pay the depositors, and after appropriating the sums allotted to common schools and academies, to pay the

balance to the Union Bank. It also provided that nothing in the act should be so construed, as to alter or effect, in any way, the claims or liabilities of said bank, but that they should stand as before, thus manifesting a proper regard for all contracts made by an institution based on state funds and state credit.

In 1833 the Planter's Bank was incorporated, capital stock not exceeding two millions, with corporate existence till 1863. The act provided that county courts, trustees of colleges and academies, and common school commissioners, should be authorized to take stock in this bank to the extent of their means on hand, the profit for the benefit of parties so subscribing.

In 1833 the Farmers' and Merchants' Bank was incorporated; capital stock $600,000; their charter gave the same authority to trustees of colleges and academies, commissioners of common schools, and county courts, to take stock for the benefit of institutions of learning, the profits arising from such investments to be distributed according to existing statutory enactments.

It thus appears that as early as 1811 the precedent of the subscription and ownership of stock in incorporated banking companies by the State was established and executed. It appears that in 1817 the Legislature of the State established the precedent of investing public moneys for educational purposes in bank stock, and that such portion of such funds as was then in the hands of commissioners to be loaned to individuals on bond, with security, real or personal, was directed to be withdrawn, and re-invested in bank stock. It appears also that it was settled as the public policy by successive Legislatures, under the varied ascendency of parties. Whether wise or unwise, it must be regarded as the policy of our fathers. It was regarded as the safest and most profitable mode of investment of public moneys for educational purposes at that time within their reach, and the system of private loans was abandoned. The guaranty

of paper money, issued by incorporated companies, based on public revenues, and on public lands and their proceeds, was also well established at an early period in the financial policy of this State, as it was in many of the other States. It was connected with the supposed necessities of a new and growing country. The alleged want of capital to develop more rapidly than personal and private credit could do the resources of a country vast in extent, and almost indefinitely great in its resources, aided in the establishment of the system. The people were industrious, energetic, and eager for the promotion of the growth of the country, and the creation of a paper currency, founded on the necessities of the whole people, for the united purposes of education and material improvement, was thoroughly fixed in the public mind, and established by the law-making department at the time of the meeting of the Convention in 1834.

The Convention of 1834 gave their earnest consideration to the subject.

They did not condemn the previous policy of the State. They did not prohibit the investment of public funds for educational purposes in bank stock. They did not prohibit the guaranty of paper money issued by incorporated companies by the State. They not only left the previously established policy in force, but declared it to be the duty of the Legislature, in all time to come, to adopt " a well regulated system of internal improvement, and to cherish literature and science in all future periods of the government." That body proceeded to declare that the fund called the school fund, and all the lands and the proceeds thereof, dividends, stocks, and other property of every description whatever, previously appropriated by the General Assembly of the State, and all such as shall be hereafter appropriated, shall remain a perpetual fund, the principal of which shall never be diminished by Legislative appropriation, and the interest thereof should be inviolably appropriated to the encouragement and support of common schools throughout

the State, and for the equal benefit of all the people, and no law should be passed authorizing said fund, or any part thereof, to be diverted to any other use than the support and encouragement of common schools, and that the General Assembly should appoint a Board of Commissioners for such term of time as they should think proper, who should have the general superintendence, and who should make a report of its condition from time to time, under such rules and regulations as should be required by law; and that the proceeds of the sales of the public lands coming from the United States to the State of Tennessee should never be appropriated to any other purposes than those of education and internal improvements.    This provision was in substantial conformity with the act of 1827.   N. and C., p. 171. It gave force and direction to the preceding public policy and statutes.

The Legislature of 1835, ch. 23, provided that the Treasurer of the State, the Comptroller, and an executive officer, to be called the Superintendent of Public Instruction, should be a body politic and incorporate, by the name of the Board of Commissioners of Common Schools; that the superintendent should be the president of the board; that all sheriffs, collectors, corporations, agents, or other persons having the custody of the common school fund, whether the same be money, notes, bonds, stocks, or other property, should deliver the same to the said superintendent, who should cause to be registered the debts due to the school fund, and all bank stock, road stock and other property belonging to the fund, and that the superintendent should invest the same by subscribing for stock in the Planters' Bank, which had been incorporated in 1833.

This act further provides that the act creating the board of commissioners, and incorporating the same, should be subject to legislative modification, alteration or repeal, thus showing that the Legislature intended to retain control over the

State, and Watson, Trustee *v.* Bank of Tennessee.

whole subject matter, as it was provided in the Constitution it should do so.   See N. and C., p. 168.

It therefore appears, that long before the adoption of the Constitution in 1834, the policy of investing school funds in bank stock was established by repeated Legislative enactments; that there was a large amount of funds appropriated by legislative enactment to schools, academies, and colleges so invested at the time of the adoption of the Constitution of 1834; that the Convention, in the provison in regard to common schools, recognizes the established policy by direct reference to the stocks and dividends previously appropriated to common schools, and the Legislature next succeeding the Convention, did, by the act of 1835 organizing the board of commissioners of common schools, direct the investment of the school fund by the president of the board in the stock of the Planters' Bank, as the most judicious mode of investing it for the purpose of profit, to be realized in the shape of dividends on capital invested in banking operations.

The Constitution declares that the lands and the proceeds thereof, dividends, stocks, and other property of every description, whether previously appropriated by the General Assembly for the use of common schools, or which should after that period be appropriated, should remain a perpetual fund, and that the principal should never be diminished by legislative appropriation, and that no law should be made authorizing said fund, or any part thereof, to be diverted to any other use than the support and encouragement of common schools.   The principal shall never be diminished by legislative appropriation to any other purpose, but the interest arising from the fund shall be inviolably appropriated to the support and encouragement of common schools throughout the State, and for the equal benefit of the whole people.   The principal shall never be appropriated by law to any other use, but shall remain a perpetual fund, undiminished.   The interest shall be inviolably appropriated by

State, and Watson, Trustee *v.* Bank of Tennessee.

law for the support of common schools. This section of
the Constitution cannot be construed otherwise than as a
mandate to the Legislature to employ the fund in such a
manner as to secure interest, to be appropriated from time
to time as it should seem best to the support of common
schools for the benefit of the whole people. The interest
on this perpetual fund could only be secured by some mode
of investment. The investment of the fund involved a
transfer of the specific fund in possession, and a transfer of
the ownership of the specific fund to the party receiving it.
The interest or profit is the consideration paid for the use
of the specific fund, with full title thereto, by the receiver
from the State, authorizing the investment and transfer of
the ownership of the specific fund. The Constitution does
not undertake to tramel the Legislature by any direction
whatever as to the mode of investment. This was a matter
of legislative expediency, depending upon circumstances
and the general condition of the country, and the means of
investment which might be provided from time to time.
What would be safe at one time might be very unsafe in
another and altered condition of the country. The framers
of the Constitution, therefore, wisely left to the Legislature,
which should assemble from time to time, the choice of the
various modes of investment which should present them-
selves. They were required to execute the power vested in
their hands, and they had to judge of the means of accom-
plishing a great public purpose marked out by the Consti-
tution, and designed for the benefit of the whole people.

The Legislature which had assembled prior to the Con-
stitution of 1834 had invested large sums in bank stock,
which had been appropriated to the purposes of education.
The framers of the Constitution recognized and affirmed the
validity of the investment by specific reference to their
mode of investment, and the Legislature, which assembled
immediately after the adoption of the Constitution, organ-
ized the board of commissioners of common schools, and

directed that board to invest the whole of the school fund in stock of the Planters' Bank.

The validity of this investment of the school fund in the stock of this bank, which was controlled by individuals, was passed upon by the Supreme Court of Tennessee. McEwen, superintendent, did not invest all the moneys collected in the stock of the Planters' Bank as directed by the act of 1835, but loaned a part of the sums collected to individuals, and a part of the money so invested was lost.

A bill for an account was filed by the Attorney-General, by the direction of the Legislature, against the superintendent, charging him with delinquency in not investing the moneys collected in the stock of this bank, as prescribed by the statute. That wise and able Judge Reese, declaring the opinion of the court, said: "It was never contemplated by the Legislature that the large sums which it was known he (the superintendent) would receive should continue in his hands, and under his control, all experience having shown that very large amounts of funds of others can seldom, if ever, be kept securely, and interest paid thereon, for any length of time, by any individual, however prudent and honest. The Constitution intended the principal to be a perpetual and permanent fund, and the interest to be certainly paid, for upon the preservation of the former, and the prompt payment of the latter, would depend the success and prosperity of the common school system."

The court held the superintendent delinquent in not investing the fund in stock of the bank, as prescribed by law, and decreed that he should be charged with losses arising from noncompliance with the law.

After this decree, and before the final decree, the Legislature passed a resolution appointing commissioners to settle with the securities of McEwen, and declaring that their award should be entered as the judgment of the Supreme Court. On the presentation of this award the validity of the resolution was contested by the Attorney-General for

the State, and the power of the Legislature and of the board of commissioners of common schools became the subject of judicial determination.

It was contended that the Constitution directed the appointment of a board of commissioners of common schools, who should have the control and possession of the fund, that the Legislature had established this board and incorporated it with power to sue; that the fund was a trust fund, and had been placed and was in the hands of the board; that this suit had been instituted in the name of the State and the board of commissioners of common schools, and that an account had been decreed to be taken, and that the Legislature had no constitutional right to withdraw this case from the hands of the commissioners of common schools and the courts, and place it in the hands of another set of commissioners, appointed by the Legislature for the determination of the case.

But the court said that the Legislature, in the absence of constitutional prohibition, was the guardian and protector of its funds, that it was its duty to see that such funds were properly secured, invested, and applied; that this power was supreme, and when exercised, could not be revised or called in question by any power whatever. The power is the same whether the fund be appropriated or unappropriated, whether it be set apart for internal improvement, banking operations, or any purpose whatever. This power was inherent in the legislative department of the State, and it is neither lost or diminished by the fact that the Legislature may have appointed curators for the safe keeping of the funds, or to superintend the distribution of them in pursuance of appropriations made by law, such as a treasurer, commissioners of internal improvement, or of common schools, or president and directors of a bank based on state funds. The power of the Legislature over the school fund previous to the adoption of the Constitution of 1834 was absolute. The fund might have been diverted from the purpose for which

State, and Watson, Trustee *v.* Bank of Tennessee.

it was created, and directed in an entirely different channel. It might have been appropriated to the payment of the public debt; it might have been distributed in bounties and premiums to our citizens; it might have been applied to lighten the burthen of taxation for the time being, or in any other manner consistent with constitutional obligations. The Constitution of 1834 limited the power of the Legislature over this fund to this extent, and no further, to-wit.: That no law should be passed diminishing that fund, but that it should be a permanent fund, and that the interest which should arise from the fund should be appropriated to the use of common schools, and to no other use whatever; that the Constitution had directed that the Legislature should appoint a board of commissioners to have the superintendence of the fund, and that the Legislature had appointed the board and incorporated it; that the Legislature was not bound to incorporate these public officers; that this public corporation was made for public purposes, and that no private right was vested in it; that the power granted to the board might be revoked and rescinded at any time by the Legislature.   So said the court.

The legislative and judicial history of the State, therefore, shows that prior to the adoption of the Constitution of 1834, it was the recognized and habitual policy of the State to invest the school funds in bank stock; that the Constitution of 1834 recognized the constitutional existence of bank stock as portion of estate to be preserved for the benefit of schools; that the Legislature of 1835, an able body assembled to organize the State Government under that Constitution, did direct the investment of the school fund in the stock of the Planters Bank, and the Supreme Court of the State, in the face of the argument that this school fund was in part a trust fund, placed in the hands of an incorporate board of commissioners, and out of the control of the Legislature, did declare that the commissioners had no right, legal or equitable, in the fund as against the legislative

power over the fund; that they were public officers, appointed as other officers to take care of the public rights, and the superintendent (an officer required to give bond and take official oath as other officers) was delinquent in duty in not investing the school fund in stock of Planters Bank, as required by the act of 1835. Public corporations are but part of the machinery employed to carry on the affairs of the State, and they are subject to be modified and abolished as the exigency of the public service 'may require. The Legislature may exercise a general superintendence over them and their effects, when they have effects, as in case of a county or township. The Legislature have no authority to take away from a county its property, but may direct the manner in which that property may be used for the benefit of a county. 27 Vermont, 704; 29 Vermont, 19; Cooley, 279, 239; 13 Illonois, 30; 4 Missouri, 512. So in case where the ordinance of 1789 laid off 16th section of land for the benefit of schools, and commissioners were appointed, it was declared by the Supreme Court of Illinois that the Legislature had the power to lease or sell the land, to direct in what way school funds should be invested and applied. 4 Scammon, 190.

The school funds appropriated from time to time by the Legislature stood subject to investment in the Planters Bank from the date of the act of 1835 till the passage of the act of January 19, 1838, creating the Bank of the State of Tennessee.

This act expressly declares that the whole of the school fund, except such as may have been invested in works of improvement, should constitute a part of the capital of the Bank of Tennessee, and the portion of that fund in the hands of the superintendent should be paid over to the president and directors of that bank " as capital in said bank," and that the Governor of the State, the Comptroller of the Treasury, and the Superintendent of public instruction, should dispose of the stock in any and all of the banks, and

pay over the proceeds of such sales to the president and directors of the Bank of Tennessee.

This act further provided that if the Legislature, then in session, should put in operation a system of common schools, the funds arising from fines, penalties, and other sources therein specified after 1837, should constitute a fund for annual distribution, and "should not be subscribed in stock in said bank," but should a system of common schools be not adopted as aforesaid, then "said funds to be vested in stock in said bank." The English language cannot make any thing plainer than the intention expressed by this act to make the school fund a part of the capital of the bank. But there are two other portions which deserve consideration in this connection.

1. The act or charter provides that when the moneys in the hands of the superintendent shall, from time to time, be handed over to the president and directors of the bank, and the proceeds of the sales of the stocks should be paid over to them, the president and directors of the bank were required, for and on behalf of the State, and with a pledge of the public faith and credit, to issue to the superintendent state stock or certificates of debt.

2. The act or charter provided that of the dividends which shall be declared by the bank, one hundred thousand dollars should be set apart for common schools, and the faith of the State was pledged for an annual appropriation of that amount to common schools, to be applied as the General Assembly may direct.

Here, then, this act exhibits the investment of the school fund in capital stock of the bank, the execution of state stock, or certificates of debt, to be held as evidence of the amount paid, and the obligation of the State for the amount with the pledge of the State for an annual appropriation of $100,000 of the dividends to the support of common schools.

This investment of the school fund as part of the capital stock of the bank has been constantly referred to by public

officers. In 1842, Williams, president, refers to the school fund as part of the capital of the bank (House Journal, 11), $777,000. In 1843–4, the school fund is referred to as a part of the capital of the bank in appendix to Senate Journal, p. 195, by the school committee. In 1845–6, Nichol, president, in report, said the school fund was part of the capital stock of the bank, not so safe as stock of the bank as in bonds of the State—that the State stood pledged for its safety. Senate Journal, p. 159. In 1847–8, Nicholson, president, specifies the items of the capital of the bank, and in his enumeration he places the school fund as a part thereof. He states the amount going to schools, according to the fund, to be $78,000 annually. In 1853 the Comptroller of the treasury, in a report, estimates the school fund as one of the items of the capital stock of the bank. Senate Journal, p. 52. In 1859–60, C. Johnson, president, in a report, places the school fund, as part of the capital stock of the bank, at $1,200,000, not $1,500,000, as stated in the Code, and that no certificates of indebtedness or State stock on file in the public offices. Leg. Doc., p. 76.

These are the declarations of public officers, whose duty it was to report the facts, and they are evidence which the court will recognize. Greenleaf's Ev.

The Code declares that the president and directors of the Bank of Tennessee are constituted a board of commissioners of common schools; that they shall have the superintendence of the fund, shall guard it against diminution, and see that the interest of so much of the school fund as constitutes a part of the capital stock of the bank, and all other school dividends shall be paid over to the superintendent of of common schools throughout the State, and for the benefit of all the people of the State. 963, 964, 965.

These provisions are in direct execution of the Constitution, and describes the profits arising from the school fund as the dividends arising from the capital stock of the bank. So Code 948 declares that the annual fund for distribution

consists of the one hundred thousand dollars of the dividends of the Bank of Tennessee as appropriated to common schools. So Code 946 declares that the whole of the common school fund shall continue in the Bank of Tennessee, where it is now invested by law.

The only evidence to be found in all the public records, or in the statutes of the State, which gives the slightest color to the statute of 1865, stating that this fund was not a part of the capital stock of the bank, but a mere debt funded as a deposit, is found in Code 947, which declares that the fund consists of the sum of $1,500,000 deposited in the Bank of Tennessee, for which a certificate of deposit was filed with the treasurer or superintendent. Now, this is not an affirmative enactment of law declaring that the previous law in the charter, and always recognized, which made it a part of the capital stock of the bank should be abrogated, and capital stock converted into a mere deposit subject to be withdrawn at any time, without regard to the claims of creditors. It is no such thing. In describing the fund, it undertakes to recite the facts, and not to establish or make law. There was not the sum of $1,500,000 appropriated to common schools. It was not deposited in the Bank of Tennessee. There was no law that could be construed in any manner to mean that the school fund was a mere deposit in the bank, and not capital stock. There was not and never had been any certificates of deposit issued to the superintendent and filed. There was not any law which, in the remotest degree, could be construed as a direction to the president and directors of the bank to issue a certificate of deposit to the superintendent upon the delivery of the school fund to them. On the contrary, the charter directed that on the receipt of school moneys the president and directors of the bank should issue to the superintendent state stock or certificates of debt, with the pledge of the public faith, and in connection therewith declared again and again that the funds so paid over to the president and directors of the

bank should constitute a part of the capital stock of the bank. The Legislature was not legislating on the subject of the bank charter. They were not acting with a view to modify or change the bank charter, or to affect the rights of its creditors, and no mere loose declaration of acts in regard to the supposed state of the laws can be construed to change or as meant to change the express language of the charter and the uniform construction of the charter by the whole body of the public officers authorized by law to report and act in the subject matter of the capital of the bank. The Legislature may make the law, but it has been decided by the Supreme Court of Tennessee that a legislative opinion of what the law is, is a nullity, and changes nothing.

The school fund, therefore, stands as a part of the capital stock of the Bank of Tennessee. 1 Swan, 276.

The moneys which had been appropriated by law, and then by the Constitution, for the support of the common schools, having been realized by sale of the stock of banks in which it was invested, and which were controlled by individuals, were now invested in the stock of a bank in which the State was the sole stockholder. The State owned the stock of the bank, and the State owned the school fund, and the president and directors of the bank were constituted the board of common school commissioners, and the superintendent was called an executive officer in the act of 1835. He gave bond to the State for the faithful discharge of his duties, and took the usual official oath. The bank was created in the name of the State, and for the benefit of the State.

Was the bank chartered in conformity with constitutional law? The judicial decisions leave no doubt on the subject. The State of Kentucky incorporated a banking institution with usual powers. The directory were elected by joint ballot of both houses of the Legislature. The bank was the exclusive property of the State. The notes were issued and debts contracted in the faith of the proceeds of the

public lands, and on the faith of the funds of a former bank owned by the State. The dividends were directed to be paid into the treasury of the State, and the notes were receivable in payment of public dues. The Supreme Court of the United States said a uniform exercise of the power to incorporate banking institutions by the state governments, affords no unsatisfactory evidence that the power has been rightfully exercised. It is, indeed, not contested at the bar. It is also admitted that a state may own stock in a bank, but it is contended that it cannot become the exclusive owner of the stock. They give no rule by which the interest of the State in such institutions must be graduated, nor at what point the exact limit shall be fixed. May a state own a fourth, a third, or three-fourths of the stock? If the proper limit be passed, does the charter become unconstitutional? and is its unconstitutionality sustained if it recede from that limit? If a state may own part of the stock of a bank, we know of no principle which prevents it from owning the whole. As a stockholder in a bank, it can exercise no more power than any other stockholder.

The court said that the banking charter having provided for a specific fund subject to legal process by the creditors of the bank, the notes issued by it were not bills of credit, and the law creating the bank was valid. *Briscoe* v. *Com. B. Ky.*, 11 Pet., 326.

This case was decided in 1837. In 1851 the same principle was settled by the Supreme Court of the United States in the case of *The Bank of the State of Alabama* v. *Darrington*, 13 How., 17. The court say the State was the sole stockholder. The capital stock was raised by the proceeds of the sale of bonds and lands of the State. The dividends were devoted to public purposes. The directors were appointed by the State, and the faith of the State was pledged for the redemption of its bills and notes. The validity of this charter was assailed, as in the case in 11 Pet., on the ground that the Constitution of the United States prohib-

26—VOL. 5.

ited any state from issuing bills of credit; that the issuance
of notes, bonds on public funds, and for the redemption of
which the faith of the State was pledged, was a bill of
credit. But the court sustained the validity of the charter,
on the ground that the State had the right to charter banks,
to take the stock, and having provided a specific fund
pledged to the creditors of the bank by legal execution, it
was therefore valid. There has been similar charters in
Mississippi, Arkansas, Indiana, and in many other states,
in none of which have such charters been annulled by judi-
cial decree on the ground of unconstitutionality.

The decision in the case of the Commonwealth Bank of
Kentucky was made in 1837, and in 1838 the Bank of the
State of Tennessee was incorporated. As to the question
of constitutional validity, it settled it in all the states in
which banks were incorporated in which the exclusive own-
ership was in the State.

The investment therefore of the common school fund,
whether owned by the State as a sovereign power or as a
constitutional fund devoted by the Constitution to specific
purposes, or as a fund held in special trust for subordinate
municipal divisions, it was a constitutional and valid in-
vestment.

So far as regards the great body of the school fund is
concerned, it has no feature of trust on it whatever. This
was urged on the Supreme Court in the case of the *State* v.
*McEwen,* and not noticed directly, but the authority over
the fund declared not to be subject to revision by the judi-
ciary, the Legislature having the choice of the means neces-
sary to make the fund profitable; but it cannot be gravely
contended that a fund raised by the whole people for the
benefit of the whole people, is a trust fund, merely because
the Legislature is prohibited from appropriating the fund to
any other purpose than the support of common schools. A
trust in a judicial sense, capable of judicial administration,
must be founded on funds coming from some external

source and dedicated to certain persons or localities. This is no trust; but if any portion of the school fund were held by the Legislature in trust, still the Legislature in its sovereign capacity enacts such regulations in regard to the investment of trust funds as it may deem expedient, by general law or otherwise. It did direct this investment in bank stock in conformity with the long-established practices of the State. Judge Story states that English courts of chancery sanction the investment of trust funds in the public securities of the kingdom, in bank stock, in East India stock, exchequer bills, and in annuities, as well as upon mortgage securities upon real estate in England or in Wales. Story, sec. 1296.

The questions which have generally arisen in the courts in regard to the mismanagement and loss of trust funds by the trustee, have arisen in the efforts of the beneficiaries to subject the trustee to individual responsibility for the mismanagement and loss of the funds, and to remove the trustee as for an illegal or fraudulent investment whereby they were lost. No such question can arise in this case. The bill is not formed with that view. The bill presents no parties asking such a decree, or in whose favor a decree would be rendered. The board of commissioners of common schools could be stricken out, and without impairing thereby any decree, proper or legal, in the aspect the case here assumes. It will not be argued that the judicial department of the State could remove the legislative department from the control of the fund upon any of the usual grounds upon which a court of chancery acts in the case of individuals, as in cases of gross profligacy, insolvency or insanity. So the State, as far as regards its liability for any part of the school fund held in absolute ownership or in trust, by the act which made the whole of the school fund a part of the capital stock, and subjected the money so entrusted to the hazards of commercial enterprise, did then order the execution of state stock in the name of the State,

and with the pledge of the public faith to stand as permanent evidence of the absolute liability of the State to perpetuate that fund for the purpose specified as in the Constitution. 'So, after it was supposed the bank was insolvent and the State had seized the specie in the custody of its officers and appropriated it to the payment of the debts of the State, the Legislature by statute recited the provisions of the Constitution that the fund should be inviolably appropriated to the support of common schools, and that the school fund should constitute an indebtedness and liability on the part of the State for the purpose specified in the Constitution ; and by subsequent act that act was amended so as to declare that the interest arising from the school fund should constitute an indebtedness and liability subsisting against the State. [See Revised Statutes, 962, 963.] The State is permanent, and viewed in the light of pecuniary responsibility for its obligations, must be regarded as pledging all the real estate within its boundaries, and all the wealth of those who may inhabit the State now or hereafter, for the payment of the interest. Can the value of a permanent indebtedness be placed on a more lasting basis than that which is charged by the Constitution upon a free state for purposes of education within its boundaries ?

The State may have lost the capital of the State Bank, but the apprehension of a loss of the school fund as an argument to be addressed to the judicial department, is absurd when predicated on the permanent acts of the legislative department.

The Supreme Court has utterly rejected the idea of preserving this fund by securing better curators than the successive Legislatures which assemble from time to time under the Constitution of the State.

The Legislature of Tennessee, in 1838, declared the whole of the school fund a part of the capital stock of the bank. It then guaranteed the perpetuity of the fund, and in 1870 it substantially declared the same guarantee. The

act of 1838 was based on the idea that the State had sub-
jected the school fund to the hazards of a commercial en-
terprise by making it a part of the capital stock of the
State Bank, and the State reaffirming the perpetuity of the
fund.

But if this fund, or any part thereof, be regarded as held
in trust, and had representatives in the boards of commis-
sioners of common schools, or in the trustees of colleges
and academies, or if there were living beneficiaries in all
the counties of the State with courts open to them, why did
they not at the outset appeal to the judiciary to arrest this
hazardous and illegal investment of their funds?     Years
elapsed before the funds were reduced to the possession of
the directors of the bank after the charter was enacted.
Why did not the trustees of colleges and academies arrest
the investment in bank stock in 1817?     Why, in the long
stretch of time, did not those independent powers, those
beneficiaries, prevent the investment of their funds in the
old State Bank, in the Union Bank, in the Planters' Bank?
When the Superintendent of Public Instruction was direct-
ed to collect and pay over to the Bank of Tennessee these
trust funds and take in place thereof state stock with the
pledge of the public faith, why did not the beneficiaries
aforesaid and their representatives appeal to the judiciary
to arrest an illegal and unconstitutional measure?     If the
representatives of the school fund, and of colleges and
academies, existed as independent powers in the land, con-
tinuous in existence as the State itself, why did they receive
during the whole period of the existence of the bank the
sum of $100,000 annually as an appropriation to the cause
of education?     Why the sum of $18,000 annually to col-
leges and academies?

They sanctioned and confirmed these contracts of invest-
ment by receiving the bonds of the State and the annual
appropriations of the dividends by the State for the use and
benefit of these alleged beneficiaries.     These alleged corpo-

rations and beneficiaries must be governed by these permanent rules established for the security of the rights of creditors, when they come in conflict with such creditors. They are estopped. There is a time when all human transactions on the doctrine of acquiescence and estoppel are considered as closed and settled for good or evil. The great principle which operates here is, that parties under no incapacity or disability, having sanctioned and participated in bargains and arrangements for their benefit, and received the full benefit of such arrangements running through long periods of time, must be held bound by such bargains and arrangements. The opposite doctrine would open the doors for boundless litigation and fraud. See Story, ch. 44, Redfield's edition.

This must be regarded as an executed transaction, closed forever, with all separate rights merged in the execution of the contract which placed that money in the hands of the president and directors of the Bank of Tennessee as a part of the capital stock thereof.

Now, what is the capital stock of an incorporated institution? It is that fund money, estate, real and personal, authorized and required by law, to be placed in the hands of the directors or managers to enable them to accomplish the purposes of the charter and organization.

If the charter authorizes the construction of a railroad, the money and effects placed in the hands of the directors, or agreed to be placed in their hands, are for the purpose of procuring the right of way, grading the track and furnishing iron, lumber, materials and service for the completion of the structure, etc.

If the charter contemplates the establishment of insurance operations, then the funds paid, or secured to be paid, by the deposit of public and private securities, these funds paid or secured to be paid, when demanded by the necessities of the company, are placed there for the purpose of meeting engagements arising from losses by death, fire and accidents.

State, and Watson, Trustee *v.* Bank of Tennessee.

If the charter authorizes the business of banking, that is, to deal in exchange, to receive and pay out deposits, to issue notes and to deal in state stocks, the capital stock is that sum of money subscribed, or those securities, public and private, which may be placed in the hands of the directors to discharge the debts and obligations which they may lawfully create.   The capital stock of the Bank of Tennessee to be employed in banking operations, consisted of the school fund, the surplus revenue, and an additional sum to be raised by the sale of state bonds, or otherwise,—the aggregate to amount to five millions.   By the general rules of law, the estate of the stockholders, real or personal, is exempt from seizure for the debts created by the corporation in its operations.   The capital stock paid, or agreed to be paid, by the stockholders becomes the property of the corporation for the payment of all debts created by the corporation managers in the execution of their functions.   Hence the stringency in the application of the corporate funds to corporation debts.

The Supreme Court, in *Brightwell* v. *Mallory*, says:  "It is a mistake to suppose that the stock of an individual in a bank consists of so much money owned by him in a bank. The money in the bank is the property of the institution, to the ownership of which the stockholder has no more right than any other person not at all connected with the bank.   The stockholder has the entire ownership of his own stock, and may sell and transfer it.   The certificate of stock declares that he is entitled to so many shares of the capital stock.  They entitle him to his proportion of the profits which may be declared from time to time, and when the institution closes business, to his proportion of the capital stock and profits which may remain to be distributed." 10 Yer., 198; A. & A., 318.   In the case of *Union Bank* v. *The State*, the Supreme Court says that the capital stock of a bank is the whole undivided interest paid in by the stockholders, the legal right to which is vested in the cor-

porate body for the purposes of the act of incorporation; that by bank stock is meant the right of stockholder to an interest in the dividends and the right to a distributive share of the effects of the bank on hand at the time of the expiration of the charter. 9 Yer., 501.

The case of *Wood* v. *Dummer*, 3 Mason, 308, was the case of a bill filed by a noteholder against a part of the stockholders of a bank, who had divided the effects of the bank among themselves without payment of the debts. Story says: "The charter relieved the stockholders of individual liability for the debts contracted by the managers of the corporate body, and substituted instead thereof the capital stock of the bank. To this fund credit was given as the only means of payment, which upon general principles, as well as legislative intention, was to be deemed pledged for the payment of the debts of the corporate body." See Story's Eq. Jur., sec. 1252.

In the case of *The Ohio Life Ins. Co.* v. *The Nashville Ins. Co.*, 11 Hum., 31, a bill was filed against the latter company and the stockholders to subject them to pay a debt due the former company contracted by the corporate body. The court said: "The capital stock is the fund provided and intended to be kept for the security and benefit of the creditors of the corporation. The stock subscribed and agreed to be paid becomes the property of the corporation, and the creditors may enforce its payment in equity." 8 Cow., 396.

The interest of the stockholder is in the dividends, and at the dissolution of the corporation to demand a return of the subscription paid or the residue. Until the payment of the debts the interests of the stockholders is to be regarded as in all respects subordinate to the demands of the creditors. They have no right to withdraw it, or in any way to diminish it or endanger it to the prejudice of the creditors." The sum of money which the State withdrew from the hands of the president and directors of the bank in 1865 by the

seizure and appropriation of $460,000 of specie, and appropriation of the same to the payment of obligations of the State, was in violation of the contract with the creditors of the bank, whose rights to the fund attached as soon as these contracts were made.   The stockholders are not the creditors nor the sureties of the corporation.   They are its debtors till their subscriptions are discharged.

The Eaton Manufacturing Company having exhausted their effects, the creditors filed their bill against the stockholders to subject them to the payment of their unpaid subscriptions.   The Supreme Court of Georgia say, the capital stock is the amount fixed by the stockholders as their stake in the concern, upon which they got their credit and transacted their business.   It may not all be paid, still they are liable for the amount so fixed.   A case might be made out where the stockholders would be enjoined from paying out dividends till the debts were paid, and to compel them to pay back dividends which had been paid out of the capital stock.   The whole capital stock is a fund held to pay debts which cannot be distributed or otherwise divided among the stockholders till the debts are paid.

The credit is gained on the promise of the stockholders to pay in given sums of money, and the creditors trust to the stockholders' promises, as well as the effects in the hands of the directory.   Ang. and A., 612; 2 Denio, 119; 10 Page, 299; 27 Eng. L. and Eq., 572.

The Supreme Court of the United States put the liability for unpaid subscriptions on the higher ground of contract between the stockholders and the creditors.   In the case of *Calef* v. *Hawthorne*, 2 Wall., 20, where the charter of a railroad provided for the individual responsibility of the stockholders, the Supreme Court say this was not, in form, an express personal contract, but it was an agreement resulting from the acts of the parties through the charter, and the acceptance thereof by the contractors on the faith of the propositions so put forth.

So, in the case of *Ogilvee* v. *Knox. Ins. Co.*, 22 How., 389, the court say : "The complainants are the creditors of the insurance company. The defendants are the stockholders, and are severally charged as debtors to the corporation for the unpaid portion of the stock subscribed by them. The company is insolvent, or at least unable to pay its creditors, without calling in the capital subscribed and secured, but not paid in cash. This bill is filed to compel the stockholders or debtors to the corporation to pay the amount of their debts in order that the creditors may obtain satisfaction. As stockholders who have not paid in the whole amount, they stand in the relation of debtor to the corporation for the several amounts due by each of them. When a number of persons are incorporated to carry on the business of insurance, the stock subscribed by them constitutes the capital publicly pledged to all who deal with them. This company did not require the payment of more than ten per cent. of the subscriptions, leaving in the hands of the stockholders ninety per cent. thereof, and substituting their notes or other securities in lieu of money. Then every stockholder became a borrower from or debtor to the capital stock of the company. The amounts retained by the stockholders is as much a part of the capital stock pledged to the creditors as the money actually paid in, where that part of the capital stock represented by their securities is required to pay the creditors of the company." It was therefore ordered that a decree be entered against the stockholders, who are made defendants, for such sums as may be due from them severally on these shares, ect.

It has been declared that a bill may be filed at the instance of a creditor for the sequestration of the rights, franchises and property of a railroad corporation, and for the appointment of a receiver with power to collect from its stockholders their unpaid subscriptions, though it may have no property except such unpaid subscriptions. See Brightly Digest Sup. 67, citing 2 Black, C. C. R. And when a cor-

poration expires by lapse of time, or is forfeited by legal proceedings, the rights of creditors survive and have an available existence against the effects of the defunct corporation, whether it exists in the shape of real or personal property, or debts due by subscription or otherwise. They survive as completely as the rights of a creditor do to the whole of the effects of a dead man. *Bacon* v. *Robertson,,* 18 How., 480; *Lum* v. *Robertson,* 6 Wall., 277; *Mumm* v. *Potomac Co.,* 8 Pet.

The leading principles above set forth were established in the great and well considered case of *Currin* v. *State of Arkansas,* 17 How. In that case the capital of the bank was furnished by the State exclusively, and placed for banking operations in the hands of directors appointed by the State authorities. On the accruing insolvency of the bank, the State, by acts of the Legislature, seized the remaining estate of the bank, its specie, its bonds, mortgages and other effects, and appropriated them to the payment of the debts of the State. The creditors sued the State under the statute law of the State authorizing the State to be sued. The whole of the effects seized by the State were declared to be a part of the capital stock and property of the bank, pledged as capital stock to be used in banking operations, and pledged to the payment of the debts of the bank, and that all action by the legislative authority to divert the effects from the purposes designated in the charter, and appropriate them to the purposes of the State, were of no validity whatever.

It is established, therefore, by a long series of decisions in England and in the United States, running through a long series of time, that the capital stock of all incorporated companies must be kept up and preserved as a fund, by law and public understanding pledged specifically for the payment of all debts which said corporations may lawfully create; that the unpaid subscriptions constitute a part of the capital stock, and are also pledged for the payment of the debts; that the rights of stockholders are to dividends and

residue, and are altogether subordinate to the rights of the creditors, and that they cannot diminish the capital stock to the prejudice of creditors—as in the *Ohio Life Ins. Co.* v. *N. Ins. Co.;* that they cannot divide the capital stock amongst the stockholders without payment of debts—as in *Wood* v. *Dummer;* that they cannot distribute the capital stock in dividends—as in the Easton Manufacturing Company; that they cannot escape responsibility by a modification or repeal of the law—as in *Calef* v. *Hawthorne;* nor evade liability by the substitution of worthless notes as securities for their own stock notes—as in *Nathan* v. *Whitlock,* 9 Page; nor withdraw their stock by bill in equity, before the debts are paid, and corporation closed—as in *Woodfork* v. *Planters' Bank,* 3 Col., 488; nor enforce set-off against calls, but must pay up and share with other creditors; nor evade the claims of creditors by sale of the effects and appropriation of the proceeds, for the court will subject the property in the hands of holders with notice, and where the charter is extinguished by lapse of time or by forfeiture, the debts remain and are charged on the effects, for the extinction of remedy at law furnishes the grounds of equity jurisdiction to sustain the trust and enforce the rights of creditors against estate pledged for the payment of their demands, to the exclusion of others.

This stringent subjection of the capital stock of incorporated companies to the satisfaction of the debts of those who contract with the corporate managers, stands on the satisfactory and well sustained ground, that by the general principles of law the individual property of the stockholder is exempt from subjection to the payment of corporate debts, and they are forced to look to corporate funds alone for payment; and if so, it is necessary that the capital stock should stand pledged and specially guarded against withdrawal, diminution or distribution to protect the creditors from fraud, and to give solidity and credit to corporations to enable them to accomplish the purposes of their organization.

# DECEMBER TERM, 1875. 413

State, and Watson, Trustee v. Bank of Tennessee.

Having shown that the school fund was, by the charter, constituted a part of the capital stock of the bank, and that it was therefore specifically pledged against withrawal, diminution or distribution till the debts were all paid, it follows that the instruction by the General Assembly to the bank to pay the sum of $1,500,000 to the Treasurer of the State, as a preferred claim against the effects of the bank, was in violation of the obligation of the contract made by the State that the school fund should be a part of the capital stock of the bank, and that any assignment made to a trustee with such instruction should be disregarded, and the funds of the bank appropriated to the payment of the debts, and that the sum of $460,900 in specie, taken from the officers of the bank as school fund and appropriated, was in violation of law and the rights of creditors, and that the State must be held accountable to the creditors for that amount so withdrawn.

But if the school fund was a trust fund, and there were proper representatives of that fund before the court holding rights hostile to those of the State, and if the investment of the school fund as capital of the bank was illegal and void, then the State would be bound to make up the deficiency of $1,500,000, which it agreed to supply and never did supply. If the school fund never was legally a part of the capital stock of the bank, how has the State supplied the five millions pledged to the creditors of the State? If the court shall declare this school fund no part of the capital stock of the bank, the State has unquestionably violated the covenants of the charter that such fund should be a part of the capital stock, and the State being before the court as a party, the court is bound to do complete justice by entering a decree against the State in favor of the creditors for the amounts which it had pledged for the payment of corporate debts, and which it did not supply.

This is an established power, vested in courts of chancery.

The State of Tennessee drew from the Bank of Tennessee the sum of $465,487 and appropriated the amount so drawn to the payment of the ordinary and current expenditures of the State. The record does not show whether it was drawn out prior to the 6th day of May or afterwards. This was lawfully appropriated. The State Legislature in 1861, after the 6th day of May, 1861, drew from the bank the sum, say $3,800,000 or more. This was paid on checks of the military and financial board in the purchase of eight per cent. bonds issued by the State, bearing eight per cent. interest, and coming to maturity in ten years. See Acts of 1861. The president of the bank at that time (Torbett) states that he purchased them because he believed it was the interest of the bank to take them. The cross-bill states that the bank was required to take them. The fact is otherwise, and a motion is pending to amend the record by making the allegation correspond with the statement of the president. These bonds are in the hands of the trustee of the bank, and held as a part of the effects of the bank, subject to the order and decree of the court as to the validity and disposition thereof.

The statute under which it seems these bonds were issued, declares that they were to be issued for the defense of the State. The money drawn was so appropriated.

It may be argued that the State of Tennessee did not, by its lawfully authorized officers, take and appropriate the money so withdrawn in payment of its ordinary and current expenditures, and in the purchase of bonds issued by the authority aforesaid, and that these complainants who deposited their money in the hands of the directory of the Bank of Tennessee after the 5th day of May, 1861, did not deposit the same in the hands of a directory lawfully authorized to receive such deposits.

In reference to this argument, it is maintained that these complainants deposited their money in the hands of the directory, under and by virtue of the charter as enacted in 1838, and that they deposited it in the years 1858, 1859,

State, and Watson, Trustee, v. Bank of Tennessee.

1860, 1861 and 1862. These contracts of deposit do not rest for their validity on any acts passed after the 5th day of May, 1861. The contracts of deposit which they made with the corporate institution, and with the State, as pledging its faith for the support of the bank, was made under and by virtue of the act which created the bank. They placed their money in the hands of a directory, the fidelity of which was guaranteed by the State by virtue of laws which had been in existence for more than a quarter of a century, and not by virtue of or under any ordinance of secession, and not for any purpose connected with war or insurrection. These directors, appointed in 1859, were occupying the established banking houses in 1860, 1861 and a part of 1862, at the principal banking house at Nashville, and at all the branches, with all the books of the bank. They had lawfully received these banking houses and books from their lawful predecessors, by lawful election or appointment, and with no disputed succession. They came into possession by no revolutionary ouster, but by uncontroverted appointment. The Legislature, which was in session in 1860 and in 1861 in the State, was lawfully elected in 1859, and were the legitimate successors of the Legislature which had assembled in the State from the foundation of the government, with no revolutionary ouster, no disputed succession. The Governor of the State in 1861 was elected in 1859, and was the lawfully elected and undisputed successor of Blount, Carroll, Cannon, Polk and Johnson. The Governor and the Legislature were elected lawfully in 1859 under the Constitution of the United States and the Constitution of the State, and the laws thereof previously in existence, and occupied these respective positions under the Constitution of the United States and of the State, and the directory which received these deposits, and which purchased the bonds of the said State, were officers under and by virtue of an appointment made in 1859. The laws under which this board was organized, and the official au-

State, and Watson, Trustee, *v.* Bank of Tennessee.

thority under which they were organized, had existence prior to the year 1861. The officers who delivered to them the possession of the banking houses and stocks, had all the authority so to do that could be acquired from pre-existing statute laws of the state. The contracts of deposit which they made with these directors appointed in 1859, were just such contracts as were made in all the States in peace and in war, and without the slightest connection with a state of peace or war. It would seem impossible on any principle of reason or authority to affirm that the State Government of Tennessee in 1861 or 1862 originated in usurpation, or that the bank directors were usurpers. The entire body of the laws of the State originating in 1860 or 1861, or prior thereto, must be construed as in full force, not incompatible with the Constitution of the United States or the Constitution of the State, unless repealed by a subsequent Legislature, and any officer lawfully appointed must be construed as being of lawful and valid existence until displaced by lawful authority. Every intendment of law and of fact which can be made by a court must be made in support of lawful and constitutional government, for the reason that it is the manifest interest of all men that the whole machinery of trade and of organized society should go on in war as well as in peace. It has been the labor of the soundest and ablest men in all civilized ages, in all countries, to restrict the operations of war to the least possible disturbance of regular operations of internal government. It was declared many centuries ago, by the British Parliament, that no man should be disturbed in his person or property for acts done in defence of existing authority, and on the ground that it was impossible for the great mass of men to know with certainty which side was right in civil commotions and conflicts. Thirty millions of people on one side, with ten millions on the other; we have a wide margin for the exercise of sound principle and conscientious conviction, more especially when we consider the opinions

State, and Watson, Trustee *v.* Bank of Tennessee.

of Jefferson, Sir James McIntosh and the celebrated French statesman, Sully, that organized peoples in insurrection were generally right, and their conduct always based on conviction of right. That statute was enacted on considerations of general humanity, and to moderate the rage of men in the hour of victory. It is said by writers of physical law that nature abhors a vacuum. It is said by writers on public law that humanity shudders at an interregnum. In war, for the interests of general humanity, contracts must be made and enforced, crimes must be punished, courts and officers must exist. The business of merchandizing must exist and be regulated by law. Estates must be distributed, and orphans protected. Taxes must be assessed, collected and distributed. Places for the deposit of produce and of money should exist in war as well as peace, and be protected. Laws and constitutions in existence do not cease to have existence and operative effect, and courts can only act in safety on the affirmative establishment of the negative fact that they do not exist. We cannot, on any principle of reason, assume that constitutions, and laws, and officers have ceased to exist, except the fact be shown to be so. Even where no lawful government exists, judicial tribunals enforce the acts of acting officers, acting corporate bodies and acting governments. It would seem, upon general principles of reason, and in support of the public good, that governmental acts not in conflict with fundamental law, and in conformity with existing law, should be enforced.

The State of Tennessee, as to its officers, has been declared an acting government by all the courts of supreme authority that have been held since the war. Thompson was elected clerk under Confederate rule in March, 1862. He had the control of the records of the court, the treasury, issued licenses in all cases authorized by law, made settlements with guardians, administrators and others, attested official bonds, and performed all the official acts pertaining to the duties of the office till July, 1865. Defendant Ward was

27—VOL. 5.

indicted for acting under a license issued by Thompson, who was duly sworn as a Confederate officer. The court, by Hawkins, say that his official acts to the public and third persons were binding. Public justice required that the acts of such officers should be supported. He quotes *Venable* v. *Curd & White*, 2 Head, 582, in which the court say that the acts of such officers shall be supported when they are for the benefit of the public, or of strangers who have an interest in the act done, and who are presumed to be ignorant of the defect of the title of the officer; but that a different rule prevails where the act is for the benefit of the officer, for he should not have the benefit of his insufficient title. Judge Hawkins says this rule is one of public necessity, which has been required at all times and in all countries to prevent a failure of justice. To hold the acts of all such officers void, would entail upon the public a train of evils little short of those of the war. There never was a time when the application of this rule was more imperatively demanded. 2 Cold., 609.

This principle has been enforced by the Supreme Court of the United States. 16 Pet., 86. The courts have applied this principle to the acts of corporate officers, to the acts of state and federal officers, and to governments. The courts declare that they will not in such cases go into the collateral questions in the trial of the right and title of such officers to the positions they assume to act in on the investigation of the rights of persons who have an interest in the act.

Judge Story lays down the rule as follows: The acts of such person are valid when they concern the public or third persons who have an interest in the acts done. This rule has been objected to in the case of oath required not having been taken, or taken illegally, bonds not given as required by law, on the ground that the acts done were done after the expiration of the term of office, as in *Hasley* v. *Cooke;* they have been objected to in cases where the persons hold-

ing office were incompetent by reason of age, non-residence and personal disqualification, as in cases under the test and corporation acts in England, and in cases where the appointing power was utterly void and unconstitutional, but it has been confirmed in such cases.    It has been enforced in cases of legislative, executive and judicial officers.    This rule was enforced in the establishment of title under the governments established by Bonaparte in many states where his governments were subsequently overthrown.    So the transfer of territory by all *de facto* governments are recognized as valid acts by international law.    Kent's Com. Wildman, L. Lib.

Thompson acted for years by Confederate authority, which he was sworn to support, and made contracts on behalf of State and county, for which he received money, and discharged the multifarious duties of his office of Clerk of County Court, acts both of a ministerial and judicial character, and these acts were sustained, and persons protected who acted under them by the Supreme Court.

How can it be contended that the acts of this directory were not valid and binding within the limits of the Constitution of the United States and the Constitution of the State, and the laws thereof.    They were lawfully appointed in 1859.  They lawfully took possession of the bank and books of the bank, and were authorized by the charter of the bank to hold them, and discharge the duties of bank officers till their successors were duly elected and qualified.    There were no contending claimants, no disputed succession, no force or fraud alleged in the transfer of the possession. Their action in the receipt of deposits was in conformity to the charter made by virtue thereof, and not by virtue of statutes enacted, and their acts in the due line of administrative duty, for the good of the State as a stockholder. Banks of deposit are a necessary agency of society in war as well as in peace, and the right and duty of receiving deposits exist at all times, and can in no sense be regarded as

a war agency interfering with the rights of a belligerent. The fact that this bank was owned by the State as sole stockholder, cannot alter the essentially private character of its administrative acts as a bank agency.

These bank officers, therefore, were lawfully appointed, they were lawfully in possesion, with lawful authority; their acts were in the line of lawful administrative duty, and their contracts bound the effects of the bank and the State as the stockholder therein, pledged as it was by the charter, to support the bank, and see that its creditors were paid and satisfied according to contract.

But it is urged the Legislature of the State made a declaration of independence, and a withdrawal from the United States, and that on the 6th day of May, 1861, they joined the Confederate States in hostility to the war then prosecuted against them by the United States, and that her movements were sanctioned by the people in their sovereign character, and that on the 22d day of February, 1866, there assembled a Convention, elected by a portion of the votes of the State by authority of the Government of the United States; and that said Convention did declare the acts for the withdrawal of the State from its political association with the United States unconstitutional, null, and void, and that such act of independence and secession were acts of treason and usurpation, and that all laws, ordinances and resolutions, as well as acts, in pursuance thereof, under the authority of the usurped State Government, after the declared independence of the State of Tennessee, on or after the 6th day of May, 1861, were unconstitutional, null, and void from the beginning, and that all laws, ordinances, and resolutions of the usurped State Government, passed on or after the 6th day of May, 1861, providing for the issue of said bonds, and all notes of the Bank of Tennessee, or any of its branches, issued on or after the 6th day of May, 1861, and all debts contracted in the name of the State by said authority, were unconstitutional, null, and void, and that no

future Legislature should provide for the payment of said bonds, debts or notes.

In 1872, after the people of the State were enfranchised, a Convention, elected by the whole people, and representing the whole, abrogated these provisions of the Constitution of 1865. Steiger and Thompson, vol. 1, p. 113, art. 11.

This was the last constitutional declaration of the people in convention assembled, and that obligation put an end to the declaration that the State organization of 1859–60 was an usurpation. This schedule of 1865 was, therefore, in this respect, as if it had never been adopted, for it will not be contended that if one convention make an ordinance, a succeeding convention may not abrogate that ordinance. Does not that abrogation declare to the courts that the organization of 1861 was no usurpation? If the Convention of 1865 declare the State Government of 1861 an usurpation, as a matter of opinion, does not the abrogation thereof by the Convention of 1870 furnish the strongest evidence, as a matter of opinion at least, that it was not an usurpation, and that the judiciary of the State and the subsequent Legislatures of the State should not act upon it as an usurpation, or regard its acts as a usurpation, more especially when it is well known that the first convention was not the convention of the popular will, and that the second was.

It was no usurpation, for it was a lawfully elected and authorized body. The bank directory was no usurpation, but was lawfully appointed, and the Convention of 1870 emphatically so declared.

It cannot be contended that the State of Tennessee had not the right to charter a bank, and authorize it to receive deposits as one of the reserved rights of the states. It had so done in 1838, and the laws to that effect existed at the time the complainants made their deposits. It cannot be denied that the State was in the full possession of the right

to appoint a directory to this bank; that it had so done prior to 1861, and that it had a right to continue to discharge their duties as directors till their successors were elected and qualified. It cannot be contended that the Bank of Tennessee had not the power by the charter of 1838 to buy and sell state stocks, and this power was habitually exercised by the institution whenever the necessary advantage of the bank was believed to require such a course.

It cannot be contended that any of these powers exercised by the State were not within the limits of the general powers which the State had reserved by the Constitution, and that being within the power of the Legislature, by the State Constitution and the Constitution of the United States, their acts and resolutions were valid. The cases which have been decided elsewhere in regard to other states are all cases where such states were organized under constitutions made up and organized under the Confederate States, and never had at any time any connection with the United States in their original organization, or subsequently.

The directory had, therefore, all the powers vested in them by the existing statutes. It will be hardly contended that the commission of treason or other felony by any member could affect the validity of his acts or the acts of the body as such, unless they had previously been convicted thereof, and disqualified to act as members of the government. The offense of treason is a personal offense, and the guilty person liable to punishment by the law as such, and that is the result of the whole matter. There has been no conviction or no disqualification. If any treason has been committed, the action of the executive and of Congress has placed them in a position to be regarded as if no offence had ever been committed. (Garland's case.) What invalidates the acts of the directory done under and by virtue of laws enacted prior to 1861? What invalidates the power of this directory to act in conformity with pre-existing statutes,

and in the line of duty, to bind the effects of the bank by the receipt of deposits, and the State by virtue of the statute which pledges the faith of the State for the payment of the obligations of the bank within the limits prescribed by the charter?   What put an end to the validity of the acts of a lawful body on subjects within the constitutional sphere of State action ?   When the people of the states organized the Government of the United States they conceded to that government certain powers which they believed could best be exercised by all for the benefit of all for the government of all, as making war, collecting revenue, and regulating foreign commerce, and commerce between the states.   They reserved to the states the powers not conceded.   The powers of one are enumerated, those of the other not set forth, being all they severally retained.   If, says Marshall, in *McCulloch* v. *Maryland,* we measure the power existing in a state by the extent of the sovereignty which a single state possesses, we have a standard which leaves to the State the command of all its resources, and which places beyond its reach all those powers conferred on the government of the Union—we have a principle which is safe for the Union and safe for the states; we are relieved from clashing sovereignty, from interfering powers—from a repugnancy between a right in one government to pull down what another government has the right to build up.   4 Wheat., 430.   So Chase, delivering the opinion of the court in *Lane* v. *Oregon,* says the people of each state composed a state having a separate and independent existence.   The states disunited might continue to exist.   Without states in union there could be no such political body as the United States; within their respective spheres the independent existence of each is distinctly recognized by the Constitution; that to the states all the powers are committed or left which are not delegated to the general government, and that nearly the whole power of internal regulation is left with them, and that the Government of the United States had no power

to compel the states to take United States treasury notes in payment of taxes—that the power of taxation is as complete in the states as the power of Congress.   7 Wall., 47. So in *Hart* v. *Texas*, 13 Wall., 650, says the Government of the United States and the government of the states are each alike absolute and independent of each other in their separate spheres of action.   Says Judge McLean, on the power of the states in regard to the prohibition of the sale of liquors, the Federal Government is supreme within the scope of its delegated powers, and the state governments are equally supreme in the exercise of the powers not delegated by them nor inhibited to them.   A state regulates its domestic commerce, contracts, the transmission of estates— real and personal—and acts upon all internal matters in regard to its moral and political welfare.   On these subjects the general government has no power.   They appertain to state sovereignty as exclusively as powers delegated appertain to the general government.   5 How., 598.

This principle is so familiar that it is unnecessary to do more than cite a few of the many cases establishing it.

The general government has, by the passage of laws, encroached on the reserved rights of the states, and these laws have, in numerous instances, been declared inoperative and void by the Supreme Court of the United States; so, the states have enacted laws in numerous instances in conflict with the Constitution of the United States, which have been declared inoperative and void by the State tribunal and the Supreme Court of the United States.   These controversies as to the boundaries of the powers of the respective governments have been going on at all times since the foundation of the government in the judicial tribunals, and are now going on in the Supreme Court of the United States, and will never cease to arise as long as we have a federal government with any recognized limitations, and an independent judiciary and a free press.   But these controversies have never been brought to the test of arms at any time except

in the late civil war, arising on the alleged right to restrict the rights of the states, and the alleged right of the State to withdraw as the means of giving effect to armed resistance to alleged and apprehended encroachments. The Government of the United States assumed the ground, by resolution passed July 22, 1862, that "the war was not waged in any spirit of oppression, nor for any purpose of conquest or subjugation, or for the purpose of overthrowing or interfering with the rights and constitutions of the states, but to preserve the supremacy of the Constitution, the union of the states, with all the rights, dignity, and equality of the states unimpaired," and that as soon as these objects were accomplished the war ought to cease. Acts of 1861; McPherson's History, 286.

The Secretary of State, in reply to commissioners appointed by the Confederate States to negotiate separation, declined to receive them on the ground that the ordinances of separation were void; that the law was intact, and the Constitution in force over all the states in all its provisions; that the Constitution had never been suspended in any of the states, but was in full operation and force in all, though its enforcement may have been obstructed by force. So, after the war terminated, the Supreme Court adjudicated that Georgia was a state in 1865, before the adoption of a State Constitution imposed by act of Congress, whilst the State was under military government, when it had no representation in Congress, and that the Legislature was bound by the Constitution of the United States, and could not pass any law impairing the obligation of contracts. So in the case of *White* v. *Texas*, it was declared that the State of Texas was a State whilst it was a military province, and had a right to sue in the courts of the United States.

The states being, according to the established and accepted theory, always under the operation of the Constitution of the United States, their existence as states was a matter of constitutional necessity, and they possessed all the

rights and dignities of states as secured to them by the Constitution, for without constitutional states there could be no such constitutional union as the United States. The states, therefore, notwithstanding the ordinance of separation and of independence, notwithstanding the confederacy of states for the purpose of establishing their independence by confederate action; the states stood during the war and after the war with all the rights which they had reserved by the Constitution of the United States, and amongst these rights were those, the validity of which are contested in this case. According to a just construction of the Constitution of the United States, all those acts of an organized state government which were not in derogation of any law of the United States were valid, and all those not in conformity with the Constitution of the United States were invalid. The Congress of the United States claimed the right to collect the revenues, carry the mails, and hold the courts of the United States, and execute the laws of the United States within the limits of the Confederate States. They did not claim the right to annul the Constitution of the United States, and the valid and constitutional existence of states, with all the rights of states in the hands of the states. They did not claim the right to conquer the states and hold them as subjugated provinces, under the control of the federal sword. The states were to be left after the war with all their constitutional vigor, with all the rights of the other states. It was not supposed that they were to be military dependencies of the United States. It is not necessary to enumerate the provisions of the Constitution which recognize the independent existence of the states, which declare their reserved rights, and which limits their rights and powers. The accepted theory, in the language of the Supreme Court by Chase, is, that there is an "indestructible union with indestructible states," or an union which was made by states with constitutional existence and rights, which could not be subverted by the Government of the United States without

treasonable revolutionary action; and certainly a revolutionary violation of the rights of the states, and a revolutionary subversion of the state governments, would be in principle no way different from any attempt to subvert the laws of the United States, for all violation of the reserved rights of the states is revolutionary in its character. Strike out the confederacy, declare all acts of separation null and void, and enforce the Constitution and laws of the United States; collect the revenues; carry the mails; establish courts for the enforcement of all laws in the withdrawing states,— the states are left as existing with all the rights and dignities of other states. There may have been forfeitures of personal and individual rights which might be enforced by the competent courts, but the forfeiture of rights as states under a constitutional government, rights maintained by the Constitution, is simply an absurdity. Why was not such a power to declare and enforce a forfeiture against a state placed in the Constitution of the United States? It is most probable all would have rejected such a proposition, as equivalent to a power to abolish state governments and states at pleasure. No such thing was provided or proposed. The states, therefore, stood as they stood before the war—as states having rights which could not be subverted, and which were not intended to be subverted, by Congress. The United States Government, acting upon the Constitution, had no power to prohibit the people of the State to make contracts through its corporate agent in regard to corporate property. That government had the right to remove obstructions to the laws of the United States constitutionally enacted, but no authority to obstruct, defeat or annul the entire mass of the contracts and obligations of the people as amongst themselves, or by the State with the people or portions of them. The Constitution of the United States forms the rule by which Congress and the Executive and the Judiciary would be controlled and restricted in its operative force in the removal of obstructions

to the enforcement of the laws of the United States, as well as the preservation of reserved rights of the states.

If this was placed on ground of a complete conquest—if the Congress of the United States had the right to effect a complete conquest of the states, and subvert all their constitutional rights, by setting aside the Constitution of the United States and of the states—it would be contrary to the usages of civilized states to subvert the laws of the State, invalidate the decrees of the courts and the dealings of the people.    Catron, delivering the opinion of the court in *United States* v. *Powers*, 11 How., 577, says:   "By the laws of nations in all cases of conquest amongst civilized nations having established laws of property, the rule is that laws, usages, and municipal regulations in force at the time of the conquest, remain in force until changed by the new sovereign."

So Marshall, in the case of *Perchman* v. *United States*, 7 Pet., 86, says:   "In cases of conquest it is not usual to do more than assume dominion."

But here the Constitution of the United States was not impaired by war, either as to the states or the power of the government over them.    4 Wall., 4.    The Constitution is the rule in war as well as in peace.    No success in a civil war can extend the power of the government beyond the limits prescribed by the fundamental law.    Brightly's Dig. "War 26," citing 2 Sprague, 143 ;  2 Black, 635.

When the government took possession of any "rebel district, it acquired no new title, but merely vindicated that which previously existed"—that is, the Government of the United States acquired the right to carry the mails, collect the revenue, organize the courts of the United States, and enforce the laws.    It acquired no power over the State of Tennessee except those conferred on the government by the Constitution.    After the termination of the war the laws resumed their sway, and all the inhabitants of the country possess all their rights without amnesty or pardon,

subject to prosecution; so, after the termination of the war, the property of no person is liable to capture as enemy's property, by reason of hostility to the government. Brightly "War 29," 2 Wall., 258. So the Supreme Court of Tennessee, in 1867, in the case of *Fogg* v. *Rutledge,* said that the United States acquired no rights by success. 3 Col., 554. Their power is not measured by force nor by the right of conquest, but by the Constitution of the United States. There can be no other governing rule but the Constitution of the United States, and whilst some courts have sought to release themselves from all the limitations of the Constitution, under the pretext that the laws of nations were in force instead of the Constitution, they will fail before all impartial tribunals. The counsel for the defense have referred to the case of *Hickman* v. *Jones,* where the Supreme Court of the United States said that officers who arrested persons for treason, under the authority of the courts of the Confederate States, were not protected by Confederate statutes; and also to the case of the *United States* v. *Keechler,* 9 Wall., where a postmaster under the authority of the United States was held not discharged by payment under authority of Confederate statutes. These cases, and others to the same effect, have no application either as to the facts or principles upon which they turned, to this case. The court say, in the latter case, that "whatever effect may be given to the statutes of the Confederate Government as a government or power of paramount force, or whatever effect may be given in proper cases to the legislation of the states whilst in a state of insurrection, 'are questions which we propose to decide only when they arise,' the acts of the Confederate Congress can have no force as law for any act opposed to the just authority of the Government of the United States." The Confederate Government had its origin in a combination formed by certain states against certain other states, and admitting the position at all times assumed by the Government of the United

States and enforced by them, that the States had no right to withdraw, that secession was unconstitutional, that the Confederate Government had no lawful origin, but was an usurpation, and that its acts could only be enforced as the doings of an acting government, lawful for some purposes, and unlawful as to all its acts in derogation of the constitutional authority of the Government of the United States; yet the case is different with states under regular organization, since the foundation of the Constitution, with their successors regularly installed, and the validity of whose acts can only be invalidated by some defect in constitutional force.. We rest the validity of the acts of this directory, which is now controverted, on the ground that their appointment was a valid and legal appointment, and that their acts were all in conformity with pre-existing statutes, and not unconstitutional; that the legislative body which drew money from the bank was a constitutional body, and that its authority could not be vacated by any authority whatever under the limitations of the Constitution of the United States; that no collateral evidence could be heard with regard to their titles to the positions which they held, and that their contracts could not be impaired without a violation of the Constitution of the United States.

In the case of *White* v. *Cannon*, 6 Wall., 150, a judgment was rendered by the Supreme Court of Louisiana after the ordinance of secession was enacted. The Supreme Court of the United States says the objection that the judgment of the Supreme Court of Louisiana is to be treated as invalid because it was rendered after the passage of the ordinance of secession, is not tenable. That ordinance was an absolute nullity, and of itself alone neither affected the jurisdiction of the court nor its relation to the appellate power of this court.

Congress, on the 15th day of July, 1861, enacted a law authorizing the President of the United States to issue a proclamation declaring a state of non-intercourse between

State, and Watson, Trustee, v. Bank of Tennessee.

the United States and those states which had confederated to establish their independence. On the 15th day of August, 1861, the President, in conformity with the law, did declare non-intercourse. This was based on the right to suppress insurrection. It was derived from the power to make war against the states confederated according to international law. This state of insurrection might embrace the whole people, including the officers of the government, or might embrace only a portion thereof. It might embrace a part of the territory, or the whole, according to the actual facts of the case; or a total non-intercourse might be considered proper to suppress a local rising.

The proclamation recited that an insurrection existed; that the insurgents claimed to act under the authority of the State Government; that the State Government had not disclaimed the fact asserted, and that the State Government had failed to suppress the insurrection. How can the proclamation of non-intercourse be construed to mean that the Government of the State was an usurpation; that its acts and contracts were void; that corporate bodies were annulled or suspended, their officers deprived of office, and pre-existing statutes annulled or suspended? It may be construed to mean that the government was unable, or so inefficient as to be unable, to put down the insurrection. It seems impossible to assume that the act of Congress was intended to invalidate all the actions of the existing State Government. That Congress did not intend to annul the existence of the State authority originating in lawful authority, as it did, is not only proved by the cautious wording of the proclamation, but by the well-known fact that that body, at or about the very time of the issuance of the proclamation of non-intercourse, declared, with extraordinary unanimity, that it did not intend to go further than to support and enforce the laws of the United States in all the states, and that it did not intend to subjugate or conquer such states, or subvert the state governments and state laws

and institutions, but to preserve unimpaired equality of the states and all their rights and dignities. They intended to take such measures as were necessary to enforce the collection of the revenues, transmit the mails, re-establish the courts, and enforce all the laws of the United States over the withdrawing states, leaving the states in the full possession of all their "reserved" rights, and maintaining, in the language of Chase, "indestructible states in an indestructible Union." If the acts of secession were revolutionary and void, and the Constitution of the United States was in full force and operation in Tennessee in the year 1861, upholding and protecting the existence, rights and dignity of the State, and limiting the Government of the United States to its constitutional sphere of action; if the Constitution were the governing law in war as well as peace, as said by the court in *ex parte* Milligan,—then the declaration that the State Government was null and void, and all its acts, within the unquestioned sphere of state action, void, would be as revolutionary as the action of the State. It seems impossible to assume for a moment that the acts and contracts involved in these transactions of the bank are not of that class which are designated by Judge McLean as within the undoubted and exclusive cognizance of and jurisdiction of the states, and over which the United States could have no supervision so long as we assume that there are any recognized and chartered limitations to the power of the central government. It is respectfully maintained that the Government of the United States could not annul the State Government in regard to these transactions without revolutionary excess in its action, and "shooting madly from its sphere." The whole history of the times, the express refusal to charge the State authorities with treasonable confederacy, the objects of the act itself, the enforcement of non-intercourse, all go to show that the intention to annul the State action within its regular and constituted orbit was no part of the policy of Congress, and that the resulting

invalidity of a vast mass of contracts, in violation of the Constitution of the United States, and the arresting of the whole movement made in the interests of organized society, would have produced great mischief, confusion and wrong, without aiding in the object sought to be accomplished, to-wit: the simple enforcement of the laws of the United States.

Now, it is asked with confidence, can the judicial tribunals of the State be required to annul contracts and enforce political forfeitures against unoffending and offending citizens indiscriminately, upon the ground that a proclamation of the chief magistrate of the United States, ordering the enforcement of non-intercourse, recited that the inhabitants of the State were in a state of insurrection? If these contracts were in violation of the proclamation of non-intercourse, undoubtedly they might look into the legality of the transaction and act accordingly. If they were made in support of insurrection, or in violation of any law of the United States or of the State, considerations of public policy would avoid them; but upon what ground are vast numbers of contracts to be annulled upon a recitation in an act of Congress where these contracts in no way contravene the act?

But it may be insisted that the State had inserted these provisions in its Constitution before it was admitted to representation in Congress; that the government was an usurpation, and that no debts contracted by the bank after the 6th day of May, 1861, should be recognized or paid by the State. The Constitution of 1870 abolished the Schedule of 1865, but it provided for the abolition of slavery, as the Constitution of the United States already in force had done. The Constitution of the United States had already, by amendment, declared that debts contracted by the State should not be recognized or paid by the State. The abolition of the Schedule of 1865, declaring the State Government of 1861 an usurpation and all its acts void, and all

debts contracted in the name of the State and notes issued by the bank void, left the provisions of the Constitution of the United States in force, and at the same time it declared that the governmet of 1861 was not an usurpation and void. This was the intention of the Constitution of 1870. There was no compact with the United States that the State of Tennessee should not modify its own statutes in any particular not conflicting with the Constitution of the United States. The laws and constitutional provisions of the State, which the act of Congress admitting the State to representation enumerated as indicating "loyalty," or what should be expressed in the language of the friends of constitutional government as evidence of an intention to support the Constitution of the United States, made no compact. The change thereof indicated no determination to defeat the operation of the Constitution of the United States, and that it was not so regarded is proved by the fact that no action was taken or proposed to be taken to replace the State under military authority and to supersede the Constitution of the State in any particular.

Thus abrogated, the fact of war existing did not authorize the United States to suspend or abrogate the laws and constitutional contracts of the State, much less to abrogate contracts made between banking corporations and individuals, which the United States had no policy to counteract or defeat.

This, then, places the convention in 1870 as giving the grounds to the court in regard to the construction of the act of 1865. That act was passed February 16, 1866. It was an act to close the business of the Bank of Tennessee. It represents the State as sole stockholder; it must be supposed in vindication of its right to order its transactions with its debtors and creditors to be liquidated and closed. It ordered its effects to be transferred to a trustee, and instructed the distribution of them. It did not declare the directory appointed in 1859 a void directory. It did not

declare it had not a right to bind the bank and the State, or to make contracts for and in behalf of the State. It did not annul its contracts in mass after the 6th day of May, 1861, but it instructs the trustee or its assignee in trust not to pay any debts contracted after the 6th day of May, 1861, as "null and void." It is a mere instruction to the assignee, or a communication of the will of the stockholder to the asstgnee in trust as to the distribution of the effects of the bank. It gives no reason for this instruction, except so far as we can derive, the meaning of the act from the Code as "null and void."

This is not even a direct mandate to the court, that it should regard the contracts as void, but a feeble instruction, vague in itself, without any reference to the facts which constitute it void. We may by inference suppose they referred to the constitutional declaration of 1865, that the government of 1861 was an usurped government, and all acts and resolutions under it void, and that it depends on that Constitution for its validity; but the act does not so recite. That feature has no force since its abrogation, except it be used as an exposition of the opinion of that convention, that the government of 1861 was an usurpation. It was the intention of the convention of 1870, it should not be used to inflict wrong and injustice by sweeping off the validity of all the transactions of the Legislature of 1861, and all adjudications, decrees, negotiations, charters of incorporations, and all the multiplied transactions depending directly or indirectly for their validity on the action of the Legislature of the State, although clearly within the reserved, inherent and self-derived powers of the State and of individuals; they did not intend to stamp with the seal of constitutional invalidity all contracts of an organized community, existing during the whole of the present century. The act of 1866, so far, therefore, as it rested for its validity on the abrogated provisions of the Schedule of 1866, must share its fate. The statute has no foundation

to rest on. It can only be regarded as the acts of a legislature acting upon prior legislative transactions and contracts made under them. The act of 1866 can no longer be regarded as law, but as indicating the will of a subsequent Legislature to the trustee as to certain contracts. It is no controlling law governing the judiciary. It cannot be considered proper to construe the act of 16th of February, 1866, except in connection with the abrogation of the Constitution of 1866, and in connection with the legislation subsequent to that period. So far from acting upon the idea that that government was an usurpation, and that all the contracts of that period were void, the action of the Legislature and the practical action of the trustee have been in the opposite direction.

It is a well understood fact that the trustee has been and is now engaged in enforcing the contracts made by that directory, and that the same has been at all times enforced when they operated for the benefit of the bank and the State.

In 1869 (Thompson and Steger, vol. 1, p. 1829) the Legislature directed the dismissal of all suits against the debtors of the institution when the payments were made and the moneys collected by the former officers of the bank, or by the persons lawfully acting as such officers, and having the control of the assets of the bank in the Confederate States, and in Confederate notes, and that such payments, when pleaded, should be valid, and that all suits should be dismissed when brought in the name of the State of Tennessee as sole stockholder in the bank against any president, directors, or cashier of the bank for any loss sustained by the State, by reason of their participation in the late civil war, receiving Confederate treasury notes, and approval of the removal of the assets of the·bank. There has been a full ratification of the acts of the bank as to the collection of its obligations during the term which elapsed between the years 1861 and 1865, and their ratification of payments

to these bank officers acting from 1861 to 1865 by refusing to attempt to enforce the payment against them, on the ground that the payments made to them were illegally made. So they have ratified their course and their title to their offices, by refusing to sustain suits against the officers of the bank for any losses to the State by reason of their participation in the civil war, in the removal of the assets, or in receiving those notes. When this mass of legislation is considered in connection with the abrogation of the Schedule of 1865 by that of 1870, can we come to any other conclusion than that their acts leave the court no other guide than the Constitutions of the United States and of the State of Tennessee as the test of the validity of its instruction to the bank assignee, Watson.

There is no ground for the interdiction of these claims. The constitutional amendment of 1865, and the act of 1866, both specially mention the notes issued since the 6th of May, 1861, but do not mention the claims of depositors in the books of the bank, then in possession of that Legislature, showing the amount of these claims.

This instruction to the bank trustee, not to pay these debts, does not amount to a law. It is true that it is the Legislature acting according to the forms of law, because it could only express its will in the form of a law; but it is the stockholder of the bank making an assignment of its effects formally for the closing of the transactions of the bank, directing a suit for that purpose. It is acting as con-tractor in regard to claims, and expresses its will in regard to matters of contract in which its sovereignty did not operate, and over matters over which it has no more right to control than another stockholder or creditor. It is not a law. It cannot transfer rights or extinguish claims as sovereign over this matter. It can express its will with as much effect as an individual person would do—no more. As a Legislature, the Legislature of 1866 could repeal the charter of 1838, but could not undo transactions done under

the charter. One Legislature can repeal the acts of another Legislature. The act of 1866 could repeal the acts of 1861, but it could not annul the acts of a board of directors lawfully appointed according to the charter of 1838, and lawfully acting in conformity with the statutes existing prior to the 6th day of May, 1861, in receiving deposits and dealing in State stocks. *Fletcher* v. *Peck*, 6 Cranch.

The act of January, 1865, amounted to a direction of submission of the question to the courts, nothing more. As a law it was a nullity, as it violated the obligation of contracts. If the act of February, 1866, is a law, the Legislature of 1866 had the power to defeat all the legislation which occurred during the year 1861, and what is more startling, all the transactions and contracts which arose from that Legislature. The Legislatures which shall assemble hereafter may do the same. How are any of the acts of that body, or of the directory which came into office under it, or of the acts of officers under them (which the Supreme Court have by their decisions validated), how are they to stand against this sweeping power of the Legislature?

But it has been argued that if this power to annul the acts and contracts of that board does not exist, the Legislalature had the power to confiscate these claims as enemies' property under international law or for the treason of the parties under municipal law, and that the act of 1866 confiscates these debts.

The property here proposed to be confiscated was money entrusted to the faith of the State. It is well known that since the organization of this bank in 1838, the practical and legal construction placed upon the covenants in the bank charter was, that money so deposited in the bank was deposited upon the faith of the State, and that the property of the State was pledged as by a mortgage for the repayment of the money. Money so deposited is not subject to confiscation. Wheaton, 367, so lays down the law explicitly as standing upon general principles of public law. So

Chancellor Kent quotes the declaration of Vattel and others stating that the argument of the British Commissioners (Mansfield and others), in the case of the Prussian loan, showing that money deposited in trust was not subject to confiscation, was unanswerable. Vol. 1, 65. These authorities show that the practice in England and France and elsewhere, in case of war, was to exempt property so situated. The case of Brown against the United States, which is cited by adverse counsel, was a proceeding in Admiralty for the confiscation of British property, (a cargo of lumber) seized on American shores during the war of 1812. The cargo was not confiscated in that case, though captured in the midst of a war then pending between the United States and Great Britain. The property was discharged because there was no act of Congress in existence at the time of the capture to authorize proceedings for confiscation. It was declared by Marshall, delivering the opinion of the court, that the declaration of war by Congress did not authorize confiscation. It was declared that there must be an express statute investing the courts with the power to proceed to investigate facts according to the established mode of proceeding. Kent, commenting on this case, says that there was at least one point gained, one advance made, and that was, that private property could not be confiscated without express action by Congress authorizing it; that the right was against universal practice, a naked and impolitic right which ought not to be exercised.

If it was a naked and impolitic right not proper to be exercised in the case of contending parties, foreign in all respects, how much more improper to exercise that right upon those whom the victorious party intend shall remain as fellow citizens. See Vattel. There was no law enacted by the Legislature of Tennessee, either before or after the war, for the confiscation of property in the courts of the State, and prescribing the mode of proceeding against the property as the property of belligerent territorial enemies, or as pub-

lic enemies, and no mode of proceeding established by statute
for the confiscation of property for treason except upon con-
viction of personal guilt.   Admitting that a nation may ex-
ercise both sovereign and belligerent rights, and be capable
of acting in either character, the nature of the law enacted,
and the proceedings prescribed by the act must determine
whether the public authority intends the court should act as
a prize court or as a court enforcing municipal regulations.
*Rose* v. *Himely*, 7 Cranch.

The court is here called upon to confiscate indiscrimi-
nately the estates of hundreds of citizens as territorial ene-
mies to the State, regardless of past political conduct.
There is no law on the statute book authorizing the court to
confiscate property indiscriminately on the ground of the
existence of a territorial war, always regarded as the sever-
est and least tolerable of all belligerent rights.   The act of
February, 1866, was after the termination of the war, and
does not furnish the slightest evidence of an intention to
exercise the hard belligerent rights against a large number
of citizens who had trusted their money to the public faith.
An instruction to a trustee of the State is construed into
practical confiscation of the estates of mere territorial ene-
mies.   Where is the mode of proceeding prescribed for the
trial of issues of the fact always submitted to a jury in such
cases.   *Union Insurance Co.* v. *United States,* 6 Wall., 759 ;
*Armstrong's foundry*, 6 Wall., 775.   The states have no
right to act upon the laws of the United States and enforce
them.

On the 6th day of August, 1861, Congress enacted a law
by which it was provided that property used for the support
of insurrection should be subject to capture and regarded as
a prize, and if such property should be libeled and found on
trial to have besn so used, it was confiscated by decree of
the court.

This authorized the institution of a proceeding *in rem.*
This involved a proceeding instituted—a trial of facts by

jury—being land capture. It involved proof of use or intended use, and of personal delinquency. 11 Wall., 322; 2 Sprague, 150. And though it proceeded against the thing, and did not, according to some decisions, involve an indictment and conviction of treason, it required in fact proof of a treasonable use of the property by consent of the owner.

In July, 1862, Congress enacted a law which established a mode of proceeding for the punishment of treason, and the confiscation of estates, as enemies' property, of a class of persons mostly officers engaged in the Confederate service.

There was a cautious discrimination in the persons selected as the intended victims of this proceeding. As this act was for the punishment of treason, it was declared by the Supreme Court of the State of Kentucky to be unconstitutional and void, on the ground that the property could not be confiscated, except upon the conviction of the persons of treason by indictment, according to the Constitution of the United States. This act, however, was sustained by a decision of the Supreme Court of the United States, there being a dissenting minority. *Miller* v. *United States,* 11 Wall. The chief magistrate of the United States remitted the bill to Congress after its passage, on the ground that it did not provide for the confiscation of life estates only in certain cases, and on the ground that it did not operate exclusively on acts committed after the passage of the act. These amendments were incorporated in the act and it was then signed.

Now, if it be admitted that the act of Congress and the decisions of the court establish the dangerous proposition, that Congress can confiscate property of citizens as public enemies, and without a conviction of treason, and thus deprive the citizen of the benefits of many of the provisions of the Constitution of the United States, yet those acts and decisions establish the constitutional necessity for a statutory law authorizing confiscation of property as enemies' prop-

erty. It establishes the constitutional necessity of a statute charging expressly the treason involved in the transaction upon the law enacted before commission of the offence which exacted the forfeiture. It involves an issue of facts, a trial by jury, and conviction of personal and treasonable guilt, as the ground of confiscation.

Can it be assumed that there was any such proceeding authorized by the Legislature of 1866? Can it be assumed that that Legislature intended to authorize confiscation, upon the basis of proof of guilt of all these depositors of treason.

These acts of Congress did not operate indiscriminately upon all alike. They may have converted technically the war into a territorial war against public enemies. But in its practical results by virtue of qualifications and conditions, it was, in commencement and termination, a war against insurgents personally, and not a war against all, a territorial and international war. The provisions made for the recovery of captured and confiscated property in two years after the termination of the war; the provision for trial and proof of intentional treasonable use of things confiscated; the cautious discrimnation in favor of persons favorable to the government, and the confinement of the operation of the law to a certain class of Confederate citizens, charged with treasonable service; the effects of proclamations of pardon and amnesty made at different times during the war, all, with other laws not necessary here to enumerate, show they never did intend to confiscate the property of those who were favorable to the Government of the United States in that conflict, and that it was not in fact a territorial war, but a war against insurgents, so far as confiscation of property was concerned.

But the subsequent action of Congress went still further and authorized the discharge of nearly the whole body of those who were embraced in the confiscation acts, and proclamations of amnesty and grants of pardon were made from

State, and Watson, Trustee *v.* Bank of Tennessee.

time to time, leaving all the persons embraced by them so far as political offenses were concerned just as if no offense or violation of declared law had been committed. It is most probable that every single person in this list of depositors, who is now sought to be deprived of his just demands, has been discharged by the operation of executive action under the laws of the United States for all violation of law for which his property, if ever liable, was subject to confiscation.

But if the act of 1866 is construed as a confiscating statute, as contended, and applied with indiscriminate vengeance to all alike, without regard to their political opinion or conduct during the war, it cuts off all proof in regard to the most determined support of the government, whether the party resided in the South or in the North, whether the party depositing was an infant incapable of committing crime, whether they were aged widows or decayed old men. It cuts off all issues as to the grant of amnesty or pardon, and shuts the door against the legislation of Congress for the benefit of the people without regard to past conduct, and enforces a blind and arbitrary confiscation, without the slightest excuse, except that the State owes the money and has pledged its faith to pay it. There is nothing in the act of 1866 to show that that Legislature intended to confiscate estates The act does not provide for a system of judicial confiscation. The Legislature has no power to nullify the acts of Congress and proclamations of amnesty intended to give relief, and to confiscate the estates of persons without regard to guilt or innocence, without reference to pardon and amnesty, on the ground of being territorial enemies, and therefore without conviction of personal guilt.

The argument for the State amounts to this. The State incorporate a bank and appoints a directory. The State invites the citizens to deposit their money in it, with a pledge of the public faith to restore it. The State now seeks to confiscate the rights of these depositors, because, as the State

alleges, its own directors were traitors, and appropriated the money of these depositors to unlawful purposes.

But it may be argued that those sums of money were not drawn from the bank by the lawful authorities of the State, and constitute no contract founded on such consideration as can be enforced ; that the money was taken by check of the military and financial board, and appropriated to the support of the insurrectionary war then pending, and that the Constitution of the United States, as amended after the creation of these debts, prohibits the State from paying any debt or obligation incurred in aid of insurrection.

· The bonds on which the money was drawn were placed in the hands of the bank, and are now amongst the effects of the bank, if they are valid the lien of the creditors of the bank instantly attached upon the delivery of the same to the officers of the bank as part of the effects of the bank held and pledged for the satisfaction of the claims of creditors.   Waiving all question as to the validity of the bonds, and assuming that they were invalid, the transaction was, in form and on its face, that of a sole stockholder of a bank depositing his invalid security in the hands of his corporate agent, and receiving from that agent an equivalent amount of corporate effects, upon which effects the creditors had a valid lien for the satisfaction of their debts.   Although the State, as a stockholder in an incorporated institution, made a contract according to the forms of law with its agent, yet this contract, *quasi* contract, was a contract in the making of which these complainants had no agency, direct or indirect, and to which it is not possible to assume that they assented.   It was the deposit of an invalid security by the stockholder, without any participation by the complainants in the motives or action of either the state authorities or directory, or any knowledge on their part of the intended appropriation of the money withdrawn, much less any participation in any alleged and unconstitutional enterprises which were to be upheld by its use.   The corporate body

held the money, which was paid over to the military board, in trust for the benefit of the creditors of the bank. The directory received for their money an invalid security. The parties who deposited these sums in the bank were no parties to this contract. They had no authority or opportunity to accept or reject this negotiation, to accept or reject these bonds, or to object to the appropriation of the funds of the bank which were taken from the bank. If they had any such opportunity it would have been totally unavailable to them. These complainants have a right to the money which was taken under the form of a legal transaction. It was the State, the people who inhabit its territory, who own the estate; it was the organized body politic, acting by and through lawful and constitutionally elected officers, who took this money and deposited their bonds as a security for its repayment. It was the people, the organized body politic, who owe this money to the bank and to the creditors of the bank. It was the same organized body politic that covenanted that the capital stock of this bank should be five million dollars, that its debts to the extent of five millions of dollars should be paid, and that the directory should be faithful to their trust, and to those who dealt with them. These creditors look to this organized body politic to comply with their stipulations made in the charter of 1838. If this was the case of a private stockholder taking their trust funds and depositing in lieu thereof a worthless security, would any one controvert the liability of such a stockholder for the sum withdrawn on bill filed by the stockholder against the creditors and corporation?

The authorities declare that such a transaction would be regarded as a fraud, would be annulled, and the stockholder decreed to account for the amount. Ang. and Am., 598. *Nathan* v. *Whitlock*, 9 P., 159.

The facts then stand that these complainants neither gave their assent to the negotiation of the bonds, nor have they accepted the bonds; nor have they assented to the appro-

State, and Watson, Trustee v. Bank of Tennessee.

priation of the money drawn, and had no notice of these transactions, nor available authority to accept or reject the transaction. They do not assert a claim against the State on any ground of aid furnished to the State in any insurrectionary movement. They assert their claim against the organized body politic, on the ground of a valid and *bona fide* deposit of their money in the hands of the bank, and the guarantee of the State by the charter, that such money so deposited should be repaid on demand, according to the stipulations of the State.

The State of Tennessee comes into court asking the court to adjust the transactions of the bank with the creditors of the bank, and the accounting creditors ask a fulfillment of the guarantees of the State, that the bank should repay them the money deposited. It is no answer to the demands of these complainants that the moneys were obtained from the bank and appropriated to the support of insurrection.

Many of these complainants, no doubt, were opposed to any insurrectionary movement, and probably all of them would have withdrawn their money if they had known at the time of the negotiation that the State or the people would not be liable for their money, according to the stipulations of the charter.

Now it is contended that the provisions of the Constitution of the United States do not apply to the case of these complainants. The State is bound by common honesty, and the principle of contract to pay these debts, unless the Constitution of the United States prohibits the payment. The fair and just construction of the Constitution is that the persons who furnish money to a state for the unlawful and unconstitutional purpose of aiding an insurrection against the United States, shall not be repaid such sum so loaned or advanced, and that such person shall not be permitted to demand the same in the courts, and the Legislature of the State shall not be permitted to pay the same. The Constitution intended to punish the persons who aided in insur-

rection.  It involves proof of an intention by the act to do
the unlawful and prohibited act.  It involved an intent to
discourage and suppress insurrections.  These parties are
not, as before stated, any parties to any such contracts, nor
do they stand in privity with any who were, nor do they
claim any right through any party who did furnish money
to aid insurrection.

This construction of the Constitution makes these deposi-
tors the victims of an indiscriminate forfeiture, regardless
of age, sex, or political conduct.  It deprives them of all
the benefits extended by the laws of the United States, and
the proclamations of the President.  It has been decided
that all persons who lived in the State during the war, who
remained attached to the cause of the United States, were
restored to their rights (if any one had been deprived of
them) without amnesty or pardon, so soon as the war termi-
nated.  Can this provision of the Constitution be construed
o operate in violation of the settled policy of the govern-
ment, as manifested by the action of Congress?  The Con-
stitution thus makes the provision a bill of attainder, with-
out a crime even assumed.

The provision declares that no state shall pay any debt
or obligation incurred in support of insurrection.  Incurred
by whom and to whom?  Incurred by a state to those who
contracted with the State to aid the State in an insurrection-
ary movement, or those who derive their right against the
State by assignment from the persons who did so aid the
State.

It is most difficult to see how the provision of the Con-
stitution can be extended to embrace a case like the present,
so as to inflict political forfeitures of the rights of those who
have never assisted, either directly or indirectly, any insur-
rection, and who do not derive their demands from those
who did assist.  This construction of the Constitution would
be to discharge the debts of the State, merely because it
was the State, and to punish those who were not suspected

of any illegality of conduct, in violation of the settled action of Congress and of the executive.

It is a rule of construction by common law that all provisions which inflict forfeitures or penalties are penal in their character, and shall be strictly construed. Such provisions shall not be construed to embrace cases which are not within the manifest reason and intention and policy of the provision. This rule is applicable to constitutional provisions as well as to statute law. Such provisions embrace the idea of punishment, and cannot be construed to embrace cases where no punishment was deserved or intended to be inflicted. The great principle which underlies that provision is that no person is allowed to come into court and ask the enforcement of contracts made to assist in the commission of crime. It was intended to embrace parties to illegal transactions, and not to forfeit the rights of persons who were not parties to the transaction. Why should this provision be extended to embrace the case of infants, idiots, widows, the aged, whose contracts of deposit are untainted with crime, and whose conduct has been blameless? If the construction of this provision be that it extends to contracts made by persons with the State, with intent to aid the State in insurrectionary war, that provision is harmonious with common law, and has some foundation to rest upon, which will be recognized. If it be construed to extend to contracts with persons who acted with no intention to assist the State in such enterprise, it is an arbitrary fiat, contrary to public justice, and to the settled policy of Congress since the war. There is, therefore, no ground to discharge the State from the obligations incurred by the charter of the bank, and to account for the money withdrawn in 1861 from the bank.

The State having filed this bill for the adjustment of the transactions of the bank, of which it was the owner, and having made the creditors parties, can it be made to account for the sums it has withdrawn or permitted to be withdrawn,

and has failed to supply according to contract?   It is maintained that it can.

The State of Tennessee was the sole proprietor of the Bank of Tennessee, and is designated in the statutes of the State as the sole stockholder in this bank.   See Rev. Stat., 1869, ch. 48, p. 1829.   The property invested for banking purposes is called capital stock.   So the Supreme Court of the United States have designated the State as the sole stockholder, where the bank was incorporated, and the whole belonged to the State.   *Commonwealth of Kentucky* v. *Briscoe, Currin* v. *Arkansas,* 15 Howard.

The case of the *United States Bank* v. *The Planters Bank of Georgia,* was tried before the Supreme Court of the United States in 1824.   The Planters Bank pleaded that the State of Georgia was a stockholder, and was thereby a party and could not be sued.   The court says: Many states take stock in banks.   When a state takes stock in a trading corporation, it lays down its sovereignty, so far as the transactions of that company are concerned, and accepts the terms of the charter, and can exercise no power, and is entitled to no privilege which an individual corporator is not entitled to.   9 Wheat., 909.   It imparts to the corporation none of its attributes as a sovereignty.   So the court says, in *Briscoe* v. *Commonwealth Bank of Kentucky,* whether the State owns the whole or part of the stock in a banking company, it has no more power under the charter than an individual stockholder has.   So in the case of *Darrington* v. *The Bank of Alabama,* the State supplied the capital stock, appointed the directory, appropriated the profits, made its notes receivable in payment of public dues, and guaranteed the payment of the debts of the bank.   The court says, the State holds its property in the bank as an individual would hold his.   The specie in the vaults of the bank, the notes taken on discount, and all its property are subject to judicial process, and on such proceeding the State in its sovereign capacity could no more interfere than an

individual stockholder. Its power would be no greater than the power of an individual under similar circumstances. 13 Howard, 12, 1851. The State stands as an individual in regard to all the transactions of the company, and in all legal proceedings instituted by the State, or by the creditors of the bank. It is the providing of this fund, and the entire surrender of the sovereignty of the State in all the transactions of the company, which relieves the notes from the character of bills of credit, and that character is not at all affected by the fact that the State is absolutely and primarily liable as a stockholder.

These principles are inforced in the great case of *Currin* v. *The State of Arkansas*, when a direct liability was enforced against the State, and it was held liable for its seizure of the effects of the bank in which it was the sole stockholder. So the Supreme Court of Tennessee, in *Dibrell* v. *The Bank of Tennessee*, holds, that when the State enters into an incorporated company as a trader, banker, or public carrier, the State stands as other traders, bankers and carriers, and has the same right, and none others, and are subject to the same liabilities. So, when it enters a company, and appoints its directory, it appoints that directory as a stockholder, or a trader, banker or carrier appoints his directory, and the same relations exist between the State as a stockholder in such company as exists between the individual stockholder and trader, banker and carrier, and the directory they may appoint. The State, as a sovereign state, is not responsible for the paid frauds and wrongs and neglects of its public officers. This is a sovereign prerogative of the State intended to protect the body politic. But when the State enters the precincts of a corporation, it does not impart to or carry into the corporation this prerogative. Its directory stands as the directory of private corporations. The State does not give sovereignty to the corporation. It does not exempt itself from liabilities for the frauds, wrongs and neglects of its directory, for in this transaction it is not

the State as a state, but it is the State as a stockholder, under the laws of a private chartered company, with the same rights of exemption that stockholders in other companies have, and none others.

The reason of this distinction between the State as a state and the State as a stockholder is manifest. It is the interest of the State, when it enters the arena of trade, that it should hold out to its customers the same advantages that other companies hold out. The State limits its liability to the stock subscribed. It is bound on the plainest principle of protection to place itself upon the same advantageous platform with individuals, and hold itself, as stockholder, liable for the wrongs and neglects of its directory to the same extent that individual stockholders are liable in other incorporated companies. This is indeed the very object of putting the State's interests in the hands of a directory. Why did not the State act by its constitutional officers, if it did not intend to place this fund and its subscribed and guaranteed liabilities, and itself as stockholder, out of the pale of sovereignty, and upon the same advantageous platform that other stockholders stood? No person would cheerfully deal with an institution which was not, in regard to its dealings, subject to the laws of the land, and which did not give to the dealer or customer the same rights against the State, as a stockholder, that he had against the stockholder in other institutions; who would deal with an institution which declared that the stockholder would not be liable for the conduct of those whom it holds out to the world as its directory, when other well managed and powerful institutions guaranteed the integrity and fidelity of their directors? It was essential to the success of the bank that the State should not go into it as a sovereign, but that it should go into it as a stockholder, subject to the general laws of the land which govern individuals. When the State of Tennessee declared in the charter that the State should pay in five millions of dollars capital stock, prescribed the mode of

raising it, and that bonds of the State for two and a half millions should be executed and placed in the hands of the directory, in execution of the laws of the charter, will it be contended that the State stands in regard to the capital stock, their bonds deposited, as a sovereign state or as stockholder? When it is asserted that such attributes of sovereignty are imported into the enclosure of this charter, and the State stands there as a sovereign power, you establish a distinction eminently injurious to the institution, and calculated to weaken its sphere of success in competition with other powerful and well managed banking institutions. It is well known that the State Bank was able, and barely able, to sustain itself in the market in competition with the Union and Planters and other banks in the State.

In what consists the difficulty in arriving at the conclusion that it was the intention of the State to render itself liable as a stockholder to the extent of its stock liability, and to suit as individuals are so sued in reference to its chartered and stock transactions? The object was to sustain an institution, the profits of which were to go to the education of all the children of the State, and the promotion of internal carriage and trade. Prior to that period the State had authorized itself to be sued, and subsequent to that time, to-wit: in 1854, it authorized all its creditors to sue. When the depositors placed their money in the bank, they had a right to sue the State for the enforcement of their contracts. They placed their money in the bank under that right. Why, then, repel the idea that the State intended not to claim the sovereign's law, excepting it from suit when it entered as a stockholder into this trading company? The stockholders of the Union and Planters and other banks were liable to suit.

The principle which declares a state not liable as a state in its sovereign character to suit, and which subjects it to suit in its character as stockholder, does not seem to be new or without precedent.

The East India Company having power to govern that country, and to make peace or war, was held not to act in its sovereign character in making a lease to an individual for the exclusive vending of certain articles within the territories of the company. The company have sovereign powers, said the Lord Chancellor, but in the execution of this lease they have acted as a private company. They have, as a private company, executed a private contract. Cooley, citing 1 Brown's Ch. Rep. So, half a century later, in the case of the *Duke of Brunswick* v. *The King of Hanover*, where a bill was filed in the English Chancery Court to call the King to an account of his guardianship in regard to certain transactions in Germany, the court took the distinction between acts done as a King in Germany and acts done as a subject in England. In the one case the court would not take jurisdiction over the King, in the other they would. In the latter capacity he was declared liable to suit by English bill. 2 Phillimore, 414. So, where powers of government were delegated to the city of New York, and the corporate authorities act exclusively with reference to the matter for the benefit of the city, and not the general public, as in the case of the Croton water works, the city authorities were held to stand in relation to them on the same footing as the private owners of houses and lands, and responsible accordingly for injuries to individuals. 3 Hill, 531; 2 Denio. The authorities did not import their sovereignty into this transaction, and their officers were held liable as private individuals, as well as corporate officers. The corporation *quo ad hoc* is a private person. 9 Wheat., 907.

It is the principle upon which courts act, that they will go as far as permitted to put states on the same footing as individuals in the courts. When a state is holder of a bill of exchange, it must be subjected to the same diligence to hold the endorser as individuals; so, as the maker of a protested bill, it must respond as an individual. 15 Pet., 377.

So if a state enters into a compact as a charter party, it incurs the same liabilities as an individual person : Brightly's Dig., 842. So the liability of the United States as a contractor is precisely the same as an individual in the Court of Claims; so in the construction of contracts; so if the United States purchase land in a state, it holds it as a private person, and cannot claim sovereign exemptions: Brightly's Dig., 841 ; Wall. C. Ct., vol. 3. So the United States, as the owners of property, have the same rights and privileges and are subject to the same liabilities as individual persons: Black Prize Cases, 20. Statute of limitations runs against government as stockholder: 2 Brock, 393. The prerogatives of the United States do not attach to the United States as stockholder; it only attaches when it appears as a sovereign.

In 1851 the Supreme Court of the United States said, in regard to a prosecution instituted by the State of Pennsylvania to abate the Wheeling bridge as a nuisance, that when a state became a member of a trading or other corporation, its sovereignty was not involved in the business, but it stands and is treated as other stockholders are treated. So, in the present case, the rights asserted and the relief prayed are in no respect different from those accorded to an individual. So Daniel, Judge, said : "Here we have the State occupying the position of every private suitor, asking the action of the court over the subject of nuisances." 13 How., 664. Where a state comes into court asking a decree against one of its citizens, it has the privileges and rights of a private citizen, and as a general rule none others. When it comes into court its sovereignty is not involved in the business whether it be as plaintiff or defendant. It is bound by the same legal restrictions and liability, and has the same rights and none others. If it had been believed that the school fund was not liable legally as capital stock in the bank, but was a mere deposit having a preferred claim on the bank for payment; that the State

as a stockholder was not liable as other stockholders; that the State came into this corporation not as an individual, but as a sovereign, controlled by no law but its own will, could any one predicate a successful career for such a baseless, hollow and sham contrivance? If it had been supposed that the State could at its pleasure withdraw the two and a half millions it had directed to be placed in the bank as capital stock, and would not be bound to supply its place to the creditors; if it were supposed that the State or its trustee could withdraw what it had invested as state and as capital stock,—would not the whole scheme have fallen dead-born as proposing a grand swindle? The State contemplated in 1838 no such swindle. The State intended to come into this charter as a stockholder and not as a sovereign state. It intended to pledge all funds, whether trust funds or other funds, to the creditors as other capital stock of banks was pledged. The charter was created for the express purpose of placing the capital stock and the State as sovereign and trustee on the same footing as in other chartered institutions. The State of Tennessee subscribed $5,000,000 in this incorporated company just as completely as if it had issued its bonds for that entire amount. A court of equity will consider that as done which the persons have agreed to do. The State of Tennessee declared that the whole of the school fund, stocks, bonds and money, should be a part of the capital stock. The State got into the corporation as a stockholder in order to avoid the provision in regard to the issuance of bills of credit. Having securely seated herself as a stockholder of the corporation, and being besieged, comes into court as a stockholder, sues the creditors as a stockholder, claims rights as a stockholder, and the residue as a stockholder, yet, with the face of a fraudulent monarch of the middle ages, she seeks to shield herself from responsibility for unpaid subscriptions and moneys withdrawn, on the plea of sovereignty. Sovereignty attaches when it appears as a state; it does not attach when

the State appears as a stockholder. The State placed itself in the character of a banker and stockholder in this charter. The State stood as a stockholder when these debts were contracted, and this liability it cannot now arbitrarily change by subversion of the rights of its creditors.

A sovereign power may prescribe the extent of its own legal responsibility not trenching upon vested rights. It may declare itself exempt from security and exempt from execution, as it has done. It may make claims against it enforceable in its own courts to any extent, if it desires to do so, and believes it necessary to support public justice, maintain public confidence, and support the public interest. It may mortgage the public lands, as Kentucky, Tennessee and many other states have done, and make them subject to judicial process at the instance of public creditors or certain classes of creditors. It may hypothecate the public revenues or any particular branch of the revenue, as has been the practice of Great Britain and the continental states from the earliest times. It may make a contract to receive notes of a bank in payment of debts due the State, and taxes, as Indiana, Kentucky, Tennessee and perhaps half the states have done in the progress of their existence. It may give the noteholders of a bank the right to appropriate the public revenues to the extent of their legal demands. If the State Legislature should deem it expedient to hpothecate the revenues to the amount of six millions of dollars. for the benefit of the noteholders of this bank, can it be deemed strange that the State should file a bill and subject itself to a general account as stockholder to the extent of its subscription, when the only remedy would be a declaratory decree ending in an application to the Legislature to discharge the decree?

The State comes into this court as a stockholder after having ordered an assignment of the effects of the bank, asking an adjustment of all questions of law and fact involved in the transactions of the bank, demanding the pay-

ment of one million and a half of capital stock as a preferred claim, and the residue.  Can it, either in its own name or in the name of its trustee, stand in this .court and ask an adjudication of the rights of all, and yet withdraw itself from the obligations of those rules of law and evidence which govern in the courts the rights of men?  Can it give the court jurisdiction and order it to proceed, and yet, on the ground of exemption, exclude all evidence of unpaid subscriptions, all evidence of the liability of the State in account as stockholder, and all judgments as against the State as stockholder?

I maintain that the filing of this bill in the name of the State and of the trustee of the State for the benefit of all, is a submission to the jurisdiction of the court, and authorizes a judgment over against the State if the facts establish a liability.

The State of Tennessee, as a stockholder, declared that the bank should no longer do business, that its effects should be assigned to a trustee for liquidation, that the sum of one million five hundred thousand dollars should, as a preferred claim, be paid over to the Treasurer of the State, the debts and demands against the bank made. and credited prior to the 6th day of May, 1861, should be paid *pro rata*, all after that should not be paid; that the Attorney General of the State, if it become necessary in the judgment of the Governor, should file a bill in the Chancery Court to execute the deed of trust, and without security to enjoin all creditors from suing said bank, and making all creditors, so far as known, parties, and so far as unknown, parties by publication, to the end that all interested therein may come in under one decree, and that equal justice be done to all. Rev. Stat. 1829, sec. 7.

The deed of trust was executed in conformity with the statute.  It provides for the sale and conversion of the effects of the bank into cash, excepting the lands of the State, which shall not be sold until after the school fund is

satisfied, or until after the court shall have decided that the school fund cannot be paid out of the effects of the bank. It also provides that the residue, after the payment of creditors of every description, shall be paid over to the State.

When we look to the whole of the acts of the Assembly on the subject connected with the provisions of the deed of trust made at the time, under the supervision of the high officials of the State directly connected with the disposition of this fund, it would seem that there could not be a reasonable doubt but that the general legal intent, fairly deducible from these proceedings, was to subject the whole subject to a judicial determination, and to submit the matter of the rights of the creditors, and those claiming to be creditors, as well as the rights of the State, to be governed by those principles of justice which control in the adjustment of the litigated transactions of individuals. The great body of intelligent members of the Legislature of 1866 must, as a matter of perfect certainty, have known that a legislative declaration that certain debts were to be paid and others excluded from payment out of the effects of the bank, would be brought to the test of judicial scrutiny, and that these declarations as to the validity of these debts gave the Governor and Attorney General specific instructions what position they should assume before the judiciary, but that such legislative disposition of the rights of the citizens could not bind the judiciary, further than the laws would sustain them in their position. As a matter of fact and of individual intention, members no doubt existed who wished to annul the claims of depositors and other creditors of the bank, but the great body of well-meaning men who assisted in the enactment of this law knew that the questions were judicial questions, which of necessity, without gross tyranny, were to be decided in the last resort by the great department so well qualified to determine the judicial rights of men in controversy with each other or with the government, and that the whole matter was intended to be a sub-

mission to the judiciary of the rights of all, with an asser-
tion of specific right on behalf of the State.   The great
body of enlightened men in the Legislature must have
known that the Supreme Court would decide whether the
State of Tennessee had a right to invest the school fund in
the State Bank in 1838, and whether a legislature sitting in
1865–66 could set aside the action of all preceding legisla-
tures, and declare the school fund no part of the stock of
the bank, and an illegal if not a fraudulent investment, and
reclaim it against the creditors.   They well knew that they
had no right to settle and finally determine that certain
claims should be excluded and others allowed, without giv-
ing those creditors a judicial hearing.   They knew it was
impossible to determine the amount of the residue without
a judicial hearing of various issues of fact and of law in-
volving the whole circle of state liabilities as stockholder
from the commencement to the termination of the bank.
They knew that they could not declare the bank insolvent,
seize the remnant of its effects as the property of the State
as stockholder or trustee, and smother the whole affair in
fraud and violence, and thus close all judicial rights.   Al-
though the filing of the bill is submitted to the judgment
of the Executive, it is impossible to assume, in the very
nature of things, that the mere assertion of a stockholder
in a bank could or would determine and conclude the rights
of all the creditors interested in the bank.   Can this court
assume that the numbers of able and experienced lawyers
in that body would not know that the creditors of this
bank, which was subject to suit and had capacity to sue,
would not have instituted a proceeding against the bank,
have had a receiver appointed and secured all its effects to
be administered in chancery, notwithstanding any high-
handed and arbitrary measures that might have been at-
tempted by the Legislature?   As a practical fact, it is well
known that all the claims of creditors now asserted were
then upheld as matters which must ultimately be brought

to judicial test, and that a large body of creditors would not surrender upon the *brutum fulmen* of a legislature without a judicial investigation. The bill so states. It cannot, therefore, strike any one with surprise that the Legislature of 1866 should direct a general creditors' bill for an account to be filed at Nashville, in which suit all the creditors are required to be brought in, that justice might be done to all. It cannot excite surprise that, as stockholder in this bank, it should assert its rights, or supposed rights, in its own name, and direct what course the Governor and Attorney General should assert on behalf of the State.

Although it may be supposed that many members of the Legislature of 1865 may have believed that they had the right to think and declare that citizens of the State who had deposited their money to the extent of nearly a million of dollars in the Bank of Tennessee, had no claim upon the State or upon the bank for their money so deposited, and many others may have believed that this legislative declaration would put an end to the claims forever, and close up all judicial controversy on the subject, and that a bill was not necessary, yet the general legal intent stands. The existence of the outstanding claims, the statement of the assertion of these claims, the acknowledgment of *bona fide* unadjudged legal controversies by the bill, of the necessity of settlement of them by the judiciary, attest the legal intent of that Legislature to submit to the jurisdiction of the court the rights of all parties, the State included. Can this court, then, assume that when the State directed a creditor's bill to be filed and the Governor and Attorney General to assert claims as creditor and for the residue as the stockholder, that these creditors would not have the right, according to the established course of chancery, to file a cross-bill to hold the State liable for unpaid subscriptions, and for money withdrawn at different times?

I therefore contend that the framers of the act of 1866 intended, as the necessary consequence of the filing of the

bill in this case, that all the matters involving the rights of the State, as well as the rights of the creditors, should be submitted to the judiciary. The fact that the Legislature intended to submit all matters fairly within the scope of a creditor's bill, is confirmed by the fact that the Governor and Attorney General instituted this suit in the name of the State, and made the State a party complainant as stockholder and creditor of the bank, and in order to give the State the benefit of that direct control that would occur from being a party of record in the case, as is the general statutory arrangement in both civil and criminal cases. See legislative resolutions of enquiry, Acts of 1873, p. 212. The provision of the act of 1865–66 commanding him to file this bill, if in his judgment deemed necessary to do justice to all the parties interested in the bank effects, does not direct in express language that the suit should be brought in the name of the State, nor in whose name it should be brought. But, by filing the bill, he affirmed the necessity of the suit as a matter of justice to the creditors; and by filing it in the name of the State, he affirms the necessity and justice and propriety of bringing the State, as a stockholder and creditor and as a party of record, face to face in litigation with all persons claiming and asserting rights in hostility to the rights asserted by the State as creditor and stockholder. The assignment does not put the State out of the transaction, although it may have vested in the trustee the legal interest, or in other words, the power to administer the effects, yet the legal status of the State is not changed in equity. It is the beneficiary. It is a still contesting claimant as creditor and stockholder entitled to the residue, and if there be no residue, entitled to claim a right to be a party of record, in order to make the effects go as far as they could, by protecting it against fraudulent claims and demonstrating the ultimate irresponsibility of the State. Even if the Governor and Attorney General were not bound to institute the suit

in the name of the State, he was authorized to do so. It cannot be contended that it was unlawful for him to institute a creditor's bill against a corporation by the stockholder and creditor against the other creditors, whose claim, if asserted successfully by the stockholder and creditor, would absorb all the effects of the bank. The policy of this bill was proper, lawful and just to the creditors. It was lawful and proper for the creditors and the State that it should be filed in the name of the State, and the mandate to the Governor to file this bill is a mandate to file it in the name of the State, and, upon just principles of legal construction, he was bound to file it in the name of the State, and to make the State a party of record. In the case of *Madraso* v. *The Governor of Georgia,* 7 Pet., 110, it was decided that when the chief magistrate of a state is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely in his official character, the State must be considered the party on the record. That was where the State was a defendant. The practice, says the court, when the State is plaintiff, has been frequently adopted of suing in the name of the Governor on behalf of the State, and was the form generally used and always recognized as the suit of the State. So in 1860, in 24 How., 98, there was a motion made on behalf of the State of Kentucky, by the direction of the Governor for a writ on the Governor of the State of Ohio to show cause why a mandamus should not issue, commanding him to deliver up a fugitive from justice, to be remanded to the State of Kentucky.

The court says that when a state is a party, plaintiff or defendant, the Governor represents the State, and may be in form a suit by him as Governor of the State in behalf of the State when the State is plaintiff, and the Governor must be notified or summoned when the State is defendant.

This suit was, therefore, a suit by Kentucky against

Ohio, and the Circuit Court of the United States had no jurisdiction.

A mandatory statute addressed to the Governor of the State to institute a suit, when the State was a stockholder and creditor, is by necessary construction of law a mandate to bring the suit in the name of the State, and so the Governor and Attorney General instituted it.  The State had a large stake in this banking corporation, and it was intended by this mandate or order to protect its interest against mismanagement, waste or loss, and to give the creditors all the benefits this law allowed them to assert their claims against the State, and as a contesting claimant should be a party of record.

The facts, then, seem to be, that in 1865–66 the Legislature of the State directed the Governor of the State to file a creditor's bill in the name of the State against the Bank of Tennessee and its creditors, in order that justice might be done to all; that the Governor did file the bill in the name of the State, thus judicially construing the mandatory statute to him; that this suit in the name of the State has been so prosecuted for a series of years, and several successive governors have had charge of the suit, and cross bills have been filed, with a view more effectually to present to the court the matter of fact involved, and to hold the State responsible for unpaid subscription and for moneys withdrawn from the bank, and no Legislature has as yet taken any backward step.  The proposition is made, after a lapse of six years or more, that the name of the State as a party of record shall be withdrawn.

It is now contended on behalf of those depositors who have placed in the hands of these bank directors their money, amounting to nearly a million of dollars, that the Legislature directed the Governor to file this bill in the name of Tennessee, and the Governor having acted upon it, for the benefit of the creditors, and all the creditors being now fully and fairly before the court, according to

the mandatory provision of this statute, the present Governor and Attorney General have no authority vested in them by law to revoke and annul the action of their predecessors, and annul the action of the Legislature, and undo what has been done, and take the State as a party of record out of the hands of the court, where the Legislature and his predecessor had placed it. All the power of the Governor over the subject has been exhausted, and was exhausted by the filing of this bill. The action of the Legislature of 1865–66 did not vest the various successive governors with plenary power to act over the whole subject, and to legislate on the subject in withdrawing or prosecuting the suit as in their discretion might seem fit. It recognized the rights of all creditors who are now present. The Governor has no undefined prerogatives, no inherent power. He is the creature of law, which defines the exact extent of his duties. *Chisholm* v. *The State of Georgia*, 1 Curtis. The duty of the Governor is defined in this transaction. He was instructed to file this bill if necessary to do justice to all the creditors of the bank, and the Governor does file it in the name of the State. Where does the Governor get the power to withdraw this prosecution? He is directed to prosecute the suit—not to withdraw it. He is directed to prosecute the suit and to do justice to all the creditors—not to prevent the creditors from getting justice by withdrawing the name of the State. When the Governor, for the time being, placed this matter in the hands of the court, he lost all power over the subject-matter, except to see that the suit was prosecuted according to the laws of the land. His power is exhausted.

When the Legislature shall decide that the State shall withdraw as a party, then the question will arise whether the State can be placed in the dishonorable attitude of evading the responsibility which a previous Legislature and Governor have directed to be incurred for the benefit of all creditors, and whether the rights of the creditors did not

pass into the sacred keeping of the judiciary when they filed their cross-bill against the State. So far from the State having instructed the Governor to withdraw the name of the State, with a view to defeat all judicial remedy against the State, they have acted in affirmation of the prosecution of the suit, by directing an appeal to the Supreme Court of the United States in the event of a decision of the court sustaining the validity of the issus made after the 6th of May, 1861.

The Legislatures which have been in existence since 1865–66, all, as a matter of law, knew of the institution of this suit in the name of the State. The acts of the Chancery Court, and the numerous reports of the trustees to the State, all informed the Legislature from time to time of the prosecution of the suit in the name of the State. They have not assumed to put the State in the dishonorable attitude of getting clear of responsibility, and defeating public justice by directing the dismission of the State as a party.

But they have submitted to the jurisdiction, brought these creditors in by general bill who have already asserted their rights against the State by cross-bill, and had these rights vindicated upon general demurrer before the proposition was made to withdraw the prosecution in the name of the State.

Can the State be held as a stockholder to the extent of its stock liability, by virtue of its invoking the exercise of the jurisdiction of this court to bring in all the creditors that they may assert their demands against this bank and this stockholder?

This is a bill for an account by one alleged creditor against other creditors. It is what is called a creditor's bill. All the creditors, though brought in at the instance of the stockholder and alleged creditor, are actors or complainants. They bring forward claims. They all seek a decree. They do not pray to be dismissed with their costs. They seek a decree and pray for a substantial decree

30—VOL. 5.

.against the bank and against the stockholder. They file their claims for adjudication on the prayer of the State as a complainant that they come in, be made parties, substantiate their demands, in order that justice be done them. The Legislature has expressed its purpose that justice should be done to all those it considered valid claimants. The mode of filing claims or demands under the English chancery practice, is by filing what is called statement and charge. This was verified by the affidavit of the claimant when he filed his demand. The forms of these statements and charges are exhibited in the Appendix to Bennet's Chancery Practice. These statements show as much accuracy in detail, as a bill or declaration without the redundant language. This statement and charge is required to be regularly proven on a reference, as charges or allegations in a bill or declaration, or plea is required to be established. This practice from mere looseness or negligence has not been in use in this State so far as I know. But I do not know that it has been, as a rule of chancery practice, abrogated by any statute or rule in chancery. I refer to it to show that creditors who filed their claims under and in response to a bill for an account, were at all times recognized as claimants, having rights to resist all other claimants. They are entitled to have orders in the cause against the plaintiff and defendants. They are entitled to writs of *ne exeat* against co-defendants. They have the right, if the original claimant does not prosecute the suit with due and legal diligence, to have him removed, and have themselves put in his place, and take charge of the prosecution of a bill filed for the benefit of all.

If the State chooses from a desire to postpone its liability to these depositors, to cease to prosecute this suit, then these creditors would have the right, according to the established chancery proceedings, to have the State removed, and these creditors take the place of the State and prosecute the suits against the stockholder.

Judge Story says in all bills for an account both parties are

·deemed actors.  It is upon this ground that defendants are entitled, in this class of cases, to orders in the cause to which, generally, plaintiffs are alone entitled.  So the general rule is, that no person but a complainant can entitle himself to a decree, but in a bill for an account, if a balance is found in favor of the defendant, he is entitled to a decree against the complainant for that balance.  So the suit may be revived against the representatives of the plaintiff.  The good sense of this doctrine is, that when the defendant may derive a benefit from a further prosecution of the proceedings, whether before or after a decree, he is entitled to revive the suit against the complainant.  Story Eq. Jur., 522, citing 10 Vesey, 406; 12 Vesey, 311; 1 P. Williams, 263; 2 Cain, 39.  This is established by the practice which originally required the complainant in a bill for an account to state that if there was a balance found against him, he was willing and undertook to pay over such balance to those entitled to it.  See Maddux Ch. Pr.; Daniels Ch. Pr., vol. 1, p. 389.  In the case of the *Columbian Government* v. *Rothschild,* 1 Sim, 104, it was argued that the Columbian Government must state in its bill that it undertook to pay and discharge any balance found against it.  But the Chancellor stated that it was now no longer necessary to make such an allegation.  It was a matter of law to make such decree, without the allegation.  This is upon the principle that those who seek the administration of equity for their benefit, must do equity to those whom they bring into the courts of equity.  A suit instituted in the name of the State for the benefit of all the creditors, and those creditors having asserted by statement and charge, or by petition, or by filing cross-bills, their claims against the State as stockholder, it cannot be dismissed as to the State, without the consent of all those who have an interest in the further prosecution of the proceedings against the State, whether before or after the decree.  22 Pick., 486; 2 Hill, ch. 375.  The State, by filing the bill for an account that

justice may be done to all, undertook to pay to those creditors any balance which may be found against it, and has, by submission to the jurisdiction of the Chancery Court, agreed that it shall apply those principles of equity which prevail in chancery, and render a decree against the State for the balance found due to those depositors.

The principles of chancery law have been incorporated by statute in the common law system of the State in the cases of set-off, where the defendant was required by the common law forms to set forth the nature and character of his demand against the plaintiff with as much accuracy as if he had instituted a suit and filed a declaration. In the case of *Riley* v. *Carter*, 3 Hum., the Supreme Court of Tennessee say that the plaintiff had no right to dismiss his suit against the defendant at any time after the defendant had pleaded a set-off, claiming an excess over against the plaintiff, and asking for judgment over for the excess; that from and after the filing of his plea and claim, the power of the plaintiff to withdraw his suit ceased to exist as a right; that the defendant had become plaintiff, and the original plaintiff had no more right to dismiss the defendant's suit than the original defendant had to dismiss the plaintiff's suit.

The statute, and the construction thereof by the Supreme Court, gave defendants having counter claims against the plaintiff the right to take judgment over for the balance due, as the law had existed in chancery in bills for an account.

This chancery and statute law is founded on the salutary public policy of preventing a multiplicity of lawsuits, and of settling in all cases all matters in controversy, as far as practicable, in one suit, and with as little delay and costs as possible.

It has been argued that the filing a cross-bill in this case was wholly unnecessary, and that the cross-bill ought to be dismissed.

By the statute laws of Tennessee the answer becomes

practically a cross-bill by the addition of a prayer for specific relief, defensive or affirmative. The object was to hold the State liable by proper allegations, and present a specific prayer for relief. The object was to place on the record the relief sought by these complainants. The great question for the court to decide is whether, upon the facts set forth in the answer and cross-bill, the State, as a stockholder, can be held to account for monies withdrawn from this bank, upon the creditor's bill, which it has filed. The mode of accomplishing this is by stating the facts, whether by answer without prayer, or by answer with prayer, is a question of practice and of costs of minor importance, which all parties ought to rejoice to get clear of in a case which ought to be settled upon general principles of jurisprudence. As it has been made by the demurrer, something may be said about it. The necessity for filing the answer as a cross-bill in this case was created by the character of the bill filed by the State. The bill did not make all the allegations necessary to make the issues required to settle the controversy on a general account. It prayed that all creditors be made parties, and all who claimed to be creditors, but did not charge who they were, nor take necessary steps to make them parties. After the lapse of a year, it became necessary for the creditors to act, to bring up all the questions involved and all parties necessary to ascertain and declare what residue, if any, was due the State.

The first cross-bill was filed in 1868. It claimed an account of the "remnant" of the school fund, and asked for a decree declaring the invalidity of the deed of trust, so far as it undertook to claim the effects of the bank for the State and school fund. The second cross-bill was filed in 1870. It was necessary as a defensive measure, and for affirmative relief against the State. It was necessary to make new parties. The delay by the State, as the acting and moving party, for benefit of all the creditors, would have justified the action of the court in placing the prosecution of the suit

in the hands of the creditors, as it might become the interest of the State to withdraw its name from the further prosecution of the suit, and delay the same as much as possible for the purpose of evading the responsibility for the payment of its just debts. It was also necessary, as it was apparent that the State would consume the last dollar of the effects of the bank as fast as they could be reduced to possession. The holders of notes issued after the 6th day of May, 1861, had not been made parties, yet they were offering such notes in defense to actions brought against them by the trustee of the bank, thus attempting to consume and appropriate the effects of the bank to the exclusion of other creditors. They were also, it seems, about to proceed to enforce by madamus, against the State, the acceptance of such notes by public collectors, in payment of public dues.

The court granted an injunction against the further prosecution of cross actions against the effects of the bank.

These holders of notes were made parties, came in and answered the bill and cross-bill. The State had prayed that they be made parties, but had taken no steps to make them parties. The State could have made them parties by amendment. The court had the power to make these noteholders parties to facilitate the adjustment, at any stage of the proceeding, when it was discovered that no final decree could be made without them; so are the authorities. Why should the State now be permitted to object to the making, by cross-bill, new parties, when the State has asked in its bill that they be made parties, when they appeared and answered the cross-bill and original bill which was in furtherance of the general objects of the bill, and when no decree could be made without the presence of these parties?

These parties, co-defendants, seeking to consume the whole fund to their exclusion by action in a court of law, the court, on its own motion, had the right to order it to be done to prevent endless delay and the consumption of the whole fund in the costs of litigation and of administration.

The Supreme Court of Illinois hold as a settled question in that State that new parties may be made by cross-bill. 14 Illionois, *Jones* v. *Smith;* 32 Illionois, 49, *Brown* v. *Case & Hurd.*

The complainant had no interest in making a purchaser a party, the defendant had; and the court said it was most proper that he should be made a party, and that the appropriate mode was to make him a party by cross-bill.

It was necessary to file a cross-bill to charge the State with the sum of $1,500,000, its unpaid subscription, and with monies from time to time withdrawn. This, the first cross-bill, did not do, nor did the original bill by the State make any allegations in regard thereto which could directly or indirectly put the same in issue so as to bring the said charge definitely and at the earliest time before the Supreme Court of the State for adjudication. It was not the interest of the State to bring forward this question and state the facts necessary to put it in issue. These creditors who had deposited their money in this bank were bound to wait till another generation had succeeded the present for the Supreme Court to decide one question at a time, the rights of one set of creditors to be decided at one time, and the year succeeding another class, and so on from year to year; or had they the right where the prosecuting creditor was delaying till the whole fund was consumed, to institute measures to bring all the parties before the court and compel an adjudication promptly of all questions, and balance all claims?

The State failing in its duty, the creditors had a right to charge in appropriate language this unsatisfied balance, and make up the issue therefor for immediate decision. This is one of those cases where, even if it could be brought up in the taking of the account, the right of the defendants to move in the matter would arise out of and be justified by the interested delay of the complainants. Whether the accounting for this sum be considered as purely defensive, or

whether it be regarded as affirmative matter for relief, it is proper matter for a cross-bill. The first cross-bill not making the allegations necessary to put it in issue, it was proper that these depositors should do it.

The Supreme Court of Illinois say, in the case of *Brown* v. *Case & Hurd,* that it is rare that the plaintiff will set forth in his bill the matter proper for a cross-bill. It must therefore come from the defendant. In that case the cross-bill prayed for the enforcement of a right to redeem as against a purchaser at a trust sale, and a conveyance from the purchaser *pendante lite* of the title to the defendant.

. The court say the subject matter of the cross-bill " is germane to that of the original bill. It is in relation to the same matter stating that the defendant to the original bill is entitled to affirmative relief, to-wit: to redeem, and to have the mortgage deed conveyed to him. He is entitled to affirmative relief, and he can obtain it by cross-bill. It is true facts justifying affirmative relief may not be set forth in the original bill, but the facts must almost invariably be stated in a cross-bill. The only limitation is that the subject matter must grow out of and be connected with the subject matter of the original bill."

A more appropriate case for a cross-bill could not well be imagined. The attempt by the cross-bill to make the State account for the sum of $1,500,000 of unpaid subscription, whether regarded as matter purely defensive, or as the basis of affirmative relief, is proper matter to be brought forward and alleged and called up for adjudication. It was part of the obligations of the bank charter, incurred by the State, who was seeking relief as a creditor and stockholder entitled to the residue. It grew out of the subject matter in litigation, was connected with the adjustment sought by the original bill, and presents the issue as to whether the rights of the creditors could be settled and the residue entertained without ascertaining the liability of the State.

It is true the State charges in the bill that the bank is in-

solvent, but the fact of its insolvency cannot be sustained without ascertaining the liability of the State for the unpaid subscription and monies withdrawn.

It is, therefore, a matter proper to be alleged, so as to bring the matter up before the Supreme Court for prompt adjudication and adjustment. It had not been brought in by original or cross-bill. So the original and cross-bill of 1868 did not set forth and declare the invalidity of the eight per cent. bonds, issued under the act of 1861. The first cross-bill did not seek to attach them or require the disposition of them, nor to charge the State with the proceeds of those bonds as money passing to the State, if they were declared worthless securities. The solvency or insolvency of the bank may turn upon the questions involved in this matter. If the State did not choose to make this issue in precise and accurate language, so as to bring up this matter for prompt adjudication, if it chooses to attempt to repeal the laws authorizing suit against the State, and to shirk responsibility by withdrawing from a suit instituted for the benefit of all the creditors, why may not these creditors by this cross-bill seek to test the solvency of the bank and liability of the State? Events had occurred, and legislation had been enacted, since the filing of the original bill and the first cross-bill. The Supreme Court of the United States had decided that the State was bound to receive the notes of the Bank of Tennessee in payment of its taxes. The State had taken up a large sum in payment of taxes, now said to be between two and a half and three millions of dollars. The State had enacted a law declaring that the taking up of these notes was the payment of a debt of the bank, and that the State was subrogated to the rights of the stockholders, as prior in right to all other creditors. This matter was brought up properly in the second cross-bill, in order that it might be the subject of early adjudication and adjustment before the whole fund was consumed in its administration.

All these matters show the necessity of the cross-bill in in this case. To recapitulate, it was necessary, because there were other classes of creditors whom the State did not or would not make parties, though they are absolutely necessary to be made parties before the suit could be brought to a close; because the prosecuting creditor was so dilatory in the prosecution of the suit, that the whole fund was likely to be consumed in its administration, and leave nothing for distribution, the State having already paid out about $700,000 more of the effects of the bank in discharge of interest on its public debt; because, in consequence of the deficiency in the allegations of the original bill, the whole of the transactions of the bank with the State necessary to be decided could not properly be decided without a cross-bill of a more complete character than the first.

Although, as before stated, a creditor made a party, or called upon by one assuming to be a creditor by bill, filed for the benefit of all other creditors, be required to file his statement and charge, although he is a complainant, and entitled to take orders in the cause as against the original complainants or co-defendants, yet the claims of the complainants in the case may make, and did in this case make, an answer necessary, and the allegations omitted to be stated, rendered a cross-bill necessary to bring the matter promptly to trial. The Code of Tennessee declares that an answer may be filed as a cross-bill. An answer prays nothing as to relief. Daniel, vol. 1. A cross-bill asserts a claim and asks relief. Before the enactment of this provision in the Code, the Supreme Court had declared that where the bill was wholly defective in its allegations, so as not to authorize a decree against the defendant, yet, if the answer stated a complete case for relief, the court would decree for the complainant on the answer. *Rose* v. *Wynatt,* 7 Yerg. So they also declared that if a bill was insufficient in its statements, and the proof insufficient, yet they would decree for the plaintiff on the allegations of the cross-bill.

State, and Watson, Trustee *v.* Bank of Tennessee.

These cases go to show that the court has gone far to break down the distinctions between answers and cross-bills, and no doubt this gave rise to the enactment which declared that the party might file his answer as a cross-bill. The law requires that the substantial facts necessary to the adju-dication of the case should appear, to show on record on which the court placed its decree. This bill was filed on application to the Chancellor for leave to do so, and leave was asked to amend, and the amendment filed and injunction granted on the amendment. These are executed judicial proceedings, and the facts, whether stated in one way or another, whether called a statement and charge, a cross-bill, or answer, or petition, is wholly immaterial. The material facts, according to the truth, are already on the record, and the attempt to get the State out of the difficulty by dismissing the cross-bill is a hair-splitting operation, which cannot have much favor as a means of defeating public justice. If the party had a right to reply by allegation in an answer to a creditor's bill, as Daniel says he may, and may file his answer as a cross-bill, with nothing added except a prayer for affirmative or defensive relief, as the facts may justify, what principle of reason or justice is to be gained by saying that the cross-bill ought to be dismissed, because the defendants could get all the relief they asked against the bank and against the State by the answer, or statement and charge. It could not rise above the dignity of the question of practice and of costs, in which justice was in no way concerned in the case. The party has alleged the facts, and the plea of misnomer of a judicial proceeding is the smallest of judicial technicalities.

The statute says the answer may be filed as a cross-bill. What is the object of a cross-bill, what is a cross-bill?

Daniel and Story state that a cross-bill is a proceeding or suit instituted by the defendant against the plaintiff in the suit, or against a co-defendant, or against both plaintiff and co-defendants, to procure a more complete determination of

the matter in controversy. It is an auxiliary proceeding. Daniel, vol. 3, 1746; Story's Eq. Pl.

The most general use and application of the cross-bill in earlier periods of judicial history was for the purpose of obtaining a discovery from the plaintiffs or co-defendant in regard to matter involved in the pending suit, a mere mode of procuring testimony in the cause as a defensive measure.

But it may be used as a means of obtaining affirmative relief, as when a bill is filed to enforce a specific performance to convey estate, the defendant may file his cross-bill to rescind the contract, and compel a surrender of the contract or deed. See Story's Eq. Pl., 391. Or when a bill was filed to foreclose a mortgage, a cross-bill to enforce a redemption was held proper.

So a cross-bill lies to enforce an equitable set-off in regard to transactions not considered in the bill. Daniel, 1344; 4 Met., 104.

So a defendant may file a cross-bill against other defendants to bring up more fully before the court litigated points, or to bring up matters accruing after the filing of the bill, or cross-bill, and when opposing interest of defendants are concerned, the court will itself direct a cross-bill, to bring up all parties and all questions. 7 Johnson, ch. 252; 4 Met., 104. So Story says, a cross-bill is always necessary where the defendant is entitled to some positive relief beyond what the scope of the plantiff's bill affords him. Redfield's Ed., sec. —; Daniel, 1744; 9 Cowen, 749; *Patterson* v. *Hull.* The only limitation, says the Supreme Court of Illinois, is that it be filed in reference to the matter of the original bill. But this limitation does not apply, when it is filed, to obtain an equitable set-off.

The State having stated the facts in the bill, without setting forth the facts essential to the claim of the defendant, either to defensive or affirmative relief, the defendants filed properly their answer as a cross-bill. The answer contained all the facts, when a prayer was added it was a cross-bill.

The State having brought the suit for the benefit of defendants as well as for itself, these defendants, in order to sustain their cross-bill against the State, are not bound to show any ground of equity to support the jurisdiction against the State. The State, by the institution of the suit, affirms the jurisdiction of the court to take cognizance of the suit. See Daniel, vol. 3, p. 1746; Story's Eq. Pl. Having affirmed the jurisdiction of the court, it cannot say it has no jurisdiction of the plaintiff asking the exercise of the jurisdiction for the benefit of all creditors, and cannot deny the authority and jurisdiction of the court over the subject matter of the bill, nor question its authority to proceed to the trial of the case, according to the rules of law and evidence, and render judgment against the State for the creditors.

The State has called on the creditors, and invoked the exercise of the authority and jurisdiction of the court, to establish and declare their respective rights. The court cannot refuse to proceed in the cause. It cannot refuse to exercise its lawful jurisdiction, when properly called upon to do so. It must proceed, and proceed according to the Constitution and general laws of the land, as prescribed for the adjustment of controversies between individuals. It has no other law to be governed by than that law which settles the controversies between individuals under similar circumstances. If the act of 1866 was intended, by the direction therein contained to the Governor to file this bill, that justice should be done to all its creditors, that justice is the same, whether the controversy be between individuals or the State and individuals.

Vattel said, a century ago, that the practice of civilized governments was to submit controversies between themselves and their subjects to their own judicial tribunals, to be decided upon principles of justice and equity, and Story applauds the practice; and expresses his regret at the slow progress in these states in that enlightened policy. But the

Code has not left this matter in doubt when the State sues. It declares that the State shall commence and prosecute suits against individuals, according to the laws of the land, as between individuals. This was, doubtless, the law before the enactment of the statute, for the court must have proceeded according to the law as established in similar cases between individuals, for otherwise it would not have any law to be governed by.

It is true the State may exempt itself from security, from execution, from the operation of the statute of limitations, from liability for the frauds, neglects and wrongs of its officers. It may authorize summary proceedings for the collection of taxes. These and other exemptions having been enacted in conformity with the Constitution, and conflicting with no vested rights of individuals, constitute a part of the body of the laws of the land, which may be enforced in controversies between the State and individuals; otherwise the court must proceed according to the statute and general law, according to those general principles of jurisprudence which govern the controversies of individuals. The statutes of the State of Tennessee have armed the courts of law and equity with power in any case to render judgments or decrees, joint and separate, or cross, against plaintiffs or defendants, for such amounts as may be found due by plaintiffs to defendants, or defendants to plaintiffs. Secs. 2918, 2970. It will not be controverted that a stockholder, filing a bill for a residue due him, or as stockholder and creditor for a contributive share against other stockholders, would have a right to obtain a decree for the residue, or for contribution, or that those creditors who were brought in by him might obtain a decree under our statute, or under general chancery jurisprudence, over against the complainant who brings him in. It must be regarded as a minor, if not frivolous question, whether he urged it by answer, or cross-bill, or statement and charge, if it were a general creditor's bill.

State, and Watson, Trustee, *v.* Bank of Tennessee.

Why is not this great protecting principle of the liability of a state as a stockholder applicable when the State files its bill, brings in all the creditors, and prays a general account? Why and on what ground shall the court say, this is the law as between the stockholder of all other incorporated companies in which individuals are stockholders, but it is not applicable when the State is the sole stockholder. The statutes declare that the courts may render over against the complainants anything found due by them. The general rules of chancery jurisprudence required all stockholders shall pay all amounts subscribed by them, or withdrawn by· them, and that judgment on a bill for a general account may be rendered over against them, until the debts are discharged, or their subscription exhausted. The statute declared that the State, in the prosecution of suit against creditors, shall proceed against them as in suits between individuals. If the State was not bound to give individuals any rights under general law when suits were prosecuted against them by the State, justice could not be done in one case in a thousand where the State sued a citizen. The very object of the charter of incorporation was to place the State to that entent on the footing of an individual stockholder. How is it possible to do justice in this case, unless the court has the power to decree that the State had no right to seize the $460,000 in the bank in 1866, and appropriate it to the payment of its current expenditures? How is it possible to do justice if it cannot declare that the State must account, on a general creditor's bill, for $460,000 drawn out of the capital stock by the State, and appropriated in payment of its current expenditures? How is it possible to ascertain whether there be a residue due to the State, without ascertaining whether the State ever paid up the sum total of its subscription? How is it possible to do justice to these creditors of the bank if the stockholder be not subject to a judgment over, if it has withdrawn and consumed the capital stock and left them unpaid? When this bill was

directed to be filed by the State, and in the name of the State, it was with a knowledge of existing laws, to-wit: that the suit must be prosecuted according to the statute and general chancery laws operating between individuals who were litigating their rights; that by general principles of chancery jurisprudence, as well as statute laws, a stockholder in default was liable on a bill for an account over to the creditors, if the facts justified a decree over. If it was intended that justice should be done to all the creditors, how is it possible to assume that the general statute and chancery law of the State should not be enforced against the State as stockholder by this cross-bill? It is impossible to do justice to those creditors, if the allegations of the cross-bill be sustained without a decree against the State as a stockholder in the bank which it stripped of its effects. Will the court halt, and refuse to give judgment against the State, as it would against individuals? Will the court carve out of the laws of the land limitations and exemptions not existing in the general laws, or will it proceed and enforce the law against the State, as it is enforced against individuals, where the State comes into court for an account, and asks that justice be done to all creditors?

I have heretofore referred to the early practice in chancery that bills for an account should allege that the complainant was willing to undertake to pay any balance which might be ascertained to exist against him; for, in asking that the court administer equity to him, he must be ready to do equity to those whom he brings into court. Why should not this apply to the State filing a bill for an account?

It is maintained on behalf of the complainant in the cross-bill against the State, that the institution of the bill by the State, and in the name of the State, by authority of the statute, is a submission to the jurisdiction of the court of all matters necessary to the attainment of justice in the case. It is so by operation of general law, without reference to the special wording of any statute on the subject.

It has been settled by the courts of Great Britain that a foreign sovereign may sue in the courts of that country; that when he does, he stands as the home sovereign stands; but that when he sues and enters the courts, he submits to the jurisdiction, and must conform, in all things, to the laws of Great Britain. If he asks for the administration of law for him, he must submit to process; if he files a bill he must submit to a cross-bill; if he asks for an account, he must declare his readiness to pay the balance found against him. The court must proceed according to established law. "The liability," says Daniel, "of a foreign sovereign to be sued when he himself sues, has been established upon the principle that by suing in the courts of England he has submitted to the jurisdiction of the court in which he sues." In the case of the *King of Spain* v. *Michado & Haillet,* there was a bill and cross-bill. It was asserted that the King of Spain was not bound to answer the cross-bill on oath; but the court say the King must answer on oath, as the Chancellor was bound to proceed according to the established practice of the courts. The bill charged that Michado had money belonging to the King of Spain, and had deposited it with Hallet, a British banker. Michado filed his cross-bill, alleging that the moneys belonged to Spanish subjects, and not to the King, and that the King had seized three ships belonging to Michado. The demurrer to the cross-bill was sustained.

The English courts act upon the principle that the sovereign, by coming into court and invoking the exercise of its jurisdiction in his favor, waives his privilege to be exempt from suit. When the parties are in court, the court must exercise its jurisdiction, not for the complainant alone, but for the defendant also. It must proceed according to law, and exercise all its legitimate powers in the case, and within the legitimate range of the pleadings in the case, for the purpose of complete justice. If the court has no power or jurisdiction to render judgment on a cross-bill, it is not

31—VOL. 5.

State, and Watson, Trustee, *v.* Bank of Tennessee.

competent to do complete justice—it can give only partial relief. It may give defensive relief, but can give no affirmative relief. Though the State may have seized and appropriated more than half a million of dollars, and wrongfully appropriated it as school fund, the court, though it has power to declare that the $300,000 now in the hands of the trustee shall be held as bank effects for creditors; yet the court has no power to decree against the State for the amount òf coin seized and appropriated, though the State declares that justice be done, and the laws authorize judgment over in such cases, as the only means of doing complete justice. This cannot be the law of this case. The institution of the suit is an unqualified submission to the jurisdiction of the court by the State. It authorizes, sanctions and directs the application of the rules of pleading and evidence to the State which are lawful in other cases. The State appeals to established chancery practice and to statute law. The State says, in effect, administer that measure of relief and justice to the State as a stockholder in this incorporated company that the court would be compelled to administer to other stockholders in other incorporated companies of every description. The object of the State in putting its funds in the hands of an incorporated company, was to get clear of its sovereignty, for if it retained its sovereignty, the notes issued would have been bills of credit. The laws of the land, in a bill for an account by a creditor as stockholder, authorize a judgment over against stockholders in other cases, and the court can render a judgment over against the State as a stockholder in this company. This is the manifest and unavoidable legal conclusion resulting from the submission to jurisdiction of the court and the invocation of the exercise of its authority.

The English authorities heretofore cited to sustain this construction, are sustained by high American authority. The case of Rhode Island against Massachusetts was a bill

filed by the former state against the latter in the Supreme Court of the United States, that court having jurisdiction where states are parties. The State of Rhode Island was seeking to recover territory in the possession of Massachusetts. It became necessary, in the judgment of the court, in that case to establish and declare the law of England and of the United States, when the rights of sovereign states are concerned, and to define the jurisdiction and authority of the court in such cases as established by precedent. The court say : "A foreign sovereign may sue in the courts of law or equity in England. The sovereign must sue by an agent whom he authorizes to represent him, on whom a cross-bill can be served, with such process as can compel him to do justice to the defendant. This was decided in the case of the *Columbian Government* v. *Rothschild*, 1 Sim., 104. These cases were recognized by the House of Lords. In the case of the *King of Spain* v. *Michado & Hillet*, it was decided that a sovereign had a right to sue as any other suitor; but when he did sue, it was as any other suitor who submitted to the jurisdiction of the court. When he seeks to subject the defendant, and the defendant appears and pleads, the whole subject-matter of the pleadings must be decided by the judicial power as a judicial question. Such has been and is the settled career of equity in England."

The court say again : "A sovereign decides by his own will; a court, by the law, which the sovereign power both prescribed, and that law is the rule of judgment. The submission by sovereigns of states to a court of law or equity of a matter in chancery, without any rule of law prescribed, gives power to the court to decide according to the appropriate law of the case. 11 Vesey, 294. This depends on the subject-matter, the source and nature of the claims, and the law which governs them. From the time of such submission, the question ceases to be a political question, to be decided by the will of the political power. It comes to the

State, and Watson, Trustee *v.* Bank of Tennessee.

courts, to be decided by the rules of law appropriate to the nature of the case, as the court is bound to act according to the known rules of jurisprudence." 12 Curtis, 900.

Again : "When the sovereign is a suitor, the court can do the parties complete justice. It has him in its power, and can impose on him any conditions it may see fit under law." 2 Bligh P. C., 54.

It is, therefore, the settled law of England and the American states that states wave their prerogative of exemption from suit by the prosecution of suit against citizens, for by so doing they invoke the application of the general laws of the land in the case in which they sue ; that cross-bills and actions asking affirmative and defensive relief are a part of the laws of the land applicable to states in such cases ; that the question, from the time of the submission to the judiciary, ceases to be a political question, to be decided by the political power, but becomes a judicial question, to be decided by the judicial authority ; and that the court must do complete justice, according to the facts alleged and proved.

It is therefore contended on behalf of these complainants in this cross-bill, that they are entitled to file their cross-bill against the State, the State being the original complainant in the case ; that the State had no right to withdraw itself from the prosecution of the suit, nor from responsibility to these complainants, from the time they filed their cross-bill against the State ; that any attempt to withdraw, with a view to defeat the liability to those complainants, after that time, is discreditable to the State, illegal, and trifling with the court, and that the complainants are entitled to a decree against the State as a stockholder in this incorporated company for any balance which may be established against it within the limitations of the charter.

But it has been argued in England, and may be argued here, that the court has no power to enforce by execution against the property of the State, or the revenues of the

State, any judgment that may be rendered, and that no judgment could or should be rendered where the court had no power to enforce such judgment. It is not controverted by me that no execution by common law can issue against the Crown or against one of the American states. It is admitted that it is a prerogative exemption which is everywhere maintained that the public treasury and public revenues are exempt from execution or appropriation to the satisfaction of debts by orders of courts. In the case of *McHeath* v. *Haldeman,* 1 Term, Lord Mansfield, commenting on *The Banker's Case,* 14 State Trials, said that prior to the revolution in 1688, the King paid the public debts, but that subsequent to that period the public debts could only be paid by act of Parliament, under the head of annual supplies for the public service (or by an appropriation bill, as we call it), and that the recovery had in that case by the bankers on the orders of the King's agent (the Barons of the Exchequer), only laid the foundation of an application to parliament to discharge the judgment.

No execution issues in any case against the Crown, where it is sued for real or personal estate, or on contract, and a recovery is had. The judgment is merely declaratory, as in the case of an award, and is certified to the treasury for payment when the suit is for money; where it is for property, it is executed *eo instanti,* when judgment is pronounced. 12 Curtis, 900; 1 Curtis, *Chisholm* v. *Georgia.*

It has not been the law in any state or in Europe to issue final process of execution against a state. Coke gives the quaint reason, that it cannot command itself.

In the case of *Rhode Island* v. *Massachusetts,* the reason given as the common law reason, is that the law will not presume that any judgment will not be executed as soon as it is rendered by the court, and that no sovereign or state will refuse to pay a debt or redress a wrong, as soon as the courts establish and declare the debt or wrong. 12 Curtis, 900; 3 Blackstone. In this case it was urged that the Su-

preme Court had no power to enforce its judgment in the event it should decide that the territory in question belonged to Rhode Island, and that therefore it was a political and not a judicial question. To this the court said they could by decree fix the boundary, and so leave it, under the assumption that Rhode Island would, if defeated in the suit, acquiesce in the declaration of the court; and that if successful, and there was a decree that the territory in possession of Massachusetts belonged to Rhode Island, it would conform to the decree of the court by the surrender of the territory; that the court would not and could not assume that the State would not execute the judgment of the court. Judgments in the Court of Claims do nothing but establish and declare the indebtedness against the United States. They are entitled to the money for payment by appropriations made before or after decrees. The public property and public treasure are not subject to seizure. The public revenues are subject to a prescribed course, in collection and payment to certain public officers, by fixed law, which no judicial authority is authorized to violate. The revenues must take the course prescribed by law, and cannot be diverted without a violation of express statutory enactment. The public buildings stand on the same footing. The revenues having passed into the treasury, cannot be paid out by these officers under judicial orders, but must be paid in conformity to appropriations made by law, as prescribed by the Constitution and laws. The Legislature is the authority that levies taxes, provides for the collection of them, makes contracts, authorizes them to be paid, and provides by appropriation for the execution of them. But the law, therefore, as declared in England and in the United States—that no execution can issue, or no means of enforcing a judgment against a sovereign power exists, and no appropriation of its property can be made for the satisfaction of debts by judicial authority, but must be made by legislative authority—furnishes no ground in reason or public policy why the

court should not proceed as far as it is authorized to go, and establish the rights of the parties litigant by a declaratory decree.   On the contrary, judgments are rendered when no executions are necessary, and the foundation of the law is that the public authority will execute these judgments when the public rigts and obligations are established by judicial authority.   The fact that the Legislature is not organized and elected with a view to the settlement of judicial controversies; that it is a large and expensive body; that it is not prepared to hear proof and argument, and settle judicial questions; that neither morally nor legally has it the right to decide for itself its controversies with her citizens—all indicate the absolute necessity of referring a great variety of questions, in which the State is interested, to the judicial department of the government, not to enforce, not to execute, but to ascertain, establish and declare the rights of the State, and of the litigant party, so that the State may do no wrong to any citizen, submit to no injustice from any, but have all rights adjusted upon general principles of jurisprudence, applicable alike to state and to individuals.

But it may be argued that the fact that in no suit instituted by the United States in the court against citizens have judgments been rendered over for an excess against the government, but that the courts have uniformly refused to give affirmative relief in such cases.   The reason is plain, and in no way militates against the claim for judgment here against the State as a stockholder in an incorporated company, under state statutes.

The act of Congress of 1797 authorizes persons who have claims against the United States, and are sued by the United States, to demand a credit on the amount for which they are sued, to the extent of the counter claim.   The act authorizes a credit but does not authorize a judgment against the United States for the excess.   The court could go no further than the act of Congress authorizes in allowing and enforcing affirmative relief by cross action.   The court say,

there being no limitation as to the nature of the claim for a credit, it was a reasonable construction of the act of Congress to allow the defendant a credit for any matter arising out of the particular transaction, or out of any distinct and independent transaction which constituted a legal or equitable set-off. 6 Wheaton, 145.

The court was limited in its power of redress to the defendant to the allowance of a credit, as stated in the act of 1797. They could go no further. In cases from the States of Pennsylvania and New York, it was asserted that the laws of these states would authorize judgment against the United States as it did against individual defendants, but the court said that the jurisdiction of the court depended upon and was limited by the express words of an act of Congress, and that it had no statute or common law jurisdiction to render judgment over against the United States. If the courts of the United States had general common law jurisdiction, they could have concurrent jurisdiction with the state courts and absorb their jurisdiction.

The complainants in this cross-bill rest their case on the ground that the State has, by its process, brought in all the creditors to account; that it acted as stockholder in the bank, and appeared as a stockholder, insisting on the application of the general laws of the State to the subject-matter of controversy; that the declared purpose of the State was to do complete justice to all, and that it was within the fair scope of the pleadings allowable under the bill filed to allege and prove the indebtedness of the State to those creditors.

In the case of *Dean* v. *Attorney General*, where this officer had filed a bill against the agent of the war office, and there was a demurrer to the pleadings of the defendant, Chief Baron Abinger said "it had been the practice, which he hoped would never be departed from, for the officers of the Crown to throw no obstacle in the way of any proceeding before a court of justice where matter arose that re-

State, and Watson, Trustee, v. Bank of Tennessee.

quired judicial construction." 1 Young and Coll., 207; 1 Daniel, 166. So in *Crawford* v. *Attorney General*, the Lords of the Treasury having demanded that a case be brought before the court, the court said it would be unbecoming the Attorney General to urge any matter of form to prevent it from being properly before the court. Price Ex. 7, p. 1, Daniel 1721.

The Supreme Court of the United States state, in the case of The Davis, 10 Wal., 19, 7 Wal., 157, the usual course in England, when the property of the Crown is involved, is for the proper officer of the Crown to give his consent for the court to proceed. The King thus consents to be sued in his own courts. The liberal exercise of this authority in England prevents any apprehension of gross injustice, and removes the difficulty which exists in the United States. The absence of any such power in any officer in the United States to submit the case to the jurisdiction of the court, justifies a liberal exercise of the rule upon which we act for the promotion of justice.

The injustice to individuals, and the frauds which arose by the absence of any remedy by suit against the United States, led to the establishment in 1863 of a special court for the adjudication of all demands against the government, founded on an act of Congress, a regulation of a department, a contract with the government, a court where these demands are adjudicated, and if indebtedness be declared, its suitor entitled to the money, to be paid by appropriation made before or after the decree. So in Great Britain, the person complaining of a grievance, petitions the Chancery Court, stating the facts of the case. This is endorsed by the proper officer, " let right be done," and the cause is referred to the proper court having jurisdiction over the matter. This is a mandate from the Crown to proceed in the case according to the laws of the land, appropriate to the case, and authorizing a recovery against the Crown. This right of petition, or to sue the government, is one of the

most ancient and valued rights of a British subject. The consent to sue the United States by a claimant or creditor, is given by general law. In Great Britain it is given as it is demanded. When these depositors placed their money in this bank, in which the State was sole stockholder, the State was liable to be sued by them.

I affirm, upon the facts of this case, that the State instituted the suit; that the State is a party; that the State is a party as stockholder; that the State declares its purpoes was that justice should be done to all; that the court is bound to take jurisdiction, proceed with the case, and render such decree as the facts would justify against any individual citizen of the land.

I affirm that the character of this great State must rest forever upon the justice which it shall measure out to its own citizens.

NOTE. See the case of *United States* v. *Eckford*, 6 Wall., 489, and the cases there referred to. These cases show that the refusal of affirmative relief against the United States is based on the words of the act of Congress of 1797, and have no application to this case. The claim for relief is here based on the general jurisdiction of the State courts and the language of State statutes.

Since the argument of this case, the Legislature has enacted a statute, which has been construed to have been intended to repeal the jurisdiction in this case, and to stifle judicial investigation of state liabilities. See Acts of 1873, ch. 13. It is sufficient to say at present, that this statute does not "reach" this case, and that if it did, it is an invalid act.

This statute will be examined in a subsequent argument.

State, and Watson, Trustee, *v.* Bank of Tennessee.

ARGUMENT OF NATHANIEL BAXTER, FOR DEPOSITORS.

On the 16th day of February, 1866, the Legislature directed the Bank of Tennessee to make an assignment of all its assets in trust, to secure—1st, what it callled the "school fund," and fixed the amount of that fund at $1,500,000, and interest thereon from and after the 6th of May, 1861.   2d, to pay all the other debts and liabilities of the bank, if the assets should be sufficient; if not, then *pro rata;* but to exclude all claims and demands of all kinds of date after the 6th of May, 1861, as absolutely null and void.

In pursuance of this direction, the bank, on the 6th of April, 1866, made an assignment of all its assets, of every description, to Samuel Watson, in trust for the uses designated by said act of February 16, 1866.

On the 16th of May, 1866, Mr. Watson and the State of Tennessee, as co-complainants, filed their bill in the Chancery Court at Nashville against the bank and its creditors, asking to be allowed "to close up said trust with the aid, and under the supervision of said court," and "to enjoin all persons or corporations from suing out any writ against said bank or its trustee, or commencing any legal proceedings whatever against either, in any court of law or equity."

My client, Mark R. Cockrell, being a creditor of said bank, as a general depositor, procured himself to be made a defendant to said bill, and answered the same, setting forth that he was a creditor, and stating the nature and amount of his debt.

He then filed a cross-bill against said Watson and State of Tennessee and others, denying the validity of said act of February 16, 1866, and of the assignment made by the bank in pursuance thereof, and claiming the right to have his debt satisfied out of the assets of said bank.   To this cross-bill said Watson and others have demurred.   The demurrer presents for the consideration of the court the single question, whether the act of the Legislature above referred

to, and the said assignment made in pursuance thereof, are valid or invalid. If valid, my client's money is gone; the assets of the bank are beyond his reach. If invalid, he will have a right to a *pro rata* share of the present assets and of such future provisions as the State may hereafter make in fulfillment of the obligations to which it has pledged its faith.

As alleged in his cross-bill, upon the faith of the pledges and guarantys of the State, as expressed in the charter of said bank, my client at an early day became a regular depositor in said bank, and on the 1st of February, 1862, had to his credit in said bank, $15,655.41, all of which remains due and unpaid to this day, and by the acts of the Legislature above referred to, such disposition has been made, or attempted to be made, of the assets of said bank, as to remove them entirely beyond the reach of his debt. Not only so, but it has assumed to repudiate so much of his debt as was deposited subsequent to the 6th day of May, 1861.

I assume that the Legislature had no power to repudiate the debts, contracts, and obligations of that bank, created within the scope and by the authority of its charter, whether the same were created before or after the 6th day of May, 1861.

I furthermore assume that the State, when it created the bank, became a guarantor of all contracts to be made by it within the scope of its chartered authority to the extent of $5,000,000, and that in and by the charter of said bank, it mortgaged the school fund, the surplus revenue, and the proceeds of the Ocoee land sales, together with such other sum as, added to these funds, would make the total of $5,-000,000 (which additional sum it pledged its solemn faith to raise) to secure the creditors of the bank; and consequently, instead of the school fund being a liability of the bank to State, for which the assets of the bank can be taken from its creditors to secure, as a preferred claim, it was a pledge made by the State to the creditors to secure their debts, and

· State, and Watson, Trustee *v.* Bank of Tennessee.

upon the faith of its being thus applied, they advanced their money, and that the execution of this deed of trust was a gross and palpable breach of the contract between the State, the bank, and the bank's creditors, as expressed in the charter of the bank itself.

A certain solution of this question can be readily reached by a clear, distinct and accurate comprehension of the object for which the bank was created, its true relation to the State on the one hand, and to its creditors on the other. This will involve but a brief inquiry into the history of its creation and the provisions of its charter.

It was chartered on the 26th of April, 1858. The professed object of the State was to establish a state bank, to raise a fund for internal improvement, and to aid in the establishment of a system of education. It was established in the name, and for the benefit of the State, to be known by the name and style of "The Bank of Tennessee," and by the terms of its charter the Legislature pledged the faith of the State for the support of said bank, and to supply any deficiency of funds therein specifically pledged, and to give indemnity for all losses arising from said deficiency.

It then provided that the capital of said bank should be $5,000,000, to be raised and constituted as follows: The whole of the common school fund (except so much as had before that time been invested in any work of internal improvement), as well as the proceeds of the Ocoee land. Also a fund known in that day as the "surplus revenue," which was then about being distributed among the several states from the overflowing treasury of the Federal Government. And in addition to these sums, the State pledged itself to raise in specie, or funds convertable into specie, at par value, on the faith of the State, sufficient to make up the whole capital to the sum of $5,000,000.

And by the third section of the charter it is provided that the money belonging to the common school fund should be handed over to the president and directors of the Bank of

Tennessee as capital in said bank, and the president and directors were authorized and required for and on behalf of the State, and with the pledge of the public faith and credit, to issue to the Superintendent of Public Instruction state stock or certificates of debt for such sum or sums as might be paid over by said superintendent to said president and directors.

By the 6th section, it was provided that the Governor should nominate and appoint twelve persons to act as directors, to be confirmed by the General Assembly, one of whom should be president; and said president and directors were by said act incorporated and made a body politic and corporate by the name and style of "The President and Directors of the Bank of Tennessee," to continue until the 1st day of January, 1867; and by that name it was empowered to sue and be sued, and made capable in law to have, receive, purchase, enjoy and retain, to them and their successors, land, rents, tenements, hereditaments, goods, chattels, and effects, of every kind, nature and quality, and the same to sell, grant, alien, demise and dispose of, and to make by-laws and ordinances, such as should seem necessary and convenient for the government of said corporation, not contrary to the laws and Constitution.

It was further provided, that of the dividends to be declared by the bank, $100,000 should be annually set apart for common schools.

By the 4th article, 9th section, it was provided that said president and directors should receive money on deposit, and pay away the same to order, deal in bills of exchange, and buy and sell any of the state stocks then issued, or that might be thereafter issued, and discount notes.

These are the principal provisions of the original charter bearing upon the questions under discussion.

Since the grant of the original charter some amendments and modifications have been made, none of which, however, are believed to be material to the issue presented by the demurrer to the cross bill.

Now, what are we to infer from these provisions? What was the plain and unmistakable idea which the Legislature intended to impress upon the public mind? My client tells you in his cross-bill how he understood it, and how he construed the proposition submitted to the public by the provisions of the charter, and his interpretation strikes me as being so palpably correct, it is difficult to comprehend how any sane man could construe it differently.

He says he understood the object of the Legislature in creating the bank, was to increase the revenue of the State without increasing the direct taxes, and that by indirect means, which should be sensibly felt by the people. That the State had on hand at that time the school fund, the proceeds of the Ocoee land sales, and was expecting to receive her distributive share of the surplus revenue; and it was believed that by establishing a bank based upon these funds, and an additional fund to be borrowed by the State, amounting in all to $5,000,000, that, besides furnishing to commerce a sound circulating medium, commanding the highest confidence of the people, and without sensibly increasing the burthen of taxation, it was possible to increase the revenue of the State by two or three hundred thousand dollars per annum, which increase could be spared for the purpose of education and internal improvement. But to realize the highest results, and experience in the smallest degree the inconvenience resulting from the competition of other banks then in existence, and which, by their integrity and prudent management, had already forestalled the public favor and confidence, it was thought necessary to furnish such security, and give such pledges of the public faith, as would remove from the minds of the people every vestige of distrust.

To do this, it was thought advisable, in the first instance, to set apart and pledge a specific fund, that the creditors of the bank might have something tangible upon which to repose their confidence. But then it was known that a State

could not be sued without its consent, and that in ordinary legislation one Legislature could not bind succeeding Legislatures, and the question would naturally arise in the minds of the people, what signifies the pledging or setting apart a fund, if no remedy is provided by which that fund can be subjected? The people will never give credit to an institution against which they have no remedy but by petition at the footstool of sovereignty. They must have "remedy by due course of law," and a fund as security, which cannot be withdrawn from their reach. To meet these objections and difficulties, it becomes necessary to create an artificial person in the nature of a corporation, and endow it with the capacity to hold property in trust or absolutely; to make contracts, and to sue and be sued, and then by placing the fund designed as a security for the public, in the hands of this corporation, as a fund in trust for the benefit of the creditors of the corporation, and within the fangs of the law, and beyond legislative control, or the caprices of politicians, and by going still further and pledging the faith of the State "to supply any deficiency of the funds therein specifically pledged, and to give indemnity for all losses arising from said deficiency," it was supposed the confidence of the public would be fully secured. And in this the authors of the scheme were not mistaken. The people yielded a most generous confidence to the promises and undertakings of said bank, backed as they supposed by so large a capital paid in, and the faith of the State solemnly pledged to supply any diminution it might sustain by losses or otherwise.

This is the history and character of the institution my client understood himself to be dealing with; this was the character of security he thought he was getting when he deposited his money.

If this is the correct history, if this was the object the Legislature had in view, and this the mode by which it undertook to carry its policy into effect, then the result

is simply this, and can be nothing else. The bank itself was but a trustee and agent for the State, doing business on the State's capital, and for the State's benefit. The capital stock and all the assets of the bank, were a trust fund, pledged by the State as security for the contrcts of the bank, and held by the bank in trust for the use and benefit of its creditors. The State was the creator of the trust, and has only a reversionary interest in so much of the capital stock and assets of the bank as may remain on hand after the bank should have discharged all the laibilities she has contracted upon the faith of those securities. In other words, the charter spoke into existence a legal entity which it named the "Bank of Tennessee." It then clothed this Bank of Tennessee with power and capacity to do a banking business, and constituted it the agent of the State, to do a banking business for the benefit of the State. But an empty corporation, without capital or personal responsibility, could command no credit. Then to give this agent credit with the public, and enable it to accomplish the ends and objects of its agency, the State clothed it with a capacity to hold property and part with property, and to sue and be sued, and then conveyed to it the school fund, and other funds, in trust to secure whosoever might become its creditors, and in addition to that, the State became guarantee of every contract the bank might make to the extent of $5,-000,000, by "pledging its faith that any deficiency in the funds specifically pledged should be supplied, and to give indemnity for all losses arising from said deficiency."

Through the medium of this agent, and upon the faith of this fund, the State obtained my client's money. The State is the real debtor, and conveyed the fund in trust to secure the debts.

The capital and assets of the bank is the trust fund; the bank, the trustee, and my client and other creditors, the beneficiaries.

The State is in no sense a creditor of said bank, and has

32—VOL. 5.

State, and Watson, Trustee, v. Bank of Tennessee.

no interest in the capital stock or assets, and has no power to exert any control, or give any directions as to the application of any portion of said assets or capital, until all the debts, contracts, and liabilities of said bank shall have been fully paid off and discharged. The surplus, if any left, will then belong to the State, and be subject to legislative control.

When we contemplate the acts of mythical, incorporeal, intangible, and invisible agencies, such as states and corporations, and especially those of sovereign states, enveloped and enthroned in the gloom and majesty of Empire, our minds become recreant, and recoil and refuse to approach the subject with that boldness and familiarity with which we handle the transactions of gross, material, bread-eating men. There seems to be a sort of mist or halo surrounding them which refracts the rays of vision, and confuses our intellectual perceptions.

To relieve the subject of that sort of mystification, suppose we state it algebraically.

Let the State equal Tom Jones, the bank equal John Smith, and Cockrell stand for himself. Tom Jones is a rich man, but wants to borrow money. He don't want to borrow on his own name, or give his own note for it, so he employs John Smith (who is not worth a cent) to go into the market, and borrow money for him, but give his own note for it. Smith goes to Cockrell to borrow money. Cockrell refuses to lend. Smith then goes to Jones and tells him, "Everybody knows I am insolvent, I can borrow no money upon my own credit." Jones then goes to Cockrell, and says to him, "Let Smith have your money, and I will pledge my faith and credit that he will pay you according to contract." Cockrell says, "No, I can't lend my money upon that sort of security. You might plead the statute of frauds, and I would have no legal remedy against you." Then says Jones, "I have a hundred bales of cotton, and as many hogsheads of tobacco, which I will place in

State, and Watson, Trustee, *v.* Bank of Tennessee.

Smith's hands as security, and by a written deed of trust I will convey the legal title to said cotton and tobacco to Smith in trust for your benefit, and to secure your debt." Now, says Cockrell, "Upon doing these things you can have my money." Jones delivers the cotton and tobacco, and executes the deed of trust, and thereupon Cockrell advances his money to Smith, and Smith hands it over to Jones. Afterwards, and while Jones still has Cockrell's money in his pocket, he discovers that Smith has misappropriated fifty bales of the cotton, and it is lost. Whereupon he rises into a towering passion, and goes to Smith and orders him, "without delay," and at as early a day as practicable, to cause an assignment and deed of trust of all his effects and property of all kind, real, personal, and mixed, including the remaining fifty bales of cotton, to be made and executed for the uses and trust as follows: 1st. To secure me for the fifty bales of cotton missing, and every thing else you are liable to me for, which shall be a preferred claim, with interest. Then, if there is anything left, you can pay other creditors a portion of their debts; those who have lent us money after the 6th of May I will not pay at all. I got mad with my creditors about that fight they got into, and I do n't intend to pay them all I owe them. "Well, but," says Smith, "what shall we do with Cockrell? This cotton and tobacco was mortgaged and pledged to secure his debt, how can I now give you a deed of trust upon the same cotton and tobacco, and give you a preference over Cockrell, while you still hold Cockrell's money in your pocket." Says Jones, "You and Cockrell both go to thunder, you do as I tell you."

Will this court let Mr. Smith do as Mr. Jones tells him? Such a case between Jones, Smith, and Cockrell, brought before a Chancellor, would present but one question to the Chancellor's mind of sufficient intricacy to possess any interest, and that would be, whether Mr. Jones had less common sense or less common honesty, and if the case supposed

is not parallel to the case at bar, it is because I am unable to draw a parallel to it.

Reduced to its purest simplicity, the transaction stands thus: The State wants its agent, the Bank of Tennessee, to borrow Cockrell's money for the benefit of the State. Cockrell will not lend his money to an empty corporation without capital upon its own credit. Then, to enable the bank to borrow the money, the State becomes guarantee for the bank, and "pledged the faith and credit of the State for the support of said bank, and to supply any deficiency of funds therein specifically pledged, and to give indemnity for all losses arising from said deficiency." But Cockrell says to the State, you are a sovereign power, and I have no legal remedy by which I could enforce your obligation. I must have tangible security, something upon which an execution or an attachment can be levied, and it placed within the reach of the courts. Then, says the State, I will place the school fund, the surplus revenue, and the proceeds of the Ocoee land sales, in the possession of the bank, in trust for your benefit, to be held as additional and collateral security, where it will be in reach of the courts, both of law and equity. Says Cockrell, upon doing these things you can have my money. The transaction is closed upon these terms, and the State, through its agent the bank, gets Cockrell's money. After getting his money, the State then discovers that the bank (its own agent and trustee) has converted a portion of the school fund improperly, and it is lost. The State now rises into a towering passion—that is, its Governor and Legislature—and requires the bank to execute an assignment upon the residue of the fund, and all its other assets, to indemnify the State for losses occasioned by the bad faith or mismanagement of its own trustee and agent, and in this assignment to give the State priority over Cockrell, as to the very fund upon the faith of which Cockrell loaned his money. The bare statement of the case presents the absurdity of the proposition in such bold relief

that an argument to make it more palpable would be as absurd as the proposition itself. It would be as absurd as an attempt to demonstrate an axiom.

A sovereign state, seen in its robes of imperial purple, impresses the imagination with an awe second only to that which is inspired by the contemplation of Jehovah himself. But when it casts off the mantle of sovereignty and empire, and descends from its high estate, and engages with little dirty men in the dirty scramble for the dirty dollar, it must play fair at least, and conform to the rules of the game. It must adhere to its contracts in good faith, and consent to be bound by them in the courts of law, just as Cockrell is bound by his contracts with the State; and I insist the State had no more right to seize the coin and other assets found in the bank, and appropriate them to its own use, than I or any other debtor, who had borrowed money upon the faith of property which we had conveyed in trust to secure the loan, would have to take the property from the trustee, and appropriate it to our own use, while the debt remained unpaid.

The State parted with its control of said funds in granting the charter of the bank. The creditors who traded with the bank upon the faith of the charter, acquired vested rights which no power in the State could divest without first paying the debts; and though the creditors of the bank may be without remedy to compel the State to redeem its solemn pledge, and supply the deficiency of the lost capital, yet they have the right and the remedy to hold on to the remnant that is left. If the bank, the State's own chosen trustee, has wasted or lost a portion of the trust fund, it may be a misfortune to the creditors and the State. But, instead of furnishing a pretext to the State to seize what is left, it only presents the contingency provided for in the charter of a "deficiency of the funds therein specifically pledged," upon which contingency the State "pledged her faith and credit to supply said deficiency, and to give in-

State, and Watson, Trustee, v. Bank of Tennessee.

demnity for all losses arising from said deficiency." Instead of the loss of the assets, making the State a creditor of the bank, it makes her a debtor to the bank for the benefit of her creditors. Instead of giving her a right to take what is left, it imposes upon her the duty to supply what is lost, for that is the letter and spirit of her contract with the creditors of the bank.

As for identifying the gold coin that was found in the bank as part of the original school fund, the assumption is as baseless as if founded on a shadow. Thirty-five years ago, when the bank was first chartered, the school fund, the surplus revenue, and the proceeds of the Ocoee land sales, were conmingled together, with such other funds as were raised to complete the capital of the bank, in one common hatch pot, unidentified by any marks by which one fund could be distinguished from another, and the whole medly has been involved and submerged, in involution and revolution, in trade and in commerce—until no man can identify a single dollar as being one of the original dollars of the school fund investment or the proceeds thereof. But suppose I were to concede the identity, what difference would it make.

Suppose the original school fund had been gold, and de-deposited with the bank in sealed boxes or bags, distinctly labeled, and the boxes or bags had never been opened, so that their identification was certain beyond doubt; it would rather strengthen than weaken the claims of the creditors, to have it applied to the satisfaction of their debts, because in that case they could put their hands upon the box and say, "Upon the faith of the gold in this box I parted with my money. I was told by the State when I parted with it, if it was not paid otherwise, it should be paid out of this gold, and that this gold should be applied to no other use until it was paid, and upon the consideration and faith of that promise I parted with my money."

Now, there can be no doubt but that this is the true rela-

tion in which the creditors of the bank stand toward this school fund if the Legislature had the power to pledge the fund to secure their debts.    Did it have the power?    I concede the Legislature is not the State, but only its agent. Nor is it the State's universal agent.    The executive and judiciary are also agents of the State, and still there is a residuum of power not confided to any agent, but is reserved to the people.

But it will not be denied that the State, in its sovereign capacity, was the owner of the school fund before and at the time of adopting the Constitution of 1834, and had the unrestricted right of disposition (except a small portion of which it held in trust from the Federal Government.)    By that instrument the State impressed upon it its destination, and directed its future use and management.    And though the Legislature is not the universal agent of the State, it has been always held to be its financial agent, and clothed with the whole power of the State, in the management and control of its exchequer, except so far as its power may be limited by the Constitution.    If the act of the Legislature, in pledging this fund to secure the creditors of the Bank of Tennessee, infringed any limitation of power imposed by the Constitution of 1834, the act was without authority and a nullity, and will be held so by this court whenever the question is properly presented.    But in the absence of such limitation, it must be conceded the Legislature had the power.

The 10th section of the 11th article of the Constitution provides that "the fund called the common school fund shall remain a perpetual fund, the principal of which shall never be diminished by Legislative appropriation, and the interest thereof shall be inviolably appropriated to the support and encouragement of common schools, and no law shall be made authorizing said fund, or any part thereof, to be diverted to any other use.    And it shall be the duty of the Legislature to appoint a board of commissioners, who

shall have the general superintendence of said fund, and shall report," ect.

1. The Constitution, in the first instance, dedicates the fund to the support of common schools, and the Legislature has no power to divert it to any other use.

2. The Constitution then qualifies and explains how this fund is to be applied to the support of common schools. It does not intend that the principal of the fund shall be paid out for that purpose, it is to remain a perpetual fund, and shall never be diminished by Legislative appropriation. But the interest thereof shall be inviolably appropriated to the support, etc.

3. The Legislature shall appoint a board of commissioners, who shall have the general superintendance of said fund.

Strictly speaking, the fund was placed by the Constitution in the hands of a board of commissioners, and intrusted to their superintendance and management. But neither they nor the Legislature could diminish the principal, but are directed to appropriate the interest. These two conditions demonstrate that the Constitution intended the principal should be put at interest; that is, made to earn or yield interest, or increase in some way. That could not be done if it was to lie locked up in the vaults of the treasury. It must of necessity be loaned, or otherwise invested. There is no particular mode of investment prescribed. When an agent is charged with a duty, and the mode of performing the duty is not prescribed, the agent may use his discretion, so he acts in good faith. If the duty be to raise interest or income upon a fund of money, he may lend it, or invest it in bank stock, or other property, being only held to good faith in the exercise of his discretion. In those days there were no state or national securities in which to invest trust funds. But whether he adopts the one method or the other, whenever he lends it or invests it, he parts with the title, and though the fund be a trust fund, in the strictest sense

of the term, if it be loaned, the borrower acquires as per-
fect a title, and as free from the encumbrance of the trust,
as if no trust had ever attached to it. If the trustee had
authority to lend it, the borrower gets a good title, and may
do with it as he pleases. It becomes a simple debt, due
from the borrower to the lender. The lender, though he be
a trustee, looses all lien upon the money, and must look
alone to the security upon which he loaned it for his indem-
nity, and it is the same if he invest it in bank stock, or any
other stocks, or in real property. In neither case can he
ever reclaim the specific fund. It follows then, conclusively,
that the framers of the Constitution of 1834, when they
directed that the principal of the fund should not be
diminished nor diverted to other objects, but that the in-
terest only should be applied to the support of schools, in-
tended the fund should be loaned out, or otherwise invested,
so as to make interest, and they also intended the borrower
of the fund should get a good title to it. If the security
upon which it is loaned proves worthless, it shares the com-
mon fate of all other improvident loans. This, then, being
the nature of the trust with which this fund was clothed,
the Legislature or board of commissioners, or both together,
had the unquestionable right to invest it or put it at in-
terest, and not being restricted as to the mode of invest-
ment, they had a right to invest it in the stock of the Bank
of Tennessee, and the Legislature and board of commis-
sioners, having both concurred in the investment, the bank
got a perfect title—a title in trust, however, for the benefit
of its creditors, and when they are all paid off, the title to
the fund, or the remainder of it, reverts to the State.

But suppose the honorable court should differ with me as
to the power of the Legislature to invest the fund in the
stock of the Bank of Tennessee—suppose the board of
commissioners had no right to do it—and that the State, in
its sovereign capacity, was not bound by it; still, I imagine
that would not help the trustee in the case. There is no

provision in the charter of the bank authorizing the assignment as made to Mr. Watson. But the bank, in making the assignment, avowedly acts under the authority of the act of February, 1866. This act was the act of the Legislature. If the Legislature had no authority to put this fund in the bank, by what authority can it take it out. If it is clothed with no authority over the fund, it would be as difficult to justify its action in withdrawing it from the bank as in placing it there. Upon what principle can it be said it has power to withdraw it, but not to place it there. But suppose it has the power to withdraw it (if it had been put there by the Governor, or some other unauthorized functionary of the State), the Legislature having put it there itself, would not it be estopped from disputing its own authority. Can an agent who exceeds his authority repudiate his own act for that reason? Can an agent, without authority to sell, reclaim the property after he has sold it. The principal may repudiate the unauthorized acts of his agent, but not the agent himself. That doctrine would be monstrous. But even if the State, in her sovereign capacity, were to come before the court at this late day to repudiate an act of her chief and general agent, the Legislature, done more than thirty years ago—an act by virtue of which her coffers have been filled with gold, her children educated, and the iron horse sent careeing through her plains, would not this honorable court have the courage to tell majesty itself it was too late—that her acquiescence was conclusively presumed, and if not so, would he not be required to disgorge the profits she had realized from the bank upon the faith of the fund.

I insist that the Legislature, in assuming to declare "all claims and demands of all kinds against the bank of date of the 6th of May, 1861, and after, absolutely null and void," assumed to do that which it had no power to do. The validity or invalidity of such a claim is a question of judicial, and not legislative cognizance. The Legislature

State, and Watson, Trustee v. Bank of Tennessee.

had no more power to declare those contracts void than it had to declare contracts void made anterior to that date; and it has no more power to nullify contracts made with the Bank of Tennessee than it has between other individuals. The validity of a contract depends upon the law of the place where made at the time it was made. If by the laws of that place, at that time, the parties were competent to contract, and the contract was in conformity to law, it is valid, otherwise not; and whether by the laws of Tennessee on the 6th of May, 1861, and subsequently, at the times when Cockrell deposited his money in the Bank of Tennessee, he and the bank were competent to contract; and whether the deposit of money at that time created a legal obligation on the bank to pay back on demand, are questions purely judicial, and can be determined only by the courts of the country, and not by the Legislature. "To receive money on deposit, and pay away the same to order free of expense," was within the very letter and spirit of the charter of said bank, and there was no law of Tennessee prohibiting it or infringed by it.

The act of secession was either valid or void. If void, as it has been pronounced by all the powers and departments of the Federal Government and of Tennessee, it was simply a nullity, affecting nothing, changing nothing, voided nothing that was valid, and validated nothing that was void. It was as the idle wind. But whether valid or void, it relates to nothing but the external relations of the State with the Federal Government, and had no more bearing upon the internal and domestic institutions of the State, and the commercial intercourse and contracts of her citizens, than it had upon the domestic laws and institutions of the other states in the Union. If the act had been constitutional, and had the effect contemplated by its authors, of dissolving the political connection between Tennessee and the other states of the Union, how could it have affected her domestic laws, and the commercial contracts and obligations of her

State, and Watson, Trustee v. Bank of Tennessee.

citizens and corporations? If the law had been effective it would simply have released Tennessee from her obligations as a state to the Union; but it could not have dissolved her government; it could not have dissolved the legal obligations of contracts between man and man; it could not have produced internal anarchy. Internally, Tennessee would have continued precisely the same she was before the dissolution, with her internal government and all her domestic institutions intact. If then, an efficient act of secession could have effected no internal disorders, how much less could an abortive and unsuccessful attempt to do it affect her internal relations. Considered as a conquered province, the Federal Government—the conquerer—might impose such terms as her humanity or inhumanity might dictate, and perhaps the Federal Government, as an act of reconstruction, or reformation of the Government of Tennessee, had chose to declare the contracts made with the Bank of Tennessee, or between citizens, either before or after the 6th of May, 1861, void, the act might have been within the war making power of the government.

But the Legislature of 1866 was not the Federal Government—was not the conqueror of Tennessee, and was not invested with the war making power. They were civilians representing the same state in the same capacity as the Legislature that passed the secession act of 1861; and in the same capacity that the Legislature now in session in this capitol are representing it. And the present Legislature might, with the same propriety, and with just as much show of authority, declare all claims and demands against the Bank of Tennessee, from and after some other year in which some previous Legislature had passed some other unconstitutional law, null and void.

But if the secession act would avoid the contracts of the Bank of Tennessee, why not avoid the contracts of the other banks deriving their charters from the same source? And if it would avoid the contracts made with banks, why

not the contracts of private citizens? And yet this court, since the close of the war, has been in the daily habit of enforcing contracts between parties of all descriptions, and as well those made since the 6th of May, 1861, as those made before it.

ARGUMENT OF R. McPHAIL SMITH, FOR HOLDERS OF NEW ISSUE.

On the 16th of February, 1866, the Legislature ordered the president and directors of the Bank of Tennessee to execute an assignment for the benefit, first, of the school fund, and second, of all the creditors of the bank, indiscriminately, whose claims arose before the 6th of May, 1861, " excluding all claims and demands of all kinds, of date after May 6, 1861, as absolutely null and void."

The failure to discriminate between the bills and the other claims against the bank to be embraced in the second class, in apparent disregard of the priority awarded by sec. 30 of the general banking act of 1860, probably arose from the fact that, at the time when the act directing the assignment was passed, the old issue of the bank was regarded as comprising about all of its liabilities antedating the 6th of May, 1861, except the school fund.

The Attorney General was directed to file a bill to carry out the assignment, and to enjoin all creditors from suing the bank, and to that end to make them all parties.

Upon the 4th of May, 1866, the assignment was executed to Samuel Watson, with preferences as directed by the legislative decree.

But it is to be remarked that the assignment contains not one word repudiative of the liabilities of the bank that arose after the 6th of May, 1861. Simply these are not embraced in its provisions.

Upon the 16th of May, 1866, the Attorney General filed the bill to carry out the assignment and to enjoin the creditors

of the bank from suing it. The State and Watson were complainants; the president and directors of the Bank of Tennessee, together with the creditors of the bank and others, were defendants.

The bill recited the act of the Legislature and the assignment pursuant thereto; stated that Watson had not qualified because unable to give the enormous bond required for the purpose, and prayed for the injunction against the creditors, and the execution, under the decrees of the court, of the assignment. Upon the same day the injunction issued as prayed for.

Upon the 21st of May, 1866, the court appointed Watson receiver of the assets embraced in the assignment, requiring of him a bond in the penalty of $50,000, which, upon the 24th of May, 1866, was given and accepted, and Watson was thereupon qualified as such receiver.

Afterwards various answers were filed by individual depositors.

Afterwards Mark R. Cockrill answered, setting up a claim as a depositor against the bank; and upon the 24th of May, 1868, he filed, on behalf of himself and all other creditors of the bank, an original bill, which was, however, styled and, as respects form, taken as a cross-bill, in which he attacked the act of February 16, 1866, and the assignment thereunder, upon substantially the same grounds as afterwards did B. R. McKennie and a number of other depositors, who, instead of coming in under the Cockrill bill, filed what is also an original bill, though styled and, as respects form, taken as a cross-bill, the grounds of attack being that, by virtue of the charter of the bank, its capital stock—including the school fund as a part of it—was a trust fund for the payment of the debts of the bank, and that it was not competent for the Legislature to invalidate the debts of the bank created after 6th of May, 1861, or to deprive these debts of their equal right with other debts to satisfaction out of the assets of the bank.

The McKennie bill also sought, but ineffectually, to make the State live up to the obligation assumed by it in the charter of the bank, to keep the capital stock up to $5,000,000.

And last, upon the 3d of December, 1872, T. A. Atchison and W. M. Duncan answered, claiming against the bank as holders of what is known as the new issue, or Torbett issue—the bills issued after the 6th of May, 1861, which the Constitutional Amendments of 1865, and the action of the Legislature thereunder, had attempted to extinguish.

In their answer, Atchison and Duncan impugned as void the act of February 16, 1866, and the assigment made according to its directions, urging that by virtue of the charter of the bank, and the general banking law existing at the time of the issuance of their money, the capital stock of the bank was bound for its debts, and that the billholders were preferred creditors. That in the very scheme of the bank, in connection with the general banking law, was involved a pledge of the assets of the bank for the benefit of its bills as preferred claims in the event of its insolvency. That this pledge attached to the bills issued after the 6th of May, 1861, and thenceforth ran with them, and that its obligation could not be impaired by a subsequent legislative decree seeking to extinguish the notes, or to sever their hold upon the assets of the bank.

Afterwards the State was allowed to retire from the cause, which thenceforth proceeded in behalf of Watson as sole complainant.

Demurrers were filed to the Cockrill and McKennie bills.

The former appeal to this court was from the decree below upon a hearing, not upon the original bill, but (preparatory to a final hearing upon that bill) upon the Cockrill and McKennie bills, and the answer of Atchison and Duncan. By the decision of this court upon that appeal, certain points were settled :

*First,* negatively, that the State being no longer a party to the cause, no question involving either her rights or her obligations was cognizable therein.

*Second,* that the school fund was merely a part of the capital stock of the bank, liable equally with the residue for the debts of the bank, and that the act of February 16, 1866, and the assignment thereunder, were void so far as they undertook to erect the school fund into a creditor of the bank.

*Third,* that they were void also so far as they attempted to deny participation in the assets of the bank to claims, otherwise valid, simply because they originated after the 6th of May, 1861 ; that the bank had the same right after as before the commencement of the rebellion to do a legitimate banking business, and therein to receive deposits and to issue bills; and that the bills of Atchison and Duncan, issued after the 6th of May, 1861, and set forth in their answer, were as valid, and as well entitled to priority of payment out of the assets of the bank, under sec. 30 of the general banking law of 1860, as the bills issued before that date.

The cause was remanded to the Chancery Court to be proceeded in conformably to these rulings.

Had all the holders of the new issue filed their claims in the cause before the 1st of January, 1873, there would, after the aforesaid decision of this court, have been little to do but to realize the assets of the bank and distribute them *pro rata* among the holders of the new issue, whose claims are well known to exceed in the aggregate the value of the assets.

For, by that decision, the only effect of the assignment to Watson, had he qualified thereunder, was to convey to him the legal title to the effects of the bank, charged with the same trusts that attached to them in the hands of the officers of the bank before the assignment. The preference of the school fund was expunged, and it was swept into the assets of the bank. The discrimination between the debts created

before and after the 6th of May, 1861, was effaced, and the bills issued afterwards were declared entitled to the same priority of satisfaction out of the assets as those issued before that date.    Any imaginary right of the State, as the holder of the old issue taken up by her for taxes, to share in the distribution, by subrogation to the rights of the tax-paying billholders, was excluded from the cause upon the very conclusive ground that the State was no longer a party thereto.

But I would remark in passing that, even were this otherwise, it could give us no trouble; for any such claim upon the part of the State would be instantly overwhelmed by her delinquency, in disregard of her liability under the charter of the bank to keep the capital stock up to $5,000,000.

This liability, were she a solvent individual, subject to her present obligations, would constitute an immense trust fund, which, at the instance of creditors, the court would compel to be paid in, and then there would be an abundance for all the creditors of the bank.    But being a State, she may skulk behind her sovereignty with no other penalty than that of dishonor.

But if she actively attempted to aggravate the deficiency produced by her dereliction, she would be told that her liability to the fund far more than swamped any rights she could have against it, and be summarily repelled from the halls of justice.

But to recur.    The only contest against the new issue involved in the present appeal, arises from its not having been filed in the cause earlier, and consists, as we think, of misconceptions as to the effect upon it of the lapse of time. The former decision of this court settled all other questions affecting the money.

The present controversy, therefore, is between those depositors who appeared so early in the cause as to preclude all questions arising out of the lapse of time, on the one hand; and the holders of the new issue and the residue of the depositors, on the other hand.

33—VOL. 5.

Only Atchison and Duncan had, until almost up to the present moment, filed any new issue in this cause, and they less than $5,000.

Outstanding depositors have no contest with holders of outstanding new issue, since the former can come in only upon grounds equally admitting the latter, whose priority thereupon would absorb all of the assets. So that the controversy becomes, practically, that of the depositors who filed their claims beyond all question seasonably, and the holders of the new issue.

A word as to the shape in which the questions involved are presented.

Several holders of new issue have filed their petition, both in the case of *Samuel Watson* v. *The President and Directors of the Bank of Tennessee and others,* and in the Mark R. Cockrill case. In the former they come in as defendants, and in the latter as complainants. This petition has been replied to by Watson in the interest of our adversaries.

Against the petitioners it is alleged that their bills are barred by the statute of limitations of six years; that, aside from this, the title to the personalty and realty of the assets of the bank has become vested in Watson through the operation of the statutes of limitations of three and seven years respectively, coupled with his alleged holding of these assets under the assignment, and therefore adversely to all claiming in conflict with it; and finally, through the expiration of the charter of the bank, and of the five years thereafter allowed by law for winding up purposes, the bank has become annihilated, and that claims against it have perished with it.

Our adversaries below seemed unaware that this last position would be as fatal to them as to us.

I proceed to consider these positions in their order.

·  ·  ·  ·  ·  ·  ·  ·

I. Has the new issue been barred by the statute of limitations of six years?

If so, when did the statute begin to run?

It has been said that the new issue was repudiated by the State in 1865, and that that set the statute in motion. But the State could not repudiate the new issue any more than A could repudiate B's note. The new issue was the debt of the bank, not of the State. The State was no more identical with the Bank of Tennessee than with any other bank.

If the State had been identified with the bank, the bank would not have been suable; the statute of limitations would not have run against the bank; the bank would have been entitled to the State's priority in the administration of insolvent estates; and the issues of the bank would have been unconstitutional bills of credit. All these positions have been thoroughly disposed of by the courts. *Bank of the U. S.* v. *Planters Bank of Georgia*, 9 Wh., 904; *Bank of Kentucky* v. *Wister*, 2 Pet., 124; *Briscoe* v. *Bank of the Commonwealth*, 11 Pet., 257; *Woodruff* v. *Trapnall*, 10 How., 190; *Darrington* v. *State Bank of Alabama*, 13 How., 12; *Curran* v. *Arkansas*, 15 How., 309; *Fields* v. *Creditors*, 1 Sneed, 354; *Bank of Tennessee* v. *Dibbrell*, 3 Sneed, 380.

The attempt of the State to extinguish the new issue cannot have set in motion the statute against what were the liabilities, not of the State, but of the bank.

But it has been said that the assignment by the bank was a repudiation by it, which set the statute in motion. But let us see. Here is the portion of the assignment that is involved:

"*First*, he (the assignee) shall pay to the State of Tennessee, or the proper officer and custodian of the fund, $1,500,000, the amount of the common school fund deposited in the Bank of Tennessee by acts of the Legislature, with interest accrued and accruing on said sum since the 6th of May, 1861, up to the time of paying over the same. *Second*, he shall pay in full, if he have means sufficient, and

if not, *pro rata,* all holders of the bank notes issued by the Bank of Tennessee prior to the 6th of May, 1861, and all persons who became creditors prior to that time, the above payments being in compliance with the act of the Legislature of Tennessee entitled An act to wind up and settle the business of the Bank of Tennessee; and the residue, if any, to be paid to said State."

We see that the assignment merely omits to provide for the new issue.

But if I execute a deed of trust providing for only a portion of my debts, do I therefore attempt to repudiate the residue? Would the execution of such a deed, whether it contained all my property or not, operate to set in motion the statute of limitations against a note payable on demand and not provided for in the deed? Assuredly not.

This court has said what is requisite to set in motion the statute of limitations against bank notes.

In *Farmers and Mechanics Bank* v. *White,* 2 Sneed, 482, it was held that there must be "an actual refusal of payment, on demand at the counter of the bank."

There the bank had suspended in May, 1847, and remained so ever since. The suit was not commenced until the 7th of September, 1854.

Now, the new issue is not shown to have ever been presented at the counter of the bank and dishonored. The merely passive non-payment of the bills, together with the execution of an assignment embracing other debts only, cannot have set in motion the statute.

The decision just cited was made in 1855, but afterwards it was provided, by sec. 2779 of the Code, that statutes of limitation should not apply at all to bills issued or put in circulation as money.

This section is embraced in the chapter devoted to the subject of limitations. After prescribing the periods applicable to different classes of actions, then it was enacted in this section: "The provisions of this chapter do not apply

to actions to enforce payment of bills, notes, or other evidences of debt issued or put in circulation as money."

Certainly no statutory provision elsewhere applies to such actions.

Our adversaries were driven to contend that the section just quoted must be limited to such bills as actually circulate as money, and to the time of such actual circulation. The plain English of the provision excludes from the operation of statutes of limitations "bills issued or put in circulation as money." But the exigency of a desperate case required our adversaries to insist upon the interpolation of the words, "for so long only as the same shall actually circulate as money." But they cannot be permitted to amend the provision to supply their necessity. They must take it as they find it. And thus taken, it, without more, disposes of all their hopes founded upon the statute of six years.

There was no need of passing an act to provide that the statute of six years should not apply to bills issued and actually circulating as money. That was the law before.

Every new statute is presumably an addition to the law.

The decision in *Farmers and Mechanics Bank* v. *White* had declared that the statute did not begin to run against bank notes until an actual dishonor at the counter of the bank. Then the section in question provided that the statute should not run against bank notes at all.

But it is needless to waste time arguing that a statutory provision has the only meaning that its language can be made to bear. It of course suffices that the bills in question were formerly issued and put in circulation as money.

In a case of less magnitude I should incline to reply no further to the plea of the statute of six years. A perfectly unambiguous section of the Code, exempting the claims involved from the operation of that statute, renders other replies as superfluous as the lawyer's remaining sixteen good reasons for his client's non-appearance, whose first excuse

was that the client was dead.   But with the indulgence of the court I offer other replies.

Upon the 6th of May, 1866, the Chancellor at Nashville, pursuant to the prayer of the original bill in this cause, enjoined "all persons or corporations from suing out any writ against the Bank of Tennessee or its trustee, either original, intermediate, or final; or commencing any legal proceeding whatever against either in any court of law or equity in the State of Tennessee, or elsewhere." This injunction as to the holders of the new issue has never been dissolved.

Now the Code, sec. 2756, provides: "When the commencement of an action is stayed by injunction, the time of the continuance of the injunction is not to be counted." And this alone would dispose of the plea of the statute of six years.

But again: Upon the 24th of March, 1868, Mark R. Cockrill filed, on behalf of himself and all the other creditors of the bank, a general creditor's bill, attacking the assignment of the bank, and asking to have the bank wound up according to law.   This is an original bill in the nature of a cross-bill.   Its prayer is that Cockrill be allowed to file the bill in the nature of a cross-bill as well on his own behalf as on that of other creditors of the bank who may elect to have themselves made parties upon the usual terms; that all creditors of the bank who come in and take the benefit of this bill be permitted to file and authenticate their claims against the bank, to be adjudicated by the court; that a rate-bill be ordered if necessary, and the assets of the bank applied in satisfaction of such claims as may be allowed, in full satisfaction if the assets be sufficient, and if insufficient, then *pro rata.*

The original bill in this cause sought to carry out the assignment.   The Cockrill bill attacks the assignment as in conflict with the original scheme of the bank under its charter, by which the capital stock was pledged as a trust fund for the benefit of the creditors.   And this court has sus-

tained the view of the Cockrill bill, that the preferences of
the assignment are void so far as they vary from the trusts
originally impressed upon the assets by the charter.

The Cockrill bill is based upon secs. 3431 and 4294 of
the Code, allowing any creditor, for himself and other cred-
itors of a corporation having lost its normal vitality, to file
a bill, whether judgment have been recovered or not, to
have the corporate property applied to the payment of the
corporate debts. It is what is known as a creditor's suit.

Now, as to the operation of the statute of limitations
upon creditors' claims in such a suit, it was determined,
says Mr. Daniell, 2 Ch. Pl. and Pr., 1211, in *Sterndale* v.
*Hankinson,* 1 Simons, 393:

"That where a bill is filed by a creditor on behalf of
himself and all others, every creditor has an inchoate inter-
est in the suit from the moment the bill is filed, and from
that moment time does not run against him; so that a sim-
ple contract creditor coming in under such a decree made
in such a suit, was admitted to prove, although there had
been a lapse of more than six years between the filing of
the bill and the decree."

Now, the new issue holders at present before the court
are complainants with Mark R. Cockrill in his suit, as well
as defendants in the original suit.

I would remark in passing, by way of explanation, why
the petitioners so long delayed to prefer their claims, that
the Legislature having ordered, and the assignment having
undertaken to give, the preference to the school fund, and
this preference having been sustained by the decree of the
court below, it naturally appeared to the holders of new
issue that their most judicious course was to await the de-
cision of this court upon this point.

If this affirmed the decree of the court below, then it
was not worth while for them to incur the expense of filing
their money; since the school fund, if entitled to its prefer-
ence, would absorb all the assets of the bank.

Now, it was only at the last term of this court that the preference of the school fund was adjudged void; and at the very term of the Chancery Court in session when that decision was announced, the petition now before the court was filed.

The Cockrill bill was of itself an ample shield against the operation of the statute of six years.

But suppose we concede that the statute of six years was set in motion, and ran its full course, what then?

Why, simply that the notes were barred as against the bank. And what of that?

We seek no relief as against the bank. That, as will hereafter be shown, has for some time probably been annihilated. We ask simply to have these bills allowed to have their proper recourse upon a trust fund which was, by the charter of the bank, and the general banking law of 1860, pledged primarily for their benefit.

If a note secured by a vendor's lien be barred by the statute of six years, while the remedy against the maker personally is gone, the note does not thereby lose its recourse upon the land involved.

If a note secured by a mortgage or trust deed be barred, yet the trust property remains as much bound for its payment as ever. *Lewis* v. *Hawkins,* U. S. Supreme Court, 1875, Cent. L. Journal, April 30, 1875.

We are seeking, I repeat, for no relief against the bank; but the assets of the bank were and are, as we shall see more fully by and by, a trust fund pledged for the payment of its debts; and the extinction of the corporate entity had no effect whatever upon the liability of the trust fund for the corporate debts. In the language of the court in *Addler* v. *Milwaukee Patent Brick Manufacturing Company,* 13 Wis., 60, "the capital stock constitutes the sole fund to which creditors look for the liquidation of their demands. It is the basis of the credit which is extended to the corporation by the public, and a substitute for the individual lia-

bility which exists in other cases. So far as creditors are concerned, it is regarded in law as a trust fund pledged for the payment of the debts of the corporation."

In *Curran* v. *Arkansas*, 15 How., 304, this principle was very clearly set forth.

There it was held that the capital stock of the State Bank of Arkansas was a trust fund for the payment of its debts, by virtue of the very scheme of the institution as defined in the charter, which involved a contract to this effect; and that a law of the State that sought to appropriate the assets to other uses, impaired the obligation of this contract, and was therefore void.

That the charter setting apart a fund as capital, amounted to a contract with those who should afterwards become creditors of the institution, that the fund should not be withdrawn and applied to other uses.

This decision, based upon points in the constitution of the Arkansas Bank not peculiar thereto, but equally involved in that of the Bank of Tennessee, applies with exactness here.

And the principles of the decision are here made much more emphatically applicable by the general banking act of 1860, containing the most careful provisions as to the capital stock of banks;—restricting its transference; regulating the liabilities, and limiting issues relatively to assets; providing for examinations and monthly statements, and for the registration of circulation; expressly forbidding the withdrawal of any part of the capital stock until all of the liabilities shall have been satisfied; declaring the liability of stockholders, to the amount of their subscription, to be a part of the fund pledged to creditors; and awarding priority to the billholders over all other creditors, in the event of insolvency.

This act, so far as applicable, and so far as its provisions were not already involved in the organic law of the Bank of Tennessee, was an amendment of its charter, which it

was of course competent for the Legislature to make, unless the obligation of some contract were thereby impaired; the consent of the State, the sole stockholder of the bank, being involved in the act of the Legislature making the amendment.

As to bills issued and deposits made subsequently to 1860, there can be no question of the applicability of the act. And it is only with these that we have now to deal.

Under this act, and independently of it under the well settled principles rendering it superfluous in the present case, the bills of the Bank of Tennessee were equitable liens upon its assets, their status in this regard resting upon the basis of the contract involved in the charter as it originally stood, and emphatically as thus modified, pledging for their security the assets of the bank, a contract inhering in the bills from the moment of their issuance, and running with them thenceforward.

Upon the insolvency of the bank, the status of its outstanding bills was already fixed upon the aforesaid firm charter contract basis, reposing ultimately on the rock foundation of the Constitution of the United States, secure from subsequent state impairment either by constitutional amendment or ordinary legislative action.

In *Marr* v. *Bank of West Tennessee*, 4 Col., 471, the assets of an insolvent bank were declared to be a veritable trust fund, which equity would jealously guard for equal distribution among the entire class entitled to share therein, not permitting any individual of the class to obtain by legal process priority over any other.

It is, of course, perfectly obvious that the same principle that forbids one creditor of an insolvent bank to gain by legal process priority over another of the same class, equally forbids the insolvent bank to confer by assignment priority upon one creditor of the class over another; still more to reverse priorities impressed by law upon the assets in the event of insolvency, or to exclude from participation in the

fund the very creditors whose claims are by law equitable preferred liens thereon.

As well might a vendee of land, with a dozen notes for the purchase money outstanding in different hands, hope, by a deed of trust upon the land, to give some of the notes priority of recourse thereon over others, all of them being coequal liens upon the land.

This would be just as feasible as for an insolvent bank to alter by assignment trusts already by law indelibly impressed upon the assets.

So that, even with the impossible concessions that the new issue was repudiated by the bank; that the statute of six years was applicable thereto, and was set in motion, and that the bar was formed before our petition was filed, we see that our adversaries could not prevail, since the notes being barred would not affect their status as preferred equitable liens upon the assets of the bank, the trust fund pledged by law for their payment.

And let it not fail to be noted, that here the insolvency of the bank occurred before the statute can have been set in motion; so that before that date, by means of the insolvency, the assets had become the more firmly impressed with the character of a veritable trust fund for the benefit primarily of the billholders.

How it might be if the statute had been applicable and had actually been set in motion before the occurrence of the insolvency, we need not inquire.

Upon the insolvency the corporation stepped down and out, leaving on the stage only the officers as trustees and the creditors as beneficiaries.

Under the general banking law of 1860, the insolvency operated as an assignment for the benefit of the billholders as preferred creditors.

Thenceforth the bills could no more be deprived by the operation of the statute of six years of their recourse upon the assets than could a note secured by a mortgage or deed

State, and Watson, Trustee *v.* Bank of Tennessee.

of trust be thereby deprived of its lien upon the property conveyed.

So that the discussion as to whether the new issue has been barred by the statute of six years or not, is after all wholly irrelevant; since it is immaterial whether it has been or not, as we are not suing the bank but are seeking our recourse against a trust fund pledged for our benefit,—a right which the bar of the statute would not affect.

II. The next position of our adversaries involves misconception both of law and fact.

They assume that from 1866 Watson held possession of the assets of the bank claiming them under the assignment as subject to the trusts thereof, and consequently adversely to all claiming in conflict with the assignment; and they contend that three years of such adverse possession as to the personalty, and seven years as to the realty, vested in him the property subject to the trusts of the assignment, and free from all recourse inconsistent with the assignment.

Let us consider first the quality of this legal conception, and then whether, if sound, it has any application in this controversy.

If I hold adversely for seven years a tract of land claiming as trustee for the use of A, the property vests in me as trustee for A. The true owner may at any time during the seven years eject me.

But suppose my possession is lawful,—under a deed vesting the legal title in me but declaring trusts which are void. Suppose that the land came into my possession already impressed with certain trusts, which the deed to me was incapable of affecting, and that the substance of the transaction was therefore that the former holders of the land charged with certain trusts placed it in my hands subject to the same trusts. Now, my possession being legal, I cannot be dispossessed.

Suppose that I regard the void trusts declared in the deed to me as those properly attaching to the land, still I cannot be ejected simply on account of my erroneous legal conceptions.

If I am about to carry out my ideas to the prejudice of the rightful beneficiaries, I may be restrained; but if (nothing of this kind being apprehended) I am suffered to remain in possession of the land for seven years, will my possession operate, through my mistaken notions, to efface the valid trusts attaching to the land, and to impress upon it the void ones declared in the deed to me?

How can the failure for seven years to bring ejectment against me produce any effect when during all that time there has been no one that had the right to disturb my possession?

The statute of seven years (Code, sec. 2763) cannot accomplish such a result as to realty.

Nor can the statute of three years (Code, sec. 2773) as to personalty. This simply provides that actions for the detention or conversion of personal property must be brought within three years. But where the possession is lawful no such action will lie.

It is a far-fetched idea of the nature of the statutes of seven and three years that they can be made to operate through the misconceptions of the trustee, to help the invalidity of the trusts of an assignment;—not to cure defective titles to property, but to vitalize void liens.

Watson's possession of the fund here was lawful; but the trusts of the assignment being void he took the assets charged with the same trusts attaching to them in the hands of the officers of the bank before they were transferred into his hands. The assets in their hands were a trust fund for the benefit of creditors, and primarily of the billholders, and this trust adhered to them in Watson's hands. Before the assignment the officers were the trustees for the creditors, and afterwards Watson was their trustee. And stat-

utes of limitations do not run between trustees and *cestuis que trust.*

Conceding him to have imagined that the trusts of the assignment were those binding the fund, yet his erroneous notions cannot have infused life into these void trusts.

But it is throwing away time to argue such a point; for even with the impossible concession to our adversaries of their view of the law in this regard, the case affords no basis of fact for its application. For Watson has never for one moment held any of the assets of the bank as trustee under the assignment.

He could not qualify as such trustee, because unable to give the enormous bond required for this purpose. His inability to qualify being stated to the court, it thereupon appointed him a receiver in this cause, under a bond of $50,000; and he has never been anything more nor less than a simple receiver, his possession being that of the court for the benefit of whoever might ultimately be found entitled to the fund.

The original bill made all the creditors of the bank parties, and sought to carry out the assignment ignoring the rights of those whose claims arose after the 6th of May, 1861. Of course it was foreseen that these creditors would resist the assignment pretermitting them, and that if successful they must be let into the distribution; and assuredly the court did not prejudge the controversy by assuming to hold the fund, by its receiver, for the benefit of one set of creditors, and adversely to the others.

The possession of the court was an impartial possession, for the execution of its own decrees after all the parties should have been heard and their respective rights determined.

The language of the decree of May 24, 1866, is the following:

"This cause came in to be heard upon the report of the clerk and master reporting upon the bond of Samuel Watson, receiver, etc."

After which follows a copy of the bond, and then the decree proceeds:

"It is therefore ordered, adjudged and decreed that said bond be accepted by the court and spread upon the minutes, and that said Watson be confirmed in the office of receiver, and go on under the orders and decrees of this court to the execution of said trust, etc."

Upon June 26, 1866, another decree was entered, reciting:

"This cause came on this day upon the motion of Samuel Watson, receiver, etc.; when it was represented to the court that said receiver had now in his hands some $50,000 belonging to the trust fund, and asking the instructions of the court in regard thereto; and thereupon it is ordered by the court that the receiver be authorized to loan out all of said trust fund, etc."

Watson's answer to our petition admits the correctness of its statements as to his receivership; and the petition states that he has never acted in any other capacity than as a mere receiver in the cause.

Yet afterwards he alleges that as trustee and receiver, he held the fund adversely to the creditors ignored by the assignment.

But the record will show that he was not at any time anything more than a simple receiver.

The plea is insufficient on the very face of it. Watson must have held as trustee long enough to form the bar of the statute, even under our adversaries' conception of the law; and it was necessary for the plea so to aver. His possession as receiver cannot have been adverse. To have held perhaps for one day as trustee and for the residue of the time as receiver, certainly would not do. But for all that the plea alleges this may have been the case.

The statute of limitations does not run as to property in *custodia legis. Moore* v. *Crockett*, 10 Hum., 365.

It does not run against a fund in court,—does not run in

favor of parties liable to the fund upon sale notes taken by the court. *Swafford* v. *Howard*, Knoxville, September Term, 1874. And of course it does not run in favor of the fund against the parties claiming it.

The granting of the injunction in this cause, and the filing of Mark R. Cockrill's creditors' bill, constitute further replies to any supposed operation of the statute of seven years and three years.

But the point under consideration has already been disposed of by the former decision of this court in the Atchison and Duncan branch of this very cause.

Atchison and Duncan did not make their appearance in the cause until the 3d of December, 1872. Upon the adverse possession theory of our adversaries, the statute of three years began to run as to the personalty of the fund in Watson's hands upon the 1st of January, 1867, (the running of the statute being suspended from May 6, 1861, until January 1, 1867) and it ran its course, and cleared away any claim of the outstanding new issue upon the fund on the 1st of January, 1870.

And Judge W. F. Cooper raised this very point among others against Atchison and Duncan, as may be seen from his very learned and exhaustive printed argument. But the court did not think it worth while even to notice so strained a notion, but in its decree declaring the parties entitled to resort for the satisfaction of their claims to the assets generally (the mass of which consisted of personalty) it impliedly disposed of the point in question.

Nor can this be explained by saying that the statute was not then plead. True, it was not. But it did not need to be plead.

There are two kinds of statutes of limitations. One, e. g. the statute of six years, operates only on the remedy. After the bar is formed the right remains, and will furnish a consideration for a new promise. This kind of statute must be plead.

But the other kind, e. g. that of three years and that of seven years,—operate upon the right itself,—to divest and vest title.    This kind need not be plead.

To replevin or ejectment, to recover goods or land, simply the general issue may be plead, and then the length of peaceable adverse possession may be shown in evidence to make out the defendant's title.    *Maury* v. *Lewis*, 10 Yer., 119; *Morrow* v. *Hatfield*, 6 Hum., 108.

So that the question of the operation of the statute of three years as now presented was fully before the court upon the former appeal, and was argued and disposed of.

. . . . . . . . . . . .

To recapitulate: the plea of the statute of six years cannot avail against the new issue, because by express enactment bills "issued or put in circulation as money" are exempt from the operation of the statute; and because, were this otherwise, it required the actual dishonor of the bills at the counter to set in motion the statute, and this is not shown to have occurred, and indeed neither in act nor word does the bank appear ever to have attempted to repudiate them; and because the injunction in this cause operated to stop the running of any statute of limitations; and because the filing of Mark R. Cockrill's creditors' bill gave every creditor of the bank an inchoate right therein, and shielded him thenceforth against the running of any statute of limitations; and because the operation of the statute of six years would no more preclude the recourse of the bills in question upon the assets of the bank, a trust fund pledged for their benefit, than it would prevent the enforcement of a vendor's lien, or the foreclosure of a mortgage, after the formation of the bar had destroyed the remedy by suit against the maker of the note secured by the lien or the mortgage.

And as to the strained theory of the operation of the statutes of three and seven years upon Watson's alleged adverse possession of the fund; in addition to the replies fur-

34—VOL. 5.

nished by the injunction in this cause and the Cockrill creditor's suit, we have seen that the theory involves a misconception of the potentiality of these statutes; and that, were this conception sound, yet there is no basis for its application in the cause, since Watson's possession under the assignment as trustee could not have been adverse to the holders of new issue, the trusts of the assignment being void, and the assets subject in his hands to the same trusts as in the previous hands of the officers of the bank, the only result of the assignment being the substitution of one trustee for others, none of the creditors having any right to dispossess Watson, and therefore none being prejudiced by not having within three or seven years attempted to do so; and statutes of limitations not running between trustee and *cestuis qui trust:* but further we have seen that Watson never held possession of any part of the fund as trustee under the assignment; that he has never been anything more than a mere receiver in the cause, his possession being that of the court for the execution of its own orders and decrees,—mere neutral possession, adverse to none: and last we have seen that the very point in question was argued, and disposed of by this court, at the last term, in the Atchison and Duncan branch of this very cause.

So that it is entirely safe to conclude that the new issue cannot have been prejudiced by the operation of any statute of limitations.

.    .    .    .    .    .    .    .    .    .    (   .    .

III. Apparently forecasting discomfiture upon the proper battle ground between us, our adversaries rush madly into a position which if maintainable would involve both them and us in one common ruin.

It is a position available in the interest only of the State if she were, as she is not, in the field against us both; and one from which her guns would tell equally upon our foemen and ourselves.

Formerly they and we, side by side, successfully withstood

the attack made upon our common rights, as creditors of the bank whose claims arose after the 6th of May, 1861; an attack made in behalf of the State; although she had formally withdrawn from the fray; her Attorney General aided by valiant special counsel conducting the assault, which had it prevailed would have captured the entire fund now in controversy for the State; since the school fund, a part of the capital of the bank, could not be a creditor, and the only claims that arose before the 6th of May, 1861,— old issue—were absorbed by the State; so that there remained only the State on the one side, as stockholder, and our adversaries and ourselves on the other, comprising all, or next to all, of the creditors; and both sought to be excluded by the assignment ordered by the State.

We parted company, to contend with each other for the fruit of our joint triumph over the State; but now that victory visibly hovers over our banner, as that of the bill-holders with preferred claims unimpaired by any statute of limitations, our adversaries, rather than succumb to their former allies, seem bent upon compelling, if possible, the abandonment of the prize, after all, to the State, from whose clutches they recently helped us to save it.

The position in question is that the charter of the bank having by its own limitation expired on the 1st of January, 1868, and the five years of additional life given by statute to corporations for winding up purposes having expired on the 1st of January, 1873, thereupon the bank was annihilated, and all claims against it perished, including the new issue.

Of course, if this view of the law be sound, then the claims against the bank of our adversary depositors were also snuffed out on the 1st of January, 1873. Their having previously appeared in the suit cannot have saved them; for where death extinguishes liability, as for instance in the case of a personal tort, this effect cannot be prevented by bringing suit in the lifetime of the party liable. Upon his

death the suit will abate, and it is incapable of being revived.

So that this is not a position capable of being occupied by our adversaries; since they cannot possibly make it available in their own behalf,—cannot fight therefrom but suicidally and in behalf of the State, who has disbanded her forces and desisted from the strife; this court having decided at the last term that the State being no longer a party to the cause, no rights nor liabilities of hers are cognizable herein. If they were not then cognizable at the strenuous instance of herself, assuredly they are not now at the instance of our adversaries, insisting upon them to their own prejudice as much as ours.

This is really all that it seems to me necessary to say upon this branch of the case; but, as previously, from abundant caution, I beg leave to offer further, though in my opinion superfluous, arguments.

Principles already adduced suggest the inquiry, how can the corporate annihilation of the bank have produced the slightest effect upon the situation? Upon its insolvency its assets became a trust fund, and its officers trustees for the benefit of its creditors, the billholders being preferred. And afterwards, but before the expiration of its charter, it made an assignment, which albeit incapable of altering the trusts by law already impressed upon the assets, at least divested the bank itself of any remaining even semblance of interest therein. After that what figure could the disembodied ghost cut for any practical purpose whatever?

Does any one seriously think that the further merely metaphysical existence of this impalpable outstanding *ens rationis* yclept the Bank of Tennessee, apparently so perfectly immaterial, was yet really a matter of tremendous consequence, mysteriously involving the vitality of large tangible interests,—hundreds of thousands of dollars of liabilities to and from individuals, and the disposition of a fund of great value?

Immediately after the 1st of January, 1873, the fatal period when this shadow vanished utterly from earth, is it supposed that all the suits throughout the State upon claims formerly held by the bank abated?

Do we not know that on the 25th of March, 1873, nearly three months afterwards, the Legislature passed an act sec. 51 of which directed the collectors to receive for taxes the old issue of the bank, which equally with the new had perished according to the notion we are considering?

The dissolution of a corporation is its death. And the death of an individual is his dissolution. Whatever view the gospel may take of the latter, the law regards him as annihilated; not as a living non-resident of our planet. Yet the debts due to him remain collectable, and his estate is to be subjected to the payment of his liabilities. And the analogy holds in the case of a moneyed corporation, only with an *a fortiori;* since from its very origin its effects are, as we have seen, a trust fund for the benefit of its creditors.

In *Lenox* y. *Roberts,* 2 Wheat., 373, the point in question was directly presented. The Bank of the United States, in contemplation of its approaching dissolution, made an assignment of its effects to trustees. Then the bank went out of existence. Afterwards the trustees brought suit in equity upon a note executed to the bank and embraced in the assignment, but which had not been endorsed by the bank. The defense was that, the note not having been endorsed, the suit had to be in the name of the bank for the use of the trustees, and that no suit in the name of a non-existent bank was maintainable. But the court held, Chief Justice Marshall delivering the opinion, that it was very clear that the suit of the trustees was maintainable in equity, whether it were so at law or not.

We shall see presently that the old common law rule never did apply except to the old common law corporations, if indeed it was ever fully enforced even as to them.

The only corporations known to the old common law were the boroughs, the universities, the monasteries, and other ecclesiastical and eleemosynary bodies; and the old common law rule was drawn from the nature of these bodies, from which the modern moneyed corporations,. though so far resembling them, in the attribute of an artificial personality symbolized by a common seal, as to justify the designation of both as corporations; yet differ so widely and so essentially in other respects as emphatically to preclude the application to them of the rule in question: and in fact it never has been applied, nor has any court either in England or this country ever seriously thought of applying it, to the case of a modern moneyed corporation.

The old common law rule, as laid down by Lord Coke,. whose language is substantially repeated by Blackstone, is that upon the dissolution of a corporation all of its real estate remaining unsold reverts to the grantor or his heirs; for that the reversion in such an event is a condition annexed by the law, inasmuch as the cause of the grant has failed; also that the personalty vests in the king, and that the debts due to and from the corporation are extinguished.

In the archaic times of the old common law the only important property was land, which was therefore called real property. Cattle and chattle were nearly synonymous terms, cattle being about the only chattels then. The credit system had not yet been invented. The old common law corporations neither owed nor had due them any debts worth mentioning. They were not business organizations.

England was then an out of the way, semi-barbarous region. The commercial nations were those around the Mediterranean and the Baltic.

But after the discovery of the passage to India by the Cape of Good Hope, and the use of the mariner's compass, and the discovery of America, and the influx of the precious. metals therefrom, had thrown the main commerce of Europe upon the Atlantic Ocean, and given such impetus to the en-

ergy and enterprise of the world, then England, a great island, now in front of Europe, with a fertile soil, fine bays and rivers, and one of the most enterprising populations in the world, became among the foremost in carrying on this great commerce which had arisen.

We are apt to forget how very modern is that commercial, manufacturing England with which we are familiar. The first steamboat was launched in 1807—upon our own Hudson. The first steam railroad was completed in 1830—the Liverpool and Manchester. The telegraph was first brought into practical use in 1844—between Baltimore and Washington. The application of steam to manufacturing and the general use of insurance are within the memory of old men now living. Formerly, what we call banking—what there was of it—was in the hands of the Jews; then of the Lombards; then of the Goldsmiths. The Bank of England, the earliest English bank, was not established until about the beginning of the eighteenth century. The earliest country bank in England was established at Newcastle-on-Tyne in 1755—the year that Ch. J. Marshall was born. Men now survive whose grandfathers were alive when Parliament first made promissory notes negotiable—in 1705.

A large portion of the commercial law of England was built up by Lord Mansfield, who retired from the bench in 1788. The Father of Equity, Lord Nottingham, until whose advent equity was in great measure the individual Chancellor's notion of what was about right under the circumstances, varying, as Selden said, with the dimensions of the Chancellor's conscience, did not begin his career until the last quarter of the seventeenth century.

Corporations cut but little figure in business until long after Lord Coke's, and indeed until years after Blackstone's time. Their almost infinite multiplication, and the enormous extension, chiefly through them, of the credit system, with its to us familiar apparatus of bonds and coupons is a

thing almost of yesterday. Less than twenty years ago the Supreme Court of Pennsylvania, upon old fogy, technical, common law notions, held that the coupon bonds of a county were not negotiable securities entitled in *bona fide* hands to the ordinary exemptions of negotiable paper. See *Mercer Co.* v. *Hackett,* 1 Wal., 95.

One would to-day as soon think of going to the year books for precedents in a patent case as of consulting Coke, or Hale, or even Blackstone, for the law of modern moneyed corporations.

Upon the dissolution of a monastery it was reasonable enough to permit the grantor's heirs to re-enter upon the lands. · They had been given solely for the purposes of the monastery. None of the individuals connected with the institution had any private interest in the corporate property. And it was hard to tell what else to do with the lands in the case supposed, unless indeed they were to be turned over to the king, as Henry VIII. made Parliament dispose of them in his time.

As to the personalty, that was of small consequence—perhaps a few fat beeves and a butt of good wine;—and such as it was, not having emanated from the grantor of the land, there seemed no propriety in giving it to his distributees; and besides at a period tolerably remote this was perhaps impracticable, although the line of heirs could be traced with sufficient ease; and so in default of any better mode of disposition it was turned over to the king, together with wrecks, treasure-trove, waifs, estrays, and the like.

There were few debts when credit was scant, and when every corporate liability had to be solemnized with the common seal; and then a body formed *ad studendum et orandum* had next to no business transactions. And so no great harm could come of wiping out the debts due both to and from the corporation.

The old common law rule then was not so irrational, in view of the nature and circumstances of the old common

law corporations. But one cannot without amusement imagine a modern court gravely contemplating its application to the widely different case of a bank, or a manufacturing, railway or insurance company, whose charter has been forfeited or has expired.

In *Bacon* v. *Robertson*, 18 How., 480, it was contended that upon the dissolution of a bank whose charter had been declared forfeited, the surplus remaining in the hands of the trustee after payment of the debts, must, under the old common law rule, go to the State, as the substitute for the king; and that the stockholders could claim no right thereto.

The question what becomes of the property of an extinct moneyed corporation was here fully considered, and I cannot do better than in this connection to make the following lengthy quotation from the elaborate opinion of Mr. Justice Campbell, speaking for the Supreme Court of the United States, beginning on p. 483:

"The common law of Great Britain was deficient in supplying the instrumentalities for a speedy and just settlement of the affairs of an insolvent corporation whose charter had been forfeited by a judicial sentence.

"The opinion usually expressed as to the effect of such a sentence was unsatisfactory and questioned.

"There had been instances in Great Britain of the dissolution of public or ecclesiastical corporations by the exertion of the public authority, or as a consequence of the death of their members; and Parliament and the courts had affirmed in these instances that the endowments they had received from the prince or pious founders would revert in such a case. *Stat. de Terris Templariorum*, 17 Edw. II.; *Dean and Canons of Windsor*, Godb. 211; *Johnson* v. *Norway*, Winch., 37; Owen, 73; 6 Vin. Abr., 280.

"What was to become of their personal estate, and of their debts and credits, had not been settled in any adjudged case; and, as was said by Pollexfen in the argument of the

*quo warranto* against the city of London, was perhaps '*non definitur in jure.*'

. . . . . . . . " The power of the courts to adjudge a forfeiture so as to dissolve a corporation was affirmed in that case, but the effect of that judgment was not illustrated by any execution, and the courts were relieved from their embarrassment by an act of Parliament annulling it. *Smith's case,* 4 Mod., 53 ; Skin., 310 ; 8 St. Tri., 1042, etc.

" Nor have the discussions since the Revolution extended our knowledge upon this intricate subject. . . . . These are all cases of municipal corporations, where the corporators had no rights in the property of the corporation in severalty.

" The courts of Westminster have found much difficulty in applying the principles settled in regard to such, to the commercial and trading corporations that have come into existence during this century.

" The courts there, within the last twelve months, have been troubled to discuss whether a commercial corporation could recover damages for the breach of a parole contract, or whether the contract should have had a seal to make it valid.

" It may be admitted that the courts of law could not give any relief to the shareholders of a corporation disfranchised by a judicial sentence in respect to a corporate right. Their modes of proceeding do not provide for the case, as they have not for many others.

" But this concession does not involve an acknowledgment that the rights of the corporations are extinguished.

" Courts of chancery have been forced into a closer contact with these associations, and have formed a more rational conception of their constitution, and a more accurate estimate of their importance to the industrial relations of society. These courts have evinced a spirit of accommodation of their modes of proceeding so as to adapt them to the changing exigencies of society.

" Lord Cottenham, in *Wallworth* v. *Holt*, 4 M. & C., 635, in reference to the conduct of suits in which similar associations were concerned, said : ' I think it is the duty of this court to adapt its practice and course of proceeding to the existing state of society, and not, by too strict an adherence to rules and forms established under different circumstances, to decline to administer justice and to enforce rights for which there is no other remedy.'

" In the same spirit Sir James Wigram, V. C., observes : ' Corporations of this kind are in truth little more than private partnerships, and in many cases which may be easily suggested it would be too much to hold that a society of private persons associated together in undertakings which though certainly beneficial to the public are nevertheless matters of private property, are to be deprived of their civil rights *inter se* because, in order to make their common objects more attainable, the crown or legislature have conferred upon them the benefits of a corporate character.' *Foss* v. *Harbottle*, 2 Hare, 491.

" These just views, which have afforded to wise chancellors a sufficient motive to enlarge the scope and relax the rigor of the rules of chancery proceeding, so as to bring the civil rights of individuals, in whatever form they may exist, or however complicated or ramified, under the protection of legitimate judicial administration have been adopted in the United States, not simply for the improvement of methods of proceeding, but also for the adjustment of rights and the assertion of responsibilities among the members of such associations.

. . . . . . " In *Lenox* v. *Roberts*, 2 Wheat., 373, the court gave effect to a general assignment of a corporation of its choses in action made in anticipation of the expiration of its charter, and which was designed to preserve to the corporators their rights of property.

" In *Mumma* v. *Potomac Co.*, 8 Pet., 281, it held that the assignment of all the property of a corporation, and the sur-

render and cancellation of its charter with the consent of the legislature, did not defeat the right of the judgment creditor to satisfaction out of the property which had belonged to it.

"The power of courts of equity in cases like these was recognized as adequate to maintain the rights of the parties beneficially interested, and this doctrine was repeated and developed in *Curran* v. *Arkansas*, 15 How., 304.

"The tendency of the discussions and judgments of the court of chancery in Great Britain and of the courts in this country, is to concede the existence of a distinct and positive right of property in the individuals composing the corporation, in its capital and business, which is subject in the main to the management and control of the corporation itself, but that cases may arise where the coporators may assert not only their own rights but the rights of the corporate body.

"And no reason can be given why the dissolution of a corporation, whether by judicial sentence or otherwise, whose capital was contributed by shareholders for a lawful and perhaps a laudable enterprise, with the consent of the legislature, should suspend the operation of these principles, or hinder the effective interference of a court of chancery for the preservation of individual rights of property in such a case.

"The withdrawal of the charter—that is, the right to use the corporate name for the purposes of suits before the ordinary tribunals—is such a substantial impediment to the prosecution of the rights of the parties interested, whether creditors or debtors, as would authorize equitable interposition in their behalf, within the doctrine of chancery precedents. *Stanton* v. *The Carron Co.*, 23 L. & E., 315; *Travis* v. *Milne*, 9 Hare, 141; 2 Ib., 491.

"For the sentence of forfeiture does not attain the rights of property of the corporators or corporation; for then the State would appropriate it. If those rights are put an end to, it would seem to be rather from a careless disregard, or

hardened and reckless indifference to consequences, than from any preconceived plan or purpose. For according to the doctrine of the text writers on this subject, the consequences are visited without any discrimination, the losses are imposed upon those who are not blameworthy, and the benefits are accumulated upon those who are without desert.

" The effects of a dissolution of a corporation are usually described to be the reversion of the lands to those who had granted them ; the extinguishment of the debts either to or from the corporate body, so that they are not a charge nor a benefit to the members.

" The instances which support the doctrine in reference to the lands, consist of the statues and judgments which followed the suppression of the military and religious orders of knights, whose lands returned to those who granted them, and did not fall to the king as an escheat ; or of cases of dissolution of monasteries and other ecclesiastical foundations upon the death of all their members, or of donations to public bodies, such as a mayor and commonalty.

" But such cases afford no analogy to that before us.

" The acquisitions of real property by a trading corporation are commonly made upon a bargain and sale for a full consideration and without conditions in the deed ; and no conditions are implied in law in reference to such conveyances. The vendor has no interest in the appropriation of the property to any specific object, nor any reversion where the succession fails.

" If the statement of the consequences of a dissolution upon the debts and credits of a corporation be taken literally, there can be no objection to it. The members cannot recover nor be charged with them in a court of law.

" But this does not solve the difficulty. The question is, have the *bona fide* and just creditors of a corporation, dissolved under a judicial sentence for a breach of its charter, any claim upon the corporate property for the satisfaction

of their debts, apart from the reservation in the act of the legislature which directed the prosecution?

"Can the lands be resumed, in disregard of their rights, by vendors who have received a full payment of their price, and executed an absolute conveyance?

"Can the careless, improvident, or faithless debtor plead the extinction of his debt, or of the creditor's claim, and thus receive protection in his delinquency?

"The creditor is blameless; he has not participated in the corporate mismanagement, nor procured the judicial sentence; he has trusted upon visible property, acquired by the corporation in virtue of its legislative sanction. How can the vendors of the lands, or the delinquent debtors, resist the might of his equity?"

It was here held that the old common law rule had no application to the case of a dissolved modern moneyed corporation;—that the State had no interest in its property.

We have seen how dubious was the old common law rule, and how slender its basis in adjudged cases, even as applicable to the old common law corporations.

Nevertheless, it found its ways into the books, as a part of the law of corporations, at a time when there were none but the old common law corporations; and as no case occurred calling for its exercise even as to one of these, in which event it would probably have been exploded, it continued to be transcribed by text writers from their predecessors, as applicable to corporations generally, even after a new species of corporations had been evolved in the development of modern commerce, resembling the old common law bodies only in the generic attribute of artificial personality,—thereby justifying indeed the common designation of both as corporations,—but differing widely from them in essential respects which rendered the application to the modern organisms of the old rule as to the consequences of corporate dissolution, absurd and impossible.

The modern corporations,—the banks, insurance compa-

nies, express companies, railroad companies, steamboat companies, telegraph companies, mining, manufacturing, and trading companies,—swarms of companies for the prosecution of every enterprise under the sun in which it is convenient to make up the necessary aggregate of capital by numerous contributions—these, unlike the boroughs, the monasteries, etc., of the olden time, are business contrivances, to further in the main the individual interests of those who take stock in them.

They are practically a sort of limited partnerships.

Their capital is subscribed for definite purposes expressed in their charters,, and credit is given them in the confidence that it will be thus applied. And equity will compel the proper application.

Thus the capital stock of a modern moneyed corporation is a trust fund, and its business but the management of a trust. Its officers are trustees for it; and the corporate entity itself is essentially but a trustee, first for creditors and then for stockholders.

The corporation is only a *vinculum* binding together a congeries of ramified transactions, rights, and liabilities, and presenting a central figure towards which, for the purposes of adjustment, everything converges.

Being but a complex embodied trust, the modern moneyed corporation is therefore emphatically a subject of equity jurisprudence, by reason of this very feature, which the old common law corporation wholly lacked.

The modern moneyed corporations can prosper only in an equitable medium. They could no more have developed until the rigid old common law regime had mellowed into this, than the complex animals of the present period could have flourished before the present atmosphere had superseded the mephitic environment of the early geological eras, adapted to the rude creations that existed then.

The old common law rule is given in the books in language seeming to import that it is applicable to corporations

generally, but with the *addendum* that it is obsolete, and inapplicable to the cases of the modern moneyed corporations.

Thus in 2 Kent, marg. p. 307, the old rule is given, while it is added in the note:

"The death of a corporation no more impairs the obligation of contracts than the death of a private person." Citing Lord Redesdale in *Adair* v. *Shaw*, 1 Scho. & Lef., 261; *Read* v. *Frankfort Bank*, 23 Me., 318, etc.

And in Angell and Ames on Corporation, after stating the old rule, it is added in sec. 779, (a):

"The rule of the common law in relation to the effects of dissolution upon the property and debts of a corporation has in fact become obsolete and odious. Practically it has never been applied in England to insolvent or dissolved moneyed corporations. . . . . . .

"Indeed, at this day it may well be doubted whether, in the view at least of a court of equity, it has any application to other than public and eleemosynary corporations, with which it had its origin. The sound doctrine of equity is that the capital or property, and debts due to banking, trading, or other moneyed corporation, constitute a trust fund pledged to the payment of the dues of creditors and stockholders; and that a court of equity will lay hold of this fund, into whosoever hands it may pass, and collect and apply it to the purposes of the trust.

"This strong equity is emphatically declared by the Supreme Court of the United States in an important case recently decided by that court; and with the non applicability of the old common law rule to the case of dissolved joint stock, trading, and moneyed corporations, forms in part the ground upon which equitable aid was given to the creditors of a state bank against the State itself, as a stockholder, and the sole stockholder thereof."

The authors, however, in that part of the text where the old rule is stated, refer to some American cases, given at the bottom of the page in a note, as if these were authorities in

support of the rule.   But when scrutinized not one of them will be found to be so in reality.   I have examined every case within my reach that I have anywhere found thus referred to; and I have no doubt that those I have looked into are fair specimens of all.

Some of them only hold, what no one ever questioned, that a defunct corporation is so far analogous to a dead man that a note or a deed to it is void, just as would be one executed to a dead man; and that a suit cannot be prosecuted at law in favor of or against a defunst corporation, any more than it could be in favor of or against a dead man.

But it no more follows from this that the dissolution of a corporation extinguishes debts due to or from it than it follows that the death of an individual extinguishes debts due to or from him.

In some other of the cases, after the decision had been made upon other grounds, the judge delivering the opinion of the court has cited the old common law rule as conducive to the same result.; assuming indeed that this rule was law, but the rule not being made the ground of the decision, and obviously the point not having been argued as cutting any figure in the case.

Here are some of the cases, fairly selected.

*White* v. *Campbell*, 5 Hum., 38.   Here Judge Turley referred to the old rule as law.   But the case was one where a note, and a deed of trust to to secure it, had been made to a bank after its dissolution.   So that the decision was merely that an instrument made to a defunct corporation is void.   So would be one to a dead man.

*Ingraham* v. *Terry*, 11 Hum., 572.   Here judgment had been recovered by a bank.   Afterwards the collection was enjoined.   Pending the injunction suit, the bank charter expired.   The court below decreed for the complainant, upon the ground that the bank judgment had perished with the bank charter.   But this court held that the act of 1831

35—VOL. 5.

had vested in the Superintendent of Public Instruction the right to collect the bank judgment. Certainly the old common law rule was not applied here.

*Hopkins* v. *Whitesides*, 1 Head, 31. Here A. had obtained a charter for a turnpike, and done something towards constructing the road, when the charter was forfeited. Then B. obtained a charter to tonstruct the same turnpike, subject to the condition that A.'s former work should be valued and the amount set apart to him in stock in the new road, which was done. A acquiesced in this, taking the certificate of stock and executing a receipt. But the second charter was afterwards forfeited; and thereupon A. sued the individuals of the second company for the value of his work on the road, and it was held, of course, that he could not recover. He had acquiesced in the arrangement by which, in consideration of his former work, he was to be made a stockholder in the new company; and certainly he had no claim against the members of the company.

In each of these cases the judge delivering the opinion of the court spoke of the old common law rule as law; but assuredly neither of them is a decision of the court to that effect.

*Miami Exporting Co.* v. *Gano*, 13 Ohio, 269, is another case cited as an authority for the rule. This decision was simply that a corporation cannot after its dissolution prosecute a suit. Neither can a man after his death.

*Renick* v. *Bank W. Union*, *Ib.*, 298, is another such case. The decision was merely that a defunct corporation cannot prosecute a writ of error; that its trustees must be before the court. Neither can a dead man prosecute a writ of error. So must his trustee,—the administrator or executor,—be before the court.

Another such case is *Merrill* v. *Suffolk Bank*, 31 Me., 57. It, however, decides only that a judgment against a defunct corporation is erroneous. So is one against a dead man.

Another is *Commercial Bank of Natchez* v. *Chambers*, 8

Sm. & Mar., 44. Here, after the bank had taken a writ of error, the corporation was dissolved. But the motion of the trustee to revive in his name was sustained. This was placed upon a statute; but the point is that the decision is not an authority for the rule in support of which it is cited.

And so on with all the cases I have been able to find. Not one really supports the rule; and I am confident that there never has been a case in England or this country where it has been decided that the dissolution of a business corporation extinguishes its liabilities.

In *Hightower* v. *Thornton*, 8 Ga., 492, this subject was very fully considered. There a bill had been filed to subject unpaid balances of subscriptions to the satisfaction of a corporate debt. The corporation had been dissolved, and there was no saving statute to obviate consequences. Here then the point was distinctly presented.

It was decided that the dissolution of the corporation did not extinguish its liabilities;—that its assets remained bound therefor.

On p. 492 the court said:

"Upon the threshold we are met with the common law principle that upon the dissolution of the corporation the debts due to and from it are extinguished, etc."

They then referred to the case of the city of London, 8 St. Tr., 1087, where although the corporation was dissolved by the revocation of its charter upon *quo warranto*, nevertheless the liabilities of the corporation were not extinguished.

Then they quoted and approved sec. 1252 of 2 Story's Ex. Jur., to the effect that the capital stock of a corporation is a trust for the payment of its debts, and that

"Therefore if the corporation is dissolved, the contracts of such corporation are not thereby deemed extinguished, and the creditors may enforce their claims against any property belonging to the corporation which has not passed into the hands of a *bona fide* purchaser; for such property will

be affected with a trust primarily for the creditors of the company."

On p. 49.3 the court said:

"In the professional opinion of Chancellor Kent, read on the argument of *Nevitt* v. *Bank of Port Gibson*, 6 Sm. & Mar., 513, he asserts that there is not an instance in the English law in which the funds of an insolvent or forfeited moneyed institution have been permitted to be abandoned, and creditors denied redress and payment out of them ; and he adds that to permit the odious and obsolete doctrine of ancient date, before moneyed institutions were introduced, to be now applied to the dissolution of a bank, perhaps by its own mismanagement and abuse, so that all its assets must be considered as dispersed to the winds, without any owner or power anywhere to collect and justly apply them, would be a disgrace to any civilized State."

By no court, however, have these principles been more clearly and positively announced than by this, in *Marr* v. *Bank of W. Tenn.*, 4 Cold., 476, from which I quote the following:

"The law seems to be well settled that whenever property is devoted by private contract, or by operation of law to special purposes, to be held for the use, benefit, or security of a particular person or class, it thereby becomes impressed with a trust character, and is to be held in trust to answer the ends to which it was appropriated

. "This general doctrine, under certain circumstances, has been applied to banks and other moneyed corporations.

"Mr. Adams, in his excellent work on Equity, p. 229, 3d Am. ed., says: 'Where corporate property is directed to be applied first to certain specific purposes, etc., a trust attaches to the property, etc.'

"The same principle is recognized in perhaps stronger and more direct terms by Chancellor Kent in the 2d volume of his commentaries (m. p. 307, note *a*), where it is said: 'The rule of the common law has in fact become ob-

solete and odious. It has never been applied to insolvent or dissolved moneyed corporations in England, etc.'

"The reasons upon which this doctrine rests are so forcibly given by Judge Story in the case of *Wood* v. *Dummer*, 3 Mason, 308, that we take the liberty of extracting from it the following paragraph."

Then follows the quotation from Judge Story, to the effect that the capital stock of banks is a trust fund for the payment of its debts, and that "on a dissolution of the corporation the billholders and the stockholders have each equitable claims," those of the billholders being prior; after which this court resume:

"The doctrine that the assets of an insolvent or dissolved banking or other moneyed corporation constitute a pledge or trust fund for the payment of the corporate debts, is now so firmly established upon the plainest principles of reason and justice, as well as authority, that it cannot be shaken or brought into doubt.

"The assets of such an institution are always liable for its debts, etc. . . . But if they have been distributed among stockholders, or gone into the hands of others than *bona fide* creditors or purchasers, leaving debts of the corporation unpaid, such holders take the property charged with the trust; and a court of equity will follow the property, and compel its application to the corporate debts." Citing 2 Story's Eq. Jur., sec. 1252; *Mumma* v. *Potomac Co.*, 8 Pet., 281; *Hightower* v. *Thornton*, 8 Ga., 493; *Nathan* v. *Whitlock*, 3 Edw. Ch., affirmed in 9 Paige, 152; *Wright* v. *Petrie*, 1 Sm. and Mar. Ch., 319; 6 Sm. and Mar., 513.

In *Mumma* v. *Potomac Co.*, the court said that while a *scire facias* can no more be maintained against a defunct corporation than against a dead man, yet the obligations of the corporation survive its dissolution, and "may be prosecuted against any property of the corporation that has not passed into the hands of *bona fide* purchasers."

*Lenox* v. *Roberts*, 2 Wh., 373, has already been cited.

There the Bank of the United States previously to the expiration of its charter had assigned its effects to trustees, and the suit was brought by the trustees in equity, after the dissolution.

But in *Curran* v. *Arkansas*, 15 How., 531, the court referred to this case, and said that the appointment of the trustees was not essential : that the creditors would without this have had the same rights in equity to follow the assets as a trust fund for their benefit.

They added:

"Indeed, if it be once admitted that the property of an insolvent trading corporation, while under the management of its officers, is a trust fund in their hands for the benefit of creditors, it follows that a court of equity, which never allows a trust to fail for want of a trustee, would see to the execution of the trust, although by the dissolution of the corporation the legal title to its property had changed."

That is, even if the legal title did vest in the State, it would be subject to the trust, the property being a trust fund.

The property of the old common law corporations not being subject to any trust, the legal title carried the beneficial interest.

On page 528 the court added :

"The obligations of its contracts (those of the State Bank of Arkansas), the funds provided for their performance, and the equitable rights of its creditors were in no way affected by the fact that a sovereign State paid in its capital, and consequently became entitled to its profits. When paid in and vested in the corporation, the capital stock became chargeable at once with the trusts, and subject to the uses declared and fixed by the charter, to the same extent, and for the same reasons, as it would have been if contributed by private persons."

On p. 531, the court cited and approved the note in 2

Kent, m. p. 307, already quoted, to the effect that the old common law rule never did apply to insolvent or dissolved moneyed corporations, the assets of which are a trust fund for the payment of the debts.

Our adversaries have wholly misconceived the nature of sections 1492 to 1497, inclusive, of the Code, providing for winding up corporations.

Sec. 1492. "Whenever powers, franchises and privileges have been granted to a corporation, and they are not used, or are assigned to others, in whole or in part, such corporation shall not be dissolved unless all the corporate property has been appropriated to the payment of its debts.

Sec. 1493. "All such corporations whose charters expire by their own limitation, or are annulled by forfeiture, or dissolved for any other cause, exist as bodies corporate for the term of five years after such dissolution, for the purpose of prosecuting or defending suits by or against them, settling their business, disposing of their property, and dividing their capital stock; but not for the purpose of continuing the corporate business.

Sec. 1494. "Upon the dissolution of any such corporation, the managers of its business at the time of dissolution, by whatever name known, are the trustees of the stockholders and creditors, unless other persons are appointed by the General Assembly or by a court of competent authority; and are authorized to settle the affairs of the corporation, dispose of such property as is necessary to pay its debts, and divide among the stockholders the money and property remaining after the payment of such debts and the necessary expenses.

Sec. 1405. "Such persons have authority to sue for and recover the debts and property of such dissolved corporation, in its corporate name, and are jointly and severally responsible to its creditors to the extent of the property which may come into their hands.

Sec. 1496. "On application to a chancellor, and making

a proper case, the power of such trustee, or any person appointed receiver of such dissolved corporation, may be continued for such length of time beyond five years as the chancellor may judge necessary for the purposes contemplated in the three preceding sections.

Sec. 1497. "The Legislature reserve the right to amend, alter, or repeal any of the provisions of this chapter, so as not to destroy any vested right; but in no event shall the remedies given against the company, its stockholders and officers, be impaired."

In *Foster* v. *Essex Bank*, 16 Mass., 266, a similar winding up act was involved, and its nature explained.

Mr. Webster, whose view was accepted by the court, said that the act merely gave a new remedy for a "manifest existing right."

That without such an act the creditors of the corporation would of course have a right to reach its assets in satisfaction of their debts.

That if the corporation should dissolve leaving any debts unsatisfied, the creditors could follow the fund in equity, and charge the debts upon it in the hands of those who should have possession of it.

That the act allowing the use of the corporate name for three years (the time allowed by the Massachusetts statute) after the dissolution, for winding up purposes, was not an extension of the corporate life, but was in the nature of an administration. Thereby the proceedings in collecting and distributing the effects were enabled to be conducted in the corporate name. Otherwise resort must have been had to equity.

The court said:

"It (the powers conferred during the additional three years) is in the nature of an administration upon the estate, and is only doing in a more convenient form what a court of equity with competent powers might do; making the fund answerable for the debts which were created on the credit of that fund."

In other words, the assets of a dissolved corporation are a trust fund for the payment of its debts, and debts due it are a part of its assets.

But a defunct corporation can no more than a dead man either sue or be sued at law. Therefore equity must lend its aid to enable the creditors of the corporation to collect its debts, and apply them and its other assets to the satisfaction of their claims.

But, for the convenience of collecting the debts and ascertaining the liabilities in the ordinary mode, by suits at law, the winding up act constitutes the corporation, dissolved so far as carrying on its business is concerned, the administrator of its former self.

Thus the corporate name may still be used in suits to collect debts for and against the corporation.

This is an additional remedy to the more clumsy equitable one, which however remains unimpaired. For it is a familiar principle that the jurisdiction of equity is not taken away by supplying the defects in the legal remedy on account of which equity originally assumed jurisdiction.

If this additional remedy expire, this extinguishes no right. Simply the parties concerned must now resort to equity, just as they must have done originally in such case, before the more convenient additional legal remedy was given.

But all this is wholly irrelevant here, because in the present case no proceeding is based upon the winding up statute.

Here a trust fund is in the hands of the court—that is, of its receiver,—and he has filed his bill asking to be directed how to distribute it, and that creditors be restrained from suing, and thereby wasting the fund in useless costs.

The bank was made a party defendant to the original bill; but so were all its creditors made defendants. The bank was made a defendant to the Cockrill bill; but so also was Watson, who has possession of the fund.

The winding up act has not been invoked, and it has never cut any figure in the cause. We do not need the corporate name. The person with the trust fund in his hands and the persons who are entitled to the fund, are the only necessary parties.

The receiver's powers were derived, not from the winding up act, but from the court; and they will continue until they are withdrawn by the court.

Does any one imagine that they have collapsed?

Then all the suits throughout the State pending in his name have abated. Then the fund is now improperly in his hands.

Our adversaries seem to labor under the delusion that the five years winding up provision is a sort of statute of limitations, operating upon the life of claims against the bank.

Only thus can their urging against us the dissolution of the bank be explained. They imagine that by having instituted their proceedings within the five years they succeeded in stopping the running of the supposed statute of limitations as to themselves.

The fallaciousness of such a conception of this provision is sufficiently glaring.

I think that there can be no doubt as to the result of the proceedings in this cause.

No creditor of the bank has been barred.

The dissolution of the bank is immaterial.

It had practically become an utter nonentity for years before its disembodied shade vanished from earth.

All the creditors have the right to come in and have their claims passed upon. The billholders have priority.

This being declared, a reference will be necessary to ascertain what bills and other claims are outstanding.

The decree will, I take it, direct the clerk to make publication, calling on the creditors to file their claims within a given time; after the expiration of which a report will be made of the claims that shall have been filed, and the

distribution will commence—the noteholders being first paid.

Creditors will be let in as long as there is any part of the fund undistributed; but if they see fit to stay out after the commencement of the distribution, they will then have no just cause of complaint if through their *laches* they come to grief.

ARGUMENT OF ED. BAXTER FOR HOLDERS OF NEW ISSUE.

I. The bank notes held by petitioners are not barred by the statute of limitations.

1st. Previous to the Code, the statute of limitations did apply to bank notes; but it was held that the defendant was bound to show that the note was last issued by the bank more than six years before the suit was brought; and it was also held that the statute did not begin to run until demand, at the counter of the bank, and refusal of payment by the bank. *Greer* v. *Perkins*, 5 Hum., 588; *F. and M. Bank* v. *White*, 2 Sneed, 486.

In the case last cited, it was argued that an exception ought to be made where a bank has suspended payment of its notes, and ceased to do business, upon the theory, advanced in this case, that the notes having ceased to circulate as money, the reason for the exemption ceased at the same time. But this court replied that the bank ought not to have the power to make a case at its own pleasure for the operation of the statute, and that the exemption from the statute applied as well when the bank was suspended as when it was in full operation.

Finally, the Legislature, in order to remove all doubt upon the subject, expressly excepted from the operation of the statute all notes "issued, or put in circulation as money." See Code, sec. 2779.

Therefore, whenever it is shown that a note was originally "issued, or put in circulation, as money," it is immediately excepted from the statute, whether it is still circulating as money or not; and whether the bank is still in operation, or has suspended; or, as in this case, is hopelessly insolvent.

The Legislature doubtless thought that, notwithstanding the insolvency of the bank, the notes still " remain in the hands of innocent holders, as the representatives of the values originally received by the bank for them, subject to the continuing liability and promise of the bank for their ultimate payment; and that it would be wrong to allow a bank to avail itself of the statute of limitations to avoid the payment of its notes, and then appropriate the property and effects of the bank to the individual benefit of the owners of the stock, in defiance of the just claim of creditors." Such was the reasoning of this court in the case of the *Farmers and Mechanics' Bank* v. *White*, 2 Sneed, 486, and it doubtless induced the Legislature to pass the law taking such notes entirely out of the operation of the statute of limitations.

It is argued, however, that this court ought to amend the section of the Code 2779, by adding thereto these words: "and so used during the time the bar is sought to be pleaded," so that it would read, as amended: "notes issued, or put in circulation as money, and so used during the time the bar is sought to be pleaded."

This attempt at judicial legislation is supposed to have a precedent in the case of *The State* v. *Turnpike Company*, 2 Sneed, 92.

But it will be seen that the court resorted to a liberal construction of the statute " in reference to the ease and convenience of the town and its vicinage, which would be greatly annoyed by a toll-gate so near that they must constantly pass it in their intercourse and business affairs." In such grants to corporations, the rule of construction is " liberal in favor of the public, and strict as against the

grantees." Cooley on Con. Lim., 395, n; Potter's Dwarris, 256. But in construing statutes of limitations, nothing is better settled than that the Legislature having made no exception, the courts can make none. *Guion* v. *Academy*, 4 Yerg., 253; *Girdner* v. *Stephens*, 1 Heis., 289. Chancellor Kent says that "it is contrary to the established rule, both in law and equity, to depart from the plain meaning and literal expression of these statutes." Angell on Limitation, sec. 485, 5th edition.

2d. The injunction, under the original bill, enjoined "all persons from sueing out any writ against said bank or its trustee, either original, intermediate, or final, or commencing any legal proceedings whatever against either, in any court of law, or equity in the State of Tennessee or elsewhere." This injunction has never been dissolved or modified.

The Code, sec. 2756, enacts that "when the commencement of an action is stayed by injunction, the time of the continuance of the injunction is not to be counted." And independent of the Code the injunction has the effect of suspending the statute of limitations, and a plea of the statute in an injunction case is of no avail. High on Injunctions, sec. 20.

Mr. Story says: "If a party should apply to a court of equity, and carry on an unfounded litigation, protracted under circumstances, and for a length of time, which should deprive his adversary of his right to proceed at law, on account of the statute of limitations having in the intermediate time run against it, courts of equity would themselves supply, and administer within their own jurisdiction, a substitute for that original legal right of which the party had been thus deprived, and by their decree give him the fullest benefit of it." 2 Story's Eq. Jur., sec. 1521.

Here Mr. Watson filed his bill to have the assignment executed "according to the uses and trusts of said assignment, and acts of the Legislature under which it was made," and though he offers to allow any creditor to come in as co-

complainant, yet no creditor, whose debt was contracted after May 6, 1861, could consent to join as complainant in a bill which sought the execution of the uses and trusts declared in the assignment, which expressly excluded all demands created after May 6, 1861. It was impossible for any of these petitioners to have come in as complainants in the original bill, without asking for the enforcement of the very trusts which they have always insisted were illegal and void.

It said, however, that all the creditors of the bank, who would not come in as complainants, were made defendants to the original bill, either by name and process, or by general description and publication, and called upon to file their claims. To this we say—

1st. This was but a part of the prayer of the bill; no order of publication was ever made by the court, nor published by the clerk. No decree has ever been made permitting creditors to file claims, much less requiring them to do so.

2d. No creditor could come in whose debt was excluded by the trusts specified in the assignment, except as a defendant. He is enjoined from commencing any independent proceedings in that court, or any other court, either in this state or elsewhere. The statute does not compel a man to accept a defendant's position in his adversary's cause to assert his own right against that adversary. The law allows a plaintiff to commence his own action, and if the commencement of that action is stayed by his opponent's injunction, the time of the continuance of that injunction is not to be counted.

3d. If the prayer of the bill, without more, made all the creditors parties in such a sense as to authorize them to assert their claims against the bank, then being before the court from the filing of the bill, of course the statute ceased to run against them from that time.

In the language of Justice Story, these creditors were

brought before the court by Mr. Watson, and enjoined from asserting any rights in hostility to the trusts declared in the assignment; those trusts have been declared invalid by the court; but, pending this litigation, it is said our right of action has been barred by the statute of limitation; but if this were true, this court "would administer within its own jurisdiction a substitute for that original legal right, of which we had thus been deprived."

4th. Cockrill's cross-bill was filed "on behalf of all the creditors of the bank who would come in under it." It is true he was a depositor, but depositors were as much interested as noteholders in attacking the trusts of the assignment in favor of the school fund. The cross-bill made no question with noteholders, but prayed that the assets might be administered "according to the rights of the parties as they may be ascertained by the court, but not according to the terms of the assignment." Every creditor interested in attacking the preference in favor of the school fund had the right to come in under that cross-bill. "A bill filed by one creditor as plaintiff in behalf of himself and others, will prevent the statute from running against any of the creditors who come in under the decree. Angell on Limitations, sec. 331, 5th edition; Hicks' Chancery Practice, Addenda, 193; 2 English Condensed Chancery Reports, 197.

There is an analogy between bills of this kind and those filed to wind up the insolvent estate of deceased individuals. The statute expressly fixes the time when creditors' claims shall be filed against deceased persons; but there is no such statute regulating the practice under creditors' bills filed to wind up a trust. The practice of the English Chancery Court remains unaltered in this State, except in regard to the estates of deceased parties; and under the English practice the court first makes an order on creditors to come in before the Master and file their claims within a reasonable time (which has not been done in this case); and even then the creditor may, if he can show that he was not guilty

of wilful default, come in at any time before the fund is actually distributed. Story's Equity Pleadings, sec. 106, p. 117, note 1, 8th edition.

II. The personal and real property of the bank has not become vested in Mr. Watson as trustee under the statute of limitations, so as to deprive the creditors of the bank of their rights in regard to it.

1st. The Code, sec. 1974, requires every trustee, before entering upon the discharge of his duty, to give bond, etc., which Mr. Watson did not give, owing to its enormous magnitude. The legal title vested in him as trustee, and he may have taken original possession as trustee at the date of the assignment, April 4, 1866; but he was appointed receiver May 21, 1866, and gave bond for the faithful execution of his duties, and "to comply with and perform the orders and decrees of the court, from time to time." By another decree he was confirmed in the office of receiver, and directed to go under the orders and decrees of the court to the execution of said trust.

It is clear that, however the possession may have been acquired, he has held it, not as trustee, but as receiver; that the property has been in *custodia legis*, and that he would be estopped from setting up a claim under the statute of limitations, either for himself or for any one else than those who may be declared entitled to the fund, under the orders and decrees of the court from which he received his appointment. *Moore* v. *Crockett*, 10 Hum., 367.

2d. Watson's answer avers that he has held the property under the trust deed, and in hostility to petitioners' rights, but it is evident that the averment that he has held in hostility to them is a legal inference of his, drawn by him from the fact that he held under the trust, and which upon its face excluded petitioners from sharing in the fund. No one ever questioned the validity of the assignment so far as it was a mere conveyance of property, but it was insisted, and so decided by this court, that it was void so far as it at-

tempted to exclude the claims of the creditors and prefer the school fund. Now, when we strike out these illegal and void provisions, the trust deed, as expurgated, stands as a valid assignment of the property to Watson from the bank, and in the language of this court at the last term, he holds the assets as " a trust fund applicable to the payment of the debts of the bank," in the order of priority directed by the court in that decree. In holding " under the trust deed," he must have held subject only to such uses and trusts of the deed as were lawful and valid, and they having been ascertained, his possession enures to their benefit, and neither he nor any one else will be allowed to controvert it.

3d. Under sec. 1494 of the Code, after the dissolution of the bank, its power to control its assets ceased, nor did the Legislature have the power to direct their appropriation; but on the contrary, so soon as the dissolution of the bank occurred, its assets, by express legislation, became a trust fund for creditors, and whoever had them in charge became a trustee for the statutory beneficiaries.

4th. If the argument of our opponents is sound, it would follow that the entire assets of the bank would go to the school fund as the first preferred claim in the assignment, and the depositors, as well as noteholders, would be deprived of everything. But this court has already decided that the school fund was not entitled to any preference, but on the contrary, is itself a part of the assets of the bank, to which the creditors of the bank had the right to look for the collection of their debts. To give these assets to the school fund by a decree at this term would be, in substance, a re-reversal of the decree of the last term.

5th. It is clear that if the claim of the noteholders on the real estate was barred in seven years, their claim on the personalty of the bank was barred in three years from January 1, 1867. The answer of Duncan and Atchison was not filed until December 3, 1872, and therefore, under the opposing argument, they would not have

36—VOL. 5.

been entitled to any part of the personal assets; but this court decided that they were entitled to payment out of the assets of the bank without making any distinction between personal and real assets. The decree of the last term has, therefore, in effect, settled this point in our favor, and it cannot now be reopened.

III. The expiration of the bank charter does not affect the right of petitioners to the relief prayed by them.

1. It is true that this court, in 1844, quoting from the text of the second edition of Kent's Commentaries, did decide, that upon the expiration of the charter of the old Bank of Tennessee, the debts due to and from the corporation were all extinguished. 5 Hum., 39. That case is cited approvingly in 1 Head, 33, where it is said that the debts due to and from a corporation are all extinguished, without some provision in the charter or some general law to prevent it.

In the case of *Ingraham* v. *Terry*, 11 Hum., 572, it appeared that the legislature had directed that all the funds of the State Bank, in the hands of various persons, be paid to the superintendent of public instruction for the use of common schools, and that he had caused a judgment to be taken in the name of the bank against one of the debtors. After the bank's charter expired, the debtor raised the point that the debt was extinguished, but the court held that the statute vested the superintendent with the right to collect the claim against the debtor, and that, though the judgment was in the name of the bank, a court of chancery would hold that the superintendent was the equitable assignee of the debt for the use of public instruction, and entitled to enforce its collection.

In other words, the principle that the debts due to and from a corporation are extinguished by its dissolution, is confined to a case between the corporation and its debtor, where the rights of third persons have not intervened. But where the assets have been assigned, either for the benefit

of creditors, as in this case, or for the benefit of common schools, as in the case cited, the principle does not apply. The assets cease to belong to the bank, and while it may remain the nominal payee of debts due to it, yet in fact, such debts in equity, belong to the beneficiaries under the assignment, and in a court of chancery they are regarded as the real owners, and may sue for and collect them in their own names.

If the assignment of the assets of a bank for the benefit of third persons has the effect to keep alive the debts due to the bank, it would also have the effect to keep alive debts due from the bank, for otherwise a debtor would lose the benefit of any set-off he might have.

Under the act of 1853-4, ch. 90, Code, sec. 1494, upon the dissolution of any corporation, the managers of the business of such corporation, at the time of its dissolution, by whatever name known, are the trustees of the stockholders and creditors, unless other persons are appointed by the General Assembly, or by a court of competent authority, and are authorized to settle the affairs of the corporation, dispose of such property as is necessary to pay its debts, and divide among the stockholders the money and property remaining after the payment of such debts and the necessary expenses.

Such persons are jointly and severally responsible to the creditors to the extent of the property which may come into their hands. Code, sec. 1495.

Whatever may have been the law in this State previous to the passage of that act, it is manifest that the dissolution of a corporation does not now have the effect to extinguish debts, whether they be one to or from this corporation. Those which are due to the corporation are to be sued for by said trustees, and when recovered, are to be applied by them to the payment of the debts due from the corporation. And it is not until " after the payment of such debts " that the trustees can distribute anything among the stockholders.

*Curran* v. *State of Arkansas,* 15 How., 311, 312; *Marr* v. *Bank of West Tennessee,* 4 Cold., 472; *Bacon* v. *Robertson,* 18 How., 480, 483.

It is argued, however, that even if it be true that the debts due from a corporation do survive its dissolution, yet they do not survive it longer than five years after the expiration of its charter. And that if any creditor desires to keep his debt alive, he must apply to a Chancellor to continue the trustees in power beyond the five years limited by the Code. To this we reply:

1st. There is no limitation as to the debts due the creditors; but a limitation upon the power of the trustees " to sue for and recover the debts and property of such dissolved corporation in its corporate name." At common law, upon the death of a corporation, a suit at law could not be brought in its corporate name any more than in the name of a dead man. But still, as held by this court in the case of *Ingraham* v. *Terry,* 11 Hum., 576, 577, if the corporate assets had been assigned in trust for the benefit of others, the beneficiaries could, notwithstanding the death of the corporation, come into equity, and enforce the collection of the assets in their own name.

To save the expense and delay of resorting to equity, the Code, secs. 1495, 1496, authorized the trustees to sue for the assets at law in the corporate name; and this power to sue at law was continued for five years, and, if necessary, the Chancellor, upon a proper application, might extend the power for a longer time. If no such application was made, the power of the trustees to sue at law in the corporate name expired; but their original rights to go into equity for the collection of the assets remained unaffected.

This is the obvious meaning of our statute; no more, no less.

Upon the civil death of a corporation, unless there be some statute to the contrary, no suit can be brought against it upon any debt due from it, and for the simple reason that

there is no one to sue. But the debts due from the corporation, while they may be extinguished as to the corporation, are not extinguished as to its property, any more than are the debts of a man extinguished by his death as to the estate left by him. In the language of the Supreme Court of the United States, "The obligation of those contracts survives, and the creditors may enforce their claims against any property belonging to the corporation which has not passed into the hands of *bona fide* purchasers, but is still held in trust for the company, or for the stockholders thereof, in any mode permitted by the local laws. *Mannassa* v. *Potomac Co.*, 8 Pet., 286; *Railroad Co.* v. *Howard,* 7 Wall, 410. The mode in which our local laws permit such property to be held in trust for the stockholders and creditors, is shown by sec. 1494 of the Code.

Suppose our opponents were right in their position, what would be the consequences? In the first place, the debts due from the bank to the depositors, would be extinguished, as well as those due the noteholders. The fact that some depositors have filed their claims, and have even obtained decrees in the cause, would not avail them. The literal language of their case is that all debts due from the corporation are extinguished, and that this applies as well to judgments and decrees as to simple contract creditors, was expressly decided in the case of *Mannassa* v. *Potomac Co.*, 8 Pet., 286. The debt to the common school fund would also be extinguished, and the assets would be left for the State, as the sole stockholder of the bank.

But, then, under another position assumed by our opponents, Mr. Watson could say that he has held the assets for the creditors and adversely to the State as a stockholder; and having first defeated the creditors, by insisting that their debts were extinguished, and then defeating the State as a stockholder, by relying on the statute of limitation, he would secure the entire assets of the bank for himself.

Another difficulty suggests itself. The same rule which

extinguishes the debts due from the bank, extinguishes all all debts due to the bank, and nine-tenths of the assets consists in debts due from third persons to the bank. The real estate of the bank would revert to the original grantors, and a litigation which has lasted for a decade would end, at last, in no practical benefit to any of the parties concerned.